ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
ILANA RUBEL (CSB No. 221517)
irubel@fenwick.com
KATHLEEN LU (CSB No. 267032)
klu@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:  415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendants
GIGANEWS, INC. and
LIVEWIRE SERVICES, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PERFECT 10, INC., a California Corporation , <br><br> Plaintiff, <br><br> v. <br><br> GIGANEWS, INC., a Texas Corporation; LIVEWIRE SERVICES, INC., a Nevada Corporation; and Does 1 through 100, inclusive, <br><br> Defendant. | Case No.: 11-cv-07098-ABC (SHx) <br><br> **DEFENDANTS GIGANEWS, INC. AND LIVEWIRE SERVICES, INC.'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:       January 6, 2014 <br> Time:      10:00 a.m. <br> Dept:      Courtroom 680 <br> Judge:    Hon. Audrey B. Collins |
| GIGANEWS, INC., a Texas Corporation; LIVEWIRE SERVICES, INC., a Nevada Corporation, <br><br> Counterclaimants, <br><br> v. <br><br> PERFECT 10, INC., a California Corporation, <br><br> Counterdefendant. | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................ 1

II.    FACTUAL BACKGROUND ........................................................ 1

    A.    The Parties ........................................................................ 1

    B.    Structure of the Usenet and Usenet Messages ................... 3

    C.    Giganews's Policies and Practices Regarding Copyrighted
        Material ............................................................................. 5

        1.    Giganews and Livewire's Copyright Complaint
            Procedures ............................................................... 5

        2.    Giganews's Two-Strike Repeat Infringer Termination
            Policy ...................................................................... 6

    D.    History of Communications with P10 .................................. 7

    E.    Procedural Background ...................................................... 8

III.   ARGUMENT ............................................................................. 9

    A.    Legal Standard for Summary Judgment ............................. 9

    B.    The Evidence Shows Defendants Qualify for the DMCA Safe
        Harbor. ............................................................................ 11

        1.    The Evidence Shows Giganews Is Eligible for Section
            512(a), 512(c), and 512(d) Immunity. ....................... 11

        2.    The Evidence Shows Livewire Is Eligible for Section
            512(a), 512(c), and 512(d) Immunity. ....................... 13

    C.    The Evidence Shows Giganews's Strict Repeat Infringer
        Termination Policy Satisfies the DMCA Safe Harbor
        Conditions. ...................................................................... 14

        1.    Relevant Legal Standard ......................................... 14

        2.    The Evidence Shows Defendants' Policies and
            Practices Meet or Exceed DMCA Safe Harbor
            Requirements. ........................................................ 15

        3.    The Evidence Shows That Giganews Has Enforced the
            Policy. .................................................................... 15

    D.    The Evidence Shows Defendants Properly Responded to
        Notices. ........................................................................... 17

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.      The Copyright Owner Must Identify Infringing
        Content.................................................................................. 18

2.      Proper Usenet DMCA Notifications Require Message-
        IDs......................................................................................... 21

3.      Giganews Expeditiously Removed All Properly
        Identified Messages. ............................................................ 23

IV.     CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
239 F.3d 619 (4th Cir. 2001) ..................................................................... 19, 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 9

*Arista Records LLC v. Usenet.com*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ........................................................... 12

*Beyene v. Coleman Sec. Serv., Inc.*,
854 F.2d 1179 (9th Cir. 1988) ....................................................................... 10

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*,
213 F.3d 474 (9th Cir. 2000) ........................................................................... 9

*Ellison v. Robertson*,
357 F. 3d 1072 (9th Cir. 2004) ........................................................... 12, 13, 17

*Hunt v. Cromartie*,
526 U.S. 541 (1999) ...................................................................................... 10

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) ....................................................................... 10

*Perfect 10, Inc. v. Amazon, Inc.*,
No. 05-cv-4753, Dkt. No. 221 (Order) at 8
(C.D. Cal. Nov. 4, 2008) ................................................................................ 10

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ................................................................*passim*

*Perfect 10, Inc. v. Google, Inc.*,
No. 2:04-cv-09484, ¶ 25 (C.D. Cal. filed Nov. 19, 2004)...................... 1, 15, 23

*Perfect 10, Inc. v. Google, Inc.*,
No. 04-cv-9484, 2010 WL 9479059 (C.D. Cal. July 26, 2010)............. 15, 18, 23

*Perfect 10, Inc. v. GUBA, LLC*,
No. C 02-2842, 2002 WL 34940074 (Dec. 30, 2002)..................................... 12

*Perfect 10, Inc. v. Yandex, N.V.*,
No. C 12-01521, 2013 WL 1899851 (N.D. Cal., May 7, 2013) ...................... 23

*Reno v. Am. Civil Liberties Union*,
521 U.S. 844 (1997) ................................................................................... 2, 3

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) (*Veoh III*)................................... 11, 13, 20

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
620 F. Supp. 2d 1081 (C.D. Cal. 2008) (*Veoh I*) ...................................... 9, 10, 11

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
665 F. Supp. 2d 1099
(C.D. Cal. 2009) (*Veoh II*) ........................................................................ 14, 15, 21

*Viacom Intern. Inc. v. YouTube Inc.*,
940 F. Supp. 2d 110 (S.D.N.Y. 2013) ........................................................ 10, 19

STATUTES

17 U.S.C. § 504(c)(2) ........................................................................................ 1

17 U.S.C. § 512(i) ............................................................................................ 15

17 U.S.C. § 512(i)(1)(A) .................................................................................. 14

17 U.S.C. § 512(a) ..................................................................................... 11, 13

17 U.S.C. § 512(a)-(d) ...................................................................................... 9

17 U.S.C. § 512(c) ........................................................................................... 11

17 U.S.C. § 512(c)(3) .................................................................... 2, 6, 18, 24

17 U.S.C. § 512(c)(3)(A) ................................................................................... 9

17 U.S.C. § 512(c)(3)(A)(iii) ........................................................................... 18

17 U.S.C. § 512(d) ..................................................................................... 11, 13

RULES

Fed. R. Civ. P. 56(e) ........................................................................................ 10

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# I.   INTRODUCTION

The Digital Millennium Copyright Act ("DMCA") provides a "safe harbor" shielding internet service providers from liability for infringing user-posted content if the providers meet certain criteria, including termination of repeat infringers and removal of properly identified alleged infringements.  Plaintiff Perfect 10 ("P10"), an aggressive litigation business claiming ownership of thousands of pornographic images, seeks partial summary judgment on several narrow issues in an effort to bar safe harbor protections of Defendants Giganews and Livewire.  An abundance of facts in Defendants' favor requires denial of Perfect 10's motion in every respect.

