UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PERFECT 10, INC., | CV 11-7098 ABC (SHx) |
|                 Plaintiff, | ORDER **DENYING** PLAINTIFF'S |
|       v. | MOTION FOR PARTIAL SUMMARY JUDGMENT |
| GIGANEWS, INC., et al., | |
|                 Defendants. | |

Pending before the Court is Plaintiff Perfect 10, Inc.'s ("Plaintiff") Motion for Partial Summary Judgment Re: (i) DMCA Compliance of Samples Notices; and (ii) Ineligibility of Defendants for DMCA Safe Harbor Defense ("Motion," docket no. 142), filed on November 4, 2013. Defendants Giganews, Inc. ("Giganews") and Livewire Services, Inc. ("Livewire") (together, "Defendants") filed an Opposition and Plaintiff filed a Reply. Plaintiff and Defendants also filed additional materials. <u>See</u> docket nos. 159-161, 165, 175. The Court finds the Motion appropriate for resolution without oral argument and therefore **VACATES** the hearing set for February 24, 2014.

See Fed. R. Civ. P. 78, Local Rule 7-15.  For the following reasons, the Court **DENIES** the Motion in its entirety.

## I.  BACKGROUND

This Order assumes familiarity with the prior Orders issued in this case, in particular with the Order granting in part and denying in part Defendants' Motion to Dismiss Complaint.  See March 8, 2013 Order (J. Matz) (docket no. 97) ("March 8 Order").

In summary, Plaintiff owns the copyrights to thousands of adult images and several trademarks derivative of its name.  Giganews is a Usenet service provider.  The Usenet is a global network of servers that host online bulletin boards or newsgroups to which users can post "messages."  As a service provider, Giganews operates servers that store this user-generated content.  Livewire claims it does not store infringing materials, but instead resells access to Giganews's servers.  Yokubaitis Decl. ¶¶ 12-16.  Plaintiff alleges that Usenet users have posted messages containing thousands of Plaintiff's copyrighted images, and, broadly speaking, Plaintiff seeks to hold Defendants liable for hosting those images on their servers and/or providing access to those images.

Following motions to dismiss, the claims remaining in the case are: for direct, contributory, and vicarious copyright infringement against Giganews; and for direct copyright infringement against Livewire.  Plaintiff now seeks summary adjudication of issues relating to Defendants' affirmative defenses, in particular, relating to Defendants' assertions that they are eligible for certain safe harbors established by the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 512.  A party that satisfies the conditions of the safe harbor

provisions is protected from liability for copyright infringement.

Although Plaintiff has not organized its Motion in the most logical way and fails to distinguish between Giganews and Livewire, Defendants have helpfully parsed the Motion, and summarize it as seeking adjudication of the following issues as to Giganews:  (1) whether five notices Plaintiff sent to Giganews meet the requirements of 17 U.S.C. § 512(c)(3)(A); (2) whether Giganews has reasonably implemented a repeat infringer termination policy as required by § 512(i); and (3) whether Giganews is eligible for the safe harbor protections of §§ 512(a)-(d).  As to Livewire, Plaintiff appears to make only one argument: that Livewire "purchases infringing materials from Giganews and resells those infringing materials to third parties," conduct that Plaintiff claims excludes Livewire from any safe harbor.  See Motion at 24:3-8.

Giganews argues that Plaintiff's five sample notices do not comply with 17 U.S.C. § 512(c)(3)(A); that it has reasonably implemented a repeat infringer termination policy; and that it is eligible for safe harbor protection under §§ 512(a), (c), and (d). Livewire also contends that it is eligible for safe harbor protection under §§ 512(a), (c), and (d).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

3

Once the moving party satisfies its initial burden, the adverse party must set forth specific facts showing that there is a genuine issue for trial. S. Cal. Gas Co., 336 F.3d at 888 ("[The non-moving party] can defeat summary judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor.") (citations omitted).

Both the moving party and the adverse party must support their factual positions by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

An issue of fact is genuine if it reasonably can be resolved in favor of either party. Anderson, 477 U.S. at 250-51. "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Rather, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." S. Cal. Gas Co., 336 F.3d at 254. Yet "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989). The "existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. The "opponent

4

must do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### III.  ANALYSIS

**A.  Preliminary Evidentiary Issues**

The Court has reviewed the parties' voluminous evidentiary objections.  Plaintiff's objections to the Declarations of Ronald Yokubaitis (docket no. 149-6) and Philip Molter (docket no. 149-11) are substantially meritless.  By contrast, Defendants do raise serious questions about whether the Declarations of Norman Zada (docket nos. 142-3, 150-1) are admissible.  Of particular concern is whether some of Zada's statements are tantamount to expert testimony that Zada is not qualified to give.  However, the Court will not rule on these objections because even if Zada's testimony is admitted, Plaintiff's Motion still fails.

The Court overrules Plaintiff's objections to the Declarations of William Rosenblatt (docket no. 149-2) and John Levine (docket no. 149-4).  Plaintiff argues that Defendants failed to disclose Rosenblatt and Levine in their Rule 26 initial disclosures and therefore should not be permitted to rely on their declarations to oppose the Motion.  However, Rosenblatt and Levine are offered as experts, and as such Defendants were not required to disclose them in their Rule 26 initial disclosures.  Rather, the deadline for disclosing experts is June 2, 2014.  See Scheduling Order (docket no. 139).  As such, Defendants have not run afoul of the deadline for disclosing Rosenblatt and Levine.  The Court also overrules Plaintiff's objection that the Yokubaitis Declaration should not be considered because Defendants did

not produce him for deposition.  It appears that Yokubaitis was ill
and the parties were working to find a convenient deposition date when
Plaintiff decided to file its Motion.  Notably, Plaintiff filed the
Motion very early, as the discovery cut-off date is June 30, 2014.
Id.  In the meantime, Yokubaitis was able to provide a declaration to
support Defendants' Opposition.  Nothing about this suggests
Defendants failed to honor discovery obligations.

Plaintiff's position in the event the Court denies its objections
is that the Court should continue the Motion to allow it to conduct
discovery on Rosenblatt, Levine, and/or Yokubaitis, and then file
supplemental briefing.  See Reply at 5, fn.1.  As noted, and as
Plaintiff should have known, this Motion is very premature.  If
Plaintiff decided in retrospect that filing the Motion so early was a
mistake, then it should have withdrawn it.  The interests of judicial
economy are ill-served when the Court makes piecemeal evidentiary
rulings and allows the parties to submit supplemental briefing that
the Court then has to reconcile with the existing flawed papers, all
to allow a party to attempt to salvage a Motion that it chose to file
months before the discovery cut-off.  The Court therefore declines to
stay the Motion on the terms Plaintiff proposes and will instead rule
on it.

**B.   The Digital Millenium Copyright Act's Legal Framework**

The DMCA establishes safe harbors that protect service providers
from liability for (1) transitory digital network communications; (2)
system caching; (3) information residing on systems or networks at the
direction of users; and (4) information location tools.  17 U.S.C. §§
512(a)-(d) (footnotes omitted).  A service provider must satisfy
certain conditions to be eligible for any particular safe harbor.  To

be eligible for any of the § 512 safe harbors, a service provider must have "adopted and reasonably implemented" a policy that provides for the termination of repeat infringers.  17 U.S.C. § 512(i).

At issue here is whether either Defendant is eligible for safe harbor under § 512(c), and whether Giganews has adopted and reasonably implemented a repeat infringer termination policy under § 512(i).

**C.  Plaintiff Has Not Shown that Giganews' Repeat Infringer Termination Policy Falls Short of § 512(i).**

To be eligible for any of the four safe harbors stated in § 512(a)-(d), a service provider must first meet the threshold conditions set out in § 512(i), including the requirement that it:

> has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(1)(A).

The statute does not define "reasonably implemented."  However, the Ninth Circuit treats this concepts as consisting of two components: first, whether a service provider implements a policy, and second, whether that implementation is reasonable.  See Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109-10 (9th Cir. 2007) (" CCBill LLC").  Under this rubric, a service provider "implements" a policy if "it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and [] does not actively prevent copyright owners from collecting information needed to issue such

notifications." CCBill LLC, 488 F.3d at 1109.  Second, that
implementation is "reasonable" if, under "'appropriate circumstances,'
the service provider terminates users who repeatedly or blatantly
infringe copyright."  Id.

Plaintiff's opening brief does not dispute that Giganews has a
working notification system, a procedure for dealing with DMCA-
compliant notifications, and that it does not actively prevent
copyright owners from collecting information needed to issue such
notices.  Despite its opening brief's silence on these issues,
Plaintiff's Reply appears to assert that the policy is inadequate.  As
such, the Court will briefly address whether Giganews's policy, on its
face, satisfies the first component set forth in CCBill.

The parties refer to Giganews's policy as a "two-strike" policy:
upon learning that a user has posted an infringing message, Giganews
freezes the user's account and provides the user with a warning that
another infringement will result in the termination of the account.
If the user responds that he/she will not post any additional
infringing material, the account is "unfrozen."  If Giganews is
informed that the user has posted any additional infringing material,
that user's account is terminated.  See, e.g., Molter Decl. ¶¶ 27-35
(describing Giganews's repeat infringer termination policy).  There is
no serious dispute that Giganews has a system in place to receive and
deal with DMCA-compliant notifications, and Plaintiff has not
suggested that Giganews prevents copyright owners from collecting data
they need to send such notices.  Having reviewed Giganews's policy,
the evidence explaining it, and the relevant law, Plaintiff has not
shown that Giganews's policy is inadequate such that Giganews does not
"implement" a policy.  Thus, the Motion is denied insofar as it argues

Giganews's policy is inadequate.

The gravamen of Plaintiff's challenge is to the "reasonableness" of Giganews's implementation of its policy, that is, whether Giganews actually terminates users as its policy states.  Again, Plaintiff has not carried its burden on this issue.  The Court will address each subissue briefly in turn.

Plaintiff argues that Giganews has not terminated all of the repeat infringers who posted messages it identified by Message-ID in its DMCA notices.  Having reviewed all of the evidence, the Court finds that it precludes summary adjudication of this issue in Plaintiff's favor.

Plaintiff also argues that Giganews must remove all of a repeat infringer's content, not just the content a copyright holder has specifically identified as infringing.  Giganews acknowledges that it removes only the specifically-identified infringing messages posted by a repeat infringer, and not all of the messages ever posted by a repeat infringer.  The Court is not persuaded that § 512(i)(1)(A) requires a service provider to disable or delete all messages a repeat infringer has ever posted.  By its terms, the section requires "termination . . . of subscribers and account holders," not the deletion of messages.  In addition, by Plaintiff's reading, § 512(i)(1)(A) would require a service provider to take down all of a user's messages, not just the infringing ones.  Because deleting non-infringing messages does not serve any infringement-preventing purpose, there is no justification for reading such a requirement into the statute.  In short, the Court will not read into the statute a requirement that its plain language does not support and that goes far beyond stopping and deterring copyright infringement.

Plaintiff argues that the fact that Giganews has terminated only 46 repeat infringers since 2008 despite removing more than 531 million infringing messages over the past year, see Molter Decl. ¶¶ 22, 28, demonstrates that Giganews does not properly implement its policy. The conclusion that Plaintiff urges is an inference that *may* be drawn from the bare facts its cites, but that conclusion is *not compelled* by the evidence.  As such, the Court cannot summarily adjudication this issue.

Plaintiff argues that the fact that Giganews does not know the identity of all users whose messages reside on its servers demonstrates that Giganews's policy is inadequate, because if Giganews cannot identify a user, it cannot "reasonably implement" a repeat infringer termination policy.  However, that a Usenet service provider cannot identify all users whose messages reside on its servers appears to be a function of how the entire Usenet works.  According to Giganews, all Usenet service providers encrypt the data that identifies the user who posted a message; this encrypted data is reflected in a part of the message header called the X-trace field.  Only the Usenet service provider with whom an account is registered can decrypt the X-trace field it has attached to a message posted by that user.  Many of the messages hosted on Giganews servers are posted through accounts registered with other Usenet providers.  Because Giganews cannot decrypt the X-trace field on such messages, it cannot link such messages to any specific users, and thus cannot apply its repeat infringer termination policy to such users.  See, e.g., Molter Decl. ¶¶ 18, 29-31; Rosenblatt Decl. ¶¶ 66-72.  The foregoing evidence precludes summary adjudication of whether Giganews "reasonably implements" its repeat infringer termination policy.

This evidence also raises an issue neither party addressed. The Court questions whether Giganews *could* "terminate" repeat infringers who are registered with a different provider because, by definition, those users's accounts reside with a different provider. If Giganews can not terminate accounts registered with other Usenet providers, then Giganews would not be able to apply its repeat infringer policy to such accounts even if it could identify them as repeat infringers. At a minimum, in light of this unresolved threshold issue, the Court cannot find that Giganews's repeat infringer termination policy is inherently infirm merely because Giganews cannot identify accounts through which infringing messages are posted when such accounts are registered with a different provider.

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion insofar as it seeks a determination that Giganews's repeat infringer termination policy does not comply with § 512(i)(1)(A)

**D.   Plaintiff Has Not Established that its Notices Comply with § 512(c)(3)(A).**

To claim the protection of § 512(c) for storing material on systems or networks at the direction of users, a service provider must, "upon notification of claimed infringement as described in paragraph (3), respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C.A. § 512(c). A service provider's obligation to remove infringing material is not triggered unless the copyright holder provides a notice that complies with § 512(c)(3)(A). Section 512(c)(3)(A) states:

> (A)   To be effective under this subsection, a
>        notification of claimed infringement must be a

11

written communication provided to the
designated agent of a service provider that
includes substantially the following:

(i)  A physical or electronic signature of a
person authorized to act on behalf of the
owner of an exclusive right that is
allegedly infringed.

(ii) Identification of the copyrighted work
claimed to have been infringed, or, if
multiple copyrighted works at a single
online site are covered by a single
notification, a representative list of
such works at that site.

(iii) Identification of the material that is
claimed to be infringing or to be the
subject of infringing activity and that
is to be removed or access to which is to
be disabled, and information reasonably
sufficient to permit the service provider
to locate the material.

(iv) Information reasonably sufficient to
permit the service provider to contact
the complaining party, such as an
address, telephone number, and, if
available, an electronic mail address at
which the complaining party may be
contacted.

(v)  A statement that the complaining party

12

1        has a good faith belief that use of the

2        material in the manner complained of is

3        not authorized by the copyright owner,

4        its agent, or the law.

5    (vi) A statement that the information in the

6        notification is accurate, and under

7        penalty of perjury, that the complaining

8        party is authorized to act on behalf of

9        the owner of an exclusive right that is

10       allegedly infringed.

11   17 U.S.C. § 512(c)(3).

12       Plaintiff seeks a ruling that five of the Notices it sent to

13   Giganews comply with § 512(c)(3)(A).  <u>See</u> Notices (Zada Decl. Exhs. 9-

14   13).[1]

15       The parties' disagreement focuses on one element, §

16   512(c)(3)(A)(iii), which has two components: identification of the

17   infringing material, and information reasonably sufficient to permit

18   the service provider to locate the material.

19       At this point, a description of Plaintiff's Notices is in order.

20   Plaintiff's Notices instruct Giganews to use certain newsreaders to

21   conduct searches of specific names within certain newsgroups, and then

22   tell Giganews that all of the messages yielded by those searches on a

23   certain date contained infringing material.  Along with (verbose)

24   written instructions for performing these searches, Plaintiff's

25   _____

26       [1]  Plaintiff sent more than these five notices to Giganews.
     However, Plaintiff appears to believe that these notices are
27   representative of the body of notices it sent to Giganews, such that
     any adjudication of this issue with respect to any of the five notices
28   will apply to other notices at issue in the case.

Notices include pages of thumbnail images of the infringing materials and/or screen shots of the newsreader interface reflecting the search results.  Plaintiff contends that this satisfies § 512(c)(3)(A)(iii) because the search results and thumbnails both "identify" the infringing messages and also provide sufficient information to permit Giganews to "locate" those messages.

Giganews contends that these Notices are inadequate insofar as they fail to include Message-IDs for each infringing message. According to Giganews, a Message-ID is a string of letters and numbers; every Usenet message is assigned a unique Message-ID that any Usenet user can view on a message's message header.  Giganews contends that a Message-ID is the only unique identifier associated with any message, and is therefore the only way it can "locate," and, accordingly, disable, infringing messages.  <u>See, e.g.</u>, Rosenblatt Decl. ¶¶ 29-39.  Indeed, insofar as Plaintiff's Notices included Message-IDs for infringing messages, Giganews disabled those messages.[2]  Yokubaitis Decl. ¶ 30.  Thus, the controversy is whether Plaintiff's Notices lacking Message-IDs satisfy § 512(c)(3)(A)(iii).

Stated in terms of the statute, the issue is whether, as Plaintiff contends, its search instructions and the attached thumbnail images and screen shots "identif[y]" the infringing material and constitute "information reasonably sufficient to permit the service provider to locate the material."  17 U.S.C. § 512(c)(3)(A)(iii).

Caselaw explains that the "DMCA notification procedures place the burden of policing copyright infringement – identifying the

---

[2]    Plaintiff's Notices indicated a Message-ID (seemingly inadvertently) for only a small minority of the infringing messages.

potentially infringing material and adequately documenting
infringement – squarely on the owners of the copyright." CCBill, 448
F.3d at 1113. "The goal of [Subsection (c)(3)(A)(iii)] is to provide
the service provider with adequate information to find and address the
allegedly infringing material *expeditiously*." Viacom Intern Inc. v.
YouTube, Inc., 940 F. Supp. 2d 110, 115 (S.D.N.Y. 2013) (emphasis
added). Congress cited as "an example of such sufficient information"
"a copy or description of the allegedly infringing material and the
URL address of the location (web page) which is alleged to contain the
infringing material." Id.

    The Court has reviewed the cases and all of the evidence bearing
on this issue and finds that Plaintiff has not met its burden of
showing that, as a matter of law, its Notices comply with §
512(c)(3)(A)(iii).

    As to the identification component of § 512(c)(3)(A)(iii), it is
not clear that Plaintiff's approach of pointing to the results of a
search performed on a specific date at a specific time on a specific
newsreader, and attaching thumbnail images and screen shots, amounts
to "identification of the infringing material. . ." First, this
method points to a list of search results, not to any material in
particular. Second, it is judicially noticeable that the material
accessible through the Usenet is in a constant state of flux. As
such, there is no certainty that any particular search will yield the
exact same results at different times. Searches moments apart could
yield different results. Plaintiff argues that the searches it
specified in fact yielded the same results when performed months
apart. See Reply at 6:4-11. However, even accepting the assertion
that searches performed at different times yielded the same results,

verifying this requires a Usenet provider to compare its search results to Plaintiff's search results in an onerous side-by-side, line-by-line manner.  See Zada Reply Decl. ¶ 7 (3:20-4:1) (describing his process for comparing search results).  Furthermore, a close reading of the Zada Reply Declaration reveals that, for at least one of the Notices, the search Plaintiff instructed Giganews to perform yielded some messages that were non-infringing.  See Zada Reply Decl. ¶ 7 (3:13-20).  As such, Plaintiff's "identification" method enlists Giganews to compare its search results to Plaintiff's search results to see if they are the same, *and* to distinguish between material that infringes Plaintiff's copyrights and material that doesn't.  The more Giganews must sort through these search results to determine what the infringing material is, the less it seems that Plaintiff has provided Giganews with "identification of" the infringing material.  In light of all of the foregoing, this issue cannot be resolved summarily in Plaintiff's favor.

     As to whether Plaintiff's Notices provide "information reasonably sufficient to permit the service provider to locate the material," again, Plaintiff has not met its burden.  This provision, by its terms, is slippery: it requires the copyright holder to provide "information *reasonably* sufficient . . ."  Every first year law student learns that the term "reasonably" is amorphous, but it almost always involves the weighing of alternatives, burdens, and costs.  As noted above, the burden of "identifying the potentially infringing material and adequately documenting infringement [falls] squarely on the owners of the copyright."  CCBill, 448 F.3d at 1113.  Furthermore, the notification should enable the service provider to remove the offending material *expeditiously*.  See YouTube, 940 F. Supp. 2d at

16

115.  "[A] copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material" is an example of sufficient information.  Id. (emphasis added).

Giganews analogizes a Usenet message's Message-ID to a webpage's URL, as, like a URL, the Message-ID is the only unique identifier that a Usenet service provider can use to locate a Usenet message.  Indeed, according to Giganews, the Message-ID is the data Giganews enters into its disabling program to disable a message.  See Molter Decl. ¶ 20. In an attempt to downplay the singular utility of a Message-ID for identifying and locating a message, Plaintiff points to several other variables in message headers that could be used in combination to "locate" a message.  But, a Message-ID suffices to locate a message, and adding more variables to the location process does not solve any problem, it only complicates them.  In short, Plaintiff's Rube Goldberg method of locating messages doesn't aid Plaintiff, because that method would just compound the problems noted below for both sides.

Based on Giganews's evidence, the searches Plaintiff instructed it to perform appear to be analogous to a web search using a search engine, such as the kind of search one would perform using Google. Such searches yield a list of results that may or may not include the content the user wants to find.  See, e.g., Rosenblatt Decl. ¶¶ 25-28, Levine Decl. ¶¶ 32-39.  Giganews has presented evidence that such searches simply do not function effectively within Usenet's architecture.  See Rosenblatt Decl. ¶¶ 29-39, Levine Decl. ¶¶ 34-39. The Court also notes that while a web search may "find" a number of results, the search itself does not actually locate the items found;

the search engine just presents its search results in a list, and any
item in that list is not "located" until its URL is extracted.

Similarly, Giganews argues that in order to "locate" a message
that appears in one of Plaintiff's searches, one must extract the
Message-ID from that message's message header.  See Rosenblatt Decl.
¶¶ 29-39.  Both sides describe several ways to extract the Message-ID.
The most onerous approach is a manual, message-by-message process
requiring a person to download each message, open each message's
message header, and extract the Message-ID by cutting-and-pasting the
Message-ID from the message header into another document or program.
A more efficient approach involves using a computer program to extract
Message-IDs automatically from a number of pre-selected messages,
without the need for a person to undertake the above-described manual
cut-and-paste steps for each message individually.  There is evidence
that both Plaintiff and Giganews can perform these manual Message-ID
extractions, and both could also easily write computer programs to
execute such extractions.  Giganews also points out that many holders
of large portfolios of copyrighted material enlist the service of
third-party companies who prepare DMCA notices with Message-IDs.

Thus, the crux of the parties' dispute is who must bear the
burden of extracting the Message-IDs associated with the infringing
messages, copyright holders or Usenet service providers.  According to
Giganews, if it had to extract Message-IDs for the hundreds of
millions of messages identified in DMCA notices it has received, it
would not be able to function.  See Opp'n 5:24-26; 21:21-25.  All of
the declarations Giganews submitted substantiate this claim.  That
Plaintiff also expects Giganews to run searches and compare its search
results to Plaintiff's search results to isolate infringing messages

makes this burden even greater.  Giganews also points out that because
Plaintiff already knows which messages are infringing, it would be
much easier for Plaintiff to extract the Message-IDs, whether by a
manual cut-and-paste method, by using a computer program, or by using
a third-party service.  For its part, Plaintiff notes that Giganews
did extract Message-IDs for infringing messages reflected in Notices 1
and 2, and argues that this demonstrates that all Notices lacking
Message-IDs were sufficient to allow Giganews to locate the messages.

Based on the foregoing, triable issues preclude summary
adjudication of this issue in Plaintiff's favor.  Giganews has
presented substantial evidence of the untenable burden it would face
if every DMCA notice it received required it to undertake the Message-
ID extraction process Plaintiff expects of it.  That Giganews
evidently chose to undertake this process for two of Plaintiff's
Notices does not necessarily mean that those Notices satisfy §
512(c)(3)(A); it may mean that Giganews went beyond its duty.

In short, Plaintiff has not met its burden to show that its
Notices comply with 17 U.S.C. § 512(c)(3)(A)(iii).  This aspect of the
Motion is therefore **DENIED**.

**E.   Plaintiff Has Not Shown that the Defendants Are Ineligible for
      Safe Harbor Protection Under § 512(c).**

Plaintiff contends that Defendants are not eligible for any of
the four safe harbors set forth in §§ 512(a)-(d), but really only
addresses § 512(c) in relation to Giganews.  Plaintiff devotes only
one page and six lines of its opening brief to this argument.  See
Mot. 23:21-24:26.  Plaintiff's argument as to Livewire is somewhat
hard to discern and is stated entirely as follows: that Livewire
"purchases infringing materials from Giganews and resells those

infringing materials to third parties," conduct that Plaintiff claims excludes Livewire from any safe harbor.  See Motion at 24:3-8.  In response, both Defendants contend that they are eligible for protection under §§ 512(a), (c), and/or (d).  Because Plaintiff did not specifically address §§ 512(a) or (d), those safe harbors are not in issue so the Court will not reach them.  The Court will therefore only reach Defendants' eligibility for § 512(c).

Section 512(c) provides immunity "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  Thus, a provider may be immune if it stores infringing material at the direction of a user.  Plaintiff contends that Giganews is not eligible for this safe harbor because it copies infringing messages to its servers without the intervention of third-party users, and because it stores these images on its servers for as long it wants to.  However, according to Giganews, that messages are copied to Usenet servers in this way is simply a function of the Usenet, which provides for the *continuous and automatic propagation or copying* of messages across all Usenet servers.  See Rosenblatt Decl. ¶ 29.  Because these messages are propagated automatically once they are posted by the third-party user, that propagation itself is arguably "at the direction of" a user.  Insofar as Plaintiff's arguments as to Livewire turns on its statement that Livewire "purchases infringing materials from Giganews and resells those infringing materials to third parties," that is a disputed issue of fact.  As such, whether Defendants are eligible for protection under § 512(c) cannot be summarily adjudicated in Plaintiff's favor, so this aspect of the Motion is **DENIED**.

### IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is **DENIED** in its entirety.


**IT IS SO ORDERED.**


DATED: **January 29, 2014**         _____
                                              **AUDREY B. COLLINS**
                                              **UNITED STATES DISTRICT JUDGE**