UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 11-07098-AB (SHx) | Date: | October 31, 2014 |
|---|---|---|---|

| Title: | *Perfect 10, Inc. v. Giganews, Inc.* |
|---|---|

| Present: The Honorable | ANDRÉ BIROTTE JR. |
|---|---|

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** [In Chambers] Order GRANTING IN PART Defendant Giganews, Inc.'s *Daubert* Motion to Exclude Portions of Dr. Justin Tygar's Expert Testimony (Dkt. No. 472)

Pending before the Court is Defendant Giganews, Inc.'s ("Giganews") and Defendant Livewire Services, Inc.'s ("Livewire," collectively "Defendants") joint motion to exclude certain expert opinion testimony offered in discovery by Plaintiff Perfect 10, Inc.'s ("Perfect 10") expert, Dr. Justin Douglas Tygar. (Dkt. No. 472.) Defendants move to exclude the opinions at issue under Federal Rules of Evidence 403 and 702, as well as the standards for expert testimony articulated by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*("*Daubert*") 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael* ("*Kumho Tire*"), 526 U.S. 137 (1999). Because the record before the Court reveals that Dr. Tygar lacks foundation or expertise to offer some (but not all) of the opinions Defendants identify in the motion, the Court **GRANTS** Defendant's motion **IN PART**.

 I. BACKGROUND

This copyright infringement action involves the alleged distribution of copyrighted adult images, owned by Perfect 10, over the internet via Defendants' Usenet systems. Dr. Tygar is Perfect 10's primary computer science expert. All parties agree that Dr. Tygar is

a highly accomplished, highly respected computer scientist on the faculty of the University of California at Berkeley with too many degrees, publications, grants, and other academic and professional accomplishments to note here. Defendants do not dispute that Dr. Tygar is qualified to offer expert opinion in many areas, and defense counsel has utilized Dr. Tygar's services as an expert witness in prior litigation. However, Defendants contend that Dr. Tygar lacks relevant expertise to offer two of the five opinions he has *in this litigation* and those opinions lack adequate foundation. Namely, Plaintiffs seek to exclude two categories of Dr. Tygar's opinions:

- Opinions relating to the incidence of infringement generally on Usenet (Dkt. No. 247-3, ¶¶20(a), 22, 24-26, 31-34; 247-4, ¶¶7(c), 27; 247-5, ¶¶29, 32-33; and
- Opinions relating to measures that Giganews might take to curb alleged infringement on Usenet (Dkt. No. 472-2, Exh. 1, ¶¶20(c), 30, 45-47, 62-65; Exh. 2, ¶¶10-12, 15-18, 22-35; Exh. 3, ¶¶9(c), 17-28.)

(Dkt. No. 472, p. 1.)   Perfect 10 opposes.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the scope of admissible expert testimony, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'"   *Kumho Tire*, 526 U.S. at 147, quoting *Daubert*, 509 U.S. at 589.   That is, Rule 702 imposes a "gatekeeping" obligation on the trial court (*Daubert*, 509 U.S. at 597) to guard "the twin concerns of 'reliability' ... and 'helpfulness.'"   *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007), quoting *United States v. Mitchell*, 356 F.3d 215, 234 (3d Cir.

2004).  "Maintaining Daubert's standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony."  *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1064-65, *overruled on other grounds in Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir. 2014)

The question of reliability embodied in rule 702 is one of foundation:  "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'"  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014), quoting *Kumho Tire*, 526 U.S. at 149.   The reliability inquiry applies to all forms of expert testimony, whether based on scientific, technical, or other forms of specialized knowledge. *Kumho Tire*, 526 U.S. at 147-48.  "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.1997).  "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive … ." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1318 (9th Cir. 1995). Rather, Court's role as a gatekeeper of *reliable* expert testimony is to independently ensure that the expert's methods are valid.  *Daubert*, 509 U.S. at 590 n.9.  An expert's opinions derived from an unsound or invalid methodology are without any evidentiary value because "[o]pinion evidence is only as good as the facts upon which it is based."  *State of Washington v. United States*, 214 F.2d 33, 43 (9th Cir. 1954).  Among the factors to consider in determining whether the expert's opinion stands upon a reliable foundation are:

> "(1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is generally accepted."

*Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007), citing *Daubert*, 509 U.S. at 593-94.

It is important to emphasize, however, that the reliability inquiry tests only the foundation for the expert's opinion, not the accuracy of her conclusion.   "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."  *Daubert II*, 43 F.3d at 1318.  As one leading practice guide correctly puts it, "the trial court's 'gatekeeping' role is not intended to serve as a replacement for the adversary system." Jones, Rosen Wegner, & Jones, *Rutter Group Prac. Guide: Fed. Civil Trials & Evid.*, §8:1503.3 (The Rutter Group, 2014).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Even reliable expert testimony must still be helpful to the jury's determination of the material factual questions at hand. *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d at 1192; *accord* Fed. R. Evid. 402. "Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1184 (9th Cir.2002). "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Daubert,* 509 U.S. at 591 (internal quotes omitted). "The evidence must logically advance a material aspect of the party's case." *Cooper v. Brown*, 510 F.3d at 942.

In assessing both reliability and relevance, the "inquiry envisioned by Rule 702 is … a flexible one." *Daubert*, 509 U.S. at 589-90. "[J]udges are entitled to broad discretion when discharging their gatekeeping function." *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). "[T]he trial court must be afforded wide latitude both in deciding whether to admit expert testimony and in deciding how to test reliability." *United States v. Alatorre*, 222 F.3d 1098, 1101-02. In the exercise of that broad discretion, a district court may determine the admissibility of an expert's opinion without hearing. *Id*. at 1102.

Finally, even if otherwise admissible under Rule 702 expert testimony "may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

### III.   DISCUSSION

As noted above, there is no dispute that Dr. Tygar is well qualified to offer numerous expert opinions on a number of topics. But that broad observation is of little use in answering the narrow question before the Court on this motion: whether the specific opinions Defendant challenges in this motion are sufficiently reliable and relevant to pass muster under Rule 702 and *Daubert*.

#### A.   Opinions Relating to the Incidence of Infringement on Usenet

Defendants first attack Dr. Tygar's opinion that:

> "In recent years, the overwhelming majority of USENET content has been 'binary' documents, which appear to be material protected by copyright and distributed without permission of the copyright owner: video files, audio files, photographs, executable software, books and other documents."

(Dkt. No. 472-3, ¶20(a); *see also* Dkt. No. 22, 24-26, 31-34; 247-4, ¶¶7(c), 27; 247-5, ¶¶29, 32-33.) His substantial qualifications as a computer scientist notwithstanding, nothing in

the record suggests Dr. Tygar is an expert on copyright law. Nor does Dr. Tygar suggest any foundation for his opinion that the documents "appear to be" protected by copyright, or that the individuals posting those files do so "without permission of the copyright owner."

It may be that, in the course of his analysis, Dr. Tygar saw a number of "binary" files with names suggesting the files were popular songs, movies, books, or video games. But Dr. Tygar does not suggest that he actually viewed any of those files to determine whether the underlying content was consistent with the file name. Nor does he offer any foundation to suggest he has actual knowledge that any of the works reflected in the file names are, in fact, protected by copyright or that he has the expertise to make such a determination as a computer scientist. Furthermore, Dr. Tygar offers nothing to suggest he has any foundation to know whether any person posting a binary file of a copyrighted work did so "without permission of the copyright owner."

Dr. Tygar's opinion on this point, therefore, requires three assumptions, none of which he supports with any foundational knowledge:

1. The names of the binary files accurately reflect their content;[1]
2. The work reflected in any particular file name is protected by a valid, current copyright; and
3. The person posting the binary file does not have permission to distribute the work.

Rather than dispute this principal deficiency in Dr. Tygar's opinion, Perfect 10 argues that Professor Tygar's opinion is not a determination the copyright status of Usenet files, but a broader opinion about the overall volume of "binary" files on Usenet made without any "attempt to determine the underlying rights or the copyright status of any particular file or opine as to whether any particular file was infringing." (Dkt. No. 524, pp. 9-10.) Perfect 10 then describes Dr. Tygar's opinion about the dominance of "infringing content" on Usenet as a comment on "the plausibility that all of that material was or was not protected by copyright … ." (Dkt. No. 524, p. 10.)

It may be, as Perfect 10's argument implies, that Dr. Tygar does not need to be an expert in copyright law or have firsthand knowledge of the three assumptions noted above to reach the reasonable conclusion that many (though probably not all) of the binary files he observed were protected by copyright and were being distributed illegally. But if that is the case, such testimony is not the proper subject of an expert opinion. Whether to make such reasonable inferences is the province of the jury. Dr. Tygar has no specialized

---

[1] To the contrary, some of Dr. Tygar's opinions undermine this assumption. Dr. Tygar opines, for instance, that Usenet is "plagued by advertisements [and] scams…." (Dkt. No. 472-3, ¶22; see also Dkt. No. 472-6, p. 63.) Dr. Tygar does not offer any foundation to suggest he is capable of distinguishing, based on the file name alone, whether a binary file contains the purported copyrighted work or whether the file is misleadingly named to trick users into downloading a "scam" or other form of virus or malware.

knowledge, skill, or training that would help him identify a copyrighted file or the holder of the copyright any better than a juror. In fact, Dr. Tygar testified he believed "that any reasonable person would come to the same conclusion," irrespective of their expertise in computer science. (Dkt. No. 472-6, p. 67 *see also Id*. at p. 69 (Dr. Tygar testifying this conclusion was "just based on my own understanding as a layperson").) Such opinions, however, fail to meet the "helpfulness" requirement set forth in Rule 702 and *Daubert* because an expert opinion must "concern matters beyond the common knowledge of the average layperson… ." *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2008). Assuming Perfect 10 can overcome a hearsay objection, Dr. Tygar may testify to what he *observed* (large numbers of binary files with file names of popular books, movies, songs, etc.), but he may not usurp the function of the jury to decide whether those observations are evidence of copyright infringement.[2]

The Court also notes that the relevance of even this narrower scope of Dr. Tygar's opinion is limited. Dr. Tygar's opinion about the volume of binary files broadly discusses the prevalence of allegedly "infringing content" generally, not any particular act of infringement regarding a copyrighted work owned by Perfect 10. As Judge Pauley of the Southern District of New York recently observed: "Evidence pertaining to the infringement of copyrights Plaintiffs do not own is of questionable relevance." *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2014 WL 503959 at *5 (S.D.N.Y. Jan. 29, 2014). A "general awareness that infringement may be occurring" is usually irrelevant to the specific question of whether a particular defendant violated a particular copyright held by a particular plaintiff. *Viacom Int'l. v. YouTube, Inc*., 676 f.3d 19, 35 (2d Cir. 2012), cited with approval in *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 (9th Cir. 2013). This is because "merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement" for copyright violation. *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d at 1022. To the extent the evidence of large amounts of binary files may be relevant at all to the particular acts of infringement alleged here, it could only be relevant to show that Defendants had a pattern or practice of being "willfully blind" to numerous "red flags" of the specific acts of infringement at issue in this case. *Id*

---

[2] Perfect 10's assertion that Dr. Tygar offered identical opinion testimony in an unrelated Australian lawsuit and for defense counsel in *A&M Records, Inc. v. Napster, Inc*., No. C 99-05183 MHP, 2000 WL 1170106 (N.D. Cal. March 5, 2001) is unavailing. (*See* Dkt. No. 524, p. 10.) As for the Australian lawsuit (which Perfect 10 refers to as the *Kazaa* lawsuit), Perfect does not offer any basis to conclude that Australian law on expert testimony is at all similar to American standards. And as for Judge Patel's decision to admit certain portions of Dr. Tygar's testimony in *A&M Records, Inc. v. Napster*, the Court notes that Dr. Tygar's opinion in that case was substantially different. In that case, Dr. Tygar did not offer, and the court did not admit, opinions about the copyright status of any file or group of files. Instead, Dr. Tygar opined on the technical feasibility of "requir[ing] Napster to obtain information from the rights-holder before providing access to the material." *A&M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106 at * 10. Unlike his opinions in this case, in *Napster* Dr. Tygar "limit[ed] his conclusions to the capabilities of the Napster computer program," which was both helpful to the jury and within his area of expertise. *Id*. If anything, the Court in *Napster* agreed with this Court's analysis, excluding Dr. Tygar's secondary opinion regarding "Napster's Ability to Tell Whether a Use of the System is Infringing" as an improper legal conclusion. *Id*. at * 11.

at 1022-23.

Prior to trial, the Court may require Perfect 10 to make an offer of proof of its evidence, if any, that Defendants were sufficiently "willfully blind" to the specific acts of infringement alleged in this case.  *See, e.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (evidence that defendant hosted sites with names such as "illegal.net" and "stolencelebrity pics.com" and other password hacking websites was insufficient to show willful blindness to the acts of infringement at issue in that case).  If Perfect 10 is unable to articulate sufficient facts to constitute willful blindness as a matter of law, the Court may yet exclude Dr. Tygar's opinion regarding the prevalence of binary files on Usenet as irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 403.  However, the record is not sufficiently developed for the Court to make such a determination at this time.

### B. Opinions Relating to Measures Giganews Could Take to Reduce Potential Infringement

Defendants attack on the other category of opinions they identify is less persuasive. Dr. Tygar opines that there are several steps Defendants could take that might possibly reduce the incidence of infringement on their platforms.  Namely Dr. Tygar opines that Defendants could:

1. Utilize so-called "cancel commands" to delete a message from their Usenet servers, which would then propagate across the internet to delete that message from other Usenet servers, too (Dkt. No,. 472-3, ¶30);[3]
2. Shut down entire newsgroups (content-themed fora to which related Usenet messages get posted) when the newsgroup received a certain threshold of takedown notices; and
3. Create an additional field in its index of Usenet messages to indicate the unique Giganews ID for every message posted on its servers or, in the alternative, decrypt the already-available X-Trace field in the message header field for messages posted to Defendants' servers to identify individuals who repeatedly upload copyrighted material and delete all the messages posted by repeat infringers.

(*See* Dkt. No. 472-3, ¶¶20(e), 62-65.)

Defendants contend Dr. Tygar lacks adequate foundation for these opinions because he is not sufficiently versed in Usenet generally and the source code for Defendants' servers and software specifically.  Defendants do not dispute that Dr. Tygar has

---

[3] According to Dr. Tygar, the upshot of utilizing a "cancel command" would be that, if Defendants issued a "cancel command" in response to a takedown notice as opposed to simply deleting the message from its servers, the message would likely be deleted from many other Usenet servers operated by other Usenet providers.  (Dkt. No. 472-3, ¶63.)   Similarly, if Defendants honored other companies "cancel commands," a takedown notice served on another Usenet provider that also issued "cancel commands" would result in the message being deleted from Defendants' servers, as well.

substantial expertise in computer cryptography or database design and function. And while Dr. Tygar's hands-on experience with Usenet protocols may be limited and somewhat dated, Defendants do not dispute that Dr. Tygar has reviewed the industry standards governing News Network Transfer Protocol ("NNTP"), the technology that forms the backbone of all Usenet systems. Nor do they cite any authority to suggest that Dr. Tygar's academic research into NNTP technologies is insufficient to give him expertise on the subject given his extensive background as a computer scientist.

The Court is mindful of its gatekeeping obligation to keep "junk science" and "unsubstantiated speculation" out of the courtroom. *Daubert II*, 43 F.3d at 1321 n.18; *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d at 853. But Defendants objections to Dr. Tygar's opinion about additional measures Defendants could take go to the weight of Dr. Tygar's testimony, not its admissibility. *See, e.g.*, Jones, Rosen Wegner, & Jones, *Rutter Group Prac. Guide: Fed. Civil Trials & Evid.*, §8:1503.3 (The Rutter Group, 2014) ("the trial court's 'gatekeeping' role is not intended to serve as a replacement for the adversary system."). Defendants do not contend, for example, that their systems operate on an entirely different platform than NNTP, or that their database architecture and X-Trace cryptography is so completely proprietary that Dr. Tygar's more generalized understanding of those technologies would be entirely irrelevant. To the extent Defendants systems differ materially from the core systems with which Dr. Tygar is most familiar, they will have ample fodder for cross examination and an opportunity to present evidence of how their systems differ or why Dr. Tygar's suggestions would be unfeasible as applied to their systems. But the strength of Dr. Tygar's testimony is not the standard for exclusion. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

That said, the Court does think the tone of Dr. Tygar's testimony suggests more certainty about the nature of Defendants' systems than is warranted given Dr. Tygar's ignorance of Defendants' precise source code, database structure, and cryptographic technologies. The Court will require Dr. Tygar to offer his opinions with more epistemological humility. He may offer general testimony grounded in his expertise that the fundamental technologies supporting Defendants systems would permit his suggested methods for fighting infringement, but that is where Dr. Tygar's expertise (and, therefore, his admissible testimony) ends. Dr. Tygar is not qualified, and the Court will not permit him to testify, as to how those technologies might be implemented in *Defendants' specific systems*, as opposed to how they would be implemented under industry standards.

## IV. CONCLUSION

In light of the foregoing, the Defendants' motion to exclude certain opinions offered by Dr. Tygar is **GRANTED IN PART** as more fully stated above. The motion is otherwise **DENIED**.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 3, 2014 at 10:00 a.m. is hereby **VACATED**. *See also United States v. Alatorre*, 222 F.3d at 1102 (holding "a pretrial hearing is not required" on a *Daubert* motion).

**IT IS SO ORDERED**