UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No.: CV 11-07098-AB (SHx) | Date: November 14, 2014 |

| | |
|---|---|
| Title: *Perfect 10, Inc. v. Giganews, Inc.* | |

| | |
|---|---|
| Present: The Honorable | ANDRÉ BIROTTE JR. |

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **[In Chambers] Order (1) GRANTING Defendants Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 357) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 453)**

Pending before this Court are the parties' competing motions for partial summary judgment regarding Defendant Giganews, Inc.'s ("Giganews") and Defendant Livewire Services, Inc.' ("Livewire") liability for direct copyright infringement. As stated more fully below, the Court **GRANTS** Defendants' motion. (Dkt. No. 357.) Even assuming certain computer functions could be construed as a violation of Plaintiff Perfect 10, Inc.'s ("Perfect 10") exclusive rights in various images under other circumstances, the undisputed evidence demonstrates that Defendants' automated, content-neutral systems are not the *direct cause* of any infringement at issue in this action and cannot be held liable for direct copyright infringement. Because the Court grants partial summary judgment in favor of Defendants on the issue of direct infringement, the Court **DENIES** Perfect 10's competing motion for partial summary judgment on the same issue (Dkt. No. 453) as **MOOT**.

# I.   BACKGROUND[1]

## A.   The Structure and Function of the Usenet

The Usenet is a set of internet transfer protocols that facilitate the transfer of information between computer servers and individual client computers.   (Dkt. No. 438-10, p. 30:4-6.)   As the Court already noted in its order regarding the expert testimony of Dr. Tygar, the primary transfer protocol governing every interaction on the Usenet is the Network News Transfer Protocol ("NNTP").   (Dkt. No. 580, p. 8)   Like other parts of the internet, including the world-wide web (the "Web"),[2] "there is no specific network that is the Usenet. Usenet traffic flows over a wide range of networks, including the Internet and dial-up phone links."   *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.* ("*Netcom*"), 907 F. Supp. 1361, 1366 n.4 (N.D. Cal. 1995);[3] *see also* Dkt. No. 438-5, p. 67:11-18.   In its broadest sense, the Usenet is "an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and exchange messages posted by USENET users."   *Ellison v. Robertson*, 357 F.3d 1072, 1074 n.1 (9th Cir. 2004).

However, "[t]o obtain access to the USENET, a user must gain access through a commercial USENET provider … or an internet service provider."   *Arista Records LLC v. Usenet.com, Inc.* ("*Arista Records*"), 633 F. Supp. 2d 124, 130 (S.D.N.Y. 2009). Defendant Giganews is one such Usenet provider.   (Dkt. No. 357-1, ¶1.)   Giganews owns and operates numerous Usenet servers, providing its subscribers access to the content stored on Giganews' servers and, using NNTP, to the content stored on the servers of other Usenet providers.   (Dkt. No. 438-5, p. 67:11-18.)   Defendant Livewire does not own or operate any of its own Usenet servers.   (Dkt. No. 357-1, ¶¶17-18.)[4]   Rather, Livewire

---

[1]  The Court has read and considered Defendants' voluminous evidentiary objections filed along with their reply. In considering these motions, the Court does not rely on any inadmissible expert testimony that it already excluded in connection with Defendants three *Daubert* motions. (*See* Dkt. Nos. 580, 581, & 582.)   To the extent that the Court addresses any disputed evidence in this order, Defendants' objection to that evidence is overruled.

[2]  The Usenet is, in essence, a subsection of the larger internet of all networked computers.   What most people commonly refer to as the "internet" (i.e., the version of the internet most people access through a web browser) is actually a different subset of the internet called the world-wide web (the "Web"), which is governed by a different set of transfer protocols – namely Hypertext Transfer Procotol ("HTTP").   *See, e.g., American Library Ass'n, Inc. v. United States*, 201 F.Supp.2d 401, 417 (E.D.Pa. 2002) ("The World Wide Web is a part of the Internet that consists of a network of computers, called 'Web servers,' that host 'pages' of content accessible via the Hypertext Transfer Protocol or 'HTTP.' Anyone with a computer connected to the Internet can search for and retrieve information stored on Web servers located around the world. Computer users typically access the Web by running a program called a 'browser' on their computers."), *rev'd on other grounds sub nom. in United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003).

[3]  Judge Matz previously took judicial notice of this fact in this action.   (Dkt. No. 97, p. 2, also available at 2013 WL 2109963.)

[4]  Perfect 10 purports to dispute this fact by noting a single web page on one of Livewire's affiliated websites which uses the phrase "our servers" in passing.   Nothing in that passing phrase, however, suggests that Livewire actually owns or operates any Usenet servers itself.   Despite a lengthy opportunity to discover any *actual evidence* that Livewire owns or operates any Usenet servers, Perfect 10 uncovered none, and a single, arguably ambiguous statement on one of Livewire's affiliated websites is insufficient to create a disputed issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

provides its customers with access to the Usenet by offering access to content stored on Giganews' Usenet servers.   (Dkt. No. 357-1, ¶19.)[5]

As Judge Matz already judicially noticed, "the content on USENET" to which Giganews (and Livewire via Giganews' servers) offer access "is primarily user-driven – that is, the content that is stored on a USENET provider's server is generally uploaded by USENET users."   (Dkt. No. 97, p. 2.)   Users provide this content by posting text-based "articles" to online bulletin boards, known as "newsgroups."   (*Id*.)   Although there are billions of articles posted to the Usenet, each article receives a unique "Message-ID," a string of 20 or more alphanumeric characters.   (Dkt. No. 438-1, p. 50:2-24.)   The only way to uniquely identify a Usenet message is by its Message-ID.   (Dkt. No. 369, Exh. 1, ¶8; Dkt. No. 465-5, p. 71:7-11.)   While a Usenet message contains a number of fields with information about the individual message, many other messages can have false or duplicative information in other fields.   (Dkt. No. 369, Exh. 1, ¶8.)   For example, although a Usenet message contains a "Sender" field in which the user's email address should appear, the "Sender" email address is not verified, and many Usenet users provide fake email addresses.   (Dkt. No. 365-9, ¶¶37-38.)[6]   For that reason, multiple Usenet users could post under the same "Sender" name.   (Dkt. No. 465-5, p. 71:1-3; Dkt. No. 465-1, p. 226:20-24.)[7]   And because users create their own "Subject" lines (as with any email), it is also possible that two different users could post two different articles, but with the same "Sender" and "Subject" information.   The only field truly unique to any Usenet article is the Message-ID.

Articles posted to the Usenet are text files.   (Dkt. No. 438-10, p. 42:15.)   However, using text, it is possible to encode another type of file (image, song, movie, etc.) into the body of an article as a binary file.   (*Id*., at p. 42:16-20.)   "These binary files are encoded in text form for storage and processing, and require a software program to convert the text into a content file such as an image or music file."   *Arista Records*, 633 F.Supp.2d at 130.   Additionally, before a user can access or download any Usenet articles to begin with (let alone view them), including articles containing encoded binary files, a user must use a Usenet browser application.   (Dkt. No. 439-1, Exh. 3, p. 3.)   Giganews offers its own Usenet browser, called "Mimo," which is apparently also capable of decoding binary files to display them as images.   (*Id*; *see also* Dkt. No. 439-5, Exh. 10.)   Giganews also offers

---

[5] Although Livewire does maintain *Web* servers (Dkt. No. 357-1, ¶20), the Court has already noted that the world-wide web is a different segment of the internet, using a different set of transfer protocols than the Usenet (HTTP as opposed NNTP).   (*See* Footnote 1, *supra*.)   It is impossible for a Livewire customer to either post or access Usenet messages using one of Livewire's Web servers.   (Dkt. No. 357-1, ¶¶21-23; Dkt. No. 369, ¶16.)

[6] According to Defendants' expert John Levine, this trend began in the early 1990s when email spammers began to use automated programs to harvest email addresses from Usenet bulletin boards.   (Dkt. No. 465-9, ¶¶37-38.)

[7] That is, two completely different people wishing to keep their email address anonymous could both post under the "Sender" name anonymous@anonymous.com.

its customers the option of purchasing access to a Virtual Private Network ("VPN"), which encrypts and secures data for all forms of internet traffic, including but not limited to Usenet, Web, and email traffic.   (Dkt. No. 439-1, Exh. 3, p. 7.)

"[W]hen an individual user with access to a USENET server posts a message to a newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc. The messages are temporarily stored on each receiving server, where they are available for review and response by individual users." *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 835 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997).   This process by which messages posted to one Usenet server are propagated to other Usenet servers is fundamental to the NNTP architecture and is commonly known as the "peering" process. *See Netcom*, *supra*, 907 F.Supp. at 1366 n.4; *Arista Records*, *supra*, 633 F.Supp.2d at 130. The peering process occurs once two Usenet access providers enter into a "peering agreement" by which "they make an affirmative agreement … for two servers to accept materials from each other."   (Dkt. No. 438-10, p. 84:7-9.)   In essence the servers cross-check the contents offered on both servers and synchronize their information so that the content of one mirrors the content on the other, with certain exceptions discussed below.   Given the amount of material Usenet providers exchange during the peering process, it is impossible for a Usenet provider to know the content of the individual articles exchanged during peering.   (Dkt. No. 438-10, p. 85:5-9.)

### B.    Defendants Control Over the Content Available on the Usenet

Once Giganews has established a peering agreement with another Usenet provider, it exercises a certain amount of control over the articles it copies from other servers. Giganews servers, for example, compares the unique Message-IDs of messages on peer servers to ensure that Giganews does not copy duplicate articles to its servers.   (Dkt. No. 438-2, p. 149:20-150:4.)   Likewise, if a peer server contains an article with a Message-ID that Giganews has already deleted from its servers (for example, in response to a takedown notice), Giganews' servers will not copy that article.   (*Id*.)   Giganews is also a member of the Internet Watch Foundation, which is a voluntary association that identifies individual articles (by Message-ID) or sometimes entire newsgroups that contain child pornography. (*Id*. at p. 147-49.)   That process is automated, and the articles or newsgroups are automatically deleted or (blocked from peering) from Giganews' servers based on information from the Internet Watch Foundation.   (*Id*. at p. 149:2-14.)

Other than setting those basic parameters, Giganews does not select any of the content available on its servers.   (Dkt. No. 357-1, ¶4.)   Giganews itself did not post any of the articles at issue in this action (containing binary files which, when decoded, contain images to which Perfect 10 owns the copyright) to any Usenet server, and all such articles

were posted by Usenet users.  (*Id.*, at ¶¶5, 9, 10.)[8]  Nor does Giganews tell any third parties what to upload to the Usenet, including Giganews' Usenet servers.  (*Id.*, at ¶¶6-7.)

As a company that merely contracts with Giganews for access to Giganews' servers, Livewire has no control over the content uploaded to, downloaded from, transmitted or stored on Giganews' servers.  (Dkt. No. 375-1, ¶12.)  Nor has Livewire uploaded or directed anyone else to upload any materials to which Perfect 10 owns the copyright to the Usenet (either to Giganews' servers or other servers on the Usenet).  (*Id.* at ¶¶13, 14.)

## C.   Giganews' Response to Various Takedown Requests

On its website, Giganews provides an information page for copyright holders, informing copyright holders what information Giganews requires to process a takedown notice submitted under the Digital Millennium Copyright Act ("DMCA," 17 U.S.C. §512(c)(3).).  (Dkt. No. 439-1, Exh. 3, pp. 11-12.)  On that page, Giganews informs copyright holders that, in order to takedown an offending article, Giganews requires the "Message-IDs for all articles the DMCA Notice is requesting Giganews take down." (*Id.*, at Exh. 3, p. 11.)  Pursuant to 17 U.S.C. §512(c)(2), Giganews has also designated an agent to "receive notifications of claimed infringement" by registering that agent's information with the Copyright Office, and posting the information on Giganews' website.  (Dkt. No. 369, Exh. 1, ¶7; Dkt. No. 439-1, Exh. 3, p. 11.)  Giganews also provides copyright holders with a template for generating a DMCA Notice.  (Dkt. No. 439-1, Exh. 3, p. 11.)

As the Court has discussed in many prior rulings, Perfect 10 owns the copyright to thousands of adult images of nude or semi-nude female models.  Perfect 10 has not delegated any of its exclusive rights under those copyrights to Defendants.  (Dkt. No. 437, ¶25.)  Perfect 10 has served Giganews with a number of letters purporting to be takedown notices under the DMCA.  (*See, e.g.,* Dkt. No. 439-11, Exh. 25.)  (*Id.*) Those DMCA Notices instructed Giganews to "locate all of the infringing messages and images in this notice by doing [a] mimo search" for a particular search term.  (*Id.*)  At least some of Perfect 10's DMCA Notices also attached screenshots of the Mimo application, which showed Message-IDs for a handful of individual posts, though only for a minority of the posts purportedly subject to the notice.  (*Id.*)  The sufficiency of

---

[8] Perfect 10 attempts to put this fact in "dispute" by arguing that Defendants have improperly blocked Perfect 10's attempts to identify the individuals who posted the allegedly offending articles.  (See Dkt. No. 437, p. 4.)  Magistrate Judge Hillman has already expressly rejected this argument in response to Perfect 10's motion for discovery sanctions, holding "Perfect 10 has the ability to obtain the information it desires, and Giganews is not obstructing Perfect 10's efforts."  (Dkt. No. 412, p. 2.)  Perfect 10 further attempts to dispute this fact by contending that, because some allegedly infringing articles posted by third parties were exchanged during the peering process, "Giganews is the entity responsible for uploading those messages to its Usenet servers, not users."  (Dkt. No. 437, p. 4.)  As discussed more fully below, Judge Matz has already considered and rejected this argument.  (Dkt. No. 97, pp. 10-11.)

those DMCA takedown notices is the subject to two other competing motions for partial summary judgment.[9]

## II.   LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact." *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56). An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson*, 477 U.S. at 251. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ." *Id.*, at 252. To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial. *Id.*, at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden in one of two ways. In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that affirmatively disproves an essential element of the opposing party's claim or defense.

---

[9] Perfect 10 also points to three individual Giganews users whose accounts Giganews terminated under Giganews' "two-strike" policy of terminating user accounts after two valid DMCA Notices linked to that individual user's account, or who have otherwise been identified as posting at least two infringing items. (Dkt. No. 436 pp. 8-10; Dkt. No. 437, ¶¶26-45.) Perfect 10 suggests that Giganews' refusal to take down every post associated with a repeat infringer, as opposed to its practice of taking down specific posts identified by their Message-IDs, somehow makes it liable as a direct infringer. (Dkt. No. 436, p. 19.) However, Judge Collins has expressly rejected Perfect 10's argument that the Copyright Act "requires a service provider to disable or delete all messages a repeat infringer has ever posted" as opposed to disabling the users account and removing specifically identified messages. (Dkt. No. 180, p. 9.) The Court agrees with Judge Collins analysis. The Copyright act requires "termination … of subscribers and account holders" associated with a repeat infringer, not deletion of every message ever posted by a repeat infringer. As Judge Collins observed, such a rule "would require a service provider to take down all of a user's messages, not just the infringing ones." (Dkt. No. 180, p. 9.) Such a result would fly in the face of the DMCA, which "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("declin[ing] to shift [that] substantial burden from the copyright owner to the provider"). The Court does not address this argument, or the facts associated with it, further.

*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970).   This is sometimes referred to as the "tried-and-true" form of summary judgment.   Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial.   Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325.   This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery.   Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact.   At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial."   *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003).   The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment.   *Anderson*, 477 U.S. at 249.   "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249).   The question is not whether the non-moving party is able to muster *any* evidence that would support it claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law."   *Anderson*, 477 U.S. at 251-52   Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations."   *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir.2000).

## III.   DISCUSSION

A copyright protects a number of "exclusive rights" vested solely in the holder of a valid copyright.   17 U.S.C. §106.   Relevant here, those rights are the rights to (1) reproduce, (2) create derivative works, (3) distribute, and (4) publicly display the copyrighted work.   17 U.S.C. §106(1)-(3), (5).   Courts "recognize three doctrines of copyright liability" for usurpation of those exclusive rights: "direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).   In this action, Perfect 10 pursues all three theories of liability.   These motions concern Perfect 10's claim for direct copyright infringement.

To succeed on a claim of direct copyright infringement, Perfect 10 must satisfy two elements: "(1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106."   *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d

1004, 1013 (9th Cir. 2001). The first element, ownership of the copyright, is not disputed in this action.  Rather, Perfect 10's claim for direct infringement hinges on the second element for such a claim: whether Defendants *themselves* violated any of Perfect 10's exclusive rights protected by their copyrights in the subject images.  *Ellison v. Robertson*, 357 F.3d at 1076 ("To prove a claim of direct copyright infringement, a plaintiff must show...that the defendant *himself* violated one or more of the plaintiff's exclusive rights under the Copyright Act.") (emphasis added).  "There is no need to prove anything about a defendant's mental state to establish copyright infringement; it is a strict liability tort." *Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D. Cal. 1999).

### A.  Direct Liability Under the Copyright Act Requires a Causal Nexus Between the Defendant's Active Conduct and the Infringement

Just what it means for *direct* copyright infringement to be a strict liability tort, however, has been the subject of some disagreement among the courts (including various courts of this district).  In a seminal opinion on the nature of strict liability for direct infringement, Judge Whyte of the Northern District of California held that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party."  *Netcom*, 907 F.Supp. at 1370 (holding Usenet provider not liable for direct infringement for infringing content stored on its servers that was uploaded by a Usenet subscriber).  In *Netcom*, the court held the fact that "incidental copies automatically made on [a Usenet provider's] computers using their software as a part of a process initiated by a third party" did not give rise to liability for direct infringement.  *Id*. at 1369.  This result centered on two key considerations.

The first, and most important, factor in the *Netcom* analysis is the element of causation.  Strict liability may obviate the need for a showing of intent or negligence, but it does not obviate the independent element of *causation*, which is a necessary prerequisite to Article III standing.  At minimum, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  In the context of direct copyright liability, the relevant question for the purposes of causation "is *who* made this copy."  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).  "[T]he purpose of any causation-based liability doctrine is to identify the actor (or actors) whose 'conduct has been so significant and important a cause that [he or she] should be legally responsible.'  *Id*. at 132. (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 42, at 273 (5th ed.1984).  Inherent in any claim for *direct* liability under the Copyright Act, then, is a plaintiff's need to prove the defendant was the *direct* cause of the injury.  Put another way, to establish causation on a

claim for direct liability, "defendants must *actively* engage in one of the activities recognized in the Copyright Act." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1168 (C.D. Cal. 2002) (Baird, J). Where, as here, the plaintiff fails to show that the defendant "himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur," there can be no liability for direct infringement. *Sega Enterprises, Ltd. v. MAPHIA*, 948 F.Supp. 923, 932 (N.D. Cal. 1996) (no liability for direct infringement against proprietor of online bulletin board system where proprietor operated online bulletin board, knew infringing activity was occurring, and solicited others to upload infringing content). A system that "automatically transmits users' material but is itself totally indifferent to the material's content" is no more the direct cause of acts committed by its subscribers than is "a traditional telephone company when it transmits the contents of its users' conversations." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (adopting holding in *Netcom*). In passing, the *Netcom* court referred to this sort of *direct* conduct as an "element of volition or causation." *Netcom*, 907 F.Supp. at 1370.

The second consideration in *Netcom*'s rationale is a policy concern that goes to the heart of modern communications. Specifically, the court noted "it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Netcom*, 907 F.Supp. at 1372. "There are thousands of owners, contractors, servers, and users involved in the Internet whose role involves the storage and transmission of data in the establishment and maintenance of an Internet facility." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 551. To hold a service provider liable in *strict liability* for the discrete acts of *third party* copyright infringers because the infringing material was stored on or passed through the service provider's facilities would be, in effect, to hold the entire internet liable for the bad acts of a few. The Copyright Act neither requires nor permits such a result. In applying the act, courts "must strike a balance between a copyright holder's legitimate demand for effective – not merely symbolic – protection of the statutory monopoly and the rights of others freely to engage in substantially unrelated areas of commerce." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984) (sale and distribution of equipment that make it possible for third parties to infringe on copyright does not constitute even indirect infringement so long as the equipment is even "capable of substantial noninfringing uses"). To conclude that service providers "are copyright infringers simply because they are involved in the ownership, operation, or maintenance of a transmission facility that automatically records material—copyrighted or not—would miss the thrust of the protections afforded by the Copyright Act." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 551. Although the Ninth Circuit has not passed on *Netcom's* causation analysis, both the Second and Fourth Circuit Courts of Appeal have adopted it. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d at 131 (2d Cir. 2008); *Costar Group, Inc. v.*

*Loopnet, Inc.* 373 F.3d at 555 (4th Cir. 2004).[10]

Some courts of this district have declined to follow *Netcom* (although no Circuit Court of Appeals has done so).  But the courts that have done so appear to have given more weight to *Netcom*'s diction and less to its underlying rationale.  In *Arista Records LLC v. Myxer, Inc.* (*Myxer*), No. CV 08-03935 GAF (JCx), 2011 WL 11660773 (C.D. Cal. April 1, 2011) (Fees, J), for example, the court declined to follow *Netcom* because "copyright infringement is a strict liability offense" and "the so-called volitional conduct requirement" is in conflict with strict liability.  *Id.* at *14; *see also Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1011 n.7 (Walter, J) (same, citing *Myxer*).  Admittedly, the *Netcom* court's passing use[11] of the term "volition" is somewhat confusing, as that term can potentially suggest a level of intent or willfulness that has no place in a claim for copyright infringement.  But as the logic of that case, and the subsequent cases applying it, make clear, the so-called "volition" element of direct infringement is not a judicially-created element of intent or knowledge; it is a basic requirement of causation.  As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement "with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Costar Group, Inc. v. Loopnet, Inc.* 373 F.3d at 550 ("to establish *direct* liability under [the Copyright Act and the DMCA], something more must be shown than mere ownership of a machine used by others to make illegal copies").[12]

### B.   The Undisputed Evidence Shows Defendants Did Not Directly Infringe on Perfect 10's Copyrights

#### 1.   Giganews

---

[10]Although *Netcom* was decided prior to the enactment of the DMCA, including the safe harbor provision for service providers found in that statute (17 U.S.C. §512(c)), the Fourth Circuit in *CoStar* rejected the argument that the DMCA supplanted the need for *Netcom*'s analysis.  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 552-55.  As the Fourth Circuit observed in that case, the DMCA expressly provides that the availability of its safe harbor provisions "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing … or any other defense.  17 U.S.C. §512(*l*).  Moreover, even if the DMCA arguably mitigated the *policy* argument in favor of *Netcom*'s result, it does not affect *Netcom*'s more fundamental point: *direct* infringement requires a showing of *direct* conduct.

[11] Although the word "volition" is oft-quoted by cases citing *Netcom*, it appears only twice in Judge Whyte's lengthy analysis.  In both instances, the term is found immediately next to a reference to causation.

[12] Both *Myxer* and *Warner Bros. Entertainment* also construed the Ninth Circuits silence on this question despite the Second and Fourth Circuit's adoption of it as an implicit rejection of *Netcom*.  *See Myxer*, 2011 WL 11660773 at *14; *Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d at 1011 n.7.  However, the Court agrees with Judge Matz' conclusion in this case that "silence on the so-called 'volitional conduct requirement'" should not be interpreted as disapproval.  (Dkt. No. 97, p. 9.)  Rather, the Ninth Circuit has been clear that it declined to reach the issue.  *See Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1160 n.6 (9th Cir. 2007) (declining to determine "whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works" and citing *CoStar Group*).

Turning to the undisputed evidence before the Court, Defendants have met their burden to establish that Perfect 10 cannot prove causation for direct infringement as a matter of law.   Indeed, on identical facts (then presented as allegations, now with evidence), Judge Matz and Judge Collins already so held.   (Dkt. Nos. 97, 129.)   In dismissing Perfect 10's initial claim for direct infringement, for example, Judge Matz held that, even if true, the fact that Defendants:

- "copy all of the materials on their servers form content uploaded onto USENET";
- "'program their servers' to distribute and download the infringing content";
- "'control which materials are distributed to and copied from other third party servers'";
- store infringing content on their servers;
- make it possible, through their Mimo software, for subscribers to "display the USENET content from the Defendants' servers" or to download it directly; and
- derive their "ability to generate revenue … almost exclusively [from] demand for the pirated works contained in the" various binary-oriented newsgroups

is insufficient to establish direct liability.   (Dkt. No. 97, pp. 3, 6-7, 10-13.)[13]   In so holding, Judge Matz declined to follow the cases Perfect 10 relies upon here to assert the same facts support a finding of direct infringement as a matter of law.   (Dkt. No. 97, pp. 11-13).   Judge Matz noted that the courts in *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124 (S.D.N.Y 2009), *Perfect 10, Inc. v. MegaUpload*, No. CV 11-0191, Doc. 16 at *7 (S.D. Cal. July 26, 2011), *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2009 WL 3364036, *3 (S.D.N.Y. Oct. 16, 2009), and *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F.Supp. 503, 513 (N.D. Ohio 1997) all suffered the same error in adopting *Netcom*'s holding as the courts noted above made in rejecting it.   (Dkt. No. 97, p. 12.)

Specifically, each of those cases read the inaptly-named "volitional" conduct requirement as "focusing on the defendant's awareness or state of mind" (which is immaterial in a strict liability claim for direct infringement) "rather than on *who* actually caused the infringement … ."   (Dkt. No. 97, p. 12 (emphasis in original).; *accord Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F.Supp.2d 1303, 1309 (S.D. Fla. 2011) (declining to follow those cases on identical grounds).)   "'[K]nowledge coupled with inducement' or 'supervision coupled with a financial interest in the illegal copying' gives rise to secondary liability, not direct-infringement liability."   *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F.Supp.2d at 1309 (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at

---

[13] Judge Matz' opinion can also be found at *Perfect 10, Inc. v. Giganews, Inc.*, Dkt. No. CV 11-07098 AHM (SHx), 2013 WL 2109963 (C.D. Cal. March 8, 2013).

549.   Again, a claim for *direct* liability requires evidence that the Defendants *directly* or *actively* caused the infringement.   Perfect 10's continued insistence that Defendants allowed its subscribers to upload, download, and view infringing material is the stuff of indirect or secondary liability, not direct liability.

Four months after Judge Matz rejected each of the arguments Perfect 10 advances in opposition to this motion, Judge Collins reaffirmed that the evidence before the Court does not support a claim for direct infringement as a matter of law.   (Dkt. No. 128.) Faced with the same allegations discussed above and now set forth in the evidence before the Court, Judge Collins again held that such allegations were insufficient as a matter of law to support a finding of direct infringement because such facts fail to support a finding of direct causation.   (*Id.*, at pp. 3-4.)   However, Judge Collins permitted Perfect 10's claim for direct infringement against Giganews to proceed *solely* on the newly alleged theory that Giganews "plac[ed] copies of copyrighted material from various internet locations onto its own servers, and not at the request of customers … ."   (Dkt. No. 128, p. 3.)   Judge Collins expressly rejected each of Perfect 10's other theories of direct liability.   (Dkt. No. 128, at pp. 3-4.)

Although Perfect 10 repeats the arguments Judge Matz and Judge Collins already rejected, the record is devoid of any evidence to support the only theory of direct liability as to Giganews that survived the pleading stage.   In the operative First Amended Complaint, Plaintiff alleged on information and belief that Giganews itself, by way of its employees, had uploaded infringing Perfect 10 images to the Usenet generally or Giganews' servers specifically.   (Dkt. No. 105, ¶¶40-43.)   Though Judge Collins noted this was "not the strongest set of allegations," Judge Collins held that it was at least sufficiently plausible to pass the pleading stage in light of the fact that another website, megaupload.com, had previously been found in criminal proceedings to have uploaded massive quantities of copyrighted materials to its own servers.   (Dkt. No. 128, p. 4; *see also* Dkt. 105, ¶43 (alleging that "it is reasonable to conclude that Giganews … likewise uploads infringing materials as well either to the USENET, or to its own servers.").) After considerable discovery, there is simply no evidence to bear out that unlikely allegation.

Rather than point to any evidence that Giganews' employees or agents themselves uploaded, downloaded, otherwise copied, displayed, or modified any work to which Perfect 10 holds a copyright, Perfect 10 rehashes arguments already considered and rejected.   Namely, Perfect 10 once again argues that Giganews personally violated Perfect 10's copyrights by allowing users to upload content to its servers and by obtaining and sending content to other Usenet servers through the peering process. (Dkt. No. 436, p. 19.)[14]   But the conduct of third party Usenet subscribers does not

---

[14]  Perfect 10 also contends that Giganews directly infringed by refusing to remove every post by individuals identified as repeat infringers.   (Dkt. No. 436, p. 19.)   As discussed in footnote 8, *supra*, Giganews had no obligation to indiscriminately remove

support a claim of direct liability as to Giganews.   The conduct of third parties is relevant, if at all, to a claim of secondary infringement (contributory or vicarious), not direct infringement.   And Perfect 10 fails to articulate any meaningful difference between the evidence before the Court and its allegations that Giganews "program[s] [its] servers to distribute and download infringing conduct" and that Giganews "control[s] which materials are distributed to and copied from other third party servers," which Judge Matz held insufficient as a matter of law to support a claim of direct infringement.   (Dkt. No. 97, pp. 3, 7, 10-11.)   The Court finds none.[15]

Moreover, Perfect 10's contention that Giganews engages in direct infringement by "sell[ing] access to infringing Perfect 10 images to their subscribers in exchange for a monthly fee" was likewise rejected by Judge Matz as a basis for direct infringement. (Dkt. No. 97, pp. 3, 6-7, 13 (noting allegations that Defendants "charge their subscribers a fee" and that "rampant piracy committed by USENET users … [is] a part of [Defendants] business model" but dismissing claim for direct infringement for failure to state a claim").   The analysis of this theory of direct liability has not changed after extensive discovery.   The evidence before the Court merely shows that Giganews offers its subscribers access to servers for a flat monthly fee (which varies depending on the bandwidth and ancillary services a user wishes to purchase).   There is no evidence, however, that Giganews specifically sells access to Perfect 10 copyrighted materials as opposed to access to the entire Usenet (of which Perfect 10 content is a fraction of a fraction), or even to erotic content in general.   In doing so, Giganews is no more directly liable for copyright infringement for selling access to the Usenet than a copy store selling access to its copy machines, which a third party then uses to infringe a copyright. "Although some of the people using the machine may directly infringe copyrights, courts analyze the machine owner's liability under the rubric of contributory infringement, not direct infringement." *Netcom*, 907 F.Supp. at 1369 (analogizing Usenet provider to owner of a copying machine).

### 2.    Livewire

---

every post a repeat infringer ever posted and Perfect 10 may not shift its burden of policing copyright infringement to Giganews in the guise of a claim for direct infringement.   The Court does not address this argument further.

[15] Perfect 10 attempts to cast the fact that Giganews had to affirmatively enter into a peering agreement with other Usenet providers before it could begin peering as evidence that the peering process somehow involves human intervention and is, therefore "volitional" under *Netcom*.   But the evidence before the Court is that those agreements are entirely content neutral. The fact that a human had to intervene to form the content-neutral peering agreement is no more evidence of direct liability than the fact that, at some point in the past, a human had to make the computer server, plug it in, or turn it on.   The undisputed evidence before the court demonstrates that the peering process itself, in which the *content* is actually exchanged and copied is a completely automated process.   "[D]esigning or implementing a system that automatically and uniformly creates temporary copies of all data sent through it" is not a direct cause of infringement.   *Netcom*, 907 F.Supp. at 1369; *accord CoStar, Inc. v. LoopNet, Inc.*, 373 F.3d at 555 ("automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act.").

The evidence of direct infringement as to Livewire is even more sparse. The sum total of evidence before the Court as to Livewire is that Livewire pays Giganews to provide subscribers access to Giganews' Usenet servers and, in turn, charges its subscribers a fee to access those Usenet servers. There is no evidence that Livewire operates any *Usenet* servers of its own, or that any infringing material has ever appeared on any of the *Web* servers Livewire does own and operate. (*See* footnote 4, *supra*) There is simply no evidence that Livewire has any direct role in any act of infringement whatsoever, let alone any act of infringement relating to Perfect 10's copyrighted works.

Perfect 10 attempts to construe Judge Collins' order as holding that such evidence is sufficient to prove direct infringement. If that were so, however, Giganews would be equally liable for direct infringement, a result both Judge Matz' order and Judge Collins' orders preclude. Even if that were not the case, the portion of Judge Collins' order Perfect 10 cites for this proposition does not support their claim. In denying Livewire's motion to dismiss Perfect 10's claim for direct infringement, Judge Collins relied exclusively upon Perfect 10's allegation that Livewire "*sells the infringing material* it receives from Giganews at different prices, depending on usage." (Dkt. No. 128, p. 4 (emphasis added) (quoting) Dkt. No. 105, ¶59.) As discussed above with respect to Giganews, however, after years of extensive discovery,[16] there is no evidence to support this allegation. Rather, the undisputed evidence affirmatively shows Livewire sells access to all the content available on Giganews' servers. There is no evidence that Livewire *sells* any of Perfect 10's copyrighted material.[17] To "sell" is to "transfer (property) by sale." Black's Law Dictionary 632 (2d. Pocket Ed. 2001). There is no evidence, however, that Livewire even had a property interest in any of the content on Giganews' servers that Livewire is capable of selling. There is no evidence, for example, that Livewire is capable of editing, modifying, deleting, or otherwise altering anything on Giganews' servers. The undisputed evidence instead shows that Livewire's sole property interest in Giganews' servers is the right to access the servers, which it then assigns to end-users for a price. But the right to of access to something is entirely distinct from the right to possess or sell the thing itself. An easement to the beach is not the same as owning the beach, and sale of that easement to someone else is not a sale of the beach. The undisputed record shows that Livewire owns the easement, not the

---

[16] Fact and expert discovery in this action are both closed.

[17] To "sell" is to "transfer (property) by sale." Black's Law Dictionary 632 (2d. Pocket Ed. 2001). There is no evidence, however, that Livewire even has a property interest in any of the content on Giganews' servers that it is capable of selling. There is no evidence, for example, that Livewire is capable of editing, modifying, deleting, or otherwise altering anything on Giganews' servers. The undisputed evidence instead shows that Livewire's sole property interest in Giganews' servers is the right to access the servers, which it then assigns to end-users for a price. But the right to possess or sell the thing itself. An easement to the beach is not the same as owning the beach, and sale of that easement to someone else is not a sale of the beach. The undisputed record shows that Livewire owns the easement, not the beach. Perfect 10's essentially argues that sale of the easement is the equivalent of selling a handful of shells found on the beach. It is not.

beach.   Perfect 10 essentially argues that sale of the easement is the equivalent of selling a handful of shells found on the beach.   It is not.

The only thing Livewire sells is content-neutral access to the Usenet, in general,[18] which even Perfect 10 acknowledges has both infringing and non-infringing uses.   *See Reno v. ACLU*, 521 U.S. 844, 851 (1997) (observing that "thousands of such [news]groups" on the Usenet, "each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls."); c*f. Capitol Records, LLC v. ReDigi, Inc.*, 934 F.Supp.2d 640, 657 (S.D.N.Y. 2013) (distinguishing owners of service that was exclusively designed and solely used to copy copyrighted material, who could be held liable for direct infringement, evidenced direct liability, from the owner of a service that "offered a mix of protected and public" content, who could not be held liable for direct infringement).

### 3.      Law of the Case and Reconsideration

In an implicit admission that the facts before the Court are no different than the allegations Judge Matz and Judge Collins previously rejected, Perfect 10 repeatedly urges the Court to depart from Judge Matz' and Judge Collins' prior rulings.   (*See, e.g.,* Dkt. No. 436, pp. 116-17, 25.)[19]   The Court declines to do so.   To begin with, the Court thinks those orders were rightly decided for the reasons discussed above.   More importantly, though, those orders are the law of the case.   "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."   *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988).   Generally, a court may only exercise its discretion to depart from the law of the case where:

---

[18]  Or at least the substantial portion of the Usenet available through Giganews' servers.

[19]  For example, Perfect 10 criticizes Judge Collins holding that Giganews does not directly violate Perfect 10's right of distribution by way of the Mimo application because Judge Collins ruling did not address, and is contrary to the Ninth Circuit's holding in *Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1160 (9th Cir. 2007).   (Dkt. No. 436 at p. 16.)   Judge Collins did not need to independently address *Amazon* because Judge Matz had already done so.   Specifically, Judge Matz held Perfect 10's citation to *Amazon* on this point was inapposite because "there was no question in [*Amazon*] that the defendant had committed a volitional act … ."   (Dkt. No. 97, p. 9.)   Rather, in *Amazon*, the evidence showed that the defendants were not passively allowing users to view images uploaded by third parties, but that the defendants themselves modified the offending image into a smaller "thumbnail" image which the defendants then copied to their own servers for their own use.   *Amazon*, 508 F.3d at 1155.   Notably, it was Judge Matz who originally held the defendants' conduct in *Amazon* (of modifying, copying, and then displaying their own version of the image) constituted direct infringement.   The Ninth Circuit affirmed Judge Matz on this point, noting that it was undisputed in that the defendants in that case directly communicated copies of those modified thumbnail images to end-users.   *Id*. at 1160.   Because the defendant's active involvement in the infringement was undisputed, the Ninth Circuit declined to decide "whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works."   *Id*. at 1160 n.6.   There is no evidence in this case that either Giganews or Livewire ever modified any of Perfect 10's copyrighted images posted by third parties for Giganews' own use.

"1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion."

*United States v. Alexander*, 106 F.3d 874, 876.

As discussed above, however, Judge Matz' and Judge Collins' orders were soundly decided, not clearly erroneous.   Nor has the intervening law changed.   Perfect 10 cites a single case (*Capitol Records, LLC v. ReDIGI, Inc.*, *supra*) that was decided after Judge Matz' order, and no cases decided after Judge Collins expressly adopted Judge Matz' holding.   (See Dkt. No. 128, p. 3 n.1 ("The Court agrees with Judge Matz's scholarly analysis of the 'volitional act' requirement, notably that it is a means of showing a defendant's direct involvement in the infringement, that is, that the defendant directly caused the infringement.   The Court sees no reason to depart from Judge Matz's analysis.")   In any event, *Capitol Records, LLC v. ReDIGI, Inc.* is inapplicable because, in that case, the offending computer software was designed for the *sole* purpose of copying copyrighted material from one computer to another.   *Capitol Records, LLC v. ReDigi, Inc.*, 934 F.Supp.2d at 657.   The district court took great pains to emphasize this unique aspect of that case (*see Id.* (noting "ReDigi's founders built a service where *only* copyrighted work could be sold" and "ReDigi's Media Manager scans a user's computer to build a list of eligible files that consists *solely* of protected music purchased on iTunes) (emphasis in original)), and expressly distinguished its facts from cases where the offending service "offered a mix of protected and public" content.   *Id.* (contrasting the facts in that case, which evidenced direct liability, with the facts in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, *supra*, 536 F.3d 121, which did not).

And, as already noted, the evidence before the Court is identical to the allegations before Judge Matz.   To the extent the evidence differs from the allegations before Judge Collins a few months later, the evidence only defeats Perfect 10's claim that Giganews itself uploaded, downloaded, transferred, copied, or displayed any of Perfect 10's copyrighted content.   Perfect 10 fails to identify any manner in which circumstances have changed or how properly applying the law would result in a "manifest injustice."   Under these circumstances, it would constitute an abuse of discretion to depart Judge Matz' and Judge Collins' prior holdings.   If Perfect 10 believed there was a basis to seek reconsideration of those orders, it was required to do so by way of a separately noticed motion for reconsideration and within a reasonable amount of time.   Fed. R. Civ. Proc. 60(b), (c).   It did not do so.

## IV.   CONCLUSION

A claim for direct copyright liability demands evidence that the defendant had a direct hand in causing the infringement.   The undisputed evidence before the Court, however, demonstrates that Defendants had no direct causal role in the alleged infringement.   Perfect 10's attempt to hold Giganews and Livewire liable for direct infringement conflates the doctrines of direct and indirect liability and ignores Judge Matz' and Judge Collins' express holdings that Perfect 10 could not proceed on a theory of direct liability without something more.   After extensive discovery, there is nothing more.   Both the law of the case and this Court's independent analysis demand the conclusion that Defendants cannot be liable for direct infringement as a matter of law, and the Court **GRANTS** their motion for partial summary judgment on Perfect 10's claim for direct infringement.   (Dkt. No. 357.)   Because Perfect 10's other theories of indirect liability as to Livewire have already been dismissed without leave to amend, this order completely disposes of all of Perfect 10's claims against Livewire.   The Court will separately address Perfect 10's remaining claims for indirect liability as to Giganews in its ruling on the parties' other summary judgment motions.

The Court having granted summary judgment on the issue of direct liability in favor of defendants, Perfect 10's mirror image motion for summary judgment on the question of direct liability (Dkt. No. 453) is **DENIED AS MOOT**.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 17, 2014 at 10:00 a.m. is hereby **VACATED**.

**IT IS SO ORDERED**