UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 11-07098-AB (SHx) | Date: | November 14, 2014 |
|---|---|---|---|

Title: *Perfect 10, Inc. v. Giganews, Inc.*

Present: The Honorable ANDRÉ BIROTTE JR.

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** [In Chambers] Order (1) GRANTING Defendant Giganews, Inc.'s Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 440) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 467)

Pending before this Court are the parties' competing motions for partial summary judgment regarding Defendant Giganews, Inc.'s ("Giganews") liability for indirect copyright infringement. As stated more fully below, there is no evidence that Giganews received a direct financial benefit from third-party infringement of Perfect 10's copyrights to support a claim for vicarious liability. Additionally, the record is devoid of any evidence that Giganews had the necessary knowledge of specific third-party infringement to support a claim for contributory infringement. Accordingly, the Court **GRANTS** Giganews' motion for summary judgment on the issue of indirect liability. (Dkt. No. 440.). Because the Court grants partial summary judgment in favor of Giganews on the issue of indirect infringement, the Court **DENIES** Perfect 10's competing motion for partial summary judgment on the same issue (Dkt. No. 467) as **MOOT**.

## I. BACKGROUND[1]

Much of the evidence before the Court on this motion is identical to evidence submitted in support of and in opposition to the parties' competing motions for partial summary judgment on the issue of direct liability. The Court set out a lengthy summary of that evidence in its separate order granting Defendants' motion for partial summary judgment on the issue of direct liability and denying Perfect 10's competing motion. For the sake of brevity, the Court does not restate that summary here. Rather, the Court incorporates that summary of evidence by reference. The Court discusses the limited additional evidence relevant to these two motions as necessary below.

## II. LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact." *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56). An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson*, 477 U.S. at 251. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ." *Id.*, at 252. To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial. *Id.*, at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden in one of two ways. In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that

---

[1] The Court has read and considered the parties' voluminous evidentiary objections filed along with the briefing. In considering these motions, the Court does not rely on any inadmissible expert testimony that it already excluded in connection with Defendants three *Daubert* motions. (*See* Dkt. Nos. 580, 581, & 582.) To the extent that the Court addresses any disputed evidence in this order, Defendants' objection to that evidence is overruled.

affirmatively disproves an essential element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970). This is sometimes referred to as the "tried-and-true" form of summary judgment. Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial. Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325. This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery. Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact. At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial." *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003). The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment. *Anderson*, 477 U.S. at 249. "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249). The question is not whether the non-moving party is able to muster *any* evidence that would support it claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52 Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations." *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir.2000).

### III. DISCUSSION

Courts "recognize three doctrines of copyright liability" for usurpation of those exclusive rights: "direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). In this action, Perfect 10 pursues all three theories of liability. The Court separately addressed Perfect 10's claim for direct copyright infringement. These motions concern Perfect 10's claims for indirect copyright infringement, namely vicarious and contributory infringement.

#### A. Vicarious Infringement

"[T]he lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn … ." *Sony Corp. of America v. Universal City Studios, Inc.* ("*Sony Corp.*"), 464 U.S. 417, 434 n.17 (1984) (quoting *Sony Corp. of America v.*

*Universal City Studios, Inc.*, 480 F.Supp. 429, 457-58 (C.D. Cal. 1979)). However, "in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities. *Perfect 10, Inc. v. Amazon.com, Inc.* ("*Amazon*"), 508 F.3d 1146, 1175 (9th Cir. 2007). "Whereas contributory infringement is based on tort-law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior*." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n* ("*Visa*"), 494 F.3d 788, 802 (9th Cir. 2007). Because vicarious liability arises out of principles of agency, a claim for vicarious infringement requires evidence of some level of principle-agent relationship. To prevail on a claim for vicarious infringement, then, a plaintiff must prove "that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Visa*, 494 F.3d at 788 (footnote omitted). Both elements are essential to a claim of vicarious infringement, and failure to satisfy either element is fatal to a claim for vicarious infringement. *Id.* at 806 (declining to reach the element of direct financial interest because plaintiff failed to allege defendant had the right or ability to control); *Ellison v. Robertson*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004) (declining to reach the element of the right or ability to control because there was no evidence that defendant received a direct financial benefit from third-party infringement).

### 1. Direct Financial Interest

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d at 1079. "Financial benefit exists where the availability of infringing material acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.* ("*Napster*"), 239 F.3d 1004, 1023 (9th Cir. 2001) (internal quotes omitted). The size of the "draw" relative to a defendant's overall business is immaterial. A defendant receives a "direct financial benefit" from third-party infringement so long as the infringement of third parties acts as a "draw" for customers "regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d at 1079.

Although the scope "draw" need not be substantial, Perfect 10 must still prove a direct causal link between the infringing activities *at issue in this case* and a direct financial benefit to Giganews. This action is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted images; it is not a lawsuit against copyright infringement in general on the Usenet. That is to say, the "direct financial benefit" requirement demands more than evidence that customers were "drawn" to Giganews to obtain access to infringing material in general. Perfect 10 must prove with

competent evidence that at least some of Giganews' customers were "drawn" to Giganews' services, in part, to obtain access to infringing *Perfect 10* material. Despite extensive discovery (which is now closed) the record lacks (and Perfect 10 does not identify) a single piece of evidence to that effect. Even if the scope of causation is expanded to the broader category of erotic images, there is no evidence that any customer was ever "drawn" to Giganews' Usenet offerings to obtain access to erotic images. "There is no evidence that indicates that [Giganews'] customers either subscribed because of the available infringing [Perfect 10] material or canceled subscriptions because it was no longer available. While a causal relationship might exist between [Giganews'] profits from subscriptions and the infringing activity taking place on its USENET servers, [Perfect 10] has not offered enough evidence for a reasonable juror so to conclude." *Ellison v. Robertson*, 357 F.3d at 1079.

Instead, Perfect 10 points to evidence that there is a lot of copyrighted material on the Usenet and concludes that the availability of copyrighted material in general constitutes a draw. If anything, however, Perfect 10's evidence that the Usenet is awash in copyrighted material only supports the conclusion no reasonable juror could find a direct causal connection between infringing Perfect 10 content and Giganews' profits. For example, if as Perfect 10 asserts, "staggering amounts of copyrighted works owned by move producers and television networks are available" on Giganews' servers (Dkt. No. 536, p. 13), what evidence is there that any Giganews subscriber purchased Giganews' services in part *because of* the relatively miniscule number of Perfect 10 images available on Giganews' servers? In short, there is none. But if the universe of infringing material on the Usenet is as broad and diverse as Perfect 10 suggests, any conclusion that subscribers were "drawn" to Giganews' services *as a result of* the availability of Perfect 10 content would be pure speculation. Speculation is not evidence of causation.

Nor is it enough to prove that some Giganews' subscribers accessed or posted infringing material once they had already subscribed to Giganews. There are "cases in which customers value a service that does not 'act as a draw.'" *Ellison v. Robertson*, 357 F.3d at 1079. That a Giganews customer may have posted or accessed copyrighted Perfect 10 material as "an added benefit" to a subscription is insufficient. *Id*. To survive summary judgment on its theory of vicarious infringement, Perfect 10 must have "significant probative evidence" that at least some of Giganews' customers subscribed to Giganews servers at least partially for the purpose of accessing or posting Perfect 10's copyrighted material, or at least copyrighted erotic images. There is no such evidence in the record, and "[t]he record lacks evidence that [Giganews] attracted or retained subscriptions because of the infringement or lost subscriptions because of [Giganews'] eventual obstruction of the infringement. Accordingly, no jury could reasonably conclude that [Giganews] received a direct financial benefit from providing access to the infringing material." *Id*; *accord Religious Technology Center v. Netcom On-Line Communication*

*Services, Inc.* ("*Netcom*"), 907 F.Supp. 1361, 1377 (N.D. Cal. 1995) (granting summary judgment on claim for vicarious infringement in defendant Usenet provider's favor because "[t]here is no evidence that infringement by Erlich, or any other user of Netcom's services, in any way enhances the value of Netcom's services to subscribers or attracts new subscribers."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 724, 748 (S.D.N.Y. 2012) (no evidence of direct financial benefit for purposes of vicarious infringement where there was "no evidence indicating that either [of the defendants] capitalizes specifically because a given image a user selects to print is infringing" and because "Defendants' profits are derived from the service they provide, not a particular infringement."); *see also Perfect 10, Inc. v. CCBill LLC* ("*CCBill*"), 488 F.3d 1102, 1118 (9th Cir. 2007) ("receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity'").[2]

### a. *Arista Records* and *Napster* Do Not Require a Different Conclusion

Perfect 10's contention that *Arista Records LLC v. Usenet.com, Inc.* ("*Arista Records*"), 633 F.Supp.2d 124, 157 (S.D.N.Y. 2009) "compels" the conclusion that Giganews received a direct financial benefit from the availability of copyrighted Perfect 10 materials (Dkt. No. 536, p. 15) misapprehends the holding in that case. It is true that, in *Arista Records*, the district court granted summary judgment in favor of the plaintiff despite the fact that "infringing music account[ed] for less than 1% of the newsgroups available" on the defendants Usenet servers. *Arista Records*, 633 F.Supp.2d at 157. But in *Arista Records*, the magistrate judge had already granted an adverse inference against the defendant that the music groups in question "acted as a draw to entice users to Defendants' service" as a discovery sanction. *Id*. Unlike here, it was undisputed in *Arista Records* that the specific content in question acted as a draw, and the Plaintiff did not need to introduce additional evidence to that effect. There is no similar evidence in this case and there is no significant probative evidence that the copyrighted images at issue in this action acted as a draw (as opposed to an added benefit) for a single Giganews subscriber.

Nor is this case akin to *Napster*, (see Dkt. No. 536, p. 15) in which the evidence showed the defendant's service was almost exclusively designed to "download and upload copyrighted music." *Napster*, 239 F.3d at 1013-14. If, for example, Giganews offered content-based subscriptions for users to specifically access erotic images, it may be the case that a juror could reasonably infer that the availability of Perfect 10 images were a "draw" to customers seeking access to erotic images to the extent those images

---

[2] Perfect 10 also suggests in a footnote that Giganews received a direct financial benefit from the presence of Perfect 10 images because Perfect 10 has paid subscription fees to Giganews to access Giganews' servers for the purposes of this lawsuit. (Dkt. 536, p. 16 n.3.) The notion that a litigant can create its own "direct financial benefit" to fabricate a claim for vicarious infringement out of thin air is as specious as it sounds. The Court does not address this argument further.

filled out a more complete "catalogue" of erotic images. The evidence here, however, shows that Giganews sells content-neutral subscriptions that permit users to access a variety of content that is limited only by the imaginations of its users. After years of discovery, there is simply no evidence in the record that the availability of the copyrighted works at issue in this action (or even the availability of erotic images more generally) ever influenced a single subscriber's binary decision to subscribe or not subscribe.

    b.  **Prior Orders in this Action Do Not Require a Different Conclusion**

  Perfect 10 also argues that Judge Matz and Judge Collins "have already ruled that the monthly fee charged by Giganews to its users to access allegedly infringing material constituted a direct financial benefit." (Dkt. No. 536, p. 14 (citing Dkt. No. 97, p. 18 and Dkt. No. 129, p. 6.) Neither Judge Matz nor Judge Collins so held. In his order on Defendants' first motion to dismiss, Judge Matz emphasized the importance of the procedural posture of the in holding that Perfect 10 had adequately *alleged* a claim for vicarious infringement. (Dtk. No. 97, pp. 16-18.) Indeed, Judge Matz distinguished the motion to dismiss from *Ellison v. Robertson*, *supra*, and *Netcom*, *supra*, both of which involved summary judgment after an ample opportunity for discovery. (Dkt. No. 97, pp. 17-18.) In fact, Judge Matz correctly observed that the operative question is whether there is a "causal relationship" between Perfect 10's infringing content and Giganews' subscription revenues. (Dkt. No. 97, p. 17.) Judge Collins adopted Judge Matz' analysis and found that the same allegations were sufficient to advance the action past the pleadings stage. However, after full discovery, the evidence does not bear out Perfect 10's allegations that the availability of its copyrighted content is a draw for Giganews' customers, and summary judgment in Giganews' favor is consistent with Judge Matz' and Judge Collins' liberal assessment of the sufficiency of the pleadings.

    2.  **Right or Ability to Control**

  Because there is no evidence in the record that Giganews obtained a direct financial benefit from the availability of Perfect 10's copyrighted images at issue in this action, the Court need not address whether Giganews had the right and ability to supervise or control its users' allegedly infringing activity. *Ellison v. Robertson*, 357 F.3d at 1079 n.10.

    B.  **Contributory Infringement**

  Perfect 10's third and final claim of copyright infringement against Giganews is for contributory copyright infringement. "[O]ne contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Visa*, 494 F.3d at 795. As to the second element, in the

context of cyberspace "a computer system operator can be held contributory liable" under a "material contribution" theory of contributory infringement "if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Amazon*, 508 F.3d at 1172 (internal quotes and citations omitted).

The alternative "inducement" theory for the second element of contributory liability has four prongs: "(1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Columbia Pictures Indus., Inc. v. Fung*, ("*Fung*") 710 F.3d 1020, 1032 (9th Cir. 2013). Giganews contends that the inducement theory of contributory liability is the *only* theory of contributory liability in light of *Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913 (2005) rather than an alternative to the "material contribution" theory of contributory liability. However, the Ninth Circuit has repeatedly held that the two tests are alternative. See *Fung*, 710 F.3d at 1029 n.11; *Amazon*, 508 F.3d at 1171; *Visa*, 494 F.3d at 795-96.[3]

Although the "material contribution" and "inducement" tests vary in a number of ways, they both reflect the Supreme Court's holding in *Grokster* that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Grokster*, 545 U.S. at 930. Under either theory, "*Grokster* tells us that contribution to infringement must be intentional for liability to arise." *Amazon*, 508 F.3d at 1170. "'[M]ere knowledge of infringing potential or of actual infringing uses' does not subject a product distributor or service provider to liability." *Fung*, 710 F.3d at 1038 (quoting *Grokster*, 545 U.S. at 937. "[P]roper proof of the defendant's intent that its product or service be used to infringe copyrights is paramount." *Fung*, 710 F.3d at 1038. However, that element of intention includes the "common law principles … that intent may be imputed" to include the "natural and probable consequences of [one's] conduct." *Id*. at 1170-71. In the context of inducement theory, intent is captured in the requirement that the defendant distribute the device or product with the "object of promoting its use to infringe a copyright… ." *Fung*, 710 F.3d at 1032. For "material inducement" the intent manifested in the dual requirements that the service provider (1) had "actual knowledge that specific infringing material is available using its system" (*Visa*, 494 F.3d 788 (internal quotes omitted); but (2) "failed to take reasonable and feasible steps to refrain from providing access to infringing images." (*Amazon*, 508 F.3d at 1177.) Under the latter test, intent is merely imputed from the defendant's failure to take "reasonable and feasible steps" in the face of specific knowledge.

---

[3] Indeed, the "material contribution" theory of contributory liability appears to be consistent with the Supreme Court's formulation that one may be liable for contributory infringement by *either* "inducing *or* encouraging direct infringement." *Grokster*, 545 U.S. at 930 (emphasis added). The Ninth Circuit's "material contribution" theory of liability appears to be a restatement of the "encouraging" theory of liability articulated by the Supreme Court in *Grokster*.

### 1. There Is No Evidence that Perfect 10 Had Knowledge of Specific Infringement

Still, irrespective of the two variations on the second element for contributory liability, the first element of any claim for contributory liability is the same in every case: "knowledge of another's infringement." *Visa*, 494 F.3d at 788. Where, as here, the service has "substantial lawful as well as unlawful uses" contributory liability (under either theory) "requires more than a generalized knowledge … of the possibility of infringement" before courts will impute the necessary intent to violate specific copyrights. *Luvdarts, LLC v. AT&T Mobility, LLC*, ("*Luvdarts*") 710 F.3d 1068, 1072 (9th Cir. 2013) (quoting *Grokster*, 545 U.S. at 932-33). So long as the system is "capable of substantial noninfringing uses" (*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984) "contributory liability [does] not automatically follow" just because the "system allows for the exchange of copyrighted material … ." *Luvdarts*, 710 F.3d at 1072 (quoting *Napster*, 239 F.3d at 1021). The Usenet system to which Giganews provides its subscribers access is capable (and is used) for substantial noninfringing purposes. *See Reno v. ACLU*, 521 U.S. 844, 851 (1997) (observing that "thousands of such [news]groups" on the Usenet, "each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls.")

Under either test, then, Plaintiff must prove that Giganews had "actual knowledge of specific acts of infringement" to hold Giganews "liable for contributory copyright infringement." *Napster*, 239 F.3d at 1021; *accord Luvdarts*, 710 F.3d at 1072. With the exception of items brought to Giganews' attention through Perfect 10's DMCA takedown notices (discussed below), there is no evidence that Giganews ever had actual knowledge of any specific Perfect 10 images on its servers. Instead, Perfect 10 first argues that Giganews had "constructive knowledge" of the alleged infringement by virtue of the vast amounts of infringing material found on Giganews' servers. (Dkt. No. 536, p. 17.) To begin with, Perfect 10 does not submit any competent evidence to suggest that infringement of other forms of media is rampant on Giganews' servers. (See Dkt. Nos. 580-583 excluding Perfect 10's expert testimony to that effect as lacking foundation). Equally as important, however, is that "general awareness that infringement may be occurring" is usually irrelevant to the specific question of whether a particular defendant violated a particular copyright held by a particular plaintiff. *Viacom Int'l. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012), cited with approval in *UMG Recordings, Inc. v. Shelter Capital Partners LLC* ("*UMG Recordings*"), 718 F.3d 1006, 1023 (9th Cir. 2013). This is because "merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement … ." *UMG Recordings*, 718 F.3d at 1022; *see also Napster*, 239 F.3d at 1020-21 (declining to "impute the requisite level of knowledge to Napster merely

because peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights")

Perfect 10 also contends that Giganews had constructive knowledge that every post submitted under the same email address used in an identified infringing message or using same "image identifier" was infringing. (Dkt. No. 536, pp. 19-20.) But as the Court notes in its separate order on direct infringement (at page 3), the basic structure of Usenet posting makes it impossible to tell if two messages with the same "sender" email address are actually from the same person or whether two posts with the same "image identifier" actually contain the same image. The only information truly unique to a post is the Message-ID. Perfect 10 confuses "constructive knowledge" about the relationship between two arbitrary (and frequently false) email addresses or image identifiers with the duty to investigate whether a second post actually infringed. However the law "impose[s] no such investigative duties on service providers." *CCBill*, 488 F.3d at 1114. "We do not place the burden of determining whether [materials] are actually illegal on a service provider." *UMG Recordings*, 718 F.3d at 1023. The Court reiterates Judge Collins holding that Congress has expressly disclaimed a service provider's duty to "disable or delete all messages a repeat infringer has ever posted" as opposed to disabling the users account and removing specifically identified messages. (Dkt. No. 180, p. 9.) Such a result would run the serious risk of stifling free speech by taking down noninfringing content and fly in the face of the Digital Millennium Copyright Act ("DMCA"), which "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *CCBill*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("declin[ing] to shift [that] substantial burden from the copyright owner to the provider").[4]

### a. Knowledge Pursuant to Perfect 10's DMCA Takedown Notices

Perfect 10 also argues that Giganews obtained actual knowledge of the allegedly infringing content on its servers by way of Perfect 10's various DMCA notices. There is no dispute that a proper takedown notice under the DMCA would confer Giganews with actual knowledge of the specific acts of infringement identified in the notice. *See Luvdarts*, 710 F.3d at 1072-73; *see also Napster*, 239 F.3d at 1021 ("for the operator to have sufficient knowledge, the copyright holder must 'provide the necessary documentation to show there is likely infringement.'") (quoting *Netcom*, 907 F.Supp. at 1374). However, takedown notices that do not substantially comply with the

---

[4] Perfect 10 also briefly cites the standard for "willful blindness," which, when applicable, can substitute for actual knowledge. (Dkt. No. 536, p. 20.) However, as discussed more fully below, the evidence demonstrates that Giganews "promptly removed infringing material when it became aware of specific instances of infringement" and the evidence does not support a claim of willful blindness. *UMG Recordings*, 718 F.3d at 1023.

requirements set forth in the DMCA "shall not be considered … in determining whether a a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."[5]   17 U.S.C. §512(c)(3)(B)(i).

As Judge Collins already observed, however, Perfect 10's practice of sending Giganews screenshots of a newsreader window along with instructions "to conduct searches of specific names within certain newsgroups" and instructing Giganews "that all of the messages yielded by those searches on a certain date contained infringing material" (Dkt. No. 180, p. 13)[6] fails to substantially comply with the requirements for a DMCA takedown notice.  In order to comply with the DMCA (and therefore confer actual knowledge on the recipient), a takedown notice must identify "the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, **and information reasonably sufficient to permit the service provider to locate the material**."   17 U.S.C. §512(c)(3)(A)(iii) (emphasis added).  "The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously." *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d 110, 115 (S.D.N.Y. 2013) (internal citations omitted).

Perfect 10's takedown notices, which "point[] to a list of search results, not to any material in particular," (Dkt. No. 180, p. 15) obstruct this goal. As Judge Collins observed, "the material accessible through the Usenet is in a constant state of flux. As such, there is no certainty that any particular search will yield the exact same results at different times. Searches moments apart could yield different results."  (*Id.*)   But even if the results of such searches were consistent, Perfect 10's search-screenshot takedown notices "requires a Usenet provider to compare its search results to Plaintiff's search results in an onerous side-by-side, line-by-line manner" (Dkt. No. 180, p. 16) defeating the service provider's ability to "find and address the allegedly infringing material expeditiously."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d at 115.  This is particularly true where, as here, Perfect 10's voluminous takedown notices would require a manual, line-by-line comparison of countless individual search results for each notice. And even Perfect 10's evidence revealed that their own search-criteria method "yielded some messages that were non-infringing."  (Dkt. No. 180, p. 16.)   These aspects of Perfect 10's takedown notices are particularly problematic because a takedown notice under the DMCA must also include "a statement that the complaining party has a good

---

[5] The Court's discussion of Perfect 10's DMCA takedown notices here must be distinguished from an analysis of whether Giganews would qualify for the safe harbor provisions under that statute.   There are a number of elements a defendant must satisfy to qualify for the safe harbor provisions set forth in that statute.   17 U.S.C. §512(a)-(d), (i).   Here, the Court addresses the narrower question of whether there is any evidence that Giganews had actual knowledge of the specific acts of alleged infringement at issue in this case.   Because *compliant* DMCA takedown notices are one method of obtaining such knowledge, the Court must address those notices to adjudicate the instant motion.

[6] Judge Collins order is also published at *Perfect 10, Inc. v. Giganews, Inc.*, 993 F.Supp.2d 1192 (C.D. Cal. 2014).

faith belief that the use of the material in the manner complaint of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. §512(c)(3)(A)(v). But in the absence of any assurance that Giganews' search results would yield results consistent with Perfect 10's search, or that Perfect 10's search results were limited to infringing material, it would be impossible to make that necessary representation in good faith.

As this Court already held in its order on direct liability, the evidence before the Court is undisputed that the only method for consistently identifying a specific Usenet message that Giganews could promptly remove is the post's Message-ID. While some of Perfect 10's takedown notices have included the relevant Message-ID (undisputedly conferring knowledge on Giganews), the evidence shows that Giganews promptly disabled access to the offending messages. (Dkt. No. 442, ¶39.) Perfect 10 concedes that Giganews generally blocks access to messages when Perfect 10 provides a Message-ID. (Dkt. No. 558, ¶45; Dkt. No. 537, ¶45.) However, Perfect 10 attempts to create a disputed issue of fact on this point by identifying 542 messages (out of the thousands for which it provided Message-IDs) that Giganews has not removed. (Dkt. No. 558, ¶45; Dkt. No. 537, ¶45.) But as Giganews' evidence makes clear, Perfect 10 submitted those Message-ID's by faxing screen printouts with the Message-ID in small text. (Dkt. No. 546-7.) That is, Giganews received a copy of a reproduction of already small text, which is illegible. (*Id.*) Perfect 10 admits that "[w]hen Perfect 10 sent Giganews a notice of claimed infringement containing faxed screenshots displaying illegible Message-IDs, Giganews sent Perfect 10 a letter asking it to provide the Message-ID in a legible form." (Dkt. No. 441, ¶ 47; Dkt. No. 537, ¶47.) However, Perfect 10 refused to provide the original digital files it admits it had on file. (Dkt. No. 442, ¶38; *compare* Dkt. No. 546-7 (versions of takedown notices Giganews received via fax) *with* Dkt. No. 508-3, Exh. 31 (versions of takedown notices Perfect 10 has on in digital format). Not only did Perfect 10 submit illegible Message-IDs for the 542 messages it claims Giganews refused to take down, but when Giganews asked Perfect 10 to resubmit the Message-IDs in a legible format so that Giganews could block access to the infringing messages (as Giganews had done with thousands of other messages in response to Perfect 10's takedown notices) Perfect 10 refused to do what was well within its power.

Even more puzzling, Perfect 10 also admits that it is aware of and capable of using an infinitely simpler method of presenting Giganews with readily identifiable Message-IDs for use in a proper takedown notice. Perfect 10 admits it "is aware of and has used software that allows it to extract thousands of Message-IDs for messages it believes to be infringing in about ten seconds." (Dkt. No. 441, ¶ 46; Dkt. No. 537, ¶46.) This feature has been built into the Mimo software Perfect 10 uses for its screenshots since at least April 2011. (Dkt. No. 325-11, pp. 3-4 (release notes for update to Mimo software). In fact, Perfect 10's CEO, Norma Zada recently declared under oath that, using the Message-ID extraction feature, he was able to extract the Message-IDs for 19 pages

of search results. (Dkt. No. 325, ¶18.) Using that same method, Zada estimated it would take less than 15 minutes to extract the Message-ID's for "more than 90% of the infringing Perfect 10 content that Perfect 10 is aware of on Defendant's servers." (*Id*.) And in deposition, Zada testified it is "actually very easy for Perfect 10 to collect message IDs to put into a DMCA notice" and that Perfect 10 has now extracted Message IDs for "approximately 54,000 Perfect 10 messages," but Perfect 10 refuses to submit a DMCA takedown notice using that information. (Dkt. No. 443-2, pp. 104:18-23, 132:1-6, 181:9-11    Had Perfect 10 performed its own "investigative duties" (*CCBill*, 488 F.3d at 1114), extracted the Message-IDs, and submitted those Message-IDs to Perfect 10 in a machine-readable format, there would be little left to discuss in this case. The evidence shows that when copyright holders submit takedown notices to Giganews with specific Message-IDs in machine readable format, even large-scale requests are processed, usually within 48-hours. (Dkt. No. 442, ¶¶32-36.) Perfect 10's own evidence makes clear that Giganews immediately processes takedown notices containing such machine-readable Message-IDs through an automated process. (Dkt. No. 539-1, p. 40:21-25.) Indeed, pursuant to such requests, Giganews blocked access to more than a half-a-billion individual messages between November 6, 2012 and November 6, 2013. (*Id*., at ¶32.)

But Perfect 10 did not take that simple step to protect its copyrights. Instead, it sent Giganews hundreds of inadequate screenshot-search takedown notices that largely failed to provide Giganews with "information reasonably sufficient to permit the service provider to locate the [allegedly infringing] material." 17 U.S.C. §512(c)(3)(A)(iii). Such "deficient notifications shall not be considered in determining whether [Giganews] ha[d] actual or constructive knowledge." *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d at 115 (citing 17 U.S.C. §512(c)(3)(B)(i)).

In short, there is no evidence that Giganews had any knowledge, actual or constructive, of any specific infringing content other than those messages for which Perfect 10 provided legible Message IDs. As to those messages, the evidence is undisputed that Giganews promptly blocked access to the infringing messages. And while Perfect 10 is aware of a simple method of providing the Message-IDs for more than 90% of all the content it believes is infringing on Giganews' servers, it refuses to utilize that method while simultaneously faulting Giganews for declining to do so. Perfect 10 criticizes Giganews for "foisting upon the copyright holder" the burden of identifying the specific infringing content with a Message-ID. (Dkt. No. 443-2, p. 313:2-3). But it is the law, not Giganews, that "place[s] the burden of … identifying the potentially infringing material and adequately documenting infringement … *squarely on the owners of the copyright*." *CCBill*, 488 F.3d at 1113 (emphasis added). The Court "decline[s] to shift [that] substantial burden from the copyright owner to the provider." *Id*.

### 2. Material Contribution or Inducement

Because, after full discovery, there is no evidence that Giganews had any actual knowledge of any specific infringing materials that it did not immediately block access to, Perfect 10 cannot establish the first element of a claim for contributory infringement as a matter of law. *Visa*, 494 F.3d at 788. Accordingly, the Court need not address the second element of a claim for contributory infringement under either the "material contribution" or "inducement" theory.

## IV. CONCLUSION

After extensive discovery, there is no "significant probative evidence" in the record tending to show that Giganews either: (a) received a direct financial benefit from the presence of Perfect 10 copyrighted material on its servers; or (b) had actual (or even constructive) knowledge that specific infringing Perfect 10 material was available on its servers. Absent the former evidence, Perfect 10's claim for vicarious infringement fails as a matter of law. And without the latter form of evidence, Perfect 10 cannot succeed on its claim for contributory liability under either the "material contribution" theory or the "inducement" theory. Accordingly, the Court **GRANTS** Giganews' motion for summary judgment on Perfect 10's remaining claims for vicarious and contributory copyright infringement. (Dkt. No. 440.)

The Court having granted summary judgment on the issue of indirect liability in favor of defendants, Perfect 10's mirror image motion for summary judgment on the question of direct liability (Dkt. No. 467) is **DENIED AS MOOT**.

By this order, each of the three theories copyright liability Perfect 10 alleged against Defendants Giganews and Livewire in its sole cause of action for copyright infringement have been adjudicated in Defendants favor (either by summary judgment or a motion to dismiss), completely resolving the action. Accordingly, Defendants are ordered to submit a Proposed Judgment, for the Court's review, by no later than, Friday, November 21, 2014.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 17, 2014 at 10:00 a.m. is hereby **VACATED**.

**IT IS SO ORDERED**