Eric J. Benink, Esq., SBN 187434
eric@kkbs-law.com
KRAUSE KALFAYAN BENINK & SLAVENS, LLP
550 West C Street, Suite 530
San Diego, CA 92101
P 619.232.0331 | F 619.232.4019

Lynell D. Davis, Esq., SBN 271152
lynell@perfect10.com
Natalie Locke, Esq., SBN 261363
natalie@perfect10.com
PERFECT 10, INC.
11803 Norfield Court
Los Angeles, CA 90077
P 310.476.0794 | F 310.476.8138

Attorneys for Plaintiff and Counter-defendant
Perfect 10, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC., a California corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>GIGANEWS, INC., a Texas corporation; LIVEWIRE SERVICES, INC., a Nevada corporation; and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No.: 11 CV 7098-AB (SHx)<br>***Before Honorable André Birotte, Jr.***<br><br>**DECLARATION OF JOHN D. O'CONNOR IN OPPOSITION TO DEFENDANTS' MOTION FOR AWARD OF ATTORNEY'S FEES AND EXPENSES**<br><br>Date:   February 2, 2015<br>Time:   10:00 a.m.<br>Ctrm:   790 (Roybal) |
| GIGANEWS, INC., a Texas corporation; LIVEWIRE SERVICES, INC., a Nevada corporation; and DOES 1 through 100, inclusive,<br><br>        Counter-claimants,<br><br>    v.<br><br>PERFECT 10, INC., a California corporation,<br><br>        Counter-defendant. | |

# I.    QUALIFICATIONS AND BACKGROUND

I, John D. O'Connor hereby declare and state as follows:

1.    I am an attorney and licensed to practice law in all courts in the State of California, and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of myself and several associates that specializes in commercial litigation. I have forty-two years of significant trial experience, including current jury trial experience. In addition to my litigation practice, I have been retained as an attorneys' fee expert on approximately fifty occasions, and served as a consulting expert on many more occasions.

2.    I was retained by Perfect 10, Inc. on December 31, 2014 to provide expert opinions regarding the reasonableness of the fees and costs sought by Defendants in the above-captioned matter. My associate and I have spent approximately 40 hours reviewing and analyzing Defendants' motion (and all supporting documents) and drafting this declaration.

3.    The following is a brief summary of my background and qualifications.

4.    I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

5.    After being admitted to the California bar, I held numerous positions at private law firms where my practice focused on trial litigation. In 1972 and 1973 I was an associate with the trial firm of Belli, Ashe and Choulos, where I assisted Mr. Melvin Belli in the trial of several large cases, and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In

that capacity, I tried white-collar criminal cases as well as a variety of civil matters.  In 1980 and 1981 I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger and Harrison.

6.     From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government.  From late 2001 through July 2006, I was employed with the San Francisco firm of Howard Rice as a Special Counsel and Director, practicing within the litigation department. At Howard Rice, litigation work consisted of business litigation, tobacco defense litigation on behalf of R.J. Reynolds Tobacco Company, intellectual property litigation, and a variety of commercial cases.

7.     Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates.  My practice continues to focus on complex business litigation, including an active trial practice.  In my career I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country.

8.     In 1982 I began managing the Tarkington office and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community, and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report.  I as well regularly reviewed more widely published legal periodicals.

9.     As written billing guidelines became in vogue for institutional clients in the mid-eighties, I participated heavily in working with our institutional clients in government, insurance and other large businesses to establish and implement practical billing standards.  I regularly consulted with these clients about their

perception of the positive and negative in our billings, and where appropriate, remedied the same.

10.     I have kept abreast of the billing rates in Northern and Southern California, and generally throughout the country since 1982.   Because we represented clientele in different business and governmental sectors, it was important to me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

11.     Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups.

12.     At Howard Rice, we kept informed about both premium rates in the area and rates charged by the wider sector of, more market-driven business firms, so that we could in turn appropriately set ours on an annual basis.  Because we did work throughout California, our surveys involved both Northern California and Southern California, as well as national firm rates.  It has been my experience that the rate structure of the San Francisco Bay Area is virtually identical to that in the greater Los Angeles area.

13.     In 2005-2006, I served as a JAMS arbitrator on an asbestos fee dispute involving over $2 million in billings.

14.     I have been retained on over 50 occasions to provide written and/or oral opinions.  For example, in 2010, I was an attorneys' fees expert retained by class counsel in *Duran v. U.S. Bank*, an employment class action case tried before Honorable Robert J. Freedman, Alameda County Superior Court, in which class counsel was awarded $18.8 million dollars.  Judge Freedman based certain findings favorable to class counsel on "persuasive expert testimony expressed by John D. O'Connor."

15.     I recently testified in a trial in San Francisco Superior Court, *J.R. Marketing, L.L.C. v. Hartford Casualty Ins. Co.*, Case No.: CGC-06-449220, and was accepted as a qualified expert by Judge Lynn O'Malley Taylor.  In that case I testified regarding $12,000,000 in legal fee billings allegedly payable by an insurer for defense work by a national law firm. I also recently testified by Declaration in U.S. District Court for the Northern District of California in *Moore v. Verizon*, Case No.: 09-1823 SBA (JSC), a nationwide class action, in which I was retained by the Munger Tolles firm on behalf of Defendant Verizon; and *U.S. v. Nosal*, Case No.: 3:08-CR-00237-EMC, in a criminal restitution matter in which the victim Korn Ferry sought recovery of legal fees of O'Melveny and Myers expended to remedy stolen trade secrets.

16.     I have experience in the field of intellectual property litigation, involving issues of copyright and patent infringement, as well as trade secret and unfair competition litigation.

17.     At the Brobeck firm, I was the lawyer assigned as lead counsel defending a patent infringement action and defended several trade secret and unfair competition claims.

18.     At the Tarkington firm I defended several copyright cases, and served as local co-counsel on several patent cases.

19.     At Howard Rice, I worked extensively with my partner highly-reputed intellectual property litigator Annette Hurst on several high exposure intellectual property cases.

20.     At O'Connor and Associates, I served as co-counsel defending a patent infringement action through to jury verdict in District Court in Seattle.  I have also served as local co-counsel on several District Court patent and copyright cases and have pursued trade secret actions in state court.

21.     I have also represented and advised intellectual property lawyers regarding law firm partnership/employment issues and intellectual property client

in its disputes with a law firm, and a national law firm in a fee dispute over intellectual property litigation fees.

22.    I have previously performed legal fee analysis in several intellectual property matters.

23.    I believe I have sufficient familiarity with intellectual property litigation such that I understand both the markets for services therein and the nature of litigation in the field.

## II.    INTRODUCTION

24.    I understand that this case involved copyright infringement claims brought by Perfect 10 against Defendants, who operate websites that offer Usenet content. One of the issues litigated was whether Perfect 10's notices of copyright infringement provided to Defendants were sufficient to provide Defendants with knowledge of infringing activity on the Usenet servers that they operate.  I have carefully reviewed the time records attached to Andrew Bridges' declaration. Based on that review, I have an understanding of the scope of the litigation and the type of activities each side undertook.

25.    Defendants seek fees of approximately $6.1 million and costs of $436,000.  The undersigned assumes for purposes of providing the opinions set forth herein only that Defendants are entitled to reasonable fees and costs for the work that its attorneys performed in defending this litigation.  I understand from Plaintiff's counsel that Plaintiff is vigorously opposing this claim, which is beyond the scope of my assignment.

## III.    SUMMARY OF OPINIONS

26.    This litigation cannot be classified as either extremely simple or of great complexity.  The claims presented in this litigation by Plaintiff could have been well and successfully defended by any of those reputable firms who have lawyers experienced in intellectual property litigation, with competence recognized as such by the legal community.

27.     The rates sought by Defendants reflect the very highest of premium rates, or "super premium" rates, charged in any legal community.  While these rates may be appropriately charged in certain "niche" areas of legal practice, including certain types of "bet the company" intellectual property ("IP"), these rates are not reasonable in any sector of the legal market that can provide these same services at far more reasonable rates.  The services required to defend this case, in my opinion, could have been provided by a very large number of firms at far more reasonable rates.  Indeed, Defendant could have easily found highly competent defense counsel who would have charged approximately fifty percent of the rates charged in this case.

28.     As discussed in more detail below, the "lodestar" before deductions for inefficiencies is approximately $4.0 million, as based upon the 2014-2015 *Laffey* matrix maintained by the Department of Justice of the United States. I opine that the lodestar should be reduced significantly for excessive hours charged.  In my opinion, at least fifty percent of the hours charged here are unreasonable and excessive, as supported both by hours billed by Plaintiff's counsel, my review of the number of hours associated with specific activities, and by surveys presented by Defendants.

29.     If all hours billed are accepted as being reasonably charged, then a reasonable billing rate, using that of established firms in metropolitan areas, multiplied by all the hours claimed would total $3,739,748.35.  However, because of excessive hours charged, this lodestar should be reduced by fifty percent, such that the net reasonable fees are approximately $1,850,000.00.

30.     Further, Defendants seek an award of costs totaling $436,634.97. Most of these claimed costs are charges for "in house" services, including data extractions, computerized research, "share room" and data hosting services.  All of these charges involve a high portion of "soft" costs intended to recoup not only "out of pocket" costs incurred by the law firm, but also recoupment of its internal

personnel costs and overhead expense.  In my view, these costs, whether or not the client here has knowingly agreed to pay them, are not costs reasonably transferred to opposing party in a fee-shifting case.  Although, per **Exhibit A**, only about $125,000 are clearly "hard" out of pocket costs, we have approximately and roughly allowed $250,000 of these costs as appropriately charged costs. See also Poblete Decl.  Exh. 6.

## IV.   <u>DISCUSSION</u>

31.    When I first read the total fees requested for this case, I was taken aback by the amount of fees requested in view of the nature of the litigation.  In my experience, a rough rule of thumb in the intellectual property legal community is that a patent or copyright infringement case litigated with some seriousness will cost $2 million to $3 million to take same through trial, whether as a plaintiff or a defendant.  Obviously, this range will be lower for more straightforward and simple cases and will be exceeded in cases involving unusually complex and contentious legal and factual issues.

32.    The statistics offered by Defendant bear out this observation.  In the Bay Area (there was insufficient data for Los Angeles) the total median fees for a case with an exposure of $1 million to $25 million is approximately $1.25 million in fees and $2 million in total fees and costs. The average (mean) fees and total fees and costs were $1,967,000 and $2,842,000 respectively.  However, average fees can be skewed by a single large case like the *Mattel* case cited by Defendants.  Accordingly, the rule of thumb which I state here is borne out by the statistics offered by Defendant in this case.

33.    Another check on the total fees and costs that would be reasonable to be charged in this case is the total hours billed by the opposing counsel.  There is usually not an exactitude to be expected in this comparison.  Often one party has different burdens from those of the other.  But generally, in most cases, there is some approximate correlation and parity, within a ten to twenty percent range,

regarding hours charged as between a single plaintiff and single defendant. Here, however, the total hours charged by each side is starkly different. For attorney hours only, Defendants seek recovery for 9,389 hours, while Plaintiff's attorneys spent 3,912 hours. In spite of these disparate totals of hours, the burden upon each party was not starkly disparate, and cannot justify the extreme difference in hours charged.

34. Both parties seemed to have had similar discovery burdens, even though Perfect 10 produced many more documents (1.462 gigabytes of documents as opposed to 47 gigabytes produced by Defendants). Zada Decl. ¶¶13-14. To be sure, it may well be that because Defendant was the moving party on various motions to compel more frequently than was the Plaintiff, there may be some increased burden upon Defendant in this regard. But, each discovery issue requires a full opposition by the responding party and thus the difference in burden should not exceed the normal ten to twenty percent difference between a plaintiff and defendant actively litigating a case.

35. Otherwise, the burdens were quite similar on each side. Both sides briefed summary judgment papers, as both moving and responding parties, and both briefed the same legal issues, presenting factual declarations on, again, the same issues. Yet, even after the deductions made, Defendants are still claiming 2.4 times more attorneys hours than Plaintiff's counsel. Poblete Decl. ¶¶3-4, Exh. 1.

36. We understand that the scope of recoverable damages was unclear. While Perfect 10's president issued an expert report suggesting that an appropriate award if Plaintiff prevailed through trial would be $15 million (which was stricken by the Court), Defendants contended that all of the copyrighted images at issue constituted a single work, and thus, the maximum exposure was only $150,000. We also understand from our interview of Plaintiff's counsel, Eric Benink, that Plaintiff would have been satisfied with a settlement of $2-3 million. It would

appear that a "cost of defense" settlement midway through this litigation would have been in the $1-2 million range. Accordingly, we would value the realistic exposure in this case as being in the low seven figures, and for statistical purposes would assess this case as having a potential value of between $1 million and $25 million. In short, this is not a large, complex or seminal copyright case, nor was there realistic "bet the company" exposure.

37.     The issues here were not of unusual complexity, the factual issues were not overly complicated and/or complex, and the number of witnesses to be examined was not unusually large. Furthermore, in my view, with the vast amount of experience Mr. Bridges has in the field and with his long experience with Perfect 10 in other litigation, he would certainly have known these expectations, as he has been involved in several settlements with Perfect 10, including in the cases against Microsoft and iWeb, both of who were represented by Mr. Bridges.

38.     Accordingly, the amount of time here billed by defense counsel is clearly unreasonable. A sophisticated Defendant would reasonably budget for defense of this case somewhere between $1 million and $2 million through the close of discovery. A total overall budget, inclusive of all costs, through trial, one would expect to be somewhere between $2 million and $3 million.

39.     Consistent with this reasonable budget, the amount of litigation activity undertaken in this case was typical. There was a Motion to Transfer Venue; two Rule 12(b)(6) Motions to Dismiss; defense of a Motion for Preliminary Injunction; cross-motions for Partial Summary Judgment; three Daubert motions, and various discovery motions, including a number of motions to compel. There were around 20 or so days of depositions. The approximately 3,912 attorney hours spent by Plaintiff is an amount that would be reasonably budgeted and expected by both a reasonably sophisticated Plaintiff and a reasonably sophisticated Defendant in a case of this nature.

40.     As to each of the activities in this case, the Defense simply spent far more time than was reasonably needed for the task, indeed more than twice the time reasonably necessary.

41.     For example, in a series of motions to compel, the amount of time billed by Mr. Gregorian at $670 an hour as an associate, over a four and a half month period, from January 14 through June 2, 2014, constituted 191.7 hours, just for the activity of drafting several "Joint Stipulations" regarding discovery. One Joint Stipulation took 75.5 hours of Mr. Gregorian's time. Attached hereto as **Exhibit B** is a true and correct copy of some of Mr. Gregorian's billing entries relating to the drafting of joint stipulations.

42.     In addition, I have reviewed examples of hours the Defense expended on tasks that I understand were calculated by Melanie Poblete, a paralegal. These amounts are incredibly high. See Poblete Decl. Exh. 2.

43.     One example of the excessiveness of the hours charged by defense counsel in this case can be seen in the activities of the Winston and Strawn firm under the guidance of Mr. Bridges prior to the Court approval of the commencement of discovery. In the Winston and Strawn phase of this litigation, the Plaintiff made a Motion to Transfer Venue and a Motion to Dismiss. Incredibly, in this period of defined and limited activity, Defendant spent 578 hours for a total of $285,445 in charges. See Poblete Decl. Exh. 2. My independent calculation led to a similarly shocking estimate of 580 hours. See **Exhibit C**, attached hereto.

44.     Another example in the Winston and Strawn phase of litigation were the hours dedicated to the preparation of a Motion for Preliminary Injunction. The defense attorneys working on this portion of the litigation billed 577.5 hours, an amount well over what would be customary, for a total cost of $282,522.50. See Poblete Decl. Exh. 2. My independent calculation led to a similarly shocking estimate of 570 hours. See **Exhibit C**, attached hereto.

45.     Similarly, the billing of discrete issues at Fenwick & West appears to be just as egregious and excessive as that of Winston and Strawn. For example, the Fenwick attorneys dedicated 371.7 hours on objections concerning the partial motions for summary judgment, amounting to $219,304.50 in charges. Likewise, Defendants spent no less than 650 hours on expert issues, for a total of $399,671.50 in charges. See Poblete Decl. Exh. 2.

46.     In short, this case was litigated as if it were "bet the company" litigation.  In fact, defense counsel knew, or certainly should have known, as Mr. Bridges so vehemently expresses in his Declaration, that this was merely an attempt by a copyright holder to protect, either appropriately or excessively, rightly or wrongly, its copyrights.  There appears to have been no budgetary constraints placed upon defense counsel, and certainly no budgetary discipline exercised by defense counsel.

47.     Plaintiff's counsel logged 3,912 attorneys hours as compared with 9,389 hours logged by defense attorneys, in addition to paralegals and support staff, who logged an additional 1,742.7 hours.  Poblete Decl. Exh. 1; see also **Exhibit H**, attached hereto.  In other words, the defense counsel here spent 240% more hours than did Plaintiff's counsel pursuing essentially the same issues. There is no way that this extreme and gross disparity can be reasonably justified, especially in view of the experience of Mr. Bridges in litigating with Plaintiff.  If anything, Mr. Bridges' experience should have been an asset, which allowed an unusually efficient defense.  In any case, I would cut as unreasonable hours billed by defense counsel by fifty percent across the board, and as well fifty percent of the paralegal and support staff hours.  This would still compensate the defense for 4,694 attorney hours, in comparison to the 3,912 hours of Plaintiff's counsel, or the 120% more hours than logged by Plaintiff's counsel.

48.     Similarly, the hourly rates here charged are far above reasonable.  I do not doubt the qualifications of Mr. Bridges or the reputations of Winston and

Strawn and Fenwick and West.  But the fact that a firm is deemed pre-eminent in a particular field does not mean that its rates in a particular case are reasonable, if the market rates for the particular type of case and particular services required therein are far lower.

49.     At the very top of the legal market are firms like Winston and Strawn, which are nationally known, and charge what I would term not only "premium" rates, but "super premium" rates, that is, rates at the high end of the premium portion of the market.  Fenwick and West is not as well known nationally as Winston and Strawn, nor has it been established as long, but Fenwick and West is well known in the California legal market, more so in the Bay Area, particularly in Silicon Valley, than it is known in Southern California.

50.     As competent as these firms generally are in this premium sector, their rates are reasonable only in cases in which there is a discernable need for the particular enhanced perceived value that the firms bring to the client.  Trial skills, for example, of attorneys at the firms of Keker and Van Nest and Bois Schiller can reasonably justify such fees in a case of sufficient exposure; hedge fund expertise of certain lawyers at Arnold and Porter; bond expertise of certain lawyers at Orrick; and other similar niche skills all can reasonably justify premium fees. Certain claims of patent infringement in particular specialized areas may be aided by the expertise of lawyers with knowledge in the particular field in a particular firm can also justify premium rates, especially truly high exposure cases.  Also, there are some litigation matters so complex, large and burdensome in scope that they need large numbers of qualified lawyers, perhaps nationwide or worldwide in scope, that can only provided by a firm with a minimum of 500 to 1,000 lawyers. And there may be a firm or individual lawyer so experienced in a niche field that high rates are justified by the efficiency that the lawyer brings to bear on the particular case.

51.     Because this case, as I understand it, was largely a relatively standard DMCA case dealing with whether certain DMCA notices substantially satisfied the DMCA notification requirements, premium rates are not justified in this case and certainly not reasonably passed on, in a "fee-shifting" case, to an opposing party who had no choice of counsel. There appear to have been otherwise no factors here present which would justify these premium rates charged by Mr. Bridges, his partners, his associates, and support staff and Defendants have not set forth any reasons for the need in this case to pay these "super" premium rates.

52.     There are a large number of firms throughout the country who litigate copyright and other intellectual property cases with top partner rates between $400 and $600 per hour, with the vast majority in California presently charging top partner rates from $450 an hour to $600 an hour, in what I would call the standard metropolitan intellectual property litigation sector in California.  A junior partner would charge lower rates.

53.     It is as well clear that there are a number of firms, especially smaller firms and spin-offs from larger firms, which are happy to charge partner rates of between $300 and $395 per hour.  I recently was co-counsel in a patent case with an excellent and experienced partner in a Washington, D.C. intellectual property firm, Jeffrey Weiss who charges in this range.

54.     An example of an excellent nationwide firm charging the more standard metropolitan rates, that is a rate of between $475 per hour to $600 per hour for senior partners, is the Novak Druce firm, highly regarded and featuring offices throughout the country.

55.     Perfect 10 cited in its opposition brief a number of intellectual property cases in which rates in the $250-$400 range have been awarded by the Central District.  In my opinion, Defendants clearly could have hired competent counsel at these rates, that is, with senior partner rates between $300 to $395 per hour.  In determining which of the above three rate sectors is appropriate in this

case, I have used the middle section, that is, rates of non-premium firms that charge standard rates in metropolitan areas, and have done so without applying discounts, which these firms would often accept.  However, I hasten to add that the lower range of reasonable partner rates, that is, between $300 to $395 per hour for a senior lawyer, is also a reasonable range of rates.

56.     In determining the rates should be charged here, rather than set a rate for each year of the litigation, I will use, for sake of simplicity, the 2014-2015 standard rates for metropolitan intellectual property firms, applying standard rates approved by various federal courts under established case law.  Specifically, I will use the *Laffey* matrix as maintained by the United States Department of Justice. This index uses the rates approved by the Court in *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354, 371 (D.D.C. 1983) as adjusted for inflation of the economy, roughly equivalent to the Consumer Price Index. From 2011 through 2014-2015, for instance, the top rates applicable to Mr. Bridges would range from approximately $510 in 2011 to $532 in 2014-15.  The 2014-2015 fee schedule is that which I use here, which would yield higher rates than would a set of rates using *Laffey* indexes for 2011 through 2014.  I do so, because Courts applying the *Laffey* matrix usually apply the *Laffey* rate for the particular year of award. Attached hereto as **Exhibit D** is a copy of the 2014-2015 *Laffey* matrix.

57.     It is customary in California to adjust the *Laffey* rates to reflect the cost of living.  In *In re HPL Technologies, Inc.* 366 F. Supp. 2d 912, 921-22 and fn. 1 (N.D. Cal. 2005), the United States District Court for the Northern District of California applied the Laffey Matrix, increasing the lodestar rate to adjust for the higher cost of living in the area where the services were rendered. Attached hereto is a true and correct copy of the *In re HPL Technologies* decision as **Exhibit E**.

58.     According to *In re HPL*, the *Laffey* matrix, which is an official source of attorney rates based in the Washington, D.C. area, can be adjusted to the Los Angeles Area by using the Locality Pay Tables prepared by the U.S. Office of

Personnel Management. Attached hereto as **Exhibit F** are true and correct copies of the Locality Pay Tables for the District of Columbia and Los Angeles areas, respectively.

59.     The District of Columbia area has a +24.22 percent locality pay differential, and the Los Angeles Area has a +27.16 percent locality pay differential over the General Schedule Base rate for the year of 2014. Applying the *In Re HPL* formula provides for a 2.4% upward rate over the Washington, D.C. area. Attached hereto as **Exhibit G** is a copy of the Locality Pay Adjustment to the 2014-2015 *Laffey* matrix, according to the *In re HPL* formula.

60.     Adjusting the attorney rates in the *Laffey* Matrix for the Los Angeles Area by the +2.4 percent increase over the Locality Pay for the District of Columbia results in 2014-2015 hourly rates of $532.48 (for attorneys with 20+ years experience), $471.04 (11-19 years experience), $378.88 (8-10 years experience), $307.20 (4-7 years experience), $261.12 (1-3 years experience), and $153.60 (as applied to paralegals and law clerks).

61.     Thus, after applying the formula derived from *In re HPL* to the 2014-2015 *Laffey* matrix, the total fees, including all hours charged by defense counsel (as calculated by Melanie Poblete in Exhibit 1 of her declaration) would amount to approximately $3,739,748 per **Exhibit H** which provides the *Laffey* rates for 11,032 hours charged by attorneys, paralegals, and support staff at the Winston and Strawn and Fenwick and West firms.

62.     As a check on the use of the *Laffey* matrix, I have compared these rates to the amounts actually reported as having been billed in the surveys to which defense counsel makes reference in its moving papers.  In the AIPLA Report of the Economic Capitalist survey of 2013 attached as Exhibit 7 to the Declaration of Melanie Poblete for the year 2012, the average partner hourly rate in Los Angeles was $557 and the average associate hourly rate in Los Angeles was $389. These rates are quite consistent with the *Laffey* matrix.

63.     These annual billing amounts also reflect the great availability of competent intellectual property counsel throughout the country, capable of litigating such matters in California and Los Angeles in particular.

64.     I believe that the requested costs of $436,000 should be reduced approximately to $250,000.  Much of the billed costs constitute recoupment of "soft" costs of the law firm, which often comprise half or more of the costs billed to clients.

65.     Oftentimes, a law firm's accounting attempts to recoup more than the true out of pocket costs, and seeks to cover certain firm personnel and overhead. For instance, a law firm will usually pay a certain amount for annual computerized research services from a research provider like Westlaw and Lexis, but in assessing charges to clients will usually recapture not just the charges to the research firm, but will also recoup overall costs significantly more than that charged to the research provider, including costs for, say, IT personnel, library personnel, and general overhead expenses.  Similar methodologies are often applied in premium firms to copying and other charges.  Usually these larger firm charges are considerably more costly than the charges levied by smaller firms or more market-driven metropolitan firms.  In other words, in effect, cost recoupment also may involve "premium" charges that are in excess of that normally charged in the market.  I have accordingly estimated that a more market-sensitive cost total would approximate about $250,000, as opposed to the approximate $436,000 charged by defense counsel here.  This amount is necessarily rough and approximate, but is nonetheless a closer approximation of actual costs than those levied and sought here by defense counsel.

66.     In sum, my opinion is that a reasonable fee and reasonable cost total approximately $2.1 million, including $1,850,000 in fees and $250,000.00 in costs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of January 2015 in San Francisco, California.

_____
JOHN D. O'CONNOR

Declaration of John D. O'Connor in Opposition to Defendants' Motion for Attorneys' Fees

# Exhibit A

| Fenwick – Expenses Analysis |
|:---:|

| | |
|:---|:---:|
| **Total Requested Expenses:** | **$436,634.97** |
| **Ambiguous or Non-Out of Pocket Costs:** | **$312,817.35** |

| Cost | Date | Amount |
|:---:|:---:|:---:|
| **"Litigation Support – Data Extraction and Processing"** | Jan-2014 | $46,925.55 |
| | Feb-2014 | $9,355.65 |
| | Mar-2014 | $11,664.15 |
| | May-2014 | $37,896.45 |
| | Jun-2014 | $10,289.85 |
| | Jul-2014 | $28,755.15 |
| | | **$144,886.80** |

| | | |
|:---:|:---:|:---:|
| **"Litigation Support – Monthly Data Hosting"** | Jan-2014 | $3,128.37 |
| | Feb-2014 | $3,752.08 |
| | Mar-2014 | $4,529.69 |
| | Apr-2014 | $4,529.69 |
| | May-2014 | $7,056.12 |
| | Jun-2014 | $7,742.11 |
| | Jul-2014 | $9,659.12 |
| | Aug-2014 | $9,659.12 |
| | Sep-2014 | $9,659.12 |
| | Oct-2014 | $9,659.12 |
| | Oct-2014 | $9,659.12 |
| | | **$79,033.66** |

| | | |
|:---:|:---:|:---:|
| **"ShareRoom"** | May-2013 | $500.00 |
| | Jun-2013 | $500.00 |
| | Jul-2013 | $500.00 |
| | Aug-2013 | $500.00 |
| | Sep-2013 | $500.00 |
| | Oct-2013 | $600.00 |
| | Nov-2013 | $600.00 |
| | Dec-2013 | $700.00 |
| | Jan-2014 | $700.00 |
| | Feb-2014 | $700.00 |
| | Mar-2014 | $700.00 |
| | Apr-2014 | $800.00 |
| | May-2014 | $800.00 |
| | Jun-2014 | $900.00 |
| | Jul-2014 | $500.00 |
| | Jul-2014 | $900.00 |
| | Aug-2014 | $500.00 |
| | Aug-2014 | $1,000.00 |
| | Sep-2014 | $500.00 |
| | Sep-2014 | $1,000.00 |

|  | Oct-2014 | $500.00 |
|---|---|---|
|  | Oct-2014 | $1,100.00 |
|  | Nov-2014 | $500.00 |
|  |  | **$15,500.00** |

| | May-2012 | $932 |
|---|---|---|
|  | Mar-2013 | $673.50 |
|  | May-2013 | $2,211.50 |
|  | Aug-2013 | $1,421 |
|  | Oct-2013 | $1,184 |
|  | Nov-2013 | $1,999 |
|  | Dec-2013 | $495 |
|  | Jan-2014 | $198 |
|  | Jan-2014 | $2,082 |
|  | Feb-2014 | $972 |
|  | Mar-2014 | $2,398 |
|  | Mar-2014 | $3,163 |
|  | Apr-2014 | $1,073.20 |
| **Westlaw / Lexis Legal Research** | Apr-2014 | $3,340 |
|  | May-2014 | $523 |
|  | May-2014 | $1,022 |
|  | Jun-2014 | $800 |
|  | Jun-2014 | $396 |
|  | Jul-2014 | $246 |
|  | Jul-2014 | $1,563 |
|  | Aug-2014 | $2,639 |
|  | Aug-2014 | $932 |
|  | Sep-2014 | $2,286 |
|  | Sep-2014 | $6,226 |
|  | Oct-2014 | $6,951 |
|  | Oct-2014 | $3,486 |
|  | Nov-2014 | $3,910 |
|  | Nov-2014 | $1,840 |
|  |  | **$54,962** |

| | Feb-2014 | $11.04 |
|---|---|---|
| **"Litigation Support - Production Deliveries"** | Mar-2014 | $14,595.30 |
|  | Apr-2014 | $299.58 |
|  | Jun-2014 | $1,033.77 |
|  |  | **$15,939.69** |

| **Lexis Legal Svs Printing** | Mar 2012 - Nov 2014 | **$2,495** |
|---|---|---|

|  | **Total:** | **$312,817** |
|---|---|---|

# Exhibit B

| Drafting / Revising Joint Stipulations - Examples of Time Spent by Todd Gregorian (Fenwick) | | |
|---|---|---|

| | Hours | Amount |
|---|---|---|
| Examples of Time Dedicated to Drafting Joint Stipulations: | 126.5 | $86,546.00 |

| Date | Entry | Hours | Amount |
|---|---|---|---|
| | **Joint Stipulation #1** | | |
| 1/14/14 | Draft joint stipulation regarding motion to compel production of documents. | 4.1 | $2,829.00 |
| 1/15/14 | Draft and revise joint stipulation regarding motion to compel production of documents, and supporting papers. | 5.7 | $3,933.00 |
| 1/16/14 | Revise joint stipulation regarding motion to compel production of documents. | 2.1 | $1,449.00 |
| 1/23/14 | Revise joint stipulation re motion to compel and supporting documents; prepare and serve on opposing counsel. | 4.1 | $2,829.00 |
| 1/31/04 | Prepare and exchange joint stipulation on motion to compel and supporting documents; attention to filing same. | 3.2 | $2,208.00 |
| 2/3/14 | Review Perfect 10 portion of joint stipulation; draft and revise supplemental memorandum; phone call to A. Bridges re same. | 2.6 | $1,742.00 |
| 2/6/14 | Draft and revise supplement to joint stipulation on motion to compel. | 2.2 | $1,474.00 |
| 2/10/14 | Revise reply in support of joint stipulation on motion to compel; prepare to file and serve same. | 3.1 | $2,077.00 |
| 3/6/14 | Draft and revise supplemental joint stipulation regarding Request for Production Nos. 1 and 2. | 5 | $3,350.00 |
| | | 32.1 | $21,891.00 |

| Date | Entry | Hours | Amount |
|---|---|---|---|
| | **Joint Stipulation #2 – Second MTC** | | |
| 3/10/14 | Draft joint stipulation on second motion to compel. | 5 | $3,350.00 |
| 3/12/14 | Draft and revise joint stipulation on motion to compel. | 2.1 | $1,407.00 |
| 3/13/14 | Draft and revise joint stipulation on second motion to compel; confer with junior associate re same. | 6.3 | $4,221.00 |
| 3/14/13 | Draft and revise joint stipulation on second motion to compel. | 2.1 | $1,407.00 |
| 3/15/14 | Draft and revise joint stipulation on second motion to compel. | 6.2 | $4,154.00 |
| 3/16/14 | Review and revise motion for reconsideration and supporting documents; draft and revise joint stipulation. | 1.5 | $2,412.00 |
| 3/17/14 | Review magistrate's discovery order; email with K. Lu re review; draft and revise joint stipulation on second motion to compel. | 2.9 | $1,943.00 |
| 3/18/14 | Draft and revise joint stipulation on second motion to compel. | 6.1 | $4,087.00 |
| 3/19/14 | Draft and revise joint stipulation on second motion to compel and supporting documents; confer with team re same. Confer with K. Lu regarding upcoming depositions. | 9.1 | $6,097.00 |
| 3/20/14 | Draft and revise joint stipulation on second motion to compel and supporting documents; confer with team re same. Confer with K. Lu regarding. | 8.2 | $5,494.00 |
| 3/21/14 | Revise joint stipulation re second motion to compel and supporting documents; attention to filing motion for reconsideration; draft proposed order re same. | 2.6 | $1,742.00 |
| 3/23/14 | Draft and revise declaration in support of second joint stipulation on motion to compel. | 4.6 | $3,082.00 |
| 3/26/14 | Draft and revise joint stipulation on motion to compel. | 8.8 | $5,896.00 |
| 3/28/14 | Revise and finalize joint stipulation on motion to compel; serve same. Draft and revise meet and confer correspondence regarding second set of interrogatories. | 5.5 | $3,685.00 |

| | | | |
|---|---|---|---|
| 4/4/14 | Draft correspondence to opposing counsel regarding recent written discovery responses; attention to finalizing joint stipulation on second motion to compel. | 3.2 | $2,144.00 |
| 4/5/14 | Review and revise documents for joint stipulation filing. | 1.3 | $871.00 |
| | | 75.5 | $51,992.00 |

| | | | |
|---|---|---|---|
| | **Joint Stipulation re Motion to Compel Further Responses to Interrogatories** | | |
| 5/24/14 | Draft and revise joint stipulation on motion to compel fulrther interrogatory responses. | 2 | $1,340.00 |
| 5/27/14 | Draft and revise joint stipulation re motion to compel further interrogatory responses;  draft emails to opposing counsel re document inspection. | 9 | $6,030.00 |
| 5/28/14 | Draft and revise joint stipulation re motion to compel further responses to interrogatories. | 1.9 | $1,273.00 |
| 5/30/14 | Revise joint stipulation on motion to compel responses to interrogatories and supporting documents; prepare same for service. | 3.4 | $2,278.00 |
| 6/9/14 | Revise and prepare joint stipulation for filing. | 2.6 | $1,742.00 |
| | | 18.9 | $12,663.00 |
| | **Grand Totals** | **126.5** | **$86,546.00** |

# Exhibit C

| Winston & Strawn's Approximate Hours on Specific Tasks | | |
|---|---|---|
| Task | Date | Hours |
| Motion to Dismiss State Claims & Motion to Transfer Venue; Replies to Perfect 10's opposition to Defendants' Motion to Dismiss & Motion to Transfer Venue | May - June 2011 | 580 |
| Defendants' Opposition to Perfect 10's Motion for Preliminary Injunction | July - August 2011 | 570 |
| Defendants' Motion to Strike Perfect 10's Reply in Support of the Motion for Preliminary Injunction | September 2011 | 98 |

# Exhibit D

# LAFFEY MATRIX – 2014-2015

Years (Rate for June 1 – May 31, based on prior year's CPI-U)

| Experience | 14-15 |
|---|---|
| 20+ years | 520 |
| 11-19 years | 460 |
| 8-10 years | 370 |
| 4-7 years | 300 |
| 1-3 years | 255 |
| Paralegals & Law Clerks | 150 |

*Explanatory Notes:*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act). The matrix does **not** apply to cases in which the hourly rate is limited by statute. *See* 28 U.S.C. § 2412(d).

2.  This matrix is based on the hourly rates allowed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The various "brackets" in the column headed "Experience" refer to the years following the attorney's graduation from law school, and are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). Thus, the "1-3 years" bracket is generally applicable to attorneys in their first, second, and third years after graduation from law school, and the "4-7 years" bracket generally becomes applicable on the third anniversary of the attorney's graduation (*i.e.*, at the beginning of the fourth year following law school). *See Laffey*, 572 F. Supp. at 371; *but cf. EPIC v. Dep't of Homeland Sec.*, No. 11-2261, ___ F. Supp. 2d ___, 2013 WL 6047561, *6 -*7 (D.D.C. Nov. 15, 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp.2d 56, 60-61 (D.D.C. 2013) (same).

3.  The hourly rates approved in *Laffey* were for work done principally in 1981-82. The matrix begins with those rates. *See Laffey*, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4.  Use of an updated Laffey Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of

prevailing market rates for litigation counsel in the Washington, D.C. area. *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996).  Most lower federal courts in the District of Columbia have relied on the United States Attorney's Office Matrix, rather than the so-called "Updated Laffey Matrix," as the "benchmark for reasonable fees" in this jurisdiction. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *see, e.g., Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 40-49 (D.D.C. 2011); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 150 (D.D.C. 2007).  *But see Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 14-15 (D.D.C. 2000).  The United States Attorney's Office does not use the "Updated Laffey Matrix" to determine whether fee awards under fee shifting statutes are reasonable.

# Exhibit E

⚠️ Caution

As of: January 12, 2015 2:28 PM EST

# *In re HPL Techs., Inc., Secs. Litig.*

United States District Court for the Northern District of California

April 22, 2005, Decided

No C-02-3510 VRW

**Reporter**

366 F. Supp. 2d 912; 2005 U.S. Dist. LEXIS 7244; 61 Fed. R. Serv. 3d (Callaghan) 693; Fed. Sec. L. Rep.
(CCH) P93,238

In Re HPL TECHNOLOGIES, INC, SECURITIES LITIGATION

**Prior History:** *Casden v. HPL Techs., Inc., 2003 U.S. Dist. LEXIS 19606 (N.D. Cal., Sept. 29, 2003)*

## Case Summary

**Procedural Posture**

Plaintiff and defendants had entered into a settlement agreement in a class action brought pursuant to
*15 U.S.C.S. § 78u-4* of the Private Securities Litigation Reform Act of 1995. Plaintiff's lead counsel
filed a motion for an award of attorney's fees and expenses, to be paid out of a common fund of $ 17
million and 7 million shares of stock--the combined settlement consideration from all defendants.

**Overview**

Lead plaintiff's counsel sought an award of 15 percent of the common fund or $ 2.76 million. The court
found that deference to lead plaintiff's agreement to a 15 percent fee was unwarranted because the fee
negotiations did not reflect the market value of lawyer services. Rather, lead plaintiff apparently just
endorsed lead counsel's proposed fee of 15 percent. The court decided to cross-check the requested
amount against a lodestar calculation. The court valued the stock, which had a low and fluctuating
value, as worth $ 0.20 per share--a third to a fifth of its recent market price. The court found that a large
fraction of lead counsel's overall time was spent by a senior attorney in settlement discussions and
preparation. Therefore, use of a blended hourly rate was rejected. The lodestar cross-check entailed
evaluation of the multiplier implied by lead counsel's requested fee ($ 2.76 million) and lead counsel's
lodestar fee (computed as $ 768,091.25). These data implied a multiplier of 3.59, which the court found
too high. The court determined that a reasonable percentage fee would be 11 percent of the common
fund.

**Outcome**

The court granted lead counsel an award of $ 59,434 in expenses, to be paid from the cash portion of
the common fund. Additionally, the court granted lead counsel a fee award of $ 1,870,000 cash plus
770,000 shares of stock, representing 11 percent of the common fund.

366 F. Supp. 2d 912, *912; 2005 U.S. Dist. LEXIS 7244, **7244

## LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN1* Merely comparing percentages of amounts recovered as attorney's fees in class actions overlooks the factors that may make a certain percentage fee reasonable in one case and unreasonable in another. And a theoretical construct as flexible as a benchmark seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case. Moreover, the benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors.

Admiralty & Maritime Law > ... > Salvage > Equitable Salvage > General Overview

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN2* Percentage awards of attorney's fees are not meant to be a windfall for class counsel at the expense of the class. Nor should a lawyer's fee be likened to a case of salvage, where reward is given to the successful finder with little regard to how much or how little effort the finder expended.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN3* There is no defensible normative reason that the amount of an attorney's fee ought to depend on the method used to compute it. Both methods should result in a ″reasonable″ fee, and reasonableness cannot logically depend on whether the fee is expressed as a percentage of the recovery or the product of hours and rates. Hence, when counsel apply for a fee award on a percentage basis, the requested award should approximate the fee counsel would have claimed on a lodestar basis. The two fee computations can be compared by a multiplier that, in the context of lodestar fee awards, is thought to represent a premium on counsel's services reflecting the ex ante risk of taking the case and the superior results achieved in the face of that risk.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN4* A proposed percentage attorney's fee can and should be compared against the fee that lead counsel would have been awarded on a lodestar basis. If the multiplier implied by that comparison is reasonable, then the percentage-based fee request is reasonable as well; if the implied multiplier is unreasonably high, then so is the proposed percentage fee award.

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

366 F. Supp. 2d 912, *912; 2005 U.S. Dist. LEXIS 7244, **7244

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

*HN5* A fairly systematic, although not terribly difficult assessment of the time devoted to a case and the value to be attached to that time is required to enable a lodestar cross-check of a percentage attorney's fee to comply with the Federal Rules' mandate of reasonableness in *Fed. R. Civ. P. 23(h)*.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

*HN6* A superficial fee arrangement of 15 percent of the settlement recovery is apparently permitted under *15 U.S.C.S. § 78u-4* of the Private Securities Litigation Reform Act of 1995 (PSLRA), which with respect to fee arrangements requires only that the lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class. *15 U.S.C.S. § 78u-4(a)(3)(B)(v)*. The PSLRA says nothing about when retention must occur; nor, for that matter, does retaining counsel necessarily involve concluding a fee arrangement.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

*HN7* As a matter of first principles, the earlier a fee arrangement is concluded between lead plaintiff in a class action and lead counsel, the more deference the court should pay to that fee agreement. This is because fee agreements set early in the litigation--ex ante, so to speak--are more likely than ex post fee agreements to be the product of market forces (i.e., competition among counsel proposing to represent the class). Those same market forces are thought to result in reasonable fee agreements between attorneys and clients in individual (i.e., non-class) cases. Under *15 U.S.C.S. § 78u-4* of the Private Securities Litigation Reform Act of 1995 (PSLRA), lead plaintiff provisions are largely built around an ideal of private ordering and client-driven class-action litigation; it is therefore plausible that the PSLRA implicitly counsels deference to fee arrangements concluded early in the litigation. It is inappropriate--indeed, downright unfair to class counsel--to take a fee arrived at by a market-based mechanism (such as by a court-administered auction or by arms' length negotiation between lead

Case 2:11-cv-07098-AB-JPR   Document 650-7   Filed 01/12/15   Page 34 of 58   Page ID
#:35984

Page 4 of 19

366 F. Supp. 2d 912, *912; 2005 U.S. Dist. LEXIS 7244, **7244

plaintiff and lead counsel) and subject it to further review by the court; such a process will often leave class counsel with the worst of both worlds.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Costs & Attorney Fees

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Counsel

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN8** There is no textual indication in *15 U.S.C.S. § 78u-4* of the Private Securities Litigation Reform Act of 1995 (PSLRA) that it supplants *Fed. R. Civ. P. 23(h)*, which obligates the court to evaluate and approve all fee awards in class actions. If anything, certain provisions of the PSLRA affirmatively command the court to remain involved in approving lead counsel and lead counsel's fees, including *15 U.S.C.S. § 78u-4(a)(3)(B)(v)* (requiring that lead plaintiff shall, subject to the approval of the court, select and retain counsel) and *15 U.S.C.S. § 78u-4(a)(6)* (providing that attorney's fees awarded by the court shall not exceed a reasonable percentage of recovery).

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Costs & Attorney Fees

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN9** The retainer agreement of a lead plaintiff in an action brought under *15 U.S.C.S. § 78u-4* of the Private Securities Litigation Reform Act of 1995 (PSLRA), is far from the final word on what counsel will actually get paid, because class counsel must first be appointed, subject to the approval of the court, *15 U.S.C.S. § 78u-4-(a)(3)(B)(v)*, and in the normal case (virtually the universal case) where there is a settlement, the court must approve the actual fees paid, subject to the PSLRA's limitations, pursuant to *15 U.S.C.S. § 78u-4(a)(6)*.

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > Special Proceedings > Class Actions > Compromise & Settlement

366 F. Supp. 2d 912, *912; 2005 U.S. Dist. LEXIS 7244, **7244

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN10* In applying a lodestar cross-check of a requested percentage-based attorney's fee award in a class action, the court must first determine the dollar value of the proposed percentage-based fee award. In the typical case, this is straightforward, because settlement consideration is delivered entirely in the form of cash.

Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN11* A common fund fee award serves to reward counsel for creativity and skill in enlarging a settlement fund beyond what was thought possible or likely at the inception of the case. As such, it is worth recognizing the value of class counsel's efforts at extracting a considerable amount of unconventional settlement consideration from defendants whose cash resources are limited. Treating non-cash settlement consideration as if it were cash can overstate the dollar value of counsel's proposed percentage fee and thus penalize class counsel.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Legal Ethics > Client Relations > Attorney Fees > Excessive Fees

*HN12* Three figures are salient in a lodestar attorney's fee calculation: (1) counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors (including unusual skill or experience of counsel, or the ex ante risk of nonrecovery in the litigation). In performing a lodestar cross-check, however, the multiplier is implied by the ratio of the proposed percentage fee to the computed lodestar fee. For example, for a proposed percentage fee of $ 250,000 and a corresponding lodestar fee of $ 100,000, the implied multiplier is 2.5. This implied multiplier may be assessed for reasonableness. Accordingly, the court need only consider counsel's reasonable hours and counsel's reasonable hourly rate in computing the lodestar.

Civil Procedure > Attorneys > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Criminal Law & Procedure > ... > Counsel > Right to Counsel > General Overview

*HN13* Billing all attorney time at a ″blended″ hourly rate is probably appropriate in most lodestar cross-check computations for three reasons. First, it simplifies calculations. Second, it encourages economically efficient allocation of work within class counsel's firm. Third, it avoids the problem of experience inflation. But the central role of settlement negotiations in a case--and the central role of a senior attorney in those negotiations--suggests that typical blended hourly rates are inappropriate where the bulk of attorney time is devoted to settlement negotiations and the preparation of settlement documents.

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Civil Procedure > ... > Class Actions > Class Attorneys > Fees

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

366 F. Supp. 2d 912, *912; 2005 U.S. Dist. LEXIS 7244, **7244

*HN14* The Class Action Reports multiplier value data are contaminated because the courts making the reported attorney's fee awards have been inconsistent in reporting a base hourly rate.

**Counsel:** [**1] For Marie Casden, individually and on behalf of all others similarly situated, Plaintiff: Ilona Kohn, Abbey Gardy LLP, New York, NY; Robert A. Jigarjian, Robert S. Green, Green Welling LLP, San Francisco, CA; Darren J. Robbins, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Fuller & Thaler Asset Management, Inc., Plaintiff: Joseph M. Barton, Steven O. Sidener, Gold Bennett Cera & Sidener LLP, San Franciscco, CA.

For HPL Technologies Inc., Defendant: Christopher A. Patz, Louis Pugh, Margaret L. Wu, Morrison & Foerster LLP, San Francisco, CA; Laurence Andrew Weiss, Heller, Ehrman, White & McAuliffe LLP, San Francisco, CA; Raymond H. Sheen, Heller Ehrman LLP, San Francisco, CA.

For Y. David Lepejian, Defendant: Michael F. Tubach, O'Melveny & Myers LLP, San Francisco, CA.

For Ita Geva, Defendant: Jacqueline D. Molnar, Latham & Watkins, Menlo Park, CA.

For PricewaterhouseCoopers LLP, Defendant: Erin Elizabeth Schneider, Gibson, Dunn & Crutcher LLP, San Francisco, CA.

For Local 705 Pension Fund, Movant: Patrick J. Coughlin, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA; Willow E. Radcliffe, Lerach Coughlin Stoia Geller Rudman [**2] & Robbins LLP, San Francisco, CA.

For UBS Paine Webber, Inc., 3rd party defendant: Rohit K. Singla, Munger Tolles & Olson, San Francisco, CA.

For Ivelocity, Interested Party: Jeffrey R. Krinsk, Findelstein & Krinsk, San Diego, CA; Andrew L. Barroway, Darren J. Check, Esq., Stuart L. Berman, Schiffrin & Barroway, LLP, Radnor, PA; Evan Jason Smith, Brodsky & Smith LLC, Bala Cynwyd, PA.

**Judges:** VAUGHN R WALKER, United States District Chief Judge.

**Opinion by:** VAUGHN R WALKER

# Opinion

[*913]   ORDER

By an order and judgments filed March 11, 2005 (Doc # # 164-166), the court granted final approval to two settlements and a plan of allocation in this securities fraud class action. In the same order, the court reserved decision on lead plaintiff's [*914] motion for an award of attorneys' fees and expenses to lead counsel. Doc # 164 at 9-12. The award of fees and expenses is to be paid out of a common fund of $ 17 million and 7 million shares of HPL Technologies common stock ("HPL stock") -- the combined settlement consideration from all defendants. Under the proposed fee award, lead counsel

366 F. Supp. 2d 912, *914; 2005 U.S. Dist. LEXIS 7244, **2

would receive an award of 15% of the common fund (taken in both cash and stock), plus lead counsel's reasonable expenses.  [**3]  The requested 15% award translates to $ 2.55 million and 1.05 million shares of HPL stock.

At first glance, such a percentage seems reasonable because fee awards in other cases have captured a larger portion of common fund recoveries (although in still other cases, lower percentage fee awards have been made). Furthermore, the fee here is below what has, in some decisions, been characterized as the 25% "benchmark" for common fund fee awards. See *Paul, Johnson, Alston & Hunt v Graulty, 886 F2d 268, 273 (9th Cir 1989)*.

For the reasons set forth here, the court rejects reliance solely on a comparison of the percentage fee requested here with other percentage awards or with a so-called benchmark percentage. ***HN1*** Merely comparing percentages overlooks the factors that may make a certain percentage fee reasonable in one case and unreasonable in another. And "a theoretical construct as flexible as a benchmark' seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case." *Goldberger v Integrated Resources, Inc, 209 F3d 43, 52 (2d Cir 2000)*. Moreover, the court has been admonished that "the benchmark [**4]  percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v Arizona Citrus Growers, 904 F2d 1301, 1311 (9th Cir 1990)*. So the circumstances that require adjusting the percentage need to be considered.

***HN2*** Percentage awards are not meant to be a windfall for class counsel at the expense of the class. Nor should "[a] lawyer's fee * * * be likened to a case of salvage, where reward is given to the successful finder, * * * with little regard to how much or how little effort the finder expended." *Klein ex rel SICOR, Inc v Salvi, 2004 U.S. Dist. LEXIS 4844, 2004 WL 596109 at *11 (S.D. N.Y. 2004)*. An inspection of the circumstances in this case indicates that the requested fee is "too large in light of the hours devoted" and "other relevant factors." This conclusion -- based on the circumstances and facts of this case -- is bolstered by the court's review of the literature which suggests that percentage-based fees in common fund class actions systematically exceed lodestar-based fees.  [**5]  See, e g, Theodore Eisenberg & Geoffrey P Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J Empirical Legal Stud 27 (2004) (concluding that, controlling for other variables, lodestar-based fees in common fund class actions are about 89% as much as percentage-based fees).

The court can envision ***HN3*** no defensible normative reason in this case -- or indeed in common fund cases generally -- that the *amount* of the fee ought to depend on the *method* used to compute it. Both methods should result in a "reasonable" fee, and reasonableness cannot logically depend on whether the fee is expressed as a percentage of the recovery or the product of hours and rates. Hence, when counsel apply for a fee award on a percentage basis, the requested award should approximate the fee counsel would  [*915]  have claimed on a lodestar basis. The two fee computations can be compared by a multiplier that, in the context of lodestar fee awards, is thought to represent a premium on counsel's services reflecting the *ex ante* risk of taking the case and the superior results achieved in the face of that risk.

Stated another way, ***HN4*** a proposed percentage fee can (and, for the reasons hereafter [**6]  explained, should) be compared against the fee that lead counsel would have been awarded on a lodestar basis.

366 F. Supp. 2d 912, *915; 2005 U.S. Dist. LEXIS 7244, **6

If the multiplier implied by that comparison is reasonable, then the percentage-based fee request is reasonable as well; if the implied multiplier is unreasonably high, then so is the proposed percentage fee award. See, e g, *In re GMC Pick-Up Tuck Fuel Tank Prods Liability Litig, 55 F.3d 768, 820-21 & n40 (3d Cir 1995)* (Becker, J) (describing the lodestar cross-check); *Vizcaino v Microsoft Corp, 290 F3d 1043, 1050-51 (9th Cir 2002)* (approving a district court's use of a lodestar cross-check).

A lodestar cross-check of this type is now in common use in district courts elsewhere in the country. See, e g, *In re Cendant Corp Securities Litigation, 109 F Supp 2d 285, 302 (D NJ 2000)* ("Traditionally, the appropriate' percentage [fee award] is * * * subjected to a cross-check."), vacated and remanded by *In re Cendant Corp Litigation, 264 F3d 201 (3d Cir 2001)*; *In re Bristol-Myers Squibb Securities Litigation, 361 F. Supp. 2d 229, 2005 U.S. Dist. LEXIS 2917, 2005 WL 447189 at *3 (S.D. N.Y. 2005)* (citing *Goldberger, 209 F3d at 50*) ("Typically, [**7] courts utilize the percentage method and then cross-check' the adequacy of the resulting fee by applying the lodestar method."). The *Manual for Complex Litigation (Fourth)* endorses the lodestar cross-check. *Manual for Complex Litigation (Fourth)* § 14.122 (FJC, 2004) ("The lodestar is at least useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate * * *."); id § 21.724. The court heeds these authorities.

To that end, the court requested at the final approval hearing on February 24, 2005, a lodestar computation from lead counsel. Lead counsel complied the very next day. Barton Decl (Doc # 162). Upon review of the Barton declaration, which establishes a base lodestar fee of approximately $ 900,000, the court requested more detailed information about the breakdown of hours and billing rates of the attorneys at lead counsel's firm. Because it was deferring decision on the attorney fee issue, the court also requested further detail about the proposed award of expenses. Lead counsel has satisfied both of the court's requests, Sidener Decl (Doc # 167), and lead plaintiff's motion for an award of attorneys' [**8] fees and expenses (Doc # 142) is now ripe for decision. These inquiries, and class counsel's quick responses, greatly aided the court's consideration of what information is necessary to make a lodestar cross-check work. It is apparent that *HN5* a fairly systematic, although not terribly difficult assessment of the time devoted to a case and the value to be attached to that time is required to enable a lodestar cross-check of a percentage fee to comply with the Federal Rules' mandate of reasonableness. See *FRCP 23(h)*.

I

This case is governed by the *Private Securities Litigation Reform Act of 1995* (PSLRA). Accordingly, the court must first determine what discretion (if any) it has under the PSLRA to depart from an award of fees and expenses that is proposed by a lead plaintiff. There is apparently no Ninth Circuit authority on whether the court retains its usual authority [*916] under *FRCP 23(h)* to fix an award of attorneys fees and expenses in a common fund class action. Lead counsel have not contended that the court lacks its usual authority, apparently assuming that the court possesses such authority. The court [**9] has nevertheless considered the matter.

Here, lead plaintiff did not negotiate a fee arrangement with lead counsel immediately after lead plaintiff was selected. (By "fee arrangement," the court refers to an agreement, such as an individual plaintiff would make with an attorney, that provides for compensation for the attorney's work and an allocation of the out-of-pocket expenses of litigation.) Rather, Frederick Stanske (a Senior Vice

Case 2:11-cv-07098-AB-JPR   Document 650-7   Filed 01/12/15   Page 39 of 58   Page ID #:35989

Page 9 of 19

366 F. Supp. 2d 912, *916; 2005 U.S. Dist. LEXIS 7244, **9

President, Portfolio Manager and board member of lead plaintiff) ″personally approved of [l]ead [c]ounsel's fee request of fifteen percent (15%) of the settlement recovery.″ Stanske Decl (Doc # 128) P 8. Lead plaintiff has not weighed in on the proposed award of expenses, and no further evidence on lead plaintiff's negotiation for or approval of the requested fee is before the court. *HN6* Such a superficial fee arrangement is apparently permitted under the PSLRA, which with respect to fee arrangements requires only that the lead plaintiff ″shall, subject to the approval of the court, select and *retain* counsel to represent the class.″ *15 USC § 78u-4(a)(3)(B)(v)* (emphasis added). The PSLRA says nothing about when retention **[**10]** must occur; nor, for that matter, does ″retain[ing] counsel″ necessarily involve concluding a fee arrangement.

*HN7* As a matter of first principles, the earlier a fee arrangement is concluded between lead plaintiff and lead counsel, the more deference the court should pay to that fee agreement. This is because fee agreements set early in the litigation -- *ex ante*, so to speak -- are more likely than *ex post* fee agreements to be the product of market forces (i e, competition among counsel proposing to represent the class). See, e g, *In re Synthroid Marketing Litigation, 264 F3d 712, 718-19 (7th Cir 2001)* (Easterbrook, J). Those same market forces are thought to result in reasonable fee agreements between attorneys and clients in individual (i e, non-class) cases. The PSLRA's lead plaintiff provisions are largely built around an ideal of private ordering and client-driven class-action litigation; it is therefore plausible that the PSLRA implicitly counsels deference to fee arrangements concluded early in the litigation. There is also Judge Shadur's wise observation that it is inappropriate -- indeed, downright unfair to class counsel -- to take a fee arrived at **[**11]** by a market-based mechanism (such as by a court-administered auction or by arms' length negotiation between lead plaintiff and lead counsel) and subject it to further review by the court; such a process will often leave class counsel with the worst of both worlds. See *In re Comdisco Securities Litigation, 150 F Supp 2d 943, 947-49 (ND Ill 2001)*.

But deference to lead plaintiff is unwarranted here because of the lack of evidence that lead plaintiff and lead counsel negotiated a fee agreement early in this litigation in a way that reflects the market value of lawyer services. Rather, lead plaintiff's involvement seems to have been confined to an endorsement of lead counsel's proposed fee. (Of course, lead counsel's desire to secure that endorsement may have constrained the fee requested here, but the court has no evidence of that before it.)

In any event, even if lead plaintiff had shopped around for lawyer services and concluded a market-based fee arrangement, *HN8* there is no textual indication in the PSLRA that it supplants *FRCP 23(h)*, which obligates the court to evaluate and approve all fee awards in class actions. If anything, **[**12]** certain provisions of the PSLRA **[*917]** affirmatively command the court to remain involved in approving lead counsel and lead counsel's fees. See *15 USC § 78u-4(a)(3)(B)(v)* (requiring that lead plaintiff ″shall, subject to the approval of the court, select and retain counsel″); *15 USC § 78u-4(a)(6)* (″[A]ttorneys' fees * * * awarded by the court * * * shall not exceed a reasonable percentage [of recovery].″). The Ninth Circuit has recognized this in dictum:

   *HN9* [A] lead plaintiff's retainer agreement is far from the final word on what counsel will actually get paid, because class counsel must first be appointed, ″subject to the approval of the court,″ *15 USC § 78u-4(a)(3)(B)(v)*, and in the normal case (virtually the universal case) where there is a settlement, the court must approve the actual fees paid, subject to the [PSLRA's] limitations. See *15 USC § 78u-4(a)(6)*.

Case 2:11-cv-07098-AB-JPR   Document 650-7   Filed 01/12/15   Page 40 of 58   Page ID #:35990

Page 10 of 19

366 F. Supp. 2d 912, *917; 2005 U.S. Dist. LEXIS 7244, **12

*In re Cavanaugh, 306 F3d 726, 733 (9th Cir 2002)*.

Likewise, the Third Circuit's attorney fee opinions arising out of the Cendant Corp securities litigation recognize that even under the PSLRA [**13] courts must still play the central role in making fee awards. In *In re Cendant Corp Litigation, 264 F3d 201, 285 (3d Cir 2001)* (Becker, CJ), the court rejected the district court's use of an auction to select class counsel and remanded for consideration of the presumptively reasonable fee arrangement negotiated by lead plaintiff with lead counsel. Yet the court noted that the fee under the retainer agreement was ″staggering in [its] size,″ and mandated that ″the possibility of rebuttal of the presumption of reasonableness″ attaching to the negotiated fee arrangement ″must be seriously considered * * * on remand.″ Id. Such an evaluation would be made ″according to the standards * * * previous cases have set down for class actions not governed by the PSLRA.″ Id. And the most recent *Cendant* opinion explained:

> [W]hile the PSLRA certainly represents a shift toward the traditional attorney-client relationship, it has not wholly adopted that paradigm. Securities class actions are still class actions, and the court retains the power to award fees. See Fed R Civ P 23(h) (″In an action certified as a class action, the court [**14] may award reasonable attorney fees * * *.″). And courts would be remiss if they abdicated all responsibility to the lead plaintiffs. The lead plaintiff is not the sole client in a PSLRA class action; instead, the lead plaintiff serves as a fiduciary for the entire class. A court must therefore retain oversight over lead plaintiff's compensation decisions in order to ensure that the lead plaintiff has fulfilled its fiduciary duties.

*In re Cendant Corp Securities Litigation, -- F3d --, 404 F.3d 173, 2005 U.S. App. LEXIS 5885, 2005 WL 820592 at *18 (3d Cir)* (Becker, J). The court will attempt to follow this wise guidance.

The court concludes that even if the PSLRA requires deference to lead plaintiff's negotiated fee arrangement with lead counsel, no deference is owed here. Furthermore, even when deference is owed, lead plaintiff's deal with counsel must still square with objectively reasonable fees and expenses.

II

Deference or no deference, the award of expenses in this case poses no problem. Lead counsel's detailed breakdown of the expenses incurred in this case, Sidener Decl (Doc # 167) Ex B, and their quite modest amount make it easy to conclude that counsel's expenses are reasonable. Accordingly, [**15] the court GRANTS lead counsel an award of $ 59,434.57 in expenses, to be paid from the cash portion of the common fund.

[*918] III

Turning to the question of a fee award, the court previously indicated that a fee of 15% of the common fund appears at first impression reasonable. Doc # 164 at 9; Doc # 131 at 13. In its order preliminarily approving an award of fees, the court reflected this impression:

> This is a common fund class action, and counsel seeks * * * 15% of the class's gross recovery, which counsel will take in cash and HPL common stock in proportion to the settlement fund. * * * The court has been impressed with the quality of plaintiff counsel's representation in this matter, and preliminarily finds the requested fees and costs to be reasonable in light of the

366 F. Supp. 2d 912, *918; 2005 U.S. Dist. LEXIS 7244, **15

nature of the case, the risks involved in the litigation, the size of the recovery and the negotiation process that led to the fee agreement.

Moreover, the fee request is on the low end of the fees recovered in comparable cases. The court undertook to analyze the data compiled in Stuart J Logan, Jack Moshman & Beverly C Moore, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep 167 (2003), [**16] which provides data covering cases from the mid-1970s to mid-2002. Specifically, the court looked at securities class action cases in the $ 10 to $ 20 million gross recovery range, the $ 20 to $ 30 million gross recovery range and the combined $ 10 to $ 30 million gross recovery range. For those sets of cases, the range, mean and standard deviation for the percentage of the common fund devoted to attorneys' fees and costs were:

|  | $ 20 to $ 30mm | $ 10 to $ 20mm | $ 10 to $ 30mm |
| --- | --- | --- | --- |
| Range | 7.6% to 70.8% | 7.6% to 55.6% | 7.6% to 70.8% |
| Mean | 27.7% | O29.5% | 29.0% |
| Std Dev | 10.9% | O9.0% | 9.5% |

The attorneys' fees and costs sought here represent, depending on the exact amount of costs and the actual value of the HPL stock, 15.3% to 15.4% of the common fund. This places the request in this case at the low end of the ranges above. In fact, assuming normally distributed fee awards, the attorneys' fees and costs sought here fall no higher than the 13th percentile of fee awards.

Doc # 131 at 13:15-14:20.

Further consideration suggests that the court's initial impression was wrong. Application of the lodestar cross-check makes plain that this first analysis -- which [**17] considered only percentage-based fees and failed to take account of the nature and amount of work put into the case -- is insufficient to ensure a reasonable fee. Relying on percentages without reference to these other factors can be, like blind reliance on benchmarks, an "all too tempting substitute for the searching assessment that should properly be performed." *Goldberger, 209 F3d at 52*. Here, a lodestar cross-check warrants a fee lower than that sought by lead counsel.

*HN10* In applying a lodestar cross-check, the court must first determine the dollar value of the proposed percentage-based fee award. In the typical case, this is straightforward, because settlement consideration is delivered entirely in the form of cash. Here, however, a component of the settlement consideration is in the form of HPL stock. Accordingly, the court must first value the HPL stock in dollar terms.

A

While the HPL stock has a market price (since the settlement, as high as $ 0.93 / share), that price appears something of an illusion for valuation purposes, because the market for HPL stock is highly illiquid and quite volatile. Although the court has been unable to locate volume data, the [**18] stock is traded only on the "pink sheets"; [*919] and in just the week following the issuance of the court's final approval order, the stock traded as low as $ 0.72 / share and as high as $ 0.93 / share. Thus, there is not only considerable uncertainty about the market price of the stock, but also the more fundamental uncertainty that lead counsel could liquidate the million-plus shares they would receive under the proposed 15% award.

366 F. Supp. 2d 912, *919; 2005 U.S. Dist. LEXIS 7244, **18

Moreover, *HN11* a common fund fee award serves to reward counsel for creativity and skill in enlarging a settlement fund beyond what was thought possible or likely at the inception of the case. See, e g, *Paul, Johnson, Alston & Hunt, 886 F2d at 271* ("Since the Supreme Court's 1885 decision in *Central Railroad & Banking Co of Ga v Pettus, 113 US 116, 28 L. Ed. 915, 5 S. Ct. 387 (1885)*, it is well settled that the lawyer who creates a common fund is allowed an extra reward, beyond that which he has arranged with his client, so that he might share the wealth of those upon whom he has conferred a benefit."). As such, it is worth recognizing the value of class counsel's efforts at extracting a considerable amount of unconventional settlement consideration from defendants [**19] whose cash resources were limited. Treating non-cash settlement consideration as if it were cash can overstate the dollar value of counsel's proposed percentage fee and thus penalize class counsel. When non-cash consideration is valued too dearly, the percentage fee when cross-checked against a lodestar fee can make counsel a victim of their own ingenuity. Thus, for reasons of proper deterrence, effective incentives and fairness to counsel, it is appropriate to place a very modest value on the HPL stock.

Accordingly, the court concludes that it is inappropriate to value the HPL stock component of lead counsel's fee award at its market price. Instead, the court will treat the HPL stock as worth $ 0.20 / share -- a third to a fifth of its recent market price. By this valuation, the court certainly expresses no view of the stock's actual value; the court simply must place some dollar value on a large block of an illiquid security, and doing so at this very substantial discount appears fair to counsel.

B

Valuing the HPL stock at $ 0.20 / share, the settlement fund is worth $ 18.4 million ($ 17 million in cash and $ 1.4 million in stock) and the court is confronted with a straightforward [**20] lodestar cross-check exercise. The first step is to establish a lodestar figure; the second step is to cross-check the proposed percentage fee against this lodestar figure.

1

*HN12* Three figures are salient in a lodestar calculation: (1) counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors (including unusual skill or experience of counsel, or the *ex ante* risk of nonrecovery in the litigation). In performing a lodestar cross-check, however, the multiplier is implied by the ratio of the proposed percentage fee to the computed lodestar fee. For example, for a proposed percentage fee of $ 250,000 and a corresponding lodestar fee of $ 100,000, the implied multiplier is 2.5. This implied multiplier may be assessed for reasonableness. Accordingly, the court need only consider counsel's reasonable hours and counsel's reasonable hourly rate in computing the lodestar.

For hourly rates, the court will simply use current (i e, 2005) hourly rates; doing so simplifies the calculation and accounts for the time value of money in that lead counsel has not been paid contemporaneously [*920] with their work in this case. See *Vizcaino v Microsoft Corp, 290 F3d 1043, 1051 (9th Cir 2002)* [**21]   (citing *Gates v Deukmejian, 987 F2d 1392, 1406 (9th Cir 1992)* ("Calculating fees at prevailing rates to compensate for delay in receipt of payment was within the district court's discretion."); *Fischel v Equitable Life Assurance Society, 307 F3d 997 (9th Cir 2002)* (citing *Florida ex rel. Butterworth v. Exxon Corp. (In re Petroleum Prods. Antitrust Litig.), 109 F.3d 602, 609 (9th Cir 1997))* (district court has discretion to compensate for delayed payment by either

366 F. Supp. 2d 912, *920; 2005 U.S. Dist. LEXIS 7244, **21

applying current rates or applying historical rates with a prime rate enhancement). Of course, the annual rise in an attorney's billing rate represents not only inflation but also the increased experience of the attorney, if different hourly rates are used (as the court does here) for lawyers of different experience and billing rates. But the inflationary effect should not usually grossly affect the lodestar calculation, unless the litigation is greatly prolonged, and such is not the case here. (The problem of "experience inflation" can be avoided altogether by the use of a "blended" hourly rate, which as explained presently has other advantages.) At any rate, the relevant data [**22] are these:

| Attorney | Experience | 2005 Billing Rate (per hr) | Total Hours | Total lodestar |
|---|---|---|---|---|
| Sidener | 20 years | $ 510 | 1027.50 | $ 524,025.00 |
| Bennett | 31 years | $ 550 | 72.75 | $ 40,012.50 |
| Cera | 23 years | $ 525 | 5.00 | $ 2,625.00 |
| Barton | 8 years | $ 360 | 397.00 | $ 144,900.00 |
| Giblin | 9 years | $ 340 | 66.50 | $ 22,610.00 |
| Dirksen | 4 years | $ 300 | 210.50 | $ 63,150.00 |
| Kim | 2 years | $ 200 | 48.25 | $ 9,650.00 |
| Investigator | n/a | $ 230 | 401.00 | $ 92,230.00 |
| Paralegale | n/a | $ 163 | 29.50 | $ 4,805.00 |
| | | | Totals 2258.00 | $ 904,097.50 |

The above figures are as reported in the Sidener declaration (Doc # 167), with the exception that the court has aggregated all paralegal hours and converted individual paralegal rates to a blended rate.

The Sidener declaration breaks out the hours expended by lead counsel into five categories: (1) investigation; (2) discovery; (3) pleadings, briefs and motions; (4) court appearances; and (5) settlement. This is an especially helpful compromise between reporting hours in the aggregate (which is easy to review, but lacks informative detail) and generating a complete line-by-line billing report (which offers great detail, but tends [**23] to obscure the forest for the trees). Upon review of this breakout, the court concludes that counsel spent a reasonable number of hours on this litigation. Additionally, two aspects are notable: First, the bulk of the hours (more than 75%) were spent on investigation and settlement. Second, about 29% of the hours expended (and about 37% of the fees accumulated) were devoted by Steven Sidener, the lead partner on this case, to settlement. This captures the importance to this case of settlement preparations and discussions.

The unusually large fraction of senior attorney time devoted to settlement is also [*921] relevant to counsel's hourly rate. *HN13* Billing all attorney time at a "blended" hourly rate is probably appropriate in most lodestar cross-check computations for two reasons. First, it simplifies calculations. Second, it encourages economically efficient allocation of work within class counsel's firm. Third, it avoids the problem of "experience inflation" mentioned above. But the central role of settlement negotiations in this litigation -- and the central role of attorney Sidener in those negotiations -- suggest that typical blended hourly rates (perhaps in the $ 200 per hour neighborhood) [**24] are inappropriate here. Cf *Allen v Bay Area Rapid Transit District, 2003 U.S. Dist. LEXIS 24917, 2003 WL 23333580 at *7 (ND Cal)* (concluding in a civil rights case on which two attorneys worked that "the court has no basis for employing a reasonable hourly billing rate in its lodestar calculation either greater or lower than the approximate local average of $ 150 discernible from publicly available data"); *Albion Pacific Property Resources, LLC v Seligman, 329 F Supp 2d 1163, 1178 (ND Cal 2004)* (holding, on a successful motion to remand, "plaintiff is entitled to an above-average hourly rate if it can demonstrate that its counsel were more efficient than reasonably competent counsel would have been" but that "[p]laintiff has made

366 F. Supp. 2d 912, *921; 2005 U.S. Dist. LEXIS 7244, **24

no such showing″ and accordingly awarding ″a reasonable attorney fee at an hourly rate of $ 190/hr for attorneys″); *Yahoo!, Inc v Net Games, Inc, 329 F Supp 2d 1179, 1185, 1188 (ND Cal 2004)* (explaining that ″the average market rate in the local legal community as a whole is a better approximation of the hourly rate that would be charged by reasonably competent counsel than the actual billing rate charged by a single attorney″ and that [**25] ″[f]ocusing on the requested number of hours as a whole rather than the requested hourly rates of individual attorneys produces better attorney fee decisions″).

The court understands that such blended rates typically depend on the overall billing mix including substantial time expended in discovery by junior attorneys with relatively low billings rates. Here, little time (3.8% of the total hours) was spent on discovery, but a large fraction of lead counsel's overall time was spent -- and necessarily so, it seems -- by a senior attorney in settlement discussions and preparation. Accordingly, the court concludes that use of a blended hourly rate is a poor fit for this case.

But the court must find some objective source for setting counsel's hourly rates; the court cannot simply look at a lone out-of-context dollar figure and pronounce it ″reasonable.″ Because the court has rejected the use of a blended rate here, another problem arises: The court will need a variety of rates to account for the various attorneys' different levels of experience. One well-established objective source for rates that vary by experience is the *Laffey* matrix used in the District of Columbia. See http: [**26] //www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_4.html (citing *Laffey v Northwest Airlines, Inc, 572 F Supp 354 (D DC 1983)*, aff'd in part, rev'd in part on other grounds, *241 U.S. App. D.C. 11, 746 F2d 4 (DC Cir 1984))*.

Under the 2005 *Laffey* matrix, attorneys with 20 or more years of experience bill $ 390/hour; attorneys with 8-10 years of experience bill $ 280/hour; attorneys with 4-7 years of experience bill $ 225/hour; attorneys with 3 or fewer years of experience bill $ 185/hour; and paralegals bill $ 110/hour. These figures are, however, tailored for the District of Columbia, which has a somewhat lower cost of living than the San Francisco Bay area (in which lead counsel's firm operates); the court will adjust these figures accordingly. The locality pay differentials within the federal courts -- which, like law firms, employ lawyers and legal support staff -- can approximate [*922] this difference. See http://jnet.ao.dcn/ Human_Resources/Pay_Tables/2005_Pay_Tables/ Judiciary_Salary_Plan_Pay_Tables_2005.html. The Washington-Baltimore area has a +15.98% locality pay differential; the San Francisco-Oakland-San Jose area has a +26.39% locality pay differential. [**27] Thus, adjusting the *Laffey* matrix figures upward by approximately 9% will yield rates appropriate for the Bay area. [1]

Applying this adjustment and rounding, the court obtains the following rates: Attorneys with 20 or more years of experience bill $ 425/hour; attorneys with 8-10 years of experience bill $ 305/hour; attorneys with 4-7 years of experience bill $ 245/hour; attorneys with 3 or fewer years of experience bill $ 200/hour; and paralegals bill $ 120/hour. Not having a suitable substitute for the investigator's billing rate, the court will accept the value of $ 230/hour from the Sidener declaration. Reproducing the table above, but substituting these values and recomputing the totals yields:

| Attorney | Experience | 2005 Billing Rate (per hr) | Total Hours | Total lodestar |
|---|---|---|---|---|
| Sidener | 20 years | $ 425 | 1027.50 | $ 436,687.50 |

[1]   (126.39 - 115.98) / 115.98 = 0.08976, or about 9%.

366 F. Supp. 2d 912, *922; 2005 U.S. Dist. LEXIS 7244, **27

| Attorney | Experience | 2005 Billing Rate (per hr) | Total Hours | Total lodestar |
|----------|-----------|---------------------------|-------------|----------------|
| Bennett | 31 years | $ 425 | 72.75 | $ 30,918.75 |
| Cera | 23 years | $ 425 | 5.00 | $ 2,125.00 |
| Barton | 8 years | $ 305 | 397.00 | $ 121,085.00 |
| Giblin | 9 years | $ 305 | 66.50 | $ 20,282.50 |
| Dirksen | 4 years | $ 245 | 210.50 | $ 51,572.50 |
| Kim | 2 years | $ 200 | 48.25 | $ 9,650.00 |
| Investigator | n/a | $ 230 | 401.00 | $ 92,230.00 |
| Paralegale | n/a | $ 120 | 29.50 | $ 3,540.00 |
| | | | Totals 2258.00 | $ 768,091.25 |

[**28] In the end, this substitution reduces lead counsel's lodestar fee by about 15% from the figure claimed in the Sidener declaration (Doc # 167).

2

The court now turns to the lodestar cross-check, which entails evaluation of the multiplier implied by lead counsel's requested fee (15% percent of a $ 18.4 million settlement fund, or $ 2.76 million) and lead counsel's lodestar fee (computed above as $ 768,091.25). These data imply a multiplier of 3.59. Is a multiplier of 3.59 reasonable in this case?

Unfortunately, there are not (to the court's knowledge) any reliable compilations of the multipliers awarded in common fund class actions against which the court could quantitatively compare this 3.59 multiplier. Multiplier values are reported in the *Class Action Reports* data set upon which the court has relied in previous orders. See Stuart J Logan, Jack Moshman & Beverly C Moore, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep 167 (2003). But **HN14** the *Class Action Reports* data are contaminated because the courts making the reported awards have been inconsistent in reporting a base hourly rate. [*923] Floating without an empirical tether, the court shares Judge [**29] Shadur's sentiment in *Comdisco* that "lodestar multipliers * * * seem most often to represent an effort to provide some non-existent garb for the proverbial emperor who has no clothes. * * * Unfortunately, any ruling that a multiplier (say) of 2.5 is reasonable, while a multiplier (say) of 3.5 or 4 is not, too often makes it possible to paper over a result-driven conclusion with a purported semblance of precision" *150 F Supp 2d at 948 n10.*

The court has an idea for a solution (albeit one that is impossible in this case): Class counsel's risk of nonrecovery (or the obverse, their probability of success) is central to the multiplier. See *In re Washington Public Power Supply System Securities Litigation, 19 F3d 1291, 1301 (9th Cir 1994)* (discussing risk multipliers). Therefore, pursuant to *FRCP 23(g)(1)(C)(iii)* and *23(h)(3)*, class counsel ought to be required at the outset of the case to file (ex parte and under seal) a candid quantitative assessment of their probability of success and the likely effort entailed in obtaining various recoveries. The information submitted to [**30] the court should address not only the probability of total nonrecovery, but also the relative likelihood of various levels of recovery, for it is only against the full continuum of possible results that the court can assess the true success that class counsel achieves (or fails to achieve). Moreover, counsel should provide their assessments of the likely time frame of the litigation and the costs they expect to incur. Indeed, this information should capture not only the "risk of nonrecovery" aspect of a multiplier, see id, but also whether counsel achieved exceptional results for the class, see, e g, *Van Gerwen v Guarantee Mut Life Co, 214 F3d 1041, 1045 (9th Cir 2000)*

366 F. Supp. 2d 912, *923; 2005 U.S. Dist. LEXIS 7244, **30

(discussing multipliers in fee-shifting context). To avoid any concern that such evaluation would contaminate the judge's decisions in the case (or reveal confidences to opposing counsel), the evaluation would remain under seal until needed to assess an application for fees and expenses. A form order requesting this information and setting conditions for its submission is annexed to this order.

It is entirely reasonable to expect class counsel to make such assessments. Any economically rational individual [**31] plaintiff retaining counsel would surely ask his attorneys for just this information: "Honestly, what do I stand to recover, and how much is it going to cost me in fees?" A sensible lead plaintiff executing the ideal model of the PSLRA's "most adequate plaintiff" would obtain exactly this kind of information. Should not the court also seek it, especially if there is any uncertainty that lead plaintiff has searched for counsel and negotiated at arms' length for a reasonable fee? Further, of course, "entrepreneurial plaintiff's attorneys" (Professor Coffee's phrase) would perform just such an analysis before commencing the long and arduous effort that often characterizes class litigation. See John C Coffee, Jr, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum L Rev 669 (1986)*.

Of course, in the class action context, knowing that the court would use such an *ex ante* assessment to award a fee (should counsel obtain a recovery), this exercise will no doubt tempt counsel to emphasize the difficulty of the task ahead of them. The court needs to recognize this danger. [**32] But even with it, bearing the risk of an unduly pessimistic evaluation of the prospects at the outset of a case or an overblown assessment of the effort required seems no worse (and may be better) than [*924] facing inflated claims of accomplishment when class counsel seek approval of a compromise and an award of fees at the end of a case. An *ex ante* assessment has to make economic sense or it loses credibility. Counsel who claim a one in twenty chance of a $ 10 million recovery and estimate 10,000 hours of attorney time to obtain it are obviously blowing smoke. There is a limit on feigned pessimism, for counsel's prediction has to square with their own economic rationality: Predictions that are too pessimistic raise the question why counsel got involved in the case in the first place. Thus an analysis using a blended hourly rate or the *Laffey* matrix could reveal whether counsel's *ex ante* assessment makes sense as a matter of law firm economics -- and therefore is credible.

Furthermore, the court can evaluate counsel's *ex ante* assessment by the same standards that apply to many other aspects of a court's work. On the one hand, an evaluation that is not substantiated by reasoned [**33] analysis and comparable cases would be entitled to little weight. On the other hand, an evaluation that laid out in detail the factors that went into the evaluation and presented data to back it up would carry a good deal of weight even if the predicted outcome, length of proceedings and costs differed from what actually occurred.

Even absent a true *ex ante* assessment, the parties ought to be able to compile -- at least if the case is settled, as often happens in successful common fund cases -- a record for the court that demonstrates their assessments of their legal positions, their predictions of liability exposure, their settlement positions and negotiations and so on. Perhaps a complete record is too much to ask for, but surely in every case some contemporaneous evidence exists that is probative of the parties' assessments of their likelihood of success. Because the court has not asked for this information and did not ask for an *ex ante* assessment in this case, the court here proceeds from a rather more limited record.

Based on this limited record, the implied multiplier of 3.59 gives the court considerable pause. It exceeds the multipliers the court has in its experience [**34] encountered and observed in other

366 F. Supp. 2d 912, *924; 2005 U.S. Dist. LEXIS 7244, **34

common fund securities class actions. The court can investigate this intuition further by positing a pair of scenarios -- one optimistic, one pessimistic -- of the sort that plaintiffs' counsel almost certainly considered at the inception of this litigation. Each scenario has several individual components representing the probability of recovering a certain amount against a certain defendant or group of defendants; using standard probability, the expectation value of the total scenario can be computed. Here are two scenarios that seem possible to the court in light of its experience with company defendants, accountant defendants and insurance coverage layers in securities class actions in the context of the insurance coverage and resources of the defendants in this litigation:

| **Scenario 1: Optimistic Scenario** | | |
|---|---|---|
| 100% chance of recovering $ 3M from insurance carriers | | $ 3.00M |
| 66.7% chance of recovering $ 4M more from company defs | | $ 2.67M |
| 50% chance of recovering $ 10M from accountant | | $ 5.00M |
| | Total expectation: | $ 10.67M |
| | Multiplier based on $ 18.4M settlement: | 1.72 |
| Scenario 2: Pessimistic Scenario | | |
| 50% chance of no recovery at all | | $ 0.00M |
| 50% chance of recovering $ 7M from company defendants | | $ 3.50M |
| 25% chance of recovering $ 10M from accountant | | $ 2.50M |
| | Total expectation: | $ 6.00M |
| | Multiplier based on $ 18.4M settlement: | 3.07 |

[*925]   [**35]  These scenarios suggest that a multiplier between 1.72 and 3.07 is reasonable.

In fairness, there is one reason to think that a multiplier toward the higher end of this wide range is appropriate here: Lead counsel have generated an unusually high recovery per hour invested. Even valuing the HPL stock at $ 0.20 per share, the settlement consideration is worth $ 18.4 million -- or about $ 8,148 per hour invested by lead counsel. If the court would approve a 15% fee award, the net recovery per hour would be about $ 6,926. Looking to the data compiled in Logan et al, 24 Class Action Rep 167, the court notes that in class actions with common funds of $ 10 to $ 20 million, the average net recovery per hour is $ 2,943, with a range of $ 292 to $ 31,996. Of the 63 cases in this range reported in Logan et al, this case would rank 6th highest in recovery per hour. In fact, this recovery per hour even exceeds the median recovery per hour of $ 4,946 seen in "megafund" cases (those with common funds that exceed $ 100 million, and thus should exhibit the greatest economies of scale).

On the one hand, these impressive results may signal lead counsel's unusual skill and efficiency. On the other [**36]  hand, they may signal a case ripe for generous settlement. But the latter possibility seems less likely: As the court has observed in its prior orders, establishing liability against -- and hence extracting a settlement from -- defendants other than Y David Lepejian (whose participation in the fraud here was demonstrably knowing) was far from certain, and it is clear that settlement negotiations in this case were anything but a cakewalk.

Nonetheless, the court has difficulty squaring a multiplier of 3.59 with what it knows about this litigation. The lodestar cross-check has thus signaled that the 15% fee proposed by lead counsel with lead plaintiff's support leads to a multiplier higher than appears reasonable. The court concludes, in the exercise of its discretion in light of the foregoing discussion, that a reasonable fee award is somewhat lower than the requested 15%.

366 F. Supp. 2d 912, *925; 2005 U.S. Dist. LEXIS 7244, **36

The amount of reduction is the next question. For reference, the court has tabulated various fee percentages, the resulting fee and the corresponding multiplier (valuing the settlement at $ 18.4 million):

| Percentage | Fee (millions) | Implied Multiplier |
|---|---|---|
| 15% | $ 2.76 | 3.59 |
| 14% | $ 2.58 | 3.35 |
| 13% | $ 2.39 | 3.11 |
| 12% | $ 2.21 | 2.87 |
| 11% | $ 2.02 | 2.63 |
| 10% | $ 1.84 | 2.39 |
| 9% | $ 1.66 | 2.16 |
| 8% | $ 1.47 | 1.91 |
| 7% | $ 1.29 | 1.67 |

[**37]  Based on the court's conclusions above about reasonable multipliers in this case, it appears that a reasonable percentage fee in this case ranges from about 8% to about 12%. Because (1) lead plaintiff supports a 15% fee award for lead counsel and (2) the recovery in this case is exceptionally high for the amount of attorney time invested, the court tends to the high side of this range. In its discretion the court fixes lead counsel's fee award at 11% of the common fund.

Accordingly, the court awards lead counsel $ 1,870,000 cash and 770,000 shares of HPL stock from the common fund. With respect to the award of HPL stock, to the extent that such an award represents securities that are not registered pursuant to the Securities Act of 1933, the court finds, pursuant to *section 3(a)(10) of the Securities Act of 1933* that under the circumstances, the exchange of these shares for a portion of lead counsel's services in this action is fair.

[*926]  IV

This order treads on somewhat unfamiliar ground, yet the court believes no less is necessary to discharge its obligation under *FRCP 23(h)* to award a *reasonable* fee. The court's excursion has led it [**38]  to take up legal issues that have not been briefed by counsel, and this order rests in some measure on a factual record that counsel might have supplemented, had they known the court's view of the law. In other words, lead counsel have perhaps not been offered a full opportunity to be heard on the issues addressed herein -- an opportunity that this court must now in fairness afford them, particularly given the deferential standard of appellate review applied to fee awards under *Rule 23(h)*.

Accordingly, the clerk shall enter final judgment on the award of fees and expenses as described herein, but the court expressly grants lead counsel leave to file a motion and supporting papers pursuant to *FRCP 60(b)(6)* for relief from that judgment. Such a motion for relief from judgment shall be filed within the time allotted by *FRAP 4(a)(1)(A)* -- that is, if lead counsel wish to challenge this order here or in the Court of Appeals, they must act within the time allotted by *FRAP 4(a)(1)(A)*; otherwise, distribution of the settlement fund may commence. Along with any motion for reconsideration, [**39]  lead counsel should advise the court whether an interim distribution of the uncontested portion of the settlement fund is warranted.

V

In sum, the court GRANTS lead plaintiff's motion for an award of attorneys' fees and costs (Doc # 142). Out of the common fund, the court awards lead counsel expenses of $ 59,434.57 and fees of $

366 F. Supp. 2d 912, *926; 2005 U.S. Dist. LEXIS 7244, **39

1,870,000 cash plus 770,000 shares of HPL stock. These amounts shall bear interest at the same rate and from the same date as the settlement funds.

IT IS SO ORDERED.

April 22, 2005

VAUGHN R WALKER

United States District Chief Judge

APPENDIX: SAMPLE ORDER

ORDER

Pursuant to *FRCP 23(g)(1)(C)(iii)* and *23(h)(3)*, the court ORDERS putative class counsel to submit, under seal, not later than _____ counsel's good faith quantitative assessments of:

> their probability of prevailing on plaintiff's claims, including their likelihood of achieving various levels of recovery;

> the hours of attorney and legal support staff time they reasonably anticipate spending to reach certain stages in the litigation and to achieve various levels of recovery; and

> the reimbursable costs they [**40]  expect to incur to reach certain stages in the litigation and to achieve various levels of recovery;

stating with particularity the reasons for these assessments. *See* *In re HPL Technologies Securities Litigation, 366 F. Supp. 2d 912 (N.D. Cal. 2005)*.

Counsel shall contact the court room deputy for direction in making this submission, which shall be made in paper form, ex parte and under seal. The clerk is directed not to unseal this submission or permit its inspection by anyone except upon notice to the parties and further order of the court.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge

# Exhibit F

## SALARY TABLE 2014-DCB
### INCORPORATING THE 1% GENERAL SCHEDULE INCREASE AND A LOCALITY PAYMENT OF 24.22%
### FOR THE LOCALITY PAY AREA OF WASHINGTON-BALTIMORE-NORTHERN VIRGINIA, DC-MD-VA-WV-PA
### TOTAL INCREASE: 1%
### EFFECTIVE JANUARY 2014

*Hourly Basic (B) Rates by Grade and Step*
*Hourly Overtime (O) Rates by Grade and Step*

| Grade | B/O | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | B | $ 10.70 | $ 11.06 | $ 11.42 | $ 11.77 | $ 12.13 | $ 12.33 | $ 12.69 | $ 13.04 | $ 13.06 | $ 13.39 |
|   | O | 16.05 | 16.59 | 17.13 | 17.66 | 18.20 | 18.50 | 19.04 | 19.56 | 19.59 | 20.09 |
| 2 | B | 12.03 | 12.32 | 12.72 | 13.06 | 13.20 | 13.59 | 13.98 | 14.37 | 14.75 | 15.14 |
|   | O | 18.05 | 18.48 | 19.08 | 19.59 | 19.80 | 20.39 | 20.97 | 21.56 | 22.13 | 22.71 |
| 3 | B | 13.13 | 13.57 | 14.00 | 14.44 | 14.88 | 15.32 | 15.75 | 16.19 | 16.63 | 17.07 |
|   | O | 19.70 | 20.36 | 21.00 | 21.66 | 22.32 | 22.98 | 23.63 | 24.29 | 24.95 | 25.61 |
| 4 | B | 14.74 | 15.23 | 15.72 | 16.21 | 16.70 | 17.19 | 17.69 | 18.18 | 18.67 | 19.16 |
|   | O | 22.11 | 22.85 | 23.58 | 24.32 | 25.05 | 25.79 | 26.54 | 27.27 | 28.01 | 28.74 |
| 5 | B | 16.49 | 17.04 | 17.59 | 18.14 | 18.69 | 19.24 | 19.79 | 20.34 | 20.89 | 21.44 |
|   | O | 24.74 | 25.56 | 26.39 | 27.21 | 28.04 | 28.86 | 29.69 | 30.51 | 31.34 | 32.16 |
| 6 | B | 18.38 | 18.99 | 19.61 | 20.22 | 20.83 | 21.44 | 22.06 | 22.67 | 23.28 | 23.89 |
|   | O | 27.57 | 28.49 | 29.42 | 30.33 | 31.25 | 32.16 | 33.09 | 34.01 | 34.92 | 35.84 |
| 7 | B | 20.43 | 21.11 | 21.79 | 22.47 | 23.15 | 23.83 | 24.51 | 25.19 | 25.87 | 26.56 |
|   | O | 30.65 | 31.67 | 32.69 | 33.71 | 34.73 | 35.75 | 36.77 | 37.79 | 38.81 | 39.84 |
| 8 | B | 22.62 | 23.38 | 24.13 | 24.88 | 25.64 | 26.39 | 27.15 | 27.90 | 28.66 | 29.41 |
|   | O | 33.93 | 35.07 | 36.20 | 37.32 | 38.46 | 39.59 | 40.73 | 41.28 | 41.28 | 41.28 |
| 9 | B | 24.99 | 25.82 | 26.65 | 27.48 | 28.32 | 29.15 | 29.98 | 30.82 | 31.65 | 32.48 |
|   | O | 37.49 | 38.73 | 39.98 | 41.22 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 |
| 10 | B | 27.52 | 28.43 | 29.35 | 30.27 | 31.18 | 32.10 | 33.02 | 33.94 | 34.85 | 35.77 |
|   | O | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 |
| 11 | B | 30.23 | 31.24 | 32.25 | 33.25 | 34.26 | 35.27 | 36.28 | 37.28 | 38.29 | 39.30 |
|   | O | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 |
| 12 | B | 36.23 | 37.44 | 38.65 | 39.86 | 41.07 | 42.27 | 43.48 | 44.69 | 45.90 | 47.10 |
|   | O | 41.28 | 41.28 | 41.28 | 41.28 | 41.28 | 42.27 | 43.48 | 44.69 | 45.90 | 47.10 |
| 13 | B | 43.09 | 44.52 | 45.96 | 47.40 | 48.83 | 50.27 | 51.71 | 53.14 | 54.58 | 56.01 |
|   | O | 43.09 | 44.52 | 45.96 | 47.40 | 48.83 | 50.27 | 51.71 | 53.14 | 54.58 | 56.01 |
| 14 | B | 50.92 | 52.61 | 54.31 | 56.01 | 57.70 | 59.40 | 61.10 | 62.79 | 64.49 | 66.19 |
|   | O | 50.92 | 52.61 | 54.31 | 56.01 | 57.70 | 59.40 | 61.10 | 62.79 | 64.49 | 66.19 |
| 15 | B | 59.89 | 61.89 | 63.89 | 65.88 | 67.88 | 69.87 | 71.87 | 73.87 | 75.28 | 75.28 |
|   | O | 59.89 | 61.89 | 63.89 | 65.88 | 67.88 | 69.87 | 71.87 | 73.87 | 75.28 | 75.28 |

* Rate limited to the rate for level IV of the Executive Schedule (5 U.S.C. 5304 (g)(1)).

Applicable locations are shown on the 2014 Locality Pay Area Definitions page: http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2014/locality-pay-area-definitions/

# SALARY TABLE 2014-LA

## INCORPORATING THE 1% GENERAL SCHEDULE INCREASE AND A LOCALITY PAYMENT OF 27.16%

### FOR THE LOCALITY PAY AREA OF LOS ANGELES-LONG BEACH-RIVERSIDE, CA

TOTAL INCREASE: 1%

EFFECTIVE JANUARY 2014

Hourly Basic (B) Rates by Grade and Step
Hourly Overtime (O) Rates by Grade and Step

| Grade | B/O | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | B | $ 10.96 | $ 11.32 | $ 11.69 | $ 12.05 | $ 12.41 | $ 12.63 | $ 12.99 | $ 13.35 | $ 13.36 | $ 13.71 |
|   | O | 16.44 | 16.98 | 17.54 | 18.08 | 18.62 | 18.95 | 19.49 | 20.03 | 20.04 | 20.57 |
| 2 | B | 12.32 | 12.61 | 13.02 | 13.36 | 13.51 | 13.91 | 14.31 | 14.71 | 15.10 | 15.50 |
|   | O | 18.48 | 18.92 | 19.53 | 20.04 | 20.27 | 20.87 | 21.47 | 22.07 | 22.65 | 23.25 |
| 3 | B | 13.44 | 13.89 | 14.34 | 14.78 | 15.23 | 15.68 | 16.13 | 16.57 | 17.02 | 17.47 |
|   | O | 20.16 | 20.84 | 21.51 | 22.17 | 22.85 | 23.52 | 24.20 | 24.86 | 25.53 | 26.21 |
| 4 | B | 15.09 | 15.59 | 16.09 | 16.60 | 17.10 | 17.60 | 18.10 | 18.61 | 19.11 | 19.61 |
|   | O | 22.64 | 23.39 | 24.14 | 24.90 | 25.65 | 26.40 | 27.15 | 27.92 | 28.67 | 29.42 |
| 5 | B | 16.88 | 17.44 | 18.01 | 18.57 | 19.13 | 19.70 | 20.26 | 20.82 | 21.38 | 21.95 |
|   | O | 25.32 | 26.16 | 27.02 | 27.86 | 28.70 | 29.55 | 30.39 | 31.23 | 32.07 | 32.93 |
| 6 | B | 18.82 | 19.44 | 20.07 | 20.70 | 21.32 | 21.95 | 22.58 | 23.21 | 23.83 | 24.46 |
|   | O | 28.23 | 29.16 | 30.11 | 31.05 | 31.98 | 32.93 | 33.87 | 34.82 | 35.75 | 36.69 |
| 7 | B | 20.91 | 21.61 | 22.30 | 23.00 | 23.70 | 24.40 | 25.09 | 25.79 | 26.49 | 27.18 |
|   | O | 31.37 | 32.42 | 33.45 | 34.50 | 35.55 | 36.60 | 37.64 | 38.69 | 39.74 | 40.77 |
| 8 | B | 23.16 | 23.93 | 24.70 | 25.47 | 26.25 | 27.02 | 27.79 | 28.56 | 29.33 | 30.11 |
|   | O | 34.74 | 35.90 | 37.05 | 38.21 | 39.38 | 40.53 | 41.69 | 42.26 | 42.26 | 42.26 |
| 9 | B | 25.58 | 26.43 | 27.28 | 28.13 | 28.99 | 29.84 | 30.69 | 31.54 | 32.40 | 33.25 |
|   | O | 38.37 | 39.65 | 40.92 | 42.20 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 |
| 10 | B | 28.17 | 29.11 | 30.05 | 30.98 | 31.92 | 32.86 | 33.80 | 34.74 | 35.68 | 36.62 |
|   | O | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 |
| 11 | B | 30.95 | 31.98 | 33.01 | 34.04 | 35.07 | 36.10 | 37.14 | 38.17 | 39.20 | 40.23 |
|   | O | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 |
| 12 | B | 37.09 | 38.33 | 39.56 | 40.80 | 42.04 | 43.27 | 44.51 | 45.75 | 46.98 | 48.22 |
|   | O | 42.26 | 42.26 | 42.26 | 42.26 | 42.26 | 43.27 | 44.51 | 45.75 | 46.98 | 48.22 |
| 13 | B | 44.11 | 45.58 | 47.05 | 48.52 | 49.99 | 51.46 | 52.93 | 54.40 | 55.87 | 57.34 |
|   | O | 44.11 | 45.58 | 47.05 | 48.52 | 49.99 | 51.46 | 52.93 | 54.40 | 55.87 | 57.34 |
| 14 | B | 52.12 | 53.86 | 55.60 | 57.33 | 59.07 | 60.81 | 62.54 | 64.28 | 66.02 | 67.76 |
|   | O | 52.12 | 53.86 | 55.60 | 57.33 | 59.07 | 60.81 | 62.54 | 64.28 | 66.02 | 67.76 |
| 15 | B | 61.31 | 63.35 | 65.40 | 67.44 | 69.48 | 71.53 | 73.57 | 75.28 | 75.28 | 75.28 |
|   | O | 61.31 | 63.35 | 65.40 | 67.44 | 69.48 | 71.53 | 73.57 | 75.28 | 75.28 | 75.28 |

* Rate limited to the rate for level IV of the Executive Schedule (5 U.S.C. 5304 (g)(1)).

Applicable locations are shown on the 2014 Locality Pay Area Definitions page: http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2014/locality-pay-area-definitions/

# Exhibit G

## Locality Pay Adjustment to the 2014-2015 *Laffey* Matrix

**Locality Pay Percentages, According to the U.S. Office of Personnel Management:**

- Locality Pay Percentage for Washington, D.C.[1]:     +24.22%

- Locality Pay Percentage for Los Angeles[2]:     +27.16%

**Locality Pay Formula,[3] Applying the Locality Pay Percentages for D.C. and L.A.:**

- (127.16-124.22)/124.22 = 2.36% = +2.4%

**Adjustment to the 2014-2015 *Laffey* Rates, Applying the +2.4% Rate Differential:**

| Experience | Laffey Matrix 2014-2015 | Locality Pay Adjustments |
|---|---|---|
| 20+ years | 520 | 532.48 |
| 11-19 years | 460 | 471.04 |
| 8-10 years | 370 | 378.88 |
| 4-7 years | 300 | 307.20 |
| 1-3 years | 255 | 261.12 |
| Paralegals & Law Clerks | 150 | 153.60 |

---

[1] Available at http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2014/DCB_h.pdf.
[2] Available at http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2014/LA_h.pdf.
[3] *See In Re HPL Techs., Inc.*, 366 F. Supp. 2d 912, 921-22 fn. 1 (N.D. Cal. 2005).

# Exhibit H

| Laffey Adjustment to Fenwick & Winston Rates | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Position | Firm | Exp. | Original Rates | Total Hours | 2014-2015 Laffey Rate | DC-LA Adjusted Rate | Laffey Totals |
| Andrew Bridges | Partner | Fenwick | 29 | 2011 - $825; 2012 - $865; 2013 - $890; 2014 - $930 | 1,292.20 | $520 | $532.48 | $688,070.66 |
| Ilana Rubel | Partner | Fenwick | 17 | 2013 - $715; 2014 - $750 | 318.1 | $460 | $471.04 | $149,837.82 |
| Jennifer Kelly | Partner | Fenwick | 17 | 2013 - $705 | 30.5 | $460 | $471.04 | $14,366.72 |
| Brian Buckley | Partner | Fenwick | 18 | 2014 - $750 | 22.5 | $460 | $471.04 | $10,598.40 |
| Joseph Belichick | Associate | Fenwick | 11 | 2013 - $660; 2014 - $690 | 1007.2 | $460 | $471.04 | $474,431.49 |
| Todd Gregorian | Associate | Fenwick | 10 | 2014 - $670 | 774.2 | $370 | $378.88 | $293,328.90 |
| Liwen Mah | Associate | Fenwick | 9 | 2013 - $660; 2014 - $690 | 446.8 | $370 | $378.88 | $169,283.58 |
| Jennifer Johnson | Associate | Fenwick | 7 | 2014 - $640 | 284.6 | $300 | $307.20 | $87,429.12 |
| Kathleen Lu | Associate | Fenwick | 5 | 2011 - $375; 2013 - $535; 2014 - $560 | 2026.8 | $300 | $307.20 | $639,129.60 |
| Shane Witnov | Associate | Fenwick | 4 | 2011 - $350; 2012 - $410 | 18 | $300 | $307.20 | $5,529.60 |
| Annasara Purcell | Associate | Fenwick | 3 | 2014 - $505 | 445.2 | $255 | $261.12 | $116,250.62 |
| Armen Nercessian | Associate | Fenwick | 2 | 2014 - $450 | 953.8 | $255 | $261.12 | $249,056.26 |
| Shannon Kumagai | Associate | Fenwick | 1 | 2014 - $370 | 38.5 | $255 | $261.12 | $10,053.12 |
| Earl Mah | Associate | Fenwick | 1 | 2014 - $360 | 15.4 | $255 | $261.12 | $4,021.25 |
| Adam Lewin | Associate | Fenwick | 2 | 2014 - $450 | 9.9 | $255 | $261.12 | $2,585.09 |
| Tyler Newby | Attorney | Fenwick | 15 | 2013 - $670 | 0.1 | $460 | $471.04 | $47.10 |
| Brownstone | Special Counsel | Fenwick | 28 | 2014 - $690 | 0.6 | $520 | $532.48 | $319.49 |
| James Corpuz | Staff Atty | Fenwick | 6 | 2014 - $200 | 220.9 | $150* | $153.60 | $33,930.24 |
| Kristy Shimosaka | Staff Atty | Fenwick | 8 | 2014 - $100 | 30.3 | $150* | $153.60 | $4,654.08 |
| Chris Fong | Contract Atty | Fenwick | 4 | 2014 - $100 | 116.1 | $150* | $153.60 | $17,832.96 |

| Name | Title | Firm | Yrs | Rate | Hours | | | Total |
|---|---|---|---|---|---|---|---|---|
| Chang, E. | Summer Associate | Fenwick | | $370 | 2 | $150* | $153.60 | $307.20 |
| Jessica Benzler | Summer Associate | Fenwick | | $370 | 2.6 | $150* | $153.60 | $399.36 |
| Carol McCoy | Paralegal | Fenwick | 16 | 2013 - $285; 2014 - $295 | 830.9 | $150 | $153.60 | $127,626.24 |
| Robert Winant | Paralegal | Fenwick | 23 | 2014 - $345 | 225.9 | $150 | $153.60 | $34,698.24 |
| Sarah Victoria | Paralegal | Fenwick | 5 | 2014 - $240 | 380.4 | $150 | $153.60 | $58,429.44 |
| Lisa Magee | Paralegal | Fenwick | 15 | 2013 - $275 | 21.9 | $150 | $153.60 | $3,363.84 |
| James Phan | Paralegal | Fenwick | | 2013 - $330 | 0.5 | $150 | $153.60 | $76.80 |
| Sarah Alonto | Paralegal | Fenwick | | 2014 - $240 | 22.3 | $150 | $153.60 | $3,425.28 |
| Amanda Hudson | Paralegal | Fenwick | | 2014 - $240 | 14 | $150 | $153.60 | $2,150.40 |
| Susanne Morales | Paralegal | Fenwick | | 2014 - $290 | 1.7 | $150 | $153.60 | $261.12 |
| Chrystelle Browman | Research Support | Fenwick | | 2014 - $220 | 15 | $150* | $153.60 | $2,304.00 |
| Lynn Brazil | Research Support | Fenwick | | 2014 - $220 | 1 | $150* | $153.60 | $153.60 |
| Brad Bonnington | Director of Practice Support Group | Fenwick | | 2014 - $290 | 28.6 | $150* | $153.60 | $4,392.96 |
| David Tran | Assistant to Bonnington | Fenwick | | 2014 - $245 | 107.5 | $150* | $153.60 | $16,512.00 |
| Peter Kung | Electronic Info. Mgmt | Fenwick | | 2014 - $255 | 1.5 | $150* | $153.60 | $230.40 |
| Jana Lay | Electronic Info. Mgmt | Fenwick | | 2014 - $180 | 1.5 | $150* | $153.60 | $230.40 |
| Gerald Delbarrio | Electronic Info. Mgmt | Fenwick | | 2014 - $170 | 0.3 | $150* | $153.60 | $46.08 |
| Phillip Giammona | Case Assistant | Fenwick | | 2013 - $125 | 3 | $150* | $153.60 | $460.80 |
| | | | | | | | | |
| Jennifer Golinveaux | Partner | Winston | 12 | 2011 - $610; 2012 - $640 | 300.5 | $460 | $471.04 | $141,547.52 |
| Kevin Joon Oh | Associate | Winston | 8 | 2011 - $470; 2012 - $525 | 584.2 | $370 | $378.88 | $221,341.70 |

| Name | Title | Firm | | Rate | Hours | Rate | Laffey | Total |
|---|---|---|---|---|---|---|---|---|
| Thomas Kearney | Associate | Winston | 5 | 2011 - $375; 2012 - $425 | 435.1 | $300 | $307.20 | $133,662.72 |
| Matthew Scherb | Attorney | Winston | 6 | 2011 - $525 | 6.6 | $300 | $307.20 | $2,027.52 |
| Donaldson, J. | Attorney | Winston | | 2011 - $435 | 0.5 | $300 | $307.20 | $153.60 |
| Craig Crockett | Attorney | Winston | 2 | 2011 - $375 | 3.6 | $300 | $307.20 | $1,105.92 |
| Cohen, S. | Attorney | Winston | | 2011 - $400 | 2.5 | $300 | $307.20 | $768.00 |
| Melodie Butler | Paralegal | Winston | | 2011 - $285 | 60.9 | $150 | $153.60 | $9,354.24 |
| Rogers, J. | Unknown | Winston | | 2011 - $305 | 1.2 | $150* | $153.60 | $184.32 |
| Rosenthal, D. | Unknown | Winston | | 2011 - $215 | 6.8 | $150* | $153.60 | $1,044.48 |
| Pace, C. | Unknown | Winston | | 2011 - $200 | 0.2 | $150* | $153.60 | $30.72 |
| Lundin, C. | Unknown | Winston | | 2011 - $195 | 2.9 | $150* | $153.60 | $445.44 |
| Butler, A. | Unknown | Winston | | 2011 - $190 | 9.6 | $150* | $153.60 | $1,474.56 |
| Ruth, L. | Unknown | Winston | | 2011 - $180 | 5.1 | $150* | $153.60 | $783.36 |
| | | | | | | | **Total** | **$3,739,748.35** |

| | |
|---|---|
| **Total Attorney Hours:** | **9,389.30** |
| **Total Non-Attorney Hours:** | **1,742.70** |
| **Time Stricken** | **99.70** |
| **Total Hours:** | **11,032.30** |

**\* Indicates the application of the *Laffey* rate for Paralegals & Law Clerks.**