# II.   FACTUAL BACKGROUND

## A.   The Parties

Perfect 10 was originally a publisher of a magazine with photographs of nude women.  It still has a website at www.perfect10.com, but its business has become full-time litigation.  P10 has launched over 30 copyright infringement lawsuits against a host of companies including Visa, and MasterCard, Google, Amazon.com, and Microsoft.  Although it claims that copyright infringement has destroyed its pornography business and that copyrights have become worthless, see Complaint, *Perfect 10, Inc. v. Google, Inc.*, No. 2:04-cv-09484, ¶ 25 (C.D. Cal. filed Nov. 19, 2004), P10 has nonetheless acquired thousands of copyrights in recent years.  Its copyright portfolio has landed P10 over $16 million in settlements of copyright litigation while it claims to have only $90,000 in annual "business" income.  *See* Dkt. No. 134 (P10 Answer to Counterclaim) ¶ 317; Dkt. No. 27 (Zada PI Decl.) ¶ 4.

This case is part of P10's business strategy of provoking and waging litigation.  While it refuses to do the math, P10 appears to put its damages claim in this case at $7.1 billion.[1]

As shown below, P10 has little evident interest in curbing copyright

---

[1] The Copyright Act allows statutory damages of up to $150,000 per work.  17 U.S.C. § 504(c)(2).  Perfect 10 claims Defendants have infringed 54,000 images, (Zada Decl., Dkt No. 142-3, ¶ 24), which would equal 7.1 billion dollars.  That equals over 75,000 years worth of Perfect 10's claimed annual "business" income.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Fenwick & West LLP
Attorneys at Law
San Francisco

infringement but prefers to set up opportunities to litigate its copyrights, with extraordinary damages demands as in this case, to gain settlement income. P10 persistently refuses to send proper takedown notices to online service providers under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c)(3), and it engages in many practices that handicap service providers in trying to address P10's notices. In this case, P10 withholds from its takedown notices to Defendants the single piece of information readily available to it that would enable Defendants to expeditiously process the notice, namely Message-IDs of allegedly infringing Usenet messages. Instead, P10 demands that Defendants do searches in order to locate the Message-IDs that it withheld. The purpose of P10's practice is to make it hard for Defendants to do appropriate takedowns, to provoke refusals based on inadequate DMCA notices, and then to litigate the sufficiency of P10's notices, all in the quest for more litigation settlement revenue.

Defendant Giganews, Inc. ("Giganews") is a Usenet service provider. It operates servers that store user-generated content as part of the Usenet, which we describe below. Giganews does not itself upload content to the Usenet. Defendant Livewire, a related company, does not operate any servers but merely resells Giganews's Usenet access service. Usenet service providers have long been mainstays of the Internet, as the Supreme Court recognized as early as 1997. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997).

As Usenet service providers, Giganews and Livewire devote significant resources to addressing concerns of copyright holders. Giganews regularly works with major copyright holders and representatives to quickly process their notices. Declaration of Ronald Yokubaitis ("Yok. Decl.") ¶¶ 23, 26. For example, in the past twelve months, the Recording Industry Association of America ("RIAA") has sent over 9000 notices identifying over 12 million Message-IDs on behalf of its members. Declaration of Philip Molter ("Molter Decl.") ¶ 24. For the typical copyright holder that provides a well-formed DMCA-compliant notice that includes

1  Message-IDs, Giganews can generally process the notice within 48 hours, even if

2  the notice covers thousands of Message-IDs.  *Id.* ¶ 26.

3        In Giganews' experience, no other copyright holder has behaved as P10 has.

4  Yok. Decl. ¶¶ 25, 28.  Of all the copyright owners that have communicated with

5  Giganews regarding allegedly infringing materials, consistent with its litigation

6  strategy, P10 is the only one that refuses to send Message-IDs for all allegedly

7  infringing messages.  *Id.* ¶ 25.  Unlike other copyright holders with large portfolios,

8  it refuses to cooperate with Giganews to send notices that can be processed quickly

9  and efficiently.  *Id.* In doing so, P10 acts less like a copyright owner genuinely

10  seeking removal of the content and more like a serial litigant throwing up barriers

11  to removal so as to set up a lawsuit against the service provider.  *Id.* ¶ 33.  Even

12  when P10 provides Message-IDs, it does so only for a fraction of the content at

13  issue, and in a manner that is inefficient for both the copyright holder and the

14  service provider; it provides screenshot images only, and refuses to provide a list of

15  Message-IDs in clear text as other copyright holders do.  *Id.* ¶ 30.  Nevertheless,

16  whenever a Message-ID is visible in P10's notices, Giganews removed the message

17  it identified.  *Id.*

18  **B.    Structure of the Usenet and Usenet Messages**

19        The Usenet is the Internet's "bulletin board," widely distributed and stored

20  on Usenet servers around the world.  Levine Decl. ¶ 12.  The Usenet differs from

21  the World Wide Web ("the web") in several material respects.  Content on the

22  Usenet resides in *messages*, not on web pages.  Rosenblatt Decl. ¶ 20-22.  Just as

23  the unique identifier for a web page is its Uniform Resource Locator or "URL,"

24  address (for example, http://www.perfect10.com/join.html), the only unique

25  identifier for a Usenet message is a header in the message called a "Message-ID."

26  *Id.* ¶ 25, 29.  The Message-ID is the same as a person's Social Security Number or

27  a credit card number in that it provides the method to identify easily and with

28  certainty a unique item being searched for in a large universe of potential items.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Accordingly, Giganews states on its website that any DMCA notices requesting the removal of copyrighted material must identify the Message-ID of the message at issue. *Id.* ¶ 42.

The Usenet is a worldwide network of servers consisting of continuously updating archives of *messages* (also called "articles"). Rosenblatt Decl. ¶ 29. Users gain access to Usenet through service providers such as Giganews. Levine Decl. ¶ 16. Users can post messages to Usenet servers and receive messages from Usenet servers. *Id.* ¶¶ 16-18. To do so, they use newsreader software, a special browser for Usenet. *Id.* ¶ 20. Usenet servers do not create new messages on their own; they only store and forward messages they have received from users or from other Usenet servers. *Id.* ¶ 16. All Usenet messages must originate with a user. *Id.*

As one would find with email, each Usenet message has a *header*, which consists of fields like Date:, Subject: and From:, and a *body*, which consists of text. Rosenblatt Decl. ¶ 34. One part of every Usenet header is the Message-ID, which is the only unique identifier of a Usenet message. *Id.* ¶ 32. There are billions of Usenet messages in the world, but a Message-ID will point to only one message. *Id.* ¶¶ 29, 32-33. Usenet server operators, including Giganews, typically index Usenet messages by Message-ID. Levine Decl. ¶ 34; Molter Decl. ¶ 10.

For a typical Usenet server operator like Giganews, a Message-ID is the industry standard and only method to identify a unique message. Levine Decl. ¶ 23; Rosenblatt Decl. ¶ 32-33.; Molter Decl. ¶ 10. Any other form of identification of a message would require the service provider to manually search, review and analyze results, with no guarantee all the content at issue would be found. Levine Decl. ¶¶ 30-31. Rosenblatt Decl. ¶ 33;37. And the Usenet provider would still have to identify Message-IDs from any messages found in order to locate and remove the material from its servers. *Id.* ¶ 30-31.

As stated above, users typically access Usenet and send and receive Usenet

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' OPPOSITION TO MOTION
FOR PARTIAL SUMMARY JUDGMENT
4
Case No.: 11-cv-07098-ABC (SHx)

messages by using newsreader software.  Rosenblatt Decl. ¶ 23.  Persons use newsreader software to access the Usenet just as persons use web browsers such as Internet Explorer or Mozilla Firefox to access the web.  *Id.* ¶¶ 20, 23. Just as a variety of web browsers exist, a variety of newsreaders exist.  *Id.*  Different from methods to search the web, to search the Usenet, a user may use newsreader software to download headers and then use the newsreader's search functionality to search through those headers.  *Id.* ¶ 32.  In addition, just as some search engines such as Google provide an independent index of the web, certain third-parties provide independent indexes of the Usenet.  *Id.* ¶ 27; Levine Decl. ¶ 35.  These indexes are created by third parties and are completely independent of the messages stored at the Usenet server level.  Levine Decl. ¶ 35.  They may be helpful sources for identifying information that may be available on the Usenet but are unauthoritative and unreliable.  *Id.*

## C.   Giganews's Policies and Practices Regarding Copyrighted Material

Giganews does not itself upload content to the Usenet; it maintains servers to which users post messages, either directly or through other Usenet servers' automatic forwarding mechanisms.  Giganews does not monitor the content on its servers, nor could it – there are over 35 billion messages on the Usenet and users generate tens of thousands of new messages every day.  Molter Decl. ¶ 20.  Giganews takes all reasonable steps to remove infringing content from its servers when it is notified of its location.  *Id.* It also has a simple and efficient process for copyright owners to request removal of messages that may infringe copyrights.  *Id.*; *see* Rosenblatt Decl. ¶ 48. Levine Decl. ¶ 33.

Giganews processes notices concerning millions of messages per month.  Molter Decl. ¶ 22-24.  Giganews has processed notices for hundreds of millions of messages, or about 2% of the total Usenet messages it has stored in its archives.  *Id.*

### 1.   *Giganews and Livewire's Copyright Complaint Procedures*

Giganews and Livewire have standard procedures for handling complaints of

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

copyright infringement.  Each has designated to the Copyright Office an agent to receive notifications of claimed infringement.  Yok. Decl. ¶¶ 7, 17.  Each provides contact information for that agent on its respective website.  *Id.*

If the notice does not provide enough information to process it, Giganews informs the sender, explains to them what is required, and invites them to send that information.  *See id.* ¶¶ 26, 29, 34.  If the notice contains all that Section 512(c)(3) requires, Giganews expeditiously processes the notice by inputting the Message-IDs the notice lists into a program that (1) removes the message associated with each Message-ID from Giganews's Usenet server, and (2) adds that Message-ID to a search list so that Giganews can periodically search its servers and automatically remove any listed Message-IDs should they reappear.  Molter Decl. ¶ 20. Giganews then informs the sender it has taken steps to remove the messages.  *Id.*

Livewire does not operate any Usenet servers. Yok. Decl. ¶ 13.  If Livewire's DMCA agent receives a notice concerning infringing material on the Usenet, it forwards it to Giganews to apply its standard process.  *Id.*

### 2.    *Giganews's Two-Strike Repeat Infringer Termination Policy*[2]

Giganews has a stricter policy regarding alleged infringers than is typical; most online service providers have three-strike or even six-strike termination policies.  Rosenblatt Decl. ¶¶ 99-105.  When Giganews removes a message based on a notice, it checks whether the user uploaded the message through a Giganews account.  Molter Decl. ¶ 27.  If so, and if it is the first time Giganews has been notified that the accountholder had posted allegedly infringing material, Giganews automatically suspends posting access for that account and sends the accountholder a notification of the suspension, also forwarding a copy of the complaint Giganews received.  *Id.*  This notification warns the accountholder that Giganews's terms of service prohibit use of its systems to commit copyright infringement, and that this notification is his or her one and only warning.  *Id.*

---

[2] Livewire has a similar policy, not at issue here.  Yok. Decl. ¶ 19; *see* MPSJ at -1-.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In order for an accountholder to regain posting access, he or she must respond affirming in writing that he or she will abide by Giganews's terms of service and not infringe any copyright. *Id.* ¶ 28.  If Giganews then gets a new notice that a user has broken this promise by continuing to post infringing materials, Giganews will permanently terminate that account's posting access. *Id.* Since it began recording copyright-specific statistics in 2008, Giganews has permanently terminated posting access for 46 accounts because of repeated infringement. *Id.*

**D.    History of Communications with P10**

Giganews first heard from P10 in 2009 when it mailed Giganews a DVD containing over 1400 pictures of naked women, which P10 called a "sampling of its copyrighted materials."  Yok. Decl. ¶ 34.   The cover letter claimed materials infringing P10's rights existed on the Usenet but provided no information identifying the location of such material. *Id.*  Instead, P10 demanded that Giganews search for and identify allegedly infringing material itself. *Id.*

Giganews wrote back, advising P10 to provide Message-IDs and pointing P10 to services that had helped other copyright holder provide Message-IDs to Giganews. *Id.* ¶ 35.  P10 continued its practice of sending defective notices, often in short succession at odd hours. *Id.* ¶ 36.

P10's typical notice states that P10's agent, Norman Zada, searched for a particular term on the Usenet and downloaded "infringing" images. *Id.*  The notice would also include thumbnail images of allegedly "infringing" images of naked women and screenshots of search results. *Id.*  The notices would not state exactly which messages P10 believes contained infringing material. *Id.*

In August 2011, P10 sent a group of notices stating that Mr. Zada searched in a particular newsgroup on a particular date with particular third-party software and that "[a]ll of the images that appear as a result of that search are copyright by P10." *Id.* ¶ 37.  Zada Declaration Exhibits 9 ("Notice 1") and 10 ("Notice 2"), upon which

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

P10 bases this motion, are part of this group. *Id.* P10 still refused to provide Message-IDs. *Id.* Though the law did not obligate Giganews to process these defective notices, Giganews nevertheless attempted to process them by taking the steps P10 should have taken. *Id.* ¶ 38. Giganews searched that newsgroup for the same term using the third-party software, checked that no search result was of a message posted after the date of Mr. Zada's search, retrieved the message header for each search result, extracted the Message-ID from each header, and proceeded to process this list of Message-IDs as if P10 has provided the Message-IDs. *Id.* This procedure was far more burdensome and time consuming than the steps Giganews has taken to process notices from any other copyright holder and involved Giganews actively searching the Usenet for allegedly infringing material. *Id.* ¶ 39.

Beginning in 2013, P10 began sending new types of notices. *Id.* ¶ 41. While the language of the cover letter was substantially the same, the screenshots P10 included depicted a few isolated Message-IDs. *Id.* For each Message-ID that was visible, Giganews has removed the corresponding message from its servers. *Id.* Zada Exhibits 11-13 (Notices 3-5) are part of this group. *Id.* ¶ 28.

In order to process P10's notices, Giganews must review the images in the new notices and manually re-type the Message-ID based on what it appears to be in the image. *Id.* ¶ 30. This greatly slows the process and introduces the risk of inadvertent error through typographical mistakes or difficulty discerning similar-looking characters, such as the number one ('1') versus the lowercase letter L ('l'). *Id.* It would take seconds for P10 to copy and paste a Message-ID from a message into the body of an email or spreadsheet, and thereby avoid this problem. *Id.* If P10 provided Message-IDs in clear text as other copyright holders do, Giganews could process thousands of Message-IDs in a matter of minutes. *Id.*

**E.    Procedural Background**

At this stage, after rulings on Defendants' motions to dismiss, different

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  claims remain as to Giganews and Livewire.  As to Giganews, there remains a

2  claim of direct copyright infringement based solely on P10's unsubstantiated theory

3  that Giganews employees have uploaded material infringing P10's rights to the

4  Usenet.  Dkt. No. 129 (Order on Motion to Dismiss) at 3.  There also remain claims

5  for contributory and vicarious copyright infringement.  *Id.* at 4.  As to Livewire, the

6  Court dismissed P10's claims of secondary liability; only a claim of direct

7  copyright infringement remains, based on P10's wild allegation that Livewire hosts

8  non-user-posted infringing material.  *Id.* at 5-6.

9       P10's motion for partial summary judgment concerns different aspects of

10  each Defendant's affirmative defenses.  As to Giganews, P10 seeks a ruling on:  (1)

11  whether five notices it sent to Giganews[3] meet the requirements of 17 U.S.C.

12  § 512(c)(3)(A); (2) whether Giganews has reasonably implemented a repeat

13  infringer termination policy; and (3) whether Giganews meets the safe harbor

14  qualifications section 512(a)-(d) describe.  *See* Motion for Partial Summary

15  Judgment ("MPSJ") at 1, 23-24.  As to Livewire, P10 challenges only whether it

16  stores the allegedly infringing material at the direction of users.  *Id.* at 23-24

17  ## III.   ARGUMENT

18  **A.   Legal Standard for Summary Judgment**

19       On a motion for summary judgment, "[t]he moving party bears the initial

20  burden of demonstrating the absence of a 'genuine issue of material fact for trial.'"

21  *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1086 (C.D.

22  Cal. 2008) (*Veoh I*); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

23  "When the party moving for summary judgment would bear the burden of proof at

24  trial, 'it must come forward with evidence which would entitle it to a directed

25  verdict if the evidence went uncontroverted at trial.'"  *C.A.R. Transp. Brokerage*

26  *Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  "In such a case,

27

28  [3] Though Perfect 10 does not distinguish between the defendants in its motion, this
Court has already ruled that notices sent to dmca2008@giganews.com were sent to
Giganews, not Livewire.  Dkt. No. 129 at 5.

1   the moving party has the initial burden of establishing the absence of a genuine

2   issue of fact on each issue material to its case." *Id.* If the non-moving party would

3   bear the burden at trial, "the moving party can meet its burden by pointing out the

4   absence of evidence from the non-moving party." *Veoh I*, 620 F. Supp. 2d at 1086.

5   If the moving party does not satisfy its initial burden, then the non-moving party

6   has no obligation to produce anything and the Court must deny summary judgment.

7   *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir.

8   2000).

9       In the DMCA context, before shifting the burden to a defendant as to whether

10   appropriate responsive policies were implemented, the plaintiff must first show that

11   it provided a compliant DMCA notice such that the Defendants were provided with

12   actual knowledge of infringement. *Viacom Intern. Inc. v. YouTube Inc.*, 940 F.

13   Supp. 2d 110, 115 (S.D.N.Y. 2013) (*YouTube*) ("[T]he burden of showing that [the

14   service provider] knew or was aware of the specific infringements of the works in

15   suit cannot be shifted to [the service provider] to disprove."); *Perfect 10, Inc. v.

16   CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (*CCBill*) (no triable issue on the

17   defendant's knowledge of infringement because the plaintiff "did not provide

18   [defendant] with knowledge or awareness within the standard of § 512(c)(1)(A)");

19   *Perfect 10, Inc. v. Amazon, Inc.*, No. 05-cv-4753, Dkt. No. 221 (Order) at 8 (C.D.

20   Cal. Nov. 4, 2008) ("[I]t is Perfect 10's burden to show that [the service provider]

21   had actual knowledge of infringement within the meaning of section 512(c)").

22       In deciding a motion for summary judgment, the Court may only consider

23   ***admissible*** evidence. Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Serv., Inc.*, 854

24   F.2d 1179, 1181 (9th Cir. 1988). P10 relies primarily on the Zada Declaration,

25   most of which is hearsay or otherwise inadmissible, as Defendants' concurrently

26   filed objections detail. Even if P10 has presented some evidence, Defendants have

27   more than met their burden to "set forth specific facts showing that there is a

28   genuine issue for trial" in the form of fact and expert counter-declarations. As "the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  nonmoving party's evidence is to be believed, and all justifiable inferences are to be

2  drawn in [that party's] favor," summary judgment for P10 is inappropriate.  *Veoh I*,

3  620 F. Supp. 2d at 1086, quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)

4  (quotation marks omitted).

5  **B.     The Evidence Shows Defendants Qualify for the DMCA Safe Harbor.**

6         The DMCA provides a safe harbor; it is not the standard for liability.  *See*

7  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1028 (9th

8  Cir. 2013) (*Veoh III*).  While Defendants address P10's motion, P10 has not proved

9  any copyright infringement by Defendants, and Defendants do not address

10  substantive liability issues at this stage.

11     *1.     The Evidence Shows Giganews Is Eligible for Section 512(a), 512(c),*

12            *and 512(d) Immunity.*

13        Giganews is eligible for the DMCA safe harbor as it stores material only at

14  the direction of users.  Section 512(c) gives immunity "for infringement of

15  copyright by reason of the storage at the direction of a user of material that resides

16  on a system or network controlled or operated by or for the service provider."

17  "Common sense and widespread usage establish that 'by reason of' means 'as a

18  result of' or 'something that can be attributed to . . . .'"  *Veoh I*, 620 F. Supp. 2d at

19  1089.  So long as the activity is 'as a result of' or 'attributable to' the fact that users

20  uploaded the content to the Usenet, 512(c) covers it.

21        P10 asserts Giganews must lose the safe harbor because it "[copies]

22  infringing materials from the Usenet and/or from the servers of other infringing

23  websites."[4]  P10 presumably refers to the core functionality of the Usenet, with

24  continuous and automatic propagation of messages across all Usenet servers to

25  update them.  Rosenblatt Decl. ¶ 29.  Such copying stems directly from the fact that

26  a user uploaded content to the Usenet, and the Usenet functions by propagating

27  ───────────────

28  [4] P10 here illustrates its core misunderstanding of the systems at issue – the Usenet
   and the Web are entirely separate systems.  A Usenet server does not receive
   materials from any website, only from other Usenet servers. Rosenblatt Decl. ¶ 23.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

messages across servers.  *Id.*  Any copying of allegedly infringing user-uploaded content from other Usenet servers is "by reason of" the storage of that material at the direction of the user.

Furthermore, in this case Judge Matz took judicial notice that "the content on USENET is primarily user-driven–that is, the content that is stored on a USENET provider's server is generally uploaded by USENET users or subscribers."  Dkt. No. 97 at 2.   P10 is wrong when it claims that the storage at issue and resulting automated transmission is not "at the direction of a third party."  MPSJ at 24.

P10 lacks no authority for its novel argument that retention of material a user uploaded is not "storage at the direction of the user."  MPSJ at 24.  Giganews has never received an authenticated request from a subscriber to stop storing his or her material, but would honor such a request if the subscriber provided a Message-ID. Molter Decl. ¶12.  Giganews thus stores at the direction of the user.

P10 fails to address the other safe harbors at all, and therefore does not present a challenge to them in this motion.  P10 instead invokes miscellaneous, inapposite cases to argue that, because other services have been liable for different conduct, no Usenet provider may invoke the DMCA safe harbor.[5]  MPSJ at 24.  But P10 neglects to mention the leading Ninth Circuit case on the Usenet and the DMCA safe harbor, *Ellison v. Robertson*, 357 F. 3d 1072 (9th Cir. 2004).  *Ellison* held that AOL, a Usenet service provider, met the specific requirements of the 512(a) safe harbor, which immunizes, among other activity, "infringement of copyright . . . by reason of the provider's transmitting, routing, or providing connections for, material through a system . . . ."  *Id.* at 1081.

To the extent P10 charges Giganews with automated interactions with other

---

[5] *Arista Records LLC v. Usenet.com* concerned discovery sanctions, not a ruling on the merits, and is thus irrelevant.  633 F. Supp. 2d 124 (S.D.N.Y. 2009).  *Perfect 10, Inc. v. GUBA, LLC* concerned a website operator that had copied material from Usenet, not a Usenet service provider.  No. C 02-2842, 2002 WL 34940074 (Dec. 30, 2002); *see* Rosenblatt Decl. ¶ 24.  Neither case suggested that storage of user content or automated copying and transmission of user-uploaded infringing content should disqualify a Usenet provider from DMCA protections.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

servers with respect to copyrighted materials, *Ellison* has already held that this safe harbor applies to Usenet operators.  To the extent P10 complains Giganews allows users to find infringing material, 512(d) immunizes referral to an online location containing infringing material through an information location tool such as an index.  P10 offers no argument to challenge the application of these safe harbors.

**2.     The Evidence Shows Livewire Is Eligible for Section 512(a), 512(c), and 512(d) Immunity.**

P10's argument for Livewire's ineligibility rests on wild, fact-free assertions. P10 proclaims, without factual support, that Livewire loses safe harbor because it "purchases infringing materials from Giganews and resells those infringing materials to third parties."   Livewire neither purchases nor sells any materials at all to others.  Yok. Decl. ¶¶ 12-16.  Nor does it store infringing materials, a point P10 admits.  MPSJ at 24.  Livewire simply resells *access* to Giganews servers which, store material only at the direction of users.  Yok. Decl. ¶ 12.

While P10 has not articulated a basis for direct infringement arising from Livewire pointing users to Giganews's Usenet servers, the 512(a), 512(c), and 512(d) safe harbors would still cover that act.  The safe harbors apply to direct infringement claims.  *Veoh III*, 718 F.3d at 1028.  Section 512(c) immunizes Livewire for any claims related to Giganews' storage of material at the direction of a user, for which Livewire pays to have access.  Section 512(d) immunizes service providers for activity "by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link."  By selling subscriptions permitting users to access Giganews's servers, it merely acts as a referrer.  Yok. Decl. ¶¶ 12-16.

The section 512(a) safe harbor also applies.  *Ellison* held that AOL, as a Usenet provider, could claim the 512(a) safe harbor protections immunizing "infringement of copyright . . . by reason of the provider's transmitting, routing, or

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

providing connections for, material through a system . . . ."  To the extent P10 argues Livewire acts as a conduit for infringing activity, 512(a) immunizes it because (1) any transmission is at the direction of users, not Livewire; (2) any transmission, routing, or provision of connections is through an automatic process without Livewire selecting the material; (3) Livewire responds automatically to the request of the user and does not otherwise select the material; (4) Livewire does not maintain materials at issue in this litigation on its system.  Yok. Decl. ¶¶ 12-16.

## C.   The Evidence Shows Giganews's Strict Repeat Infringer Termination Policy Satisfies the DMCA Safe Harbor Conditions.

Giganews' policy and practice with respect to repeat infringers meet all requirements for DMCA eligibility.  Giganews has in fact notified and terminated all repeat infringers that could be identified from the information provided by P10, and P10 has provided no evidence demonstrating otherwise.

### 1.   Relevant Legal Standard

To qualify for the DMCA safe harbor, a service provider must have "adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A); *CCBill*, 488 F.3d at 1109.  CCBill held that reasonable implementation permits a variety of procedures.  *Id*.  If the service provider has "a working notification system [and] a procedure for dealing with DMCA-compliant notifications, . . . does not actively prevent copyright owners from collecting information needed to issue such notifications," and "under 'appropriate circumstances' . . . terminates users who repeatedly or blatantly infringe copyright," it has reasonably implemented such a policy.  *Id.* at 1109-10.  This Court blessed a nearly identical repeat infringer termination policy.  "[I]f a single DMCA notice from the RIAA identified multiple videos uploaded by one user, Veoh sent the user a first warning.  It then terminated

Fenwick & West LLP
Attorneys at Law
San Francisco

1   the user's account if the user subsequently uploaded another infringing video."

2   *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1116 (C.D.

3   Cal. 2009) (*Veoh II*).  Judge Matz ruled "this policy satisfies section 512(i)'s

4   requirements."  *Id.*

5       ***2.    The Evidence Shows Defendants' Policies and Practices Meet or***

6            ***Exceed DMCA Safe Harbor Requirements.***

7       Giganews has presented ample evidence that it meets the Ninth Circuit's

8   requirements for reasonable implementation of a repeat infringer termination

9   policy.  Giganews's policy is, if anything, stricter and more aggressive than is

10  standard.  Rosenblatt Decl. ¶¶ 104-106. While many service providers allow three

11  or more strikes before terminating, Giganews suspends posting access after one

12  incident and terminates it after two.  *Id.*  Giganews publishes a well established

13  procedure on its website (as discussed above) and adheres to it without fail.  Yok.

14  Decl. ¶ 11.

15      ***3.    The Evidence Shows That Giganews Has Enforced the Policy.***

16      P10 has not provided any authority suggesting this policy is inadequate or

17  that Giganews has not properly communicated it to users.  And ultimately, P10 has

18  provided no evidence that Giganews ever permitted an identified subscriber to post

19  anything to the Usenet after being terminated pursuant to the termination policy.  In

20  every instance where a user could be identified, the core of P10's complaint is that

21  user termination was not enough; Giganews was allegedly also required to purge

22  the Usenet of all previous postings by the same user (postings that P10 itself had

23  not identified), and of which Giganews did not have an index.  P10 can offer no

24  legal support for such a view; as it well knows, "the DMCA does not impose an

25  obligation on service providers to track their users in any particular way."  *Perfect*

26  *10, Inc. v. Google, Inc.*, No. 04-cv-9484, 2010 WL 9479059, at *5 (C.D. Cal. July

27  26, 2010) (*Google*).  Section 512(i) concerns "*termination* in appropriate

28  circumstances of subscribers and account holders," not removal of unidentified past

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  activity.  17 U.S.C. § 512(i) (emphasis added).

2      P10's argument rests on a fundamental misunderstanding of the burden on

3  service providers; the standard for DMCA eligibility does not require a global

4  search and removal of all content posted previously by the terminated user.  Indeed

5  burdening a service provider with such a requirement would unjustly shift the

6  "burden of policing copyright infringement—identifying the potentially infringing

7  material and adequately documenting infringement"—"from the copyright owner to

8  the provider," something the Ninth Circuit has expressly declined to do.  *CCBill*,

9  488 F.3d at 1113.

10     Moreover, evidence shows that Giganews implemented its policy.  Mr. Zada

11 cites seven purported repeat infringers that he asserts are responsible for 90% of the

12 repeat infringement at issue and that he contends have not been properly

13 terminated.  Zada Decl. at ¶¶ 25-26.  He identifies the seven as

14 BillC@myplace.com, me@not.eu, MrD@the.net, no@email.dk,

15 Thumper@rabbit.com; Sundog@Ogworld and Trin'@again.[6]  Addressing them in

16 turn:

17     • BillC@myplace.com – From Message-IDs P10 provided, Giganews was

18 able to identify a Giganews subscriber.  Molter Decl. ¶¶ 40-42.  Giganews sent a

19 "first warning" and suspended the account's posting access.  *Id.*  The user affirmed

20 that the account would not be used to post unauthorized copies.  *Id.*  P10 has not

21 identified any allegedly infringing posts made by this account after the warning,

22 only old posts from 2009.  *Id.*  Giganews promptly removed all messages by this

23 account that P10 identified by Message-ID, but P10 objects that Giganews did not

24 search for and remove *unidentified* messages dating from before the warning.

25     • me@not.eu – This account was terminated in 2009 before Giganews

26 received P10's notice in 2013, so there was no account to terminate.  *Id.* ¶ 50.  P10

27 ─────────────
[6] Users can write whatever they want in the unmoderated "Sender" field.  Levine
28 Decl. ¶¶ 27-28.  Accordingly, more than one account can use the same pseudonym, and these pseudonyms are of no use to Giganews in finding or blocking the poster. *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

again complains only that Giganews did not purge the Usenet of all past posts by the user.

- MrD@the.net – This user account was terminated in 2010. *Id.* at ¶¶ 38-39. There was no account to terminate when P10 sent its notice. Again this is a "past posting" issue, not a failure to terminate.

- no@email.dk – The Message-IDs indicated this was not a Giganews subscriber. *Id.* at ¶ 51. Giganews had no account to terminate. *Id.*

- Thumper@rabbit.com – As with "BillC" above, this user was warned in 2011 and reinstated after responding to the first warning with a written assurance the account would not be used for infringing purposes again. *Id.* at ¶¶ 43-44. P10 has not identified any allegedly infringing posts by this account after the 2011 warning. *Id.*

- Sundog@Ogworld – The Message-IDs P10 provided indicated this was not a Giganews subscriber, so Giganews had no account to terminate. *Id.* at ¶¶ 52-53.

- Trin'@again – The Message-IDs P10 provided indicate that this is not a Giganews subscriber, so Giganews had no account to terminate. *Id.* at ¶ 53.

P10 thus has no viable evidence that Giganews ever failed to terminate an identified repeat infringer, and Giganews has provided evidence of its reasonable actions. To the extent the question of Giganews's reasonable implementation rests on a factual dispute, that is for a jury to determine. *See Ellison*, 357 F.3d at 1080 (leaving to jury to decide whether AOL was eligible under 512(i)). The Court should deny P10's motion on this issue.

**D.    The Evidence Shows Defendants Properly Responded to Notices.**

P10 does not deny that Giganews removed messages when P10 furnished Message-IDs even in inconvenient ways such as screenshots.  Giganews removed approximately 3336 messages at P10's request. Yok. Decl. ¶ 41. For the twelve-month period from November 6, 2012 to November 6, 2013, Giganews removed 1,367 messages at P10's request. During this same time period, Giganews removed

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   approximately 531,512,900 messages for other copyright holders.  Yok. Decl. ¶ 31.

2   Thus Perfect 10's takedowns account for .000262 *of one percent* of all Giganews's

3   takedowns during that year.

4       P10 steadfastly refuses consistently to provide Message-IDs as other

5   copyright holders do (and as Giganews has repeatedly asked for), instead providing

6   notices lacking sufficient information to readily identify the content at issue.  *Id.* ¶

7   29.  In so doing, P10 acts less like a copyright owner genuinely seeking removal of

8   the content, and more like a serial litigant throwing up barriers to removal so as to

9   set up a lawsuit against the service provider.  *Id.* ¶ 33.  P10 now moves to strip

10   Defendants of the safe harbor on account of takedown notices that lacked Message-

11   IDs.  As described below, apart from occasionally including screenshots of

12   Message-IDs (on which Giganews acted) those notices were defective and cannot

13   serve deprive Giganews of the safe harbor as to them.

14       P10 states that "Judge Matz . . . found that Message-IDs were not required by

15   the DMCA."  MPSJ at 3, citing Order, dated March 8, 2013 (Dkt 97).  This is a

16   gross misrepresentation.  Judge Matz merely found that, for purposes of evaluating

17   pleadings on a motion to dismiss, he would accept as true P10's *allegation* that its

18   takedown notices were sufficient to identify infringing content.  *Id.*  He specifically

19   acknowledged that evidence may show that P10's notices were not sufficient to

20   locate content.  *Id.*  Defendants' evidence now shows the notices were insufficient.

### 1.    *The Copyright Owner Must Identify Infringing Content.*

22       To qualify for the section 512(c) safe harbor, a service provider must, upon

23   receiving a notice that meets the requirements of section 512(c)(3), "respond[]

24   expeditiously to remove, or disable access to, the material that is claimed to be

25   infringing."  512(c)(1)(C).  The notice must, among other things, identify "the

26   material that is claimed to be infringing . . . and information reasonably sufficient to

27   permit the service provider to locate the material."  17 U.S.C. § 512(c)(3)(A)(iii).

28   Without that, a service provider need not act.  *See Google*, 2010 WL 9479059 at *8

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    ("Google was not required to act to remove any entry that did not meet the DMCA

2    requirements."). "Compliance is not 'substantial' if the notice provided complies

3    with only some of the requirements of § 512(c)(3)(A)." *CCBill*, 448 F.3d at 1112.

4        "The DMCA notification procedures place the burden of policing copyright

5    infringement — identifying the potentially infringing material and adequately

6    documenting infringement — squarely on the owners of the copyright." *Id.*, at

7    1113. Congress noted that "Subsection (c)(3)(A)(iii) requires that the copyright

8    owner or its authorized agent provide the service provider with information

9    reasonably sufficient to permit the service provider to identify and locate the

10   allegedly infringing material." *YouTube*, 940 F. Supp. 2d at 115. "The goal of this

11   provision is to provide the service provider with adequate information to find and

12   address the allegedly infringing material *expeditiously*." *Id.* (emphasis added).

13       Congress cited as "an example of such sufficient information" "a copy or

14   description of the allegedly infringing material *and the URL address of the location*

15   (web page) which is alleged to contain the infringing material." *Id*. (emphasis

16   added).   In the Web context, courts have required identification of the particular

17   Internet location where the material resides.  YouTube's election "to keep

18   substantially all infringing videos on the site as a draw to users, *unless and until*

19   *YouTube received a 'takedown notice' from the actual copyright owner identifying*

20   *a specific infringing clip by URL* and demanding its removal from the site," did *not*

21   remove YouTube from the 512(c) safe harbor.  *Id.* at 119 (emphasis added).

22       The same considerations require Message-IDs in the Usenet context, as

23   Message-IDs are the unique identifiers that Usenet service providers need to locate

24   Usenet messages, just as URLs are unique identifiers that Web service providers

25   need to locate webpages.  Rosenblatt Decl. ¶¶ 26, 30.

26       P10 wrongly relies on *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239

27   F.3d 619, 624 (4th Cir. 2001), to argue that Message-IDs are not necessary to locate

28   allegedly infringing messages.  MPSJ at 3. *ALS* marked a unique circumstance

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

where the copyright holder ALS claimed that the "sole purpose" of two newsgroups (which included ALS's name in the names of the newsgroups) was to infringe ALS's rights and should be removed.  239 F.3d at 624.  *ALS* in no way suggests it is appropriate to force service providers to undertake manual searches and reviews where no Message-ID is provided.  Just as a Message-ID permits the service provider to remove material without lengthy message review and analysis, removal of an entire newsgroup also does not require manual message-by-message review.  The burden on the service provider is minimal in both instances.  Rosenblatt Decl. ¶¶ 42-48.  P10 never claimed that every message in a newsgroup infringed its copyrights.  Yok. Decl. ¶ 43.  *ALS* underscores that service providers should only have to act on a notice where the burden is reasonable; it provides no support for the burdensome search and review that P10 seeks to impose on Giganews.

P10 argues that Giganews should have used third-party software to search a third-party's index for terms that P10 provided.  The Ninth Circuit has squarely rejected placing such a burden on a service provider.  In *Veoh III*, UMG argued that "Veoh should have taken the initiative to use search and indexing tools to locate and remove from its website any other content by the artists identified in the notices" and that because "some of the videos on Veoh that had been pulled from MTV or other broadcast television stations bore information about the artist, song title and record label, . . . Veoh should have used this information to find and remove unauthorized videos."  The Ninth Circuit held that such a requirement "would conflict with § 512(m), § 512(c)(1)(C) and *CCBill*'s refusal to 'impose . . . investigative duties on service providers'" and "could also result in removal of noninfringing content."  *Veoh III*, 718 F.3d at 1023.  As in its previous litigation, P10 is seeking once again to push the burden of policing its copyrights onto service providers.  The Ninth Circuit has definitively rejected P10's approach by "declin[ing] to shift a substantial burden from the copyright owner to the provider."  *See CCBill*, 488 F.3d at 1113. This Court should do so as well.

20

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

P10 argues that, because other Usenet providers agreed to remove content without Message-IDs, Giganews must follow suit.  MPSJ at 17.  This is a red herring.  P10 has offered no admissible evidence of what actions those other service providers actually took.  But even if those providers did as P10 claims, it does not mean that Giganews must take the same steps.  A service provider could have many reasons for engaging in the type of searching that copyright law does not require in response to defective notices that do not meet 512(c)(3)'s requirements (including being aware of P10's highly litigious history).  One provider volunteering for an additional burden does not increase the legal burden on other service providers to stay within the safe harbor.  *See Veoh II*, 665 F. Supp. 2d at 1113 (service provider did not need to use filtering technology to stay in 512(c) safe harbor, even though it applied the filter for a particular time period).

### 2.   *Proper Usenet DMCA Notifications Require Message-IDs.*

As Levine, Rosenblatt, Molter, and Yokubaitis show, the only unique identifier for a Usenet message is its Message-ID, just as the only unique identifier for a web page is its URL.  Levine Decl. ¶ 26; Rosenblatt Decl. ¶ 30; Molter Decl. ¶ 13; Yok. Decl. ¶ 8.  Providing search terms (or any other information) instead of Message IDs forces the service provider to undertake a time-consuming and burdensome manual review which goes beyond what is contemplated by the DMCA, and which may never lead to location of the content at issue.

Usenet has billions of messages, and Giganews has received takedown requests specifying millions of Message-IDs.  It has promptly removed every one of the specified messages.  But if those copyright holders all asked Giganews to run word searches and manually review results, as P10 claims it is entitled to do, Giganews could not possibly run a business.  Recognizing the untenable burden such demands would present to service providers, the law is clear that it is the copyright holder's responsibility, not the service provider's, to do the work required to identify specifically the location of infringing content.  *CCBill*, 488 F.3d at 1113.

Fenwick & West LLP
Attorneys at Law
San Francisco

Nor is it so difficult for the copyright holder to pass along these Message-IDs, as it has already found the messages it wishes to have removed (unlike the Usenet operator who has no idea what messages the copyright holder has in mind for removal). Levine Decl. ¶¶ 32-33. The Message-IDs are displayed with the messages, and the copyright holder need only copy and paste them into a takedown message. *Id.* It can also automate the process. Rosenblatt Decl. ¶ 46-48. Providing Message-IDs is no more burdensome than providing URLs in the web context. *Id.* ¶ 29. Other copyright holders provide notices with Message-IDs to Giganews, including copyright holders with large portfolios that have provided millions of Message-IDs. Yok. Decl. ¶¶ 21-22. In Giganews's experience, other copyright holders want to ensure their content is expeditiously removed and assist ensuring expeditious removal. No other copyright holder has behaved as Perfect 10 has. *Id.* ¶¶ 23-24.

Despite the ease of identifying and presenting Message-IDs in notices, P10 refused to do it, no matter how many times it was asked, and it now seeks to leverage Giganews' resulting inability to remove the content at issue to deprive Giganews of DMCA safe harbor protection. It was within P10's power to send Message-IDs at any time. If it had done so, it would have secured the prompt removal of all messages it identified. That it chose to throw hurdles in Giganews's path to justify a lawsuit is not a reason to reward P10.

Beyond railing against its own process of cutting and pasting Message-IDs into takedown notices, P10 asserts that it should not have to provide Message-IDs because they "cannot be used or deciphered by courts, copyright holders, or anyone other than Usenet operators." MPSJ at 2. But Usenet operators are the only audience that matters for these takedown requests, as it is they who must act on the notices. In the web context, URLs often contain long and unsightly alphanumeric strings, but takedown notices require them. Likewise, in the Usenet context, because a Message-ID is the only identifier that points directly and reliably to

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

particular message, it is necessary in a takedown notice.  512(c)(3)(A)(iii).

Furthermore, checking for a Message-ID is a convenient and efficient method for copyright holders, after making a takedown request, to confirm the Usenet operator has in fact removed the message.   Levine Decl. ¶ 40.

### 3.   *Giganews Expeditiously Removed All Properly Identified Messages.*

Giganews removed every message for which P10 provided a Message-ID. The five notices that P10 moves on partially demonstrate the deficiencies P10's notices have presented.  Defendants address these five communications.

- Zada Decl. Exhibit 9 (Notice 1)

P10 failed to provide any Message-ID or Message Header in order for Giganews to locate the allegedly infringing materials reasonably even though P10 could have easily provided the Message-IDs.  *See* Levine Decl. ¶ 33. This communication also repeatedly refers to "image identifiers," but there is no such thing on the Usenet; these are just the names of files that reside on Mr. Zada's computer which he can change at any time.  *Id.* ¶ 40.

P10 claims Notice 1 is similar to a notice found to be compliant in *Perfect 10, Inc. v. Yandex, N.V.*, No. C 12-01521, 2013 WL 1899851 (N.D. Cal., May 7, 2013), and that it would satisfy the requirements Perfect 10 failed to satisfy in *Google*, 2010 WL 9479059, at *10-13 (Group C notices were deficient).  MPSJ at 13.  P10 is wrong.  First, neither Yandex nor Google was a Usenet provider; P10's suggestion that a notice to a Usenet provider should contain the same information as a notice to a website operator overlooks the fact that Usenet messages and web sites have entirely different characteristics and identifiers, and the service providers in each environment require different information in order to locate particular content.  *See* Rosenblatt Decl. ¶ 30.  Second, the notices are not in fact similar.  The notice in *Yandex* contained URLs to identify the allegedly infringing webpages, and Judge Matz held P10 notices that failed to identify full URLs defective.  *Google*, 2010 WL 9479059, at *11, 14.  Notice 1 to Giganews contained no such unique

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  identifier.

2      Although the notice did not include Message-IDs and thus did not conform to

3  the requirements, Giganews went beyond its duty by searching for the allegedly

4  infringing material.  Molter Decl. ¶ 55.  This is because this notice stated that Mr.

5  Zada searched in a particular newsgroup on a particular date with particular third-

6  party software and that "[a]ll of the images that appear as a result of that search are

7  copyrighted by Perfect 10."  *Id.*  There were 107 search results.  *Id.*  Giganews

8  extracted the Message-ID associated with each search result, an effort it would not

9  have had to take if the DMCA notice had properly included this information, and it

10  removed those messages from its servers.  *Id.*

11              • Zada Decl. Exhibit 10 (Notice 2)

12      This notice also did not include Message-IDs and thus did not conform to

13  section 512(c)(3)'s requirements, but Giganews took the same steps as in response

14  to Notice 1.  Molter Decl. ¶¶ 57-59. The search turned up 97 results and Giganews

15  extracted the Message-IDs and removed the associated messages.

16              • Zada Decl. Exhibits 11-13 (Notices 3, 4 and 5)

17      With respect to all of these notices, P10 provided some Message-IDs in the

18  form of screenshot images, and provided other images that it wanted removed but

19  for which it provided no Message-IDs, instead suggesting that Giganews perform

20  searches to try to find the messages at issue.  Molter Decl. ¶¶ 60-62, Yok. Decl. ¶

21  28.  Where Message-IDs were visible in screenshots, Giganews retyped them by

22  hand and removed the identified messages.  *Id.* ¶ 30.  For the other images, P10

23  provided no Message-IDs, and P10's search suggestions did not provide Giganews

24  with enough information to locate the allegedly infringing material without

25  significant effort required and ultimately uncertain results.  *Id.*

26      P10 argues that Giganews could have located these materials through "image

27  identifiers" or through searches on the names of the nude models.   But "image

28  identifiers" is P10's idiosyncratic and flawed concept here, and it would not have

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  been feasible without enormous time and effort to locate additional messages

2  through name searching.  Rosenblatt Decl. ¶ 40.

3       None of the "sample notices" here complied with section 512(c)(3) as a valid

4  notification of claimed infringement insofar as P10 failed to provide Message-IDs.

5  That Giganews located and removed some messages by conducting its own

6  searches and manually extracting Message-IDs does not mean that P10's original

7  notice was DMCA-compliant or that Giganews must undertake such efforts.

8  Similarly, regardless of whether it would have been possible eventually to find

9  some or all of the remaining images through the manual search and review process

10  that P10 advocates, the notices themselves were inadequate, and Giganews cannot

11  lose its safe harbor protection for declining to expend such unreasonable efforts.

12       The DMCA protects service providers from burdens of the type P10 has

13  sought to impose on Giganews, and the DMCA fully protects Defendants here.  At

14  the very least, P10 has failed to show no material dispute of fact as to whether the

15  degree of effort P10's notices imposed rendered them defective.  The Court should

16  deny P10's motion on this issue.

## IV.   CONCLUSION

18       Because Perfect 10 has failed to demonstrate the absence of material disputed

19  facts as to the three issues it moves on, this Court should deny its motion partial

20  summary judgment on all three issues.

22  Dated:  November 25, 2013          FENWICK & WEST LLP

24                         By: /s/ Andrew P. Bridges
25                              Andrew P. Bridges

26                              Attorneys for Defendants
                               GIGANEWS, INC. and
27                              LIVEWIRE SERVICES, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO