1  Eric J. Benink, Esq., SBN 187434
   eric@kkbs-law.com
2  KRAUSE KALFAYAN BENINK & SLAVENS, LLP
   550 West C Street, Suite 530
3  San Diego, CA 92101
   P 619.232.0331 | F 619.232.4019
4
   Lynell D. Davis, Esq., SBN 271152
5  lynell@perfect10.com
   PERFECT 10, INC.
6  11803 Norfield Court
   Los Angeles, CA 90077
7  P 310.476.0794 | F 310.476.8138
8  Attorneys for Plaintiff and Counter-defendant
   Perfect 10, Inc.
9
                UNITED STATES DISTRICT COURT
10
                CENTRAL DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| 12  PERFECT 10, INC., a California corporation, | Case No. 2:11-cv-07098-AB (SHx) |
| 13          Plaintiff, | **Before Honorable André Birotte, Jr.** |
| 14      v. | |
| 15  GIGANEWS, INC., a Texas corporation; LIVEWIRE SERVICES, INC., a Nevada corporation; and DOES 1 through 10, inclusive, | **PLAINTIFF AND COUNTER-DEFENDANT PERFECT 10, INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT;** |
| 16 | |
| 17          Defendants. | |
| 18 | **REPRESENTATION STATEMENT** |
| 19  GIGANEWS, INC., a Texas corporation; LIVEWIRE SERVICES, INC., a Nevada corporation; and DOES 1 through 10, inclusive, | |
| 20 | |
| 21 | |
| 22          Counter-claimants, | |
| 23      v. | |
|     PERFECT 10, INC., a California corporation, | |
| 24          Counter-defendant. | |
| 25 | |

26

27

28

## NOTICE OF APPEAL

Notice is hereby given that Perfect 10, Inc., ("Perfect 10"), plaintiff and counter-defendant in the above-referenced case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the Judgment in Favor of Defendants Giganews, Inc. and Livewire Services, Inc., entered in this case on December 1, 2014 (Docket No. 628) (the "Judgment").

Perfect 10 also appeals from the District Court's Order Denying Plaintiff Perfect 10, Inc.'s Motion for Reconsideration of the Court's Order Granting Summary Judment [sic] In Favor of Defendants Re Indirect Copyright Infringement, entered in this case on March 9, 2015 (Docket No. 682) (the "Order on Motion for Reconsideration").

A true and correct copy of the Judgment is attached hereto as **Exhibit 1**.  A true and correct copy of the Order on Motion for Reconsideration is attached hereto as **Exhibit 2**.  True and correct copies of the Orders forming the basis for the District Court's entry of the Judgment are attached hereto as Exhibits 3 through 5, respectively.  These are:

(a)  Docket No. 619:  The District Court's Order (1) GRANTING Defendants Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 357) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 453), entered on November 14, 2014 and attached hereto as **Exhibit 3**;

(b)  Docket No. 620:  The District Court's Order (1) GRANTING Defendant Giganews, Inc.'s Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 440) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 467), entered on November

**2:11-cv-07098-AB-SH**

PLAINTIFF PERFECT 10, INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT; REPRESENTATION STATEMENT

1    14, 2014 and attached hereto as **Exhibit 4**; and

2              (c)     Docket No. 621:  The District Court's Order DENYING the

3    Parties' Remaining Motions for Partial Summary Judgment as MOOT (Dkt.

4    Nos. 449, 534, & 535), entered on November 14, 2014 and attached hereto as

5    **Exhibit 5**.

6    Dated: March 30, 2015              Respectfully submitted,

7                                       By:   /s/ Lynell D. Davis

8                                             Lynell D. Davis, Esq.
                                              Attorneys for Plaintiff Perfect 10, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF PERFECT 10, INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT; REPRESENTATION STATEMENT

1

## REPRESENTATION STATEMENT

2

The undersigned represents Perfect 10, Inc., plaintiff, counter-defendant and

3

appellant in this matter, and no other party.  Attached is a service list that shows all of

4

the parties to the action below, and identifies their counsel by name, firm, address,

5

email and telephone number, where appropriate. (F.R.A.P. 12(b); Circuit Rule 3-2(b).)

6

Dated: March 30, 2015              Respectfully submitted,

7

8                                           By:  /s/ Lynell D. Davis
                                                Lynell D. Davis, Esq.
9                                               Attorneys for Plaintiff Perfect 10, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## SERVICE LIST OF REPRESENTATION STATEMENT

2

Plaintiff, Counter-Defendant and Appellant:

3

     Perfect 10, Inc.

4

Counsel for Plaintiff, Counter-Defendant and Appellant Perfect 10, Inc.:

5

6

     Eric J. Benink, Esq., SBN 187434
     eric@kkbs-law.com

7

     KRAUSE KALFAYAN BENINK & SLAVENS, LLP
     550 West C Street, Suite 530

8

     San Diego, CA 92101
     Telephone: (619) 232-0331

9

     Facsimile:  (619) 232-4019

10

     Lynell D. Davis, Esq., SBN 271152

11

     lynell@perfect10.com
     PERFECT 10, INC.

12

     11803 Norfield Court
     Los Angeles, CA 90077

13

     Telephone: (310) 476-0794
     Facsimile: (310) 476-8138

14

15

     David N. Schultz, Esq., SBN 123094
     Schu1984@yahoo.com

16

     Law Offices of David N. Schultz
     1747 Preuss Road

17

     Los Angeles, CA 90035
     Telephone: (310) 839-3150

18

19

Defendants, Counter-claimants and Appellees:

20

     Giganews, Inc.

21

     Livewire Services, Inc.

22

23

24

25

26

27

28

PLAINTIFF PERFECT 10, INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT; REPRESENTATION STATEMENT

Counsel for Defendants, Counter-claimants and Appellees Giganews, Inc. and Livewire Services, Inc.:

Andrew P. Bridges (CSB No. 122761)
abridges@fenwick.com
Ilana Rubel (CSB. No. 221517)
irubel@fenwick.com
Todd R. Gregorian (CSB No. 236096)
tgregorian@fenwick.com
Kathleen Lu (CSB No. 267032)
klu@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Joseph S. Belichick (CSB No. 229371)
jbelichick@fenwick.com
Armen N. Nercessian (CSB No. 284906)
anercessian@fenwick.com
Annasara G Purcell (CSB No. 295512)
apurcell@fenwick.com
Fenwick & West LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

PLAINTIFF PERFECT 10, INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT; REPRESENTATION STATEMENT

# Exhibit 1

JS-6

ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
ILANA RUBEL (CSB. No. 221517)  NOTE: CHANGES MADE BY THE COURT
irubel@fenwick.com
TODD R. GREGORIAN (CSB No. 236096)
tgregorian@fenwick.com
KATHLEEN LU (CSB No. 267032)
klu@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:    (415) 875-2300
Facsimile:    (415) 281-1350

Attorneys for Defendants
GIGANEWS, INC., and
LIVEWIRE SERVICES, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PERFECT 10, INC., a California corporation, | Case No.: 11-cv-07098-AB (SHx) |
| Plaintiff, | ~~[PROPOSED]~~ JUDGMENT IN FAVOR OF DEFENDANTS GIGANEWS, INC. AND LIVEWIRE SERVICES, INC. |
| v. | |
| GIGANEWS, INC., a Texas Corporation; LIVEWIRE SERVICES, INC., a Nevada corporation; and DOES 1 through 100, inclusive, | Courtroom:    790 (Roybal)<br>Judge:         Hon. André Birotte, Jr. |
| Defendants. | |
| GIGANEWS, INC., a Texas Corporation; LIVEWIRE SERVICES, INC., a Nevada Corporation, | |
| Counterclaimants, | |
| v. | |
| PERFECT 10, INC., a California Corporation, | |
| Counterdefendant. | |

On November 14, 2014, the Court granted summary judgment in favor of Defendants Giganews, Inc. and Livewire Services, Inc. on the issues of direct, contributory and vicarious copyright infringement, completely resolving the action. *See* Dkt. 619, 620, and 621.  The Court now issues a final judgment on all of Plaintiff's claims, particularly including the following, as well as the related counterclaims by Defendants:

1. ***Trademark***.  Plaintiff's claims of direct trademark infringement, secondary trademark infringement, and trademark dilution, against both Defendants (Dkt. 1) are dismissed.  Dkt. 97 at 19-22.

2. ***Right of Publicity***.  Plaintiff's claims against both Defendants under California law for violation of the rights of publicity (Dkt. 1) are dismissed. Dkt. 97 at 22-24.

3. ***California Unfair Competition***.  Plaintiff's state-law claims against both Defendants for violation of the California Unfair Competition Law (Dkt. 1) are dismissed.  Dkt. 97 at 22-24.

4. ***Direct Copyright Infringement***.  Plaintiff's claims of direct copyright infringement by Defendants Giganews and Livewire (Dkt. 1 and 105) are dismissed.  Dkt. 97 at 7-13; Dkt 619.

5. ***Contributory Copyright Infringement***.  Plaintiff's claims of contributory infringement against both Defendants (Dkt. 1 and 105) are dismissed.  Dkt. 129 at 4-5; Dkt. 620.

6. ***Vicarious Copyright Infringement***.  Plaintiff's claims of vicarious infringement against Defendants Giganews and Livewire (Dkt. 1 and 105) are dismissed.  Dkt. 129 at 5-6; Dkt. 620.

The Court **GRANTS FINAL JUDGMENT** in favor of Defendants and against Plaintiff Perfect 10 as to all the claims by Plaintiff in the case.  ~~Plaintiff shall take nothing.~~  Furthermore, the Court **GRANTS FINAL JUDGMENT** in favor of Counterclaimants and against Counter-Defendant Perfect 10 in conjunction

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   with the counterclaims for declaratory relief.  The Court **DECLARES** that

2   Defendants did not infringe any of Perfect 10's copyrights, either directly or

3   indirectly, and thus are not liable for direct infringement, contributory infringement

4   or vicarious infringement.  The Court also **DECLARES** that Defendants Giganews

5   and Livewire bear no liability to Perfect 10 for any asserted cause of action.

6           As the prevailing parties in this litigation, Defendants Giganews and

7   Livewire are entitled to recover costs.  Fed. R. Civ. P. 54(d)(1); Civ. L.R. 54-1.  In

8   accordance with Local Rule 54-2, Defendants shall file their Notice of Application

9   to the Clerk to Tax Costs and Proposed Bill of Costs within fourteen (14) days after

10  the entry of this judgment.  ~~Fees and expenditures taxable as costs may include all~~

11  ~~items identified under 28 U.S.C. § 1920 or Civil Local Rule 54-3.  *See* Civ. L.R.~~

12  ~~54-3.1-13.~~

13          Defendants Giganews and Livewire may seek reimbursement of their

14  reasonable attorneys' fees to the extent allowed by 15 U.S.C. § 1117, 17 U.S.C.

15  § 505, Cal. Civ. Code § 3344, or any other applicable law.  The Court exercises its

16  discretion under Civil Local Rule 54-10 to extend the time within which

17  Defendants may bring a motion for attorneys' fees.  *See* Civ. L.R. 54-10 ("Any

18  motion or application for attorneys' fees shall be served and filed within fourteen

19  (14) days after the entry of judgment or other final order, *unless otherwise ordered*

20  *by the Court*.") (emphasis added).  In light of the duration, number, volume, and

21  complexity of proceedings and filings in this case, the Court **EXTENDS THE**

22  **TIME** for Defendants to serve and file any motion or application for attorney's fees

23  until 28 days following entry of this judgment.  **Should Defendants bring a**

24  **motion for attorneys' fees, they shall serve it with sufficient notice to permit**

25  **Plaintiff 14 days to oppose the motion.**

26  **IT IS SO ORDERED**.

27  Dated:  November 26, 2014

28                                          _____
                                            ANDRÉ BIROTTE JR.
                                            United States District Court Judge

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# Exhibit 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC. | Case No.  CV 11-07098-AB (SHx) |
| Plaintiff, | **ORDER DENYING PLAINTIFF PERFECT 10, INC.'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING SUMMARY JUDMENT IN FAVOR OF DEFENDANTS RE INDIRECT COPYRIGHT INFRINGEMENT** |
| v. | |
| GIGANEWS, INC. *et al.* | |
| Defendants. | |

Pending before the Court is Plaintiff Perfect 10, Inc.'s ("Perfect 10") motion for reconsideration (Dkt. No. 627) of the Court's order (Dkt. No. 620) granting Defendants' motion for summary judgment re indirect copyright infringement (Dkt. No. 440) and denying as moot Perfect 10's mirror-image motion for summary judgment. (Dkt. No. 467.)  For the reasons discussed more fully below, Perfect 10 fails to satisfy the requirements for reconsideration, and the Court **DENIES** the motion.

## I.    Background

On November 14, 2014, this Court entered three separate orders disposing of the parties' seven competing motions for partial summary judgment. (Dkt. Nos. 619,

620, & 621.) First, the Court granted Defendants' motion for partial summary judgment on the question of direct copyright liability, holding that the undisputed evidence demonstrated Defendants could not be liable for direct copyright infringement as a matter of law. (Dkt. No. 619.) Having granted partial summary judgment on direct infringement in defendant's favor, the Court denied Perfect 10's mirror-image motion for partial summary judgment on direct infringement as moot. (Dkt. No. 619.) Next, the Court granted Defendants' motion for partial summary judgment on the question of indirect copyright liability, concluding the undisputed evidence demonstrated Giganews, Inc. ("Giganews") could not be liable for contributory or vicarious copyright infringement.[1] (Dkt. No. 620.) The Court then denied Perfect 10's mirror-image motion for partial summary judgment on the question of indirect copyright infringement as moot. (Dkt. No. 620.) Finally, the Court denied the parties remaining three motions for partial summary judgment on a handful of non-dispositive issues as moot because the Court's first two orders disposed of all the claims remaining in the action. (Dkt. No. 621.) After considering Perfect 10's objections to Defendants' proposed judgment (and adopting some of them), the Court entered judgment in Defendants' favor on November 26, 2014. (Dkt. No. 628.)

After the Court entered judgment, Perfect 10 moved for reconsideration of the Court's order on the question of indirect copyright infringement. (Dkt. No. 627.) Because Perfect 10 does not move for reconsideration of the Court's order granting summary judgment in Defendants' favor on the question of direct copyright infringement or the Court's order denying the remaining motions for summary judgment as moot, the Court does not address those orders further. Nor does the

---

[1] Because Perfect 10's claims of indirect copyright infringement against Defendant Livewire Services, Inc. had already been dismissed with prejudice at the pleading stage, the Court's order did not address Perfect 10's claims of indirect infringement against Livewire.

1   Court address the portion of its order on indirect infringement concluding Giganews
2   could not be liable for vicarious infringement as a matter of law because the
3   undisputed evidence showed Giganews did not obtain a direct financial benefit from
4   the infringing conduct of third parties.  (*See* Dkt. No. 620, pp. 3-7.)  Perfect 10 does
5   not seek reconsideration of any portion of the Court's order on vicarious infringement.

6

7   **II.    Legal Standard**

8

9      "A district court may reconsider its grant of summary judgment under either
10   Federal Rule of Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule
11   60(b) (relief from judgment)."   *School Dist. No. 1J, Multnomah County Or. V.*
12   *ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993).   Generally, a motion for
13   reconsideration brought within 28 days of the entry of judgment is treated as a motion
14   under Rule 59(e).  *See* Fed. R. Civ. Proc. 59(e) (motions to alter or amend judgment
15   under that rule must be brought within 28 days of entry of judgment); *see also In re*
16   *Benham*, No. CV 13-00205-VBF, 2013 WL 3872185, at *1 (C.D. Cal. May 29, 2013)
17   ("A motion for reconsideration filed within 28 days of a judgment is typically treated
18   as a motion under Federal Rule of Civil Procedure 59(e)").  Perfect 10 moves for
19   reconsideration under Rule 59(e).  (Dkt. No. 627, p. 1.)  "Under Rule 59(e), a motion
20   for reconsideration should not be granted, absent highly unusual circumstances, unless
21   the district court is presented with newly discovered evidence, committed clear error,
22   or if there is an intervening change in the controlling law."  *389 Orange St. Partners*
23   *v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).  Reconsideration is an "extraordinary
24   remedy, to be used sparingly in the interests of finality and conservation of judicial
25   resources."  *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003).  "For reasons of
26   judicial economy and finality, such motions are disfavored and are rarely granted."
27   *Resolution Trust Corp. v. Aetna Cas. & Sur. Co.*, 873 F. Supp. 1386, 1393 (D. Ariz.
28   1994)

3.

1        Although a party may make a Rule 59(e) motion to substantively challenge a
2    court's entry of summary judgment, the challenge must be grounded in truly *new* law
3    or evidence.   Reconsideration "may not be used to relitigate old matters, or to raise
4    arguments or present evidence that could have been raised prior to the entry of
5    judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quotation
6    omitted).  A motion to reconsider may not "rehash[] what ha[s] been before the court
7    when it ruled" on the prior motion. *Faysound Ltd. v. United Coconut Chemicals, Inc.*,
8    878 F.2d 290, 296 (9th Cir. 1989); *accord* Ca*isse Nationale de Credit Agricole v. CBI*
9    *Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir.1996) ("Reconsideration is not an
10   appropriate forum for rehashing previously rejected arguments or arguing matters that
11   could have been heard during the pendency of the previous motion.").  Nor does
12   reconsideration afford a party an opportunity to try out new arguments or evidence
13   that it could have, but did not, discover or advance the first time around. *U.S. v.*
14   *Westlands Water Dist.*, 134 F.Supp.2d 1111, 1130 (E.D. Cal. 2001); *United States v.*
15   *Navarro*, 972 F.Supp. 1296, 1299 (E.D. Cal. 1997).   Generally, the aim of
16   reconsideration is to accommodate a fundamental change in circumstances going to
17   the heart of a court's original analysis.

18

19        Alternatively, reconsideration may also be used as a narrow vehicle to correct a
20   "clear" or "manifest" error of law or fact in a court's earlier ruling. *Roschewski v.*
21   *Raytheon Co.*, 471 F. App'x 588, 589 (9th Cir. 2012) (citing *School Dist. No. 1J,*
22   *Multnomah Cnty., Or. v. ACandS, Inc.*, *supra*,, 5 F.3d 1255, 1262–63 (9th Cir.1993).
23   Although the Ninth Circuit has not yet articulated what constitutes a "clear" or
24   "manifest" error for the purposes of reconsideration, other circuits have.  As the Fifth
25   Circuit has noted, "'clearly erroneous' is a very exacting standard. Mere doubts or
26   disagreement about the wisdom of a prior decision...will not suffice for this exception.
27   To be clearly erroneous, a decision must strike us as more than just maybe or probably
28   wrong; it must be dead wrong." *Hopwood v. State of Texas*, 236 F.3d 256 (5th Cir.

1    2000) (internal quotes omitted); *see also Campion v. Old Republic Home Prot. Co.*,

2    No. 09-CV-748-JMA NLS, 2011 WL 1935967, at *1 (S.D. Cal. May 20, 2011) (citing

3    *Hopwood* and applying this standard on motion for reconsideration).   Similarly, a

4    "'manifest error' is not demonstrated by the disappointment of the losing party. It is

5    the wholesale disregard, misapplication, or failure to recognize controlling precedent."

6    *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000); *see also Mays v.*

7    *Colvin,* No. 1:13-CV-00904-SKO, 2014 WL 6893825, at *3 (E.D. Cal. Dec. 8, 2014)

8    (citing *Oto* and applying this standard on motion for reconsideration).

9

10   **III.   Discussion**

11

12        Perfect 10 does not seek reconsideration on the ground that new evidence or

13   law undermines the Court's holding on the question of contributory infringement.

14   Instead, Perfect 10 seeks reconsideration solely on the ground that the Court

15   committed clear and manifest error by ignoring Perfect 10's authorities and evidence.

16   The Court considers each of these arguments in turn.

17

18        **A.     The Court Did Not Ignore, Disregard, Or Misapply Any**

19                **Controlling Authorities Cited In Plaintiff's Opposition**

20

21        The bulk of Perfect 10's motion for reconsideration contends that the Court

22   failed to account for Perfect 10's evidence.   However, Perfect 10 also contends that

23   the Court committed clear and manifest error by failing to address two cases Perfect

24   10 cited in its reply to its own motion for summary judgment on the issue of indirect

25   copyright infringement.  (Dkt. No. 627, p. 14 (noting two cases cited in Dkt. No. 620,

26   Perfect 10's reply brief.)  Perfect 10 first argues that the court failed to consider the

27   unreported, out-of-circuit district court decision in *Rogers v. Elcor Studio*, No. 11-CV-

28   4493(ARR)(RER), 2013 WL 7552256, at *7 (E.D.N.Y. Feb. 7, 2013) which held that

5.

1  a copyright notice at the end of a film gave the alleged infringer actual and
2  constructive notice that the film was subject to copyright.  (Dkt. No. 627, p. 14.)
3  Perfect 10 also argues that the Court failed to consider the Ninth Circuit's holding in
4  *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004) that a phone call from an
5  AOL subscriber should have put AOL on notice of the existence of the infringing
6  activity on the particular USENET group at issue in that case.  (Dkt. No. 627, p. 14.)
7
8      To begin with, the Court notes that its summary judgment order on indirect
9  infringement only addressed the substance of Giganews' motion, which was
10  dispositive of the entire question of indirect infringement.  The Court's did not
11  address *Rogers v. Elcor Studio* because **Perfect 10 did not cite that case anywhere**
12  **in its opposition**.  (Dkt. No. 536.)  "Judges are not like pigs, hunting for truffles
13  buried in briefs."  *Independent Towers of Washington v. Washington*, 350 F.3d 925,
14  929 (9th Cir. 2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th
15  Cir.1991)).  To the extent Perfect 10 thought *Rogers v. Elcor Studio* was material to
16  opposing Giganews' motion for partial summary judgment, it was free to cite that case
17  in opposition.  It did not do so.  Fed. R. Civ. Proc. 56(c)(1)(C) ("The court need only
18  consider the cited materials" in opposition to summary judgment).  Instead, Perfect 10
19  cited that case in a string citation in its reply brief to its own summary judgment
20  motion (Dkt. No. 606, p. 19), which the Court did not reach because Giganews'
21  motion was dispositive of the question.  Likewise, although all parties and the Court
22  cited *Ellison v. Robertson* in the context of Giganews' motion, Perfect 10 did not cite
23  *Ellison* for that proposition in opposition to Giganews' motion.  Again, Perfect 10
24  only cited *Ellison* on that point in a single sentence in its reply to its own motion for
25  summary judgment.  (*Id.*)  In hindsight, Perfect 10 may wish it had opposed
26  Giganews' motion on different grounds, but reconsideration is not an opportunity to
27  take a second bite at the apple.  *Exxon Shipping Co. v. Baker*, 554 U.S. at 485 n.5.  It
28  is an opportunity to correct the Court's error, not Perfect 10's.

1    But even if Perfect 10 had cited either case for the propositions it now

2  articulates, neither case undermines the Court's reasoning.  In *Rogers v. Elcor Studio*,

3  for example, a foreign film company made a "shot-by-shot reproduction" of the

4  plaintiff's original film, and even used audio pulled directly from the original work.

5  *Rogers v. Elcor Studio*, 2013 WL 752256, at *1.  On a motion for default judgment to

6  determine the appropriate amount of damages, the district court observed the

7  defendant had actual knowledge that the original work was copyrighted because the

8  original film "contained a copyright notice at the end of the film.  *Id.*, at *7.

9  Importantly, the district court inferred in that *direct infringement* action that the

10  defendant had seen the copyright notice in the film because there was no question the

11  defendant had watched the film to make its "shot-by-shot" copy of the original film in

12  "exacting detail."  *Id.*  In this case, by contrast, there was no evidence that Giganews

13  ever personally viewed or copied any of Perfect 10's copyrighted material such that it

14  would have had occasion to see a "copyright notice" contained in the image.[2]  Indeed,

15  it is for that reason that the Court granted summary judgment in favor of Defendants

16  on the issue of direct infringement – a result Perfect 10 does not challenge by

17  reconsideration.

18

19    Likewise, in *Ellison v. Robertson*, there was evidence that an AOL user put

20  AOL on notice that a *specific* newsgroup contained unauthorized copies of *specific*

21  works.  *Ellison v. Robertson*, 357 F.3d at 1077.  Based on that specific warning of

22  specific infringing material in a specific newsgroup, the Court of Appeals concluded

23  AOL should have known "of the infringing activity on the particular USENET group

24

25  _____

25  [2] As another court of this district has observed when Perfect 10 made a similar argument, Giganews

26  "is not obligated to comb through tens of thousands of images to determine which ones contain
copyright notices. This would impermissibly "shift a substantial burden from the copyright owner to

27  the provider … ."  *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484-AHM (SHx), 2010 WL
9479059, at *10 (C.D. Cal. July 26, 2010) (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102,

28  1118 (9th Cir. 2007).).

1   at issue in [that] case… ."  *Id.*  That holding is entirely consistent with the litany of

2   Ninth Circuit decisions preceding and following *Ellison*, cited at length in the Court's

3   summary judgment order, that Perfect 10's claim for contributory infringement

4   required evidence that Giganews had specific knowledge of specific infringing content

5   on its servers.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d

6   1006, 1022 (9th Cir. 2013); *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068,

7   1072 (9th Cir. 2013); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th

8   Cir. 2007) *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020-21 (9th Cir.

9   2001).  Nothing in *Ellison* suggests a contrary result.  Even if Perfect 10 had properly

10  raised the argument it belatedly attempts to assert on reconsideration, the result would

11  be the same because the undisputed evidence showed Giganews did not have specific

12  knowledge of a specific message or newsgroup containing specific infringing content.

13

14          **B.      The Court Did Not Ignore, Disregard, or Misapply any of Perfect**

15                  **10's Material Evidence**

16

17          The remainder of Perfect 10's request for reconsideration concerns the Court's

18  conclusion that:

19                  "[T]here is no evidence that Giganews had any knowledge,

20                  actual or constructive, of any specific infringing content other

21                  than those messages for which Perfect 10 provided legible

22                  Message IDs.  As to those messages, the evidence is undisputed

23                  that Giganews promptly blocked access to the infringing

24                  message."

25

26  (Dkt. No. 620, at p. 13.)  Perfect 10's assertion that the Court was "dead wrong" on

27  this point rests on several separate arguments.

28

1.    **The Undisputed Evidence Shows Message-IDs Were the Only Method for Consistently Identifying a Specific Usenet Message**

Perfect 10 disputes the Court's underlying conclusion "the evidence before the Court is undisputed that the only method for consistently identifying a specific Usenet message that Giganews could promptly remove is the post's Message-ID." (Dkt. No. 627, pp. 7-8 (quoting Dkt. No. 620, p. 12).) Perfect 10 begins by repeating its evidence that "Message Descriptions are superior to Message-IDs" to identify specific infringing content. (Dkt. No. 627, p. 7.) This Court has twice considered this argument, and the evidence Perfect 10 offers in support of it, and found it insufficient to create a disputed issue of material fact. (Dkt. No. 620, pp. 10-12; Dkt. No. 619, p. 3[3] (considering evidence of various fields contained in every Usenet message, and observing the evidence is undisputed that a Message-ID is the "only way to uniquely identify a Usenet message" because the content of Message-ID field is the only field that is not subject to the arbitrary whims of the individual making the post and is the only field that cannot be the same in any two messages).)[4]

To make this argument, Perfect 10 cites to a host of evidence it contends the Court "failed to consider" or "overlooked." (Dkt. No. 627, pp. 7-8.) To the extent the Court "failed to consider" or "overlooked" the evidence Perfect 10 identifies in its motion for reconsideration, the reason is simple: Perfect 10 did not cite any of it in its

---

[3] In its order on indirect infringement, the Court expressly incorporated the fact summary from its order on direct liability. (Dkt. No. 620, p. 2.)

[4] Perfect 10 did not previously, and does not now, offer anything to controvert the evidence that a Message-ID is the only field in a Usenet message over which the individual posting the message (in this context, the alleged direct infringer) has no control. Nor has Perfect 10 submitted any evidence to controvert the notion that, unlike every other field in a message, the Message-ID field is the only field in a Usenet post that cannot be the same for any two messages.

1  opposition.   Pursuant to Federal Rule of Civil Procedure 56(c)(1), Perfect 10 was
2  required to "cite to particular parts of the materials in the record" that would "establish
3  the … presence of a genuine dispute… ."   Fed. R. Civ. Proc. 56(c)(1)(A) & (B).
4  Perfect 10 largely failed to do so, and it would have been "unfair" to the Court and
5  "profoundly unfair" to Giganews to require the Court "to search the entire record for a
6  genuine issue of fact, even though [Perfect 10] [did] not set it out in the opposition
7  papers."   *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th
8  Cir. 2001).   Perfect 10's newfound reliance on evidence well outside the record on the
9  motion for summary judgment would, in effect, transform the Court into "the lawyer
10  for [Perfect 10], performing the lawyer's duty of setting forth specific facts showing
11  that there is a genuine issue for trial."   *Id.* [5]

13         Of course, in the context of cross-motions for summary judgment, a party may
14  cite to evidence attached to a separate motion for summary judgment.   *Fair Housing*
15  *Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135-36 (9th Cir.
16  2001).   Even so, however, "when parties submit cross-motions for summary
17  judgment, each motion must be considered on its own merits" and "[t]he court must
18  rule on each party's motion on an individual and separate basis.   *Id.* at 1136 (internal
19  quotes omitted").   A party opposing summary judgment who wishes to have the court
20  to consider evidence cited in a separate motion for summary judgment must actually
21  *cite* the evidence *in its opposition papers*.   *Id.* (noting on cross-motions for summary
22  judgment, district court is required to review evidence filed in support of another
23  motion so long as that evidence is "specifically identified in [the] moving papers")   As
24  one leading treatise correctly puts it, "a cross-motion for summary judgment is not an

25  _____
26  [5] At oral argument, Perfect 10 suggested it had somehow cited the entire docket in this case (which
   exceeds 600 entries) in support of its opposition.  Even if it had been proper to do so (it would not),
27  Perfect 10 did no such thing.  Instead, Perfect 10's separate statement cited specific items of
   evidence in support of its motion.  (See generally, Dkt. No. 537.)  That evidence was insufficient to
28  survive summary judgment.

1    opposition to the original motion."  Cal. Prac. Guide Fed. Civ. Pro. Before Trial,

2    ¶14:122.5 (citing *Beard v. Banks*, 548 U.S. 521, 527).  To the extent Perfect 10 sought

3    to oppose Giganews' motion based on evidence attached to one of the other six

4    motions for summary judgment, Perfect 10 was required to actually cite that evidence

5    in its opposition papers. Fed. R. Civ. Proc. 56(c)(1)(A), (c)(3); *Beard v. Banks*, *supra*,

6    548 U.S. at 527 (where party filed cross-motion for summary judgment rather than

7    opposition to original motion for summary judgment, district court properly treated

8    original motion as unopposed).

9

10       Nevertheless, the bulk of the evidence Perfect 10 cites in support of

11   reconsideration was not cited anywhere in any of their opposition papers to Giganews'

12   motion.  In support of its contention that the Court ignored important evidence, for

13   example, Perfect 10 cites extensively to evidence it submitted in support of:

14

15       • Perfect 10's opposition to Giganews' motion for summary judgment on

16         the adequacy of Perfect 10's notices under the Digital Millennium

17         Copyright Act's ("DMCA") safe harbor provision and supporting

18         evidence (Dkt. No. 550); and

19

20       • Perfect 10's reply in support of its own motion on indirect infringement

21         and supporting evidence.  (Dkt. Nos. 606, & 616.)

22

23   (Dkt. No. 627, pp. 7-9.)   Perfect 10 did not cite to any of that evidence in its

24   opposition papers (including Perfect 10's opposition separate statement), and it would

25   have be wholly inappropriate for the Court take on the role of Perfect 10's lawyer,

26   scouring the docket for uncited evidence in support of Plaintiff's opposition.  *Carmen*

27   *v. San Francisco Unified School Dist.*, 237 F.3d at 1031.

28

1    Perfect 10 also contends that the Court did not consider evidence Perfect 10

2    submitted in support of its own motion regarding the sufficiency of its notices under

3    the DMCA bearing on the role of Message-IDs in identifying a unique Usenet

4    message. (Dkt. No. 627, pp. 7-9.) Although Perfect 10 apparently did cite to some of

5    that evidence a handful of times in its opposing separate statement (Dkt. No. 537),

6    Perfect 10 failed to cite any of that evidence in its opposition brief or argue why any

7    such evidence created a disputed issue of material fact.  This fact alone prevents

8    reconsideration, as Perfect 10's failure to address that that evidence in its opposition

9    waived any arguments related to it.  *U.S. v. Kitsap Physicians Service*, 314 F.3d 995,

10   999 (9th Cir. 2002) (party's failure to present evidence to in opposition brief to district

11   court on summary judgment waived argument relating to that evidence); .  *Moreno*

12   *Roofing Co., Inc. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996) (passing remarks on an

13   issue in opposition to summary judgment insufficient to avoid waiver); *accord John-*

14   *Charles v. California*, 646 F.3d 1243, 1247 n.4 (holding party "failed to develop any

15   argument on this front, and thus has waived it"); *U.S. v. Kimble*, 107 F.3d 712, 715

16   n.2 (9th Cir. 1997) (where party fails to "coherently develop[]" an argument on appeal

17   "we deem it to have been abandoned"); *see also U.S. v. George*, 291 Fed. App'x. 803,

18   805 (9th Cir. 2008) (holding party's "failure to adequately develop these arguments in

19   his brief operates as a waiver"); and *REP MCR Realty, L.L.C. v. Lynch*, 363 F.Supp.2d

20   984, 1015 (N.D.Ill.2005) (holding that a plaintiff waives an argument he fails to raise

21   in opposition to a motion).

22

23   But even if Perfect 10's citation to evidence in its separate statement alone was

24   sufficient to put that evidence at issue in Giganews' motion for summary judgment on

25   indirect liability, the evidence did not create a disputed issue of fact and the Court did

26   not "clearly" and "manifestly" err by not discussing it.  Perfect 10 first cites to

27   evidence submitted in support of its own DMCA motion suggesting that in certain

28   circumstances it was impossible to obtain a Message-ID for a particular message, but

1   still possible to download infringing content from Giganews' servers.  (Dkt. No. 627,

2   p. 7 (citing Dkt. No. 449-3, ¶31 & Dkt. No. 449-16, Exh. 14); *see also* Dkt. No. 537,

3   pp. 13-14.)  That evidence consists of a DMCA takedown notice Perfect 10's CEO

4   Norman Zada sent to Giganews and several other Usenet providers on April 17, 2014.

5   (Dkt. No. 449-16.)  In that notice, Zada stated he had conducted a search using the

6   Mimo newsreader software for photos of a particular model who had modeled for

7   Perfect 10. (*Id*, at Exh. 14, p. 1.)  Zada attached screenshots of his computer search

8   results to the notice.  (*Id*., at Exh. 14, pp. 3, 6, 9, & 12.)  In each of those screenshots,

9   Zada had selected a particular message from the search results, but the Mimo

10  newsreader did not display any "Header" information (which would include the

11  Message-ID) and gave the message "Header Failure:  Failed loading headers from

12  server."  (*Id*.)  In a separate declaration, Zada declared he was still "able to download

13  infringing Perfect 10 images from those messages" despite the fact that the Mimo

14  newsreader software could not download the message header.  (Dkt. No. 449-3, ¶31.)

15  According to Perfect 10, the Court got it "dead wrong" by failing to discuss this

16  evidence before concluding that a Message-ID is the only way to uniquely identify

17  any specific message with specific infringing conduct.  (Dkt. No. 627, p. 7.)

18

19      As Giganews' evidence in reply made clear, however, Zada's search results did

20  not offer any evidence that content was available on Giganews' servers for which it

21  was impossible to obtain a Message-ID.  As Giganews' chief technology officer Philip

22  Molter explained in his reply declaration, newsreaders, such as the Mimo software

23  Zada used, rely upon third-party indices to search for content on Giganews servers,

24  much like a search engine such as Google searches its own index rather than the entire

25  internet, to respond to an individual search request.  (Dkt. No. 546-1, ¶12.)  Because

26  these third-party indices do not directly search Giganews' servers in real-time, an

27  index may return a search result for a message that no longer exists on Giganews'

28  servers.  (*Id*.)  However, because the message no longer exists on Giganews' servers, a

1  user who tries to access the non-existent message (including its message header) on

2  Giganews' servers in response to a search query will be unable to do so, much in the

3  same way that an internet search will sometimes produce inaccessible "dead links" to

4  websites that are no longer available on the internet.  (*Id.*)

5

6      In response to a search request for a particular set of search criteria, a

7  newsreader like Mimo will often group multiple messages into a single search result

8  listing, despite the fact that there is no similar association between the independent

9  messages on Giganews' servers.  (Dkt. No. 546-1, ¶14.)  Because of this grouping, it

10  is possible for a newsreader like Mimo to return an error message for one Message-ID

11  but still download associated content from *other Message-IDs* grouped into the same

12  search result.  (*Id.*)  This does not mean, however, that the Message-IDs from the still-

13  available posts are unavailable as Zada suggests.  (*Id.*)  Such a result would be

14  impossible because the fundamental architecture of the Usenet provides that content is

15  only available through the Usenet by way of messages, and every message must have

16  a corresponding Message-ID.  (*Id.*)  The fact that Zada did not know how to use his

17  newsreader to identify the Message-IDs of the still-existing messages lumped into his

18  single search result does not change the fundamental (and still undisputed) fact: if

19  content is available on the Usenet, it must have an associated Message-ID.  (*Id.*)

20

21      But as the Court noted in its order granting Giganews motion for summary

22  judgment, the law places the responsibility of "identifying the potentially infringing

23  material" (which can only truly be done with a Message-ID) "squarely on" Perfect 10.

24  *Perfect 10, Inc. v. CCBill LLC* ("*CCBill*") 488 F.3d 1102, 1118 (9th Cir. 2007).

25  Nothing in the evidence Perfect 10 identified in its opposition separate statement (but

26  omitted from its opposition brief), suggests it was at all impossible for Perfect 10 to

27  obtain a Message-ID for any specific infringing content *available on Giganews'*

28

14.

1    *servers*,[6] nor does it suggest any basis "to shift [that] substantial burden from [Perfect

2    10] to" Giganews.  *Id*.  The Court did not clearly err in omitting a discussion of

3    Perfect 10's irrelevant evidence on this point, and finds no basis for reconsideration.

4

5              **2.       The  Undisputed  Evidence  Shows  Giganews  Promptly**

6                      **Removed  All  Messages  for  which  Perfect  10  Provided  a**

7                      **Compliant DMCA Notice**

8

9              Perfect 10 next argues that the Court committed clear error in holding "the

10   evidence is undisputed that Giganews promptly blocked access to the infringing

11   messages" as soon as it received actual or constructive notice in the form of "legible

12   Message IDs."  (Dkt. No. 627, p. 3 (quoting Dkt. No. 620, p. 13).)  Specifically,

13   Perfect 10 points to a single sentence in its opposition brief where it noted "Giganews

14   has also failed to process 10 Message-IDs found in DMCA notices sent by Perfect 10

15   via email."  (Dkt. No. 536, p. 21 (citing Dkt. No. 538 ¶47; Dkt. No. 508-3, Exh. 31,

16   Dkt. No. 553.[7])  Again, Perfect 10's casual reference to this argument in opposition

17   was insufficient to present it to the Court, and the argument is now waived.  *Moreno*

18   *Roofing Co., Inc. v. Nagle*, *supra*, 99 F.3d at 343 (passing remarks on an issue in

19   opposition to summary judgment insufficient to avoid waiver).  Perfect 10 may not

20   _____

21   [6] It is also worth observing that nothing in the takedown notice even suggests any of the images were
     available on Giganews' servers.  None of the search results specify which index Zada searched,

22   whether that search included an index of Giganews' servers, or from which server Zada actually
     downloaded the content. (Dkt. No. 449-16.)  Indeed, Zada sent the takedown notice in question to

23   multiple Usenet providers, each operating their own set of servers.  (*Id*., at p. 1.)  Zada's
     accompanying declaration adds no more insight, omitting any reference to the servers from which he

24   actually downloaded the allegedly infringing content.  To the extent Perfect 10's intends to suggest
     this is evidence that content was available on *Giganews' servers* despite being unable to access the

25   Message-ID, that inference lacks foundation.  To the extent Perfect 10 uses it to show that the
     allegedly infringing content was available somewhere on the Usenet, it is irrelevant.

26

27   [7] The Court's citation to Docket Number 553 refers to a manually lodged disk filed under seal with
     the Court.   The docket entry itself notes that the original exhibit is on file with the clerk.

28

                                              15.

1  seek a do-over by raising it for the first time on reconsideration.[8]

2

3      Still, even if Perfect 10 had not waived this argument by failing to raise it in

4  opposition to Giganews' motion for summary judgment on indirect liability, the

5  argument is unavailing.  On reconsideration, Perfect 10 identifies 10 takedown notices

6  it sent to Giganews using its search-and-screenshot method via email. (*See* Dkt. No.

7  620, pp. 10-11; Dkt. No. 619, pp. 5-6 (discussing Perfect 10's screenshot-search

8  takedown notices).)  Each of the screenshots displayed numerous search results, with

9  one arbitrarily selected search result. (Dkt. No. 508-3, Exh. 31, Dkt. No. 553.)  For

10  each of those 10 searches, the screenshot displays a Message-ID for the randomly

11  selected search result buried in the message header in the bottom right corner of the

12  screen. (Dkt. No. 508-3, Exh. 31, Dkt. No. 553.)  For those 10 select searches, Perfect

13  10 notes a similar search more than a year later revealed the message was still

14  available. (Dkt. No. 508-3, Exh. 31, Dkt. No. 553.)

15

16      Highlighting a portion of the Court's order discussing Perfect 10's attempt to

17  fax similar DMCA notices in which the Court noted similar Message-IDs were

18  illegible, Perfect 10 concludes these 10 messages provided Giganews actual notice of

19  the allegedly infringing content contained in them because the images were clearer

20  than the ones they faxed.  Though true, this fact is of little relevance.  As the Court

21  *also* noted, DMCA notices that do not substantially comply with the requirements set

22  forth in the DMCA for a takedown notice "*shall not be considered … in determining*

23  whether a service provider has actual knowledge or is aware of facts or circumstances

24  _____

25  [8] That Perfect 10 may have addressed at least part of this argument in one of its other motions for
summary judgment is immaterial.  As Perfect 10 conceded at oral argument, the Court was not

26  required to construe all seven summary judgment motions as a single, "mega motion." (Dkt. No.

27  648 pp. 29:24-30:1.)  If Perfect 10 believed this argument was sufficient to defeat Giganews' motion
for summary judgment on the issue of indirect liability, Perfect 10 had the burden to present that

28  argument to the court in its opposition to Giganews' motion.  It failed to do so.

1   from which infringing activity is apparent."  17 U.S.C. §512(c)(3)(B)(i).  (*See* Dkt.

2   No. 620, p. 11 (quoting section 512(c)(3)(B)(i)).)  Among other things, a DMCA

3   takedown notice must identify "the material that is claimed to be infringing or to be

4   the subject of infringing activity and that is to be removed or access to which is to be

5   disabled, and information reasonably sufficient to permit the service provider to locate

6   the material." 17 U.S.C. §512(c)(3)(A)(iii).  As the Court further held, "[t]he goal of

7   this provision is to provide the service provider with adequate information to find and

8   address the allegedly infringing material expeditiously."  *Viacom Int'l, Inc. v.*

9   *YouTube, Inc.*, 940 F.Supp.2d 110, 115 (S.D.N.Y. 2013) (internal citations omitted).

10

11        This Court and Judge Collins have both concluded Perfect 10's screenshot-

12   search takedown notices fail to substantially comply with this basic DMCA

13   requirement.  (Dkt. No. 620, pp. 11-13; Dkt. No. 180, pp. 13-16.)  That Perfect 10's

14   emailed versions of those notices were slightly more legible is of little consequence

15   because, legible or not, inadequate takedown notices "shall not be considered" in

16   determining whether Giganews had notice of any infringing content on its servers.  It

17   may be that those deficient notices legibly identified a single Message-ID, but Perfect

18   10's own evidence made clear that Giganews utilizes an *automated* system for

19   processing takedown notices.  (Dkt. No. 539-1, p. 40:21-25.)  This automated system

20   is essential to expeditiously processing takedown notices in light of the staggering

21   volume of requests Giganews receives – in the year between November 6, 2012 and

22   November 6, 2013, Giganews processed more than half-a-billion takedown notices.

23   (*Id.*, at ¶32.)  Perfect 10 was well aware of this fact, indeed the Court drew the facts

24   from Perfect 10's own evidence, but the evidence was also undisputed that Perfect 10

25   obstinately refused to provide Message-IDs in any form that would permit Giganews

26   to process the requests through its automated system.  Even after Perfect 10 identified

27   a method of automatically extracting Message-IDs that it admitted would allow it to

28   takedown more than 90% of the alleged infringing material on Giganews' servers in

17.

1   less than 48 hours using Giganews' automated systems, Perfect 10 refused to present

2   its takedown notices in a form that would permit Giganews to "find and address the

3   allegedly infringing material expeditiously."   *Viacom Int'l, Inc. v. YouTube, Inc.*,

4   *supra*, 940 F.Supp.2d at 115 (quoting DMCA legislative history); *accord Perfect 10 v.*

5   *Giganews, Inc.*, 993 F.Supp.2d 1192, 1200 (C.D. Cal. 2014) (same, quoting *Viacom*

6   and DMCA legislative history).

7

8       Even in their legible emailed form, the evidence is undisputed that Perfect 10's

9   insistence on its screenshot-search method only presented the Message-IDs (to the

10   extent it provided them at all) as non-searchable, secondary information in a larger

11   image file, making it impossible for Giganews to use that information in its automated

12   systems.  Indeed, Perfect 10 admits the ancillary Message-IDs in its screenshot-search

13   notices were immaterial to the notices themselves.  (Dkt. No. 627, p. 12 (arguing it

14   was not necessary to resend legible Message-IDs where a screenshot-search notice

15   was illegible "because the notices asked Giganews to perform searches … and block

16   all resulting messages, not merely the identified Message-IDs") (emphasis in

17   original).)  Even the 10 takedown notices that happened to include a legible Message-

18   ID which Giganews ostensibly failed to remove were never designed to specify a

19   particular Message-ID with particular infringing content.  (*Id.*) (emphasis in original).)

20   As Perfect 10 acknowledges, its notices identified *search terms* rather than *specific*

21   *content*. This is fatal under the DMCA, which requires a compliant notice identify

22   *both* the specific infringing content *and* an effective means of locating that content.

23   17 U.S.C. §512(c)(3)(A)(iii).

24

25       Like other aspects of Perfect 10's takedown notices that both this Court and

26   Judge Collins held inadequate under the DMCA, Perfect 10's screenshot-search

27   notices would require Giganews to conduct a visual review of each of Perfect 10's

28   notices on the chance that the screenshot included a Message-ID (most did not) and on

18.

1    the chance that any such Message-ID was legible (most were not).  Giganews would
2    then be required to manually transcribe the lengthy string of characters making up the
3    Message-ID and perform an "onerous side-by-side" comparison (*see* Dkt. No. 620, p.
4    11; Dkt. No. 180, p. 16) of the Message-ID in Perfect 10's screenshot image and the
5    transcribed Message-ID.  This is in contrast to Perfect 10's ability to simply copy-and-
6    paste the Message-ID from the newsreader software and compile it in a file that
7    Giganews could have quickly and efficiently processed through its automated DMCA
8    takedown process.  Every aspect of Perfect 10's screenshot-search takedown notices
9    undermined the fundamental purpose of the DMCA notice procedure, which places
10   the burden "squarely" on Perfect 10 to "identify[] the potentially infringing material
11   and adequately document" it (*CCBill*, 448 F.3d at 115) and to "provide [Giganews]
12   with adequate information to find and address the allegedly infringing material
13   *expeditiously*."  *Perfect 10 v. Giganews, Inc.*, 993 F.Supp.2d at 1200.

14

15        As the Court observed in its prior order, there is no question that a valid DMCA
16   notice including a legible Message-ID would have given Giganews actual or
17   constructive knowledge of specific infringement.  (Dkt. No. 620, p. 12.)  But the 10
18   DMCA notices Perfect 10 identifies in its motion for reconsideration are not such
19   notices.  Rather, they are the sort of screenshot-search notices that run afoul of the
20   very purpose of the DMCA takedown procedure, despite Perfect 10's legal burden and
21   ability to produce compliant notices with text-readable Message-IDs.[9]

22   _____
     [9] Admittedly, the undisputed evidence also showed that Giganews actually did remove a number of
23   messages identified in Perfect 10's deficient notices.  (Dkt. No. 558, ¶45; Dkt. No. 537, ¶45.)
     However, the fact that Giganews took the extra effort to take down content in response to a number
24   of Perfect 10's deficient DMCA notices does not mean it was legally obligated to do so for all of
     them.  As Giganews pointed out at the hearing on this motion and the evidence at summary
25   judgment made plain, its handful of attempts to accommodate Giganews' inadequate DMCA notices
     was simply not scalable given the volume of DMCA notices Giganews processes each year.  Nor is
26   Plaintiff's suggestion that other Usenet service providers process Perfect 10's notices material.
     Giganews had no obligation under the DMCA to redesign its entire takedown system to
27   accommodate Perfect 10's screenshot method, even if other service providers had systems more
28   amenable to them.  Moreover, the evidence was undisputed at summary judgment that Giganews is

1                **3.**      **The Court Did not Ignore Evidence Regarding When**

2                      **Perfect 10 Discovered a Software Feature that Would Allow**

3                      **Perfect 10 to Quickly Remove More than 90% of its**

4                      **Content From Giganews' Servers**

5

6        Perfect 10 also moves for reconsideration on the ground that the Court

7  "overlooked Perfect 10's evidence that it did not learn of the automatic Message-ID

8  extraction feature found in the Mimo newsreader until May 21, 2014, after Perfect 10

9  sent to Giganews all of the DMCA notices in this case, and that, without such

10  knowledge, it would have taken Perfect 10 months to manually cut and paste 60,000

11  Message-IDs into a text file." (Dkt. No. 627, pp. 9-10.)  The Court did not overlook

12  any such evidence, and Perfect 10 does not identify any basis for reconsideration.

13

14        To begin with, much of the evidence Perfect 10 asserts the court overlooked

15  was not cited anywhere any of Perfect 10's opposition papers. (*See* Dkt. No. 627, pp.

16  9-10 (identifying evidence Perfect 10 cited in its reply on a separate summary

17  judgment motion, but not cited in Perfect 10's opposition brief or opposition separate

18  statement to Giganews' summary judgment motion on indirect infringement).)

19  Moreover, Perfect 10's argument regarding the day it discovered the particular feature

20  of the Mimo newsreader misapprehends the point the Court made in its order granting

21  Giganews' motion for summary judgment on indirect infringement.  The evidence is

22  undisputed that Perfect 10 presently has the technological capability to easily remove

23  "more than 90% of the infringing Perfect 10 content that Perfect 10 is aware of on

24  Defendant's servers" (Dkt. No. 325, ¶18) within 48 hours by automatically extracting

25  Message-IDs into a machine-readable document and submitting them to Giganews'

26

27  by far the largest Usenet service provider.  That other service providers could do something at a
28  smaller scale is not evidence that Giganews could do so at a much larger scale (let alone evidence
     that Giganews was legally obligated to do so).

1    automated takedown system.  Irrespective of when Perfect 10 learned of the software

2    feature that would allow it to do so, the evidence is undisputed that Perfect 10 knows

3    *now*.  It was that evidence, not the date of Perfect 10's discovery, that was relevant to

4    the Court's analysis in its prior order.

5

6    Despite repeated admonitions from Giganews (and one from Judge Collins) that

7    Perfect 10's takedown notices were inadequate under the DMCA, Perfect 10 insisted

8    on using its screenshot-search DMCA notices and refused to supply the sort of

9    machine-readable Message-IDs that would have allowed Giganews to immediately

10   begin the takedown process.   That Perfect 10 *continues* to refuse to produce a

11   compliant DMCA notice with machine-readable Message-IDs, despite its admitted

12   ability to do so since at least May of 2014, belies Perfect 10's insistence that the

13   purpose of its takedown notices was ever to provide Giganews sufficient information

14   to "find and address the allegedly infringing material expeditiously."[10]  *Viacom Int'l,*

15

16   [10] At oral argument, Perfect 10 argued for the first time at any point in this action that in June 2014 it
     gave Giganews a list of roughly 54,000 machine-readable individual Message-IDs of infringing
17   content but that Giganews has failed to take the messages down.  (Dkt. No. 648, p. 32:7-11.)  Perfect
     10 did not present, cite, or proffer any evidence in support of this argument on summary judgment,
18   in its motion for reconsideration, or at oral argument, and any such belated evidence cannot support
     reconsideration.  Nevertheless, the Court also notes Perfect 10 appears to have identified the
19   evidence in question for the first time two weeks after the hearing on reconsideration in the context
     of an entirely different motion.  In opposition to Defendants' separate motion for attorneys' fees,
20   Perfect 10 contends that it provided Giganews 54,000 machine-readable Message-IDs on June 26,
     2014.  (Dkt. No. 650, p. 12, citing Dkt. No. 650-8, ¶¶11-12 & Exh. 1.)  Notably, however, Perfect 10
21   does not assert in its opposition to Defendants' attorneys' fee motion that it provided those Message-
     IDs in any manner consistent with a DMCA takedown notice.  *Id.*  Indeed, Defendants' note Perfect
22   10 produced those Message-IDs *in discovery responses* at Defendants' own request.  (Dkt. No. 655-
     1, ¶35.)  There is no evidence that Perfect 10's discovery responses (1) were submitted to Giganews'
23   designated DMCA agent, or (2) included a statement under penalty of perjury that Perfect 10 had a
     good faith belief that Perfect 10 was the lawful owner of copyrighted content contained in each of
24   those 54,000 Message-IDs, both of which are necessary for a compliant DMCA notice.  17 U.S.C.
     §512(c)(3)(A), (c)(3)(A)(v).  To date, Perfect 10 has refused to supply those Message-IDs in a
25   DMCA notice despite its admitted ability to do so.  (Dkt. NO. 655-1, ¶35.)  If anything, that Perfect
     10 has such a compilation at its immediate disposal only emphasizes the Court's prior observation –
26   if Perfect 10 were actually interested in protecting its copyrights from infringement, it could do so in
     a matter days.  Instead, it makes a conscious choice not to do so.
27

28

1   *Inc. v. YouTube, Inc.*, *supra*, 940 F.Supp.2d at 115.  If Perfect 10's goal is to remove

2   its copyrighted material from Giganews' servers, Perfect 10 could have achieved that

3   goal any time since May of 2014.  It chooses not to.  With the antidote in its hands,

4   Perfect 10 declines to take it and instead insists on debating how badly it has been

5   poisoned.

6

7        Nor did the Court "overlook" evidence that, prior to discovering the automated

8   Message-ID extraction feature in the Mimo newsreader, it would have been very labor

9   intensive to identify Message-IDs.  The Court merely emphasized that the burden of

10   performing that task falls "squarely on" perfect 10, and declined to "shift [that]

11   substantial burden" to Giganews.  (Dkt. No. 620, (quoting *CCBill*, 488 F.3d at 1113).)

12

13        **4.     The Court Did Not Clearly Err in Failing to Separately**

14             **Discuss Evidence of Immaterial Variations in Perfect 10's**

15             **DMCA Notices**

16

17        Perfect 10 further argues that the Court committed clear and manifest error by

18   not considering evidence of screenshot-search notices Perfect 10 sent to Giganews

19   after Judge Collins' original order.  (Dkt. No. 627, pp. 10-13.)  Again, however, a

20   significant portion of the evidence Perfect 10 relies on for this proposition is nowhere

21   to be found in any of Perfect 10's opposition papers to Giganews' summary judgment

22   motion on indirect infringement.[11]  (*See* Dkt. No. 627, pp. 11-13 (citing to evidence in

23

24

25   [11] Specifically, Perfect 10 did not cite or rely upon any evidence regarding "Sample Notice A" in its opposition papers to Giganews indirect infringement summary judgment motion.  (*See* Dkt. No. 627, pp. 12-13.)  It would have been improper for the Court to consider such uncited evidence in deciding Giganews' summary judgment motion (*Carmen v. San Francisco Unified School Dist.*, 237 F.3d at 1031), and it would be similarly improper to reconsider summary judgment based on evidence Perfect 10 identifies for the first time in its motion for reconsideration.  *Exxon Shipping Co. v. Baker*, 554 U.S. at 485 n.5.

26

27

28

1  Dkt. Nos. 543, 550, 606, & 608, none of which were cited in Perfect 10's opposition

2  brief or separate statement).)

3

4      With respect to the evidence that actually was before the Court on Giganews'

5  indirect infringement summary judgment motion, Perfect 10's argument for

6  reconsideration essentially boils down to a claim that its later screenshot-search

7  notices produced fewer search results that would have alleviated some of the

8  numerous problems with that search method identified by Judge Collins and this

9  Court.  (Dkt. No. 627, pp. 10-12.)  The Court did not separately address these minor

10 variations in Perfect 10's DMCA notices because they were immaterial to the Court's

11 ultimate conclusion.  Nothing in the evidence Perfect 10 identified in its opposition

12 papers (and emphasizes on reconsideration) changes the fundamental problem

13 common to all of Perfect 10's takedown notices:  they identified *search terms*, not

14 *specific infringing content* (which on the Usenet can only be uniquely identified with a

15 Message-ID).  A search term on the Usenet is no more specific content than a search

16 term on the World Wide Web is a website.  Perfect 10 has never offered any evidence

17 to undermine this Court's and Judge Collins' holdings that "the material accessible

18 through the Usenet is in a constant state of flux. As such, there is no certainty that any

19 particular search will yield the exact same results at different times. Searches

20 moments apart could yield different results."  (Dkt. No. 620, p. 11 (quoting Dkt. No.

21 180, p. 15.)  As this Court observed, the ever-changing nature of the content available

22 on the Usenet made it effectively impossible for Perfect 10's screenshot-search

23 notices to make representation in good faith that Perfect 10 owned the copyright to all

24 the material accessible through the search terms.  (Dkt. No. 620, pp. 11-12 (citing 17

25 U.S.C. §512(c)(3)(A)(v)).)

26

27

28

1    **5.     The Court Did Not Clearly Err in Failing to Discuss**
2          **Evidence of Willful Blindness that Perfect 10 Did not Cite**
3          **or Rely Upon**

4

5          Finally, Perfect 10 argues that the Court committed manifest error because it
6    "did not address Perfect 10's evidence of willful blindness" which Perfect 10
7    submitted in briefing on a separate motion and never identified in its opposition
8    papers to Giganews' motion in indirect infringement. (Dkt. No. 627, p. 14.)  It would
9    have been improper for the Court to consider such uncited evidence in deciding
10   Giganews' summary judgment motion (*Carmen v. San Francisco Unified School*
11   *Dist.*, 237 F.3d at 1031), and it would be similarly improper to reconsider summary
12   judgment based on evidence Perfect 10 identifies for the first time in its motion for
13   reconsideration.  *Exxon Shipping Co. v. Baker*, 554 U.S. at 485 n.5.  As to the
14   arguments and evidence Perfect 10 actually did present in its opposition papers, the
15   Court considered and rejected them. (Dkt. No. 620, p. 10, n.4.)

16

17   **IV.   Conclusion**

18

19        In light of the foregoing, the Court **DENIES** Perfect 10's motion for
20   reconsideration.  Perfect 10 does not identify any new evidence or law that it could not
21   have, with reasonable diligence, presented to the Court in its opposition papers.  Nor
22   does Perfect 10 identify any material evidence or authorities cited in its opposition
23   papers that the Court ignored or disregarded such that the Court can be said to have
24   committed clear or manifest error.

25

26   Dated:  March 6, 2015        _____

27                               HONORABLE ANDRÉ BIROTTE JR.
                                 UNITED STATES DISTRICT COURT JUDGE
28

Exhibit 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 11-07098-AB (SHx) | Date: | November 14, 2014 |

| Title: | *Perfect 10, Inc. v. Giganews, Inc.* |

| Present: The Honorable | ANDRÉ BIROTTE JR. |

| Carla Badirian | N/A |
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Appearing | None Appearing |

**Proceedings:      [In Chambers] Order (1) GRANTING Defendants Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 357) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Direct Copyright Infringement (Dkt. No. 453)**

Pending before this Court are the parties' competing motions for partial summary judgment regarding Defendant Giganews, Inc.'s ("Giganews") and Defendant Livewire Services, Inc.' ("Livewire") liability for direct copyright infringement.   As stated more fully below, the Court **GRANTS** Defendants' motion. (Dkt. No. 357.)   Even assuming certain computer functions could be construed as a violation of Plaintiff Perfect 10, Inc.'s ("Perfect 10") exclusive rights in various images under other circumstances, the undisputed evidence demonstrates that Defendants' automated, content-neutral systems are not the *direct cause* of any infringement at issue in this action and cannot be held liable for direct copyright infringement.   Because the Court grants partial summary judgment in favor of Defendants on the issue of direct infringement, the Court **DENIES** Perfect 10's competing motion for partial summary judgment on the same issue (Dkt. No. 453) as **MOOT**.

Case 2:11-cv-07098-AB-SH   Document 619   Filed 11/14/14   Page 2 of 17   Page ID #:34418

## I.      BACKGROUND[1]

### A.      The Structure and Function of the Usenet

The Usenet is a set of internet transfer protocols that facilitate the transfer of information between computer servers and individual client computers.   (Dkt. No. 438-10, p. 30:4-6.)   As the Court already noted in its order regarding the expert testimony of Dr. Tygar, the primary transfer protocol governing every interaction on the Usenet is the Network News Transfer Protocol ("NNTP").   (Dkt. No. 580, p. 8)   Like other parts of the internet, including the world-wide web (the "Web"),[2] "there is no specific network that is the Usenet. Usenet traffic flows over a wide range of networks, including the Internet and dial-up phone links."   *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.* ("*Netcom*"), 907 F. Supp. 1361, 1366 n.4 (N.D. Cal. 1995);[3] *see also* Dkt. No. 438-5, p. 67:11-18.   In its broadest sense, the Usenet is "an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and exchange messages posted by USENET users."   *Ellison v. Robertson*, 357 F.3d 1072, 1074 n.1 (9th Cir. 2004).

However, "[t]o obtain access to the USENET, a user must gain access through a commercial USENET provider … or an internet service provider."   *Arista Records LLC v. Usenet.com, Inc.* ("*Arista Records*"), 633 F. Supp. 2d 124, 130 (S.D.N.Y. 2009). Defendant Giganews is one such Usenet provider.   (Dkt. No. 357-1, ¶1.)   Giganews owns and operates numerous Usenet servers, providing its subscribers access to the content stored on Giganews' servers and, using NNTP, to the content stored on the servers of other Usenet providers.   (Dkt. No. 438-5, p. 67:11-18.)   Defendant Livewire does not own or operate any of its own Usenet servers.   (Dkt. No. 357-1, ¶¶17-18.)[4]   Rather, Livewire

---

[1]  The Court has read and considered Defendants' voluminous evidentiary objections filed along with their reply. In considering these motions, the Court does not rely on any inadmissible expert testimony that it already excluded in connection with Defendants three *Daubert* motions. (*See* Dkt. Nos. 580, 581, & 582.)   To the extent that the Court addresses any disputed evidence in this order, Defendants' objection to that evidence is overruled.

[2]  The Usenet is, in essence, a subsection of the larger internet of all networked computers.   What most people commonly refer to as the "internet" (i.e., the version of the internet most people access through a web browser) is actually a different subset of the internet called the world-wide web (the "Web"), which is governed by a different set of transfer protocols – namely Hypertext Transfer Procotol ("HTTP").   *See, e.g., American Library Ass'n, Inc. v. United States*, 201 F.Supp.2d 401, 417 (E.D.Pa. 2002) ("The World Wide Web is a part of the Internet that consists of a network of computers, called 'Web servers,' that host 'pages' of content accessible via the Hypertext Transfer Protocol or 'HTTP.' Anyone with a computer connected to the Internet can search for and retrieve information stored on Web servers located around the world. Computer users typically access the Web by running a program called a 'browser' on their computers."), *rev'd on other grounds sub nom. in United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003).

[3]  Judge Matz previously took judicial notice of this fact in this action.   (Dkt. No. 97, p. 2, also available at 2013 WL 2109963.)

[4]  Perfect 10 purports to dispute this fact by noting a single web page on one of Livewire's affiliated websites which uses the phrase "our servers" in passing.   Nothing in that passing phrase, however, suggests that Livewire actually owns or operates any Usenet servers itself.   Despite a lengthy opportunity to discover any *actual evidence* that Livewire owns or operates any Usenet servers, Perfect 10 uncovered none, and a single, arguably ambiguous statement on one of Livewire's affiliated websites is insufficient to create a disputed issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

provides its customers with access to the Usenet by offering access to content stored on Giganews' Usenet servers.   (Dkt. No. 357-1, ¶19.)[5]

As Judge Matz already judicially noticed, "the content on USENET" to which Giganews (and Livewire via Giganews' servers) offer access "is primarily user-driven – that is, the content that is stored on a USENET provider's server is generally uploaded by USENET users."   (Dkt. No. 97, p. 2.)   Users provide this content by posting text-based "articles" to online bulletin boards, known as "newsgroups."   (Id.)   Although there are billions of articles posted to the Usenet, each article receives a unique "Message-ID," a string of 20 or more alphanumeric characters.   (Dkt. No. 438-1, p. 50:2-24.)   The only way to uniquely identify a Usenet message is by its Message-ID.   (Dkt. No. 369, Exh. 1, ¶8; Dkt. No. 465-5, p. 71:7-11.)   While a Usenet message contains a number of fields with information about the individual message, many other messages can have false or duplicative information in other fields.   (Dkt. No. 369, Exh. 1, ¶8.)   For example, although a Usenet message contains a "Sender" field in which the user's email address should appear, the "Sender" email address is not verified, and many Usenet users provide fake email addresses.   (Dkt. No. 365-9, ¶¶37-38.)[6]   For that reason, multiple Usenet users could post under the same "Sender" name.   (Dkt. No. 465-5, p. 71:1-3; Dkt. No. 465-1, p. 226:20-24.)[7]   And because users create their own "Subject" lines (as with any email), it is also possible that two different users could post two different articles, but with the same "Sender" and "Subject" information.   The only field truly unique to any Usenet article is the Message-ID.

Articles posted to the Usenet are text files.   (Dkt. No. 438-10, p. 42:15.)   However, using text, it is possible to encode another type of file (image, song, movie, etc.) into the body of an article as a binary file.   (Id., at p. 42:16-20.)   "These binary files are encoded in text form for storage and processing, and require a software program to convert the text into a content file such as an image or music file."   Arista Records, 633 F.Supp.2d at 130.   Additionally, before a user can access or download any Usenet articles to begin with (let alone view them), including articles containing encoded binary files, a user must use a Usenet browser application.   (Dkt. No. 439-1, Exh. 3, p. 3.)   Giganews offers its own Usenet browser, called "Mimo," which is apparently also capable of decoding binary files to display them as images.   (Id; see also Dkt. No. 439-5, Exh. 10.)   Giganews also offers

---

[5] Although Livewire does maintain *Web* servers (Dkt. No. 357-1, ¶20), the Court has already noted that the world-wide web is a different segment of the internet, using a different set of transfer protocols than the Usenet (HTTP as opposed NNTP).   (*See* Footnote 1, *supra*.)   It is impossible for a Livewire customer to either post or access Usenet messages using one of Livewire's Web servers.   (Dkt. No. 357-1, ¶¶21-23; Dkt. No. 369, ¶16.)

[6] According to Defendants' expert John Levine, this trend began in the early 1990s when email spammers began to use automated programs to harvest email addresses from Usenet bulletin boards.   (Dkt. No. 465-9, ¶¶37-38.)

[7] That is, two completely different people wishing to keep their email address anonymous could both post under the "Sender" name anonymous@anonymous.com.

its customers the option of purchasing access to a Virtual Private Network ("VPN"), which encrypts and secures data for all forms of internet traffic, including but not limited to Usenet, Web, and email traffic.  (Dkt. No. 439-1, Exh. 3, p. 7.)

"[W]hen an individual user with access to a USENET server posts a message to a newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc. The messages are temporarily stored on each receiving server, where they are available for review and response by individual users." *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 835 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997).   This process by which messages posted to one Usenet server are propagated to other Usenet servers is fundamental to the NNTP architecture and is commonly known as the "peering" process. *See Netcom*, *supra*, 907 F.Supp. at 1366 n.4; *Arista Records*, *supra*, 633 F.Supp.2d at 130. The peering process occurs once two Usenet access providers enter into a "peering agreement" by which "they make an affirmative agreement … for two servers to accept materials from each other."   (Dkt. No. 438-10, p. 84:7-9.)   In essence the servers cross-check the contents offered on both servers and synchronize their information so that the content of one mirrors the content on the other, with certain exceptions discussed below.   Given the amount of material Usenet providers exchange during the peering process, it is impossible for a Usenet provider to know the content of the individual articles exchanged during peering.   (Dkt. No. 438-10, p. 85:5-9.)

## B.    Defendants Control Over the Content Available on the Usenet

Once Giganews has established a peering agreement with another Usenet provider, it exercises a certain amount of control over the articles it copies from other servers. Giganews servers, for example, compares the unique Message-IDs of messages on peer servers to ensure that Giganews does not copy duplicate articles to its servers.  (Dkt. No. 438-2, p. 149:20-150:4.)   Likewise, if a peer server contains an article with a Message-ID that Giganews has already deleted from its servers (for example, in response to a takedown notice), Giganews' servers will not copy that article.   (*Id.*)   Giganews is also a member of the Internet Watch Foundation, which is a voluntary association that identifies individual articles (by Message-ID) or sometimes entire newsgroups that contain child pornography. (*Id.* at p. 147-49.)   That process is automated, and the articles or newsgroups are automatically deleted or (blocked from peering) from Giganews' servers based on information from the Internet Watch Foundation.   (*Id.* at p. 149:2-14.)

Other than setting those basic parameters, Giganews does not select any of the content available on its servers.  (Dkt. No. 357-1, ¶4.)   Giganews itself did not post any of the articles at issue in this action (containing binary files which, when decoded, contain images to which Perfect 10 owns the copyright) to any Usenet server, and all such articles

were posted by Usenet users.  (*Id.*, at ¶¶5, 9, 10.)[8]  Nor does Giganews tell any third parties what to upload to the Usenet, including Giganews' Usenet servers.  (*Id.*, at ¶¶6-7.)

As a company that merely contracts with Giganews for access to Giganews' servers, Livewire has no control over the content uploaded to, downloaded from, transmitted or stored on Giganews' servers.  (Dkt. No. 375-1, ¶12.)  Nor has Livewire uploaded or directed anyone else to upload any materials to which Perfect 10 owns the copyright to the Usenet (either to Giganews' servers or other servers on the Usenet).  (*Id.* at ¶¶13, 14.)

## C.   Giganews' Response to Various Takedown Requests

On its website, Giganews provides an information page for copyright holders, informing copyright holders what information Giganews requires to process a takedown notice submitted under the Digital Millennium Copyright Act ("DMCA," 17 U.S.C. §512(c)(3).).  (Dkt. No. 439-1, Exh. 3, pp. 11-12.)  On that page, Giganews informs copyright holders that, in order to takedown an offending article, Giganews requires the "Message-IDs for all articles the DMCA Notice is requesting Giganews take down." (*Id.*, at Exh. 3, p. 11.)  Pursuant to 17 U.S.C. §512(c)(2), Giganews has also designated an agent to "receive notifications of claimed infringement" by registering that agent's information with the Copyright Office, and posting the information on Giganews' website.  (Dkt. No. 369, Exh. 1, ¶7; Dkt. No. 439-1, Exh. 3, p. 11.)  Giganews also provides copyright holders with a template for generating a DMCA Notice.  (Dkt. No. 439-1, Exh. 3, p. 11.)

As the Court has discussed in many prior rulings, Perfect 10 owns the copyright to thousands of adult images of nude or semi-nude female models.  Perfect 10 has not delegated any of its exclusive rights under those copyrights to Defendants.  (Dkt. No. 437, ¶25.)  Perfect 10 has served Giganews with a number of letters purporting to be takedown notices under the DMCA.  (*See, e.g.,* Dkt. No. 439-11, Exh. 25.)  (*Id.*) Those DMCA Notices instructed Giganews to "locate all of the infringing messages and images in this notice by doing [a] mimo search" for a particular search term.  (*Id.*)  At least some of Perfect 10's DMCA Notices also attached screenshots of the Mimo application, which showed Message-IDs for a handful of individual posts, though only for a minority of the posts purportedly subject to the notice.  (*Id.*)  The sufficiency of

---

[8]  Perfect 10 attempts to put this fact in "dispute" by arguing that Defendants have improperly blocked Perfect 10's attempts to identify the individuals who posted the allegedly offending articles.  (See Dkt. No. 437, p. 4.)  Magistrate Judge Hillman has already expressly rejected this argument in response to Perfect 10's motion for discovery sanctions, holding "Perfect 10 has the ability to obtain the information it desires, and Giganews is not obstructing Perfect 10's efforts."  (Dkt. No. 412, p. 4.)  Perfect 10 further attempts to dispute this fact by contending that, because some allegedly infringing articles posted by third parties were exchanged during the peering process, "Giganews is the entity responsible for uploading those messages to its Usenet servers, not users."  (Dkt. No. 437, p. 4.)  As discussed more fully below, Judge Matz has already considered and rejected this argument.  (Dkt. No. 97, pp. 10-11.)

those DMCA takedown notices is the subject to two other competing motions for partial summary judgment.[9]

## II.    LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).   "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact."   *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56).   An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party.   *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.   *Anderson*, 477 U.S. at 251.   "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ."   *Id.*, at 252.   To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial.   *Id.*, at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party may meet this burden in one of two ways.   In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that affirmatively disproves an essential element of the opposing party's claim or defense.

---

[9]  Perfect 10 also points to three individual Giganews users whose accounts Giganews terminated under Giganews' "two-strike" policy of terminating user accounts after two valid DMCA Notices linked to that individual user's account, or who have otherwise been identified as posting at least two infringing items.   (Dkt. No. 436 pp. 8-10; Dkt. No. 437, ¶¶26-45.)  Perfect 10 suggests that Giganews' refusal to take down every post associated with a repeat infringer, as opposed to its practice of taking down specific posts identified by their Message-IDs, somehow makes it liable as a direct infringer.   (Dkt. No. 436, p. 19.) However, Judge Collins has expressly rejected Perfect 10's argument that the Copyright Act "requires a service provider to disable or delete all messages a repeat infringer has ever posted" as opposed to disabling the users account and removing specifically identified messages.   (Dkt. No. 180, p. 9.)   The Court agrees with Judge Collins analysis.   The Copyright act requires "termination … of subscribers and account holders" associated with a repeat infringer, not deletion of every message ever posted by a repeat infringer.   As Judge Collins observed, such a rule "would require a service provider to take down all of a user's messages, not just the infringing ones."   (Dkt. No. 180, p. 9.)   Such a result would fly in the face of the DMCA, which "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright."   *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("declin[ing] to shift [that] substantial burden from the copyright owner to the provider").   The Court does not address this argument, or the facts associated with it, further.

*Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970).   This is sometimes referred to as the "tried-and-true" form of summary judgment.   Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial.   Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325.   This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery.   Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact.   At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial."   *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003).   The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment.   *Anderson*, 477 U.S. at 249.   "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249).   The question is not whether the non-moving party is able to muster *any* evidence that would support it claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law."   *Anderson*, 477 U.S. at 251-52   Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations."   *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir.2000).

## III.   DISCUSSION

A copyright protects a number of "exclusive rights" vested solely in the holder of a valid copyright.   17 U.S.C. §106.   Relevant here, those rights are the rights to (1) reproduce, (2) create derivative works, (3) distribute, and (4) publicly display the copyrighted work.   17 U.S.C. §106(1)-(3), (5).   Courts "recognize three doctrines of copyright liability" for usurpation of those exclusive rights: "direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).   In this action, Perfect 10 pursues all three theories of liability.   These motions concern Perfect 10's claim for direct copyright infringement.

To succeed on a claim of direct copyright infringement, Perfect 10 must satisfy two elements: "(1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106."   *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d

1004, 1013 (9th Cir. 2001). The first element, ownership of the copyright, is not disputed in this action.  Rather, Perfect 10's claim for direct infringement hinges on the second element for such a claim: whether Defendants *themselves* violated any of Perfect 10's exclusive rights protected by their copyrights in the subject images.  *Ellison v. Robertson*, 357 F.3d at 1076 ("To prove a claim of direct copyright infringement, a plaintiff must show...that the defendant *himself* violated one or more of the plaintiff's exclusive rights under the Copyright Act.") (emphasis added).  "There is no need to prove anything about a defendant's mental state to establish copyright infringement; it is a strict liability tort." *Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D. Cal. 1999).

> **A.    Direct Liability Under the Copyright Act Requires a Causal Nexus Between the Defendant's Active Conduct and the Infringement**

Just what it means for *direct* copyright infringement to be a strict liability tort, however, has been the subject of some disagreement among the courts (including various courts of this district).  In a seminal opinion on the nature of strict liability for direct infringement, Judge Whyte of the Northern District of California held that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Netcom*, 907 F.Supp. at 1370 (holding Usenet provider not liable for direct infringement for infringing content stored on its servers that was uploaded by a Usenet subscriber).  In *Netcom*, the court held the fact that "incidental copies automatically made on [a Usenet provider's] computers using their software as a part of a process initiated by a third party" did not give rise to liability for direct infringement. *Id*. at 1369.  This result centered on two key considerations.

The first, and most important, factor in the *Netcom* analysis is the element of causation.  Strict liability may obviate the need for a showing of intent or negligence, but it does not obviate the independent element of *causation*, which is a necessary prerequisite to Article III standing.  At minimum, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  In the context of direct copyright liability, the relevant question for the purposes of causation "is *who* made this copy." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).  "[T]he purpose of any causation-based liability doctrine is to identify the actor (or actors) whose 'conduct has been so significant and important a cause that [he or she] should be legally responsible.' *Id*. at 132. (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 42, at 273 (5th ed.1984).  Inherent in any claim for *direct* liability under the Copyright Act, then, is a plaintiff's need to prove the defendant was the *direct* cause of the injury.  Put another way, to establish causation on a

claim for direct liability, "defendants must *actively* engage in one of the activities recognized in the Copyright Act." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1168 (C.D. Cal. 2002) (Baird, J). Where, as here, the plaintiff fails to show that the defendant "himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur," there can be no liability for direct infringement. *Sega Enterprises, Ltd. v. MAPHIA*, 948 F.Supp. 923, 932 (N.D. Cal. 1996) (no liability for direct infringement against proprietor of online bulletin board system where proprietor operated online bulletin board, knew infringing activity was occurring, and solicited others to upload infringing content). A system that "automatically transmits users' material but is itself totally indifferent to the material's content" is no more the direct cause of acts committed by its subscribers than is "a traditional telephone company when it transmits the contents of its users' conversations." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (adopting holding in *Netcom*). In passing, the *Netcom* court referred to this sort of *direct* conduct as an "element of volition or causation." *Netcom*, 907 F.Supp. at 1370.

The second consideration in *Netcom*'s rationale is a policy concern that goes to the heart of modern communications. Specifically, the court noted "it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Netcom*, 907 F.Supp. at 1372. "There are thousands of owners, contractors, servers, and users involved in the Internet whose role involves the storage and transmission of data in the establishment and maintenance of an Internet facility." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 551. To hold a service provider liable in *strict liability* for the discrete acts of *third party* copyright infringers because the infringing material was stored on or passed through the service provider's facilities would be, in effect, to hold the entire internet liable for the bad acts of a few. The Copyright Act neither requires nor permits such a result. In applying the act, courts "must strike a balance between a copyright holder's legitimate demand for effective – not merely symbolic – protection of the statutory monopoly and the rights of others freely to engage in substantially unrelated areas of commerce." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984) (sale and distribution of equipment that make it possible for third parties to infringe on copyright does not constitute even indirect infringement so long as the equipment is even "capable of substantial noninfringing uses"). To conclude that service providers "are copyright infringers simply because they are involved in the ownership, operation, or maintenance of a transmission facility that automatically records material—copyrighted or not—would miss the thrust of the protections afforded by the Copyright Act." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 551. Although the Ninth Circuit has not passed on *Netcom's* causation analysis, both the Second and Fourth Circuit Courts of Appeal have adopted it. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d at 131 (2d Cir. 2008); *Costar Group, Inc. v.*

*Loopnet, Inc.* 373 F.3d at 555 (4th Cir. 2004).[10]

Some courts of this district have declined to follow *Netcom* (although no Circuit Court of Appeals has done so). But the courts that have done so appear to have given more weight to *Netcom*'s diction and less to its underlying rationale. In *Arista Records LLC v. Myxer, Inc.* (*Myxer*), No. CV 08-03935 GAF (JCx), 2011 WL 11660773 (C.D. Cal. April 1, 2011) (Fees, J), for example, the court declined to follow *Netcom* because "copyright infringement is a strict liability offense" and "the so-called volitional conduct requirement" is in conflict with strict liability. *Id.* at *14; *see also Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1011 n.7 (Walter, J) (same, citing *Myxer*). Admittedly, the *Netcom* court's passing use[11] of the term "volition" is somewhat confusing, as that term can potentially suggest a level of intent or willfulness that has no place in a claim for copyright infringement. But as the logic of that case, and the subsequent cases applying it, make clear, the so-called "volition" element of direct infringement is not a judicially-created element of intent or knowledge; it is a basic requirement of causation. As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement "with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Costar Group, Inc. v. Loopnet, Inc.* 373 F.3d at 550 ("to establish *direct* liability under [the Copyright Act and the DMCA], something more must be shown than mere ownership of a machine used by others to make illegal copies").[12]

## B.     The Undisputed Evidence Shows Defendants Did Not Directly Infringe on Perfect 10's Copyrights

### 1.     Giganews

---

[10]Although *Netcom* was decided prior to the enactment of the DMCA, including the safe harbor provision for service providers found in that statute (17 U.S.C. §512(c)), the Fourth Circuit in *CoStar* rejected the argument that the DMCA supplanted the need for *Netcom*'s analysis. *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at 552-55. As the Fourth Circuit observed in that case, the DMCA expressly provides that the availability of its safe harbor provisions "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing … or any other defense. 17 U.S.C. §512(*l*). Moreover, even if the DMCA arguably mitigated the *policy* argument in favor of *Netcom*'s result, it does not affect *Netcom*'s more fundamental point: *direct* infringement requires a showing of *direct* conduct.

[11] Although the word "volition" is oft-quoted by cases citing to *Netcom*, it appears only twice in Judge Whyte's lengthy analysis. In both instances, the term is found immediately next to a reference to causation.

[12] Both *Myxer* and *Warner Bros. Entertainment* also construed the Ninth Circuits silence on this question despite the Second and Fourth Circuit's adoption of it as an implicit rejection of *Netcom*. *See Myxer*, 2011 WL 11660773 at *14; *Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d at 1011 n.7. However, the Court agrees with Judge Matz' conclusion in this case that "silence on the so-called 'volitional conduct requirement' should not be interpreted as disapproval. (Dkt. No. 97, p. 9.) Rather, the Ninth Circuit has been clear that it declined to reach the issue. *See Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1160 n.6 (9th Cir. 2007) (declining to determine "whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works" and citing *CoStar Group*).

Turning to the undisputed evidence before the Court, Defendants have met their burden to establish that Perfect 10 cannot prove causation for direct infringement as a matter of law.   Indeed, on identical facts (then presented as allegations, now with evidence), Judge Matz and Judge Collins already so held.   (Dkt. Nos. 97, 129.)   In dismissing Perfect 10's initial claim for direct infringement, for example, Judge Matz held that, even if true, the fact that Defendants:

- "copy all of the materials on their servers form content uploaded onto USENET";
- "'program their servers' to distribute and download the infringing content";
- "'control which materials are distributed to and copied from other third party servers'";
- store infringing content on their servers;
- make it possible, through their Mimo software, for subscribers to "display the USENET content from the Defendants' servers" or to download it directly; and
- derive their "ability to generate revenue … almost exclusively [from] demand for the pirated works contained in the" various binary-oriented newsgroups

is insufficient to establish direct liability.   (Dkt. No. 97, pp. 3, 6-7, 10-13.)[13]   In so holding, Judge Matz declined to follow the cases Perfect 10 relies upon here to assert the same facts support a finding of direct infringement as a matter of law.   (Dkt. No. 97, pp. 11-13).   Judge Matz noted that the courts in *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124 (S.D.N.Y 2009), *Perfect 10, Inc. v. MegaUpload*, No. CV 11-0191, Doc. 16 at *7 (S.D. Cal. July 26, 2011), *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2009 WL 3364036, *3 (S.D.N.Y. Oct. 16, 2009), and *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F.Supp. 503, 513 (N.D. Ohio 1997) all suffered the same error in adopting *Netcom*'s holding as the courts noted above made in rejecting it.   (Dkt. No. 97, p. 12.)

Specifically, each of those cases read the inaptly-named "volitional" conduct requirement as "focusing on the defendant's awareness or state of mind" (which is immaterial in a strict liability claim for direct infringement) "rather than on *who* actually caused the infringement … ."   (Dkt. No. 97, p. 12 (emphasis in original).; *accord Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F.Supp.2d 1303, 1309 (S.D. Fla. 2011) (declining to follow those cases on identical grounds.))   "'[K]nowledge coupled with inducement' or 'supervision coupled with a financial interest in the illegal copying' gives rise to secondary liability, not direct-infringement liability."   *Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F.Supp.2d at 1309 (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d at

---

[13]  Judge Matz' opinion can also be found at *Perfect 10, Inc. v. Giganews, Inc.*, Dkt. No. CV 11-07098 AHM (SHx), 2013 WL 2109963 (C.D. Cal. March 8, 2013).

549.   Again, a claim for *direct* liability requires evidence that the Defendants *directly* or *actively* caused the infringement.   Perfect 10's continued insistence that Defendants allowed its subscribers to upload, download, and view infringing material is the stuff of indirect or secondary liability, not direct liability.

Four months after Judge Matz rejected each of the arguments Perfect 10 advances in opposition to this motion, Judge Collins reaffirmed that the evidence before the Court does not support a claim for direct infringement as a matter of law.   (Dkt. No. 128.) Faced with the same allegations discussed above and now set forth in the evidence before the Court, Judge Collins again held that such allegations were insufficient as a matter of law to support a finding of direct infringement because such facts fail to support a finding of direct causation.   (*Id.*, at pp. 3-4.)   However, Judge Collins permitted Perfect 10's claim for direct infringement against Giganews to proceed *solely* on the newly alleged theory that Giganews "plac[ed] copies of copyrighted material from various internet locations onto its own servers, and not at the request of customers … ."   (Dkt. No. 128, p. 3.)   Judge Collins expressly rejected each of Perfect 10's other theories of direct liability.   (Dkt. No. 128, at pp. 3-4.)

Although Perfect 10 repeats the arguments Judge Matz and Judge Collins already rejected, the record is devoid of any evidence to support the only theory of direct liability as to Giganews that survived the pleading stage.   In the operative First Amended Complaint, Plaintiff alleged on information and belief that Giganews itself, by way of its employees, had uploaded infringing Perfect 10 images to the Usenet generally or Giganews' servers specifically.   (Dkt. No. 105, ¶¶40-43.)   Though Judge Collins noted this was "not the strongest set of allegations," Judge Collins held that it was at least sufficiently plausible to pass the pleading stage in light of the fact that another website, megaupload.com, had previously been found in criminal proceedings to have uploaded massive quantities of copyrighted materials to its own servers.   (Dkt. No. 128, p. 4; *see also* Dkt. 105, ¶43 (alleging that "it is reasonable to conclude that Giganews … likewise uploads infringing materials as well either to the USENET, or to its own servers.").) After considerable discovery, there is simply no evidence to bear out that unlikely allegation.

Rather than point to any evidence that Giganews' employees or agents themselves uploaded, downloaded, otherwise copied, displayed, or modified any work to which Perfect 10 holds a copyright, Perfect 10 rehashes arguments already considered and rejected.   Namely, Perfect 10 once again argues that Giganews personally violated Perfect 10's copyrights by allowing users to upload content to its servers and by obtaining and sending content to other Usenet servers through the peering process. (Dkt. No. 436, p. 19.)[14]   But the conduct of third party Usenet subscribers does not

---

[14]  Perfect 10 also contends that Giganews directly infringed by refusing to remove every post by individuals identified as repeat infringers.   (Dkt. No. 436, p. 19.)   As discussed in footnote 8, *supra*, Giganews had no obligation to indiscriminately remove

support a claim of direct liability as to Giganews.   The conduct of third parties is relevant, if at all, to a claim of secondary infringement (contributory or vicarious), not direct infringement.   And Perfect 10 fails to articulate any meaningful difference between the evidence before the Court and its allegations that Giganews "program[s] [its] servers to distribute and download infringing conduct" and that Giganews "control[s] which materials are distributed to and copied from other third party servers," which Judge Matz held insufficient as a matter of law to support a claim of direct infringement.   (Dkt. No. 97, pp. 3, 7, 10-11.)   The Court finds none.[15]

Moreover, Perfect 10's contention that Giganews engages in direct infringement by "sell[ing] access to infringing Perfect 10 images to their subscribers in exchange for a monthly fee" was likewise rejected by Judge Matz as a basis for direct infringement. (Dkt. No. 97, pp. 3, 6-7, 13 (noting allegations that Defendants "charge their subscribers a fee" and that "rampant piracy committed by USENET users … [is] a part of [Defendants] business model" but dismissing claim for direct infringement for failure to state a claim").   The analysis of this theory of direct liability has not changed after extensive discovery.   The evidence before the Court merely shows that Giganews offers its subscribers access to servers for a flat monthly fee (which varies depending on the bandwidth and ancillary services a user wishes to purchase).   There is no evidence, however, that Giganews specifically sells access to Perfect 10 copyrighted materials as opposed to access to the entire Usenet (of which Perfect 10 content is a fraction of a fraction), or even to erotic content in general.   In doing so, Giganews is no more directly liable for copyright infringement for selling access to the Usenet than a copy store selling access to its copy machines, which a third party then uses to infringe a copyright. "Although some of the people using the machine may directly infringe copyrights, courts analyze the machine owner's liability under the rubric of contributory infringement, not direct infringement."   *Netcom*, 907 F.Supp. at 1369 (analogizing Usenet provider to owner of a copying machine).

##        2.        Livewire

---

every post a repeat infringer ever posted and Perfect 10 may not shift its burden of policing copyright infringement to Giganews in the guise of a claim for direct infringement.   The Court does not address this argument further.

[15] Perfect 10 attempts to cast the fact that Giganews had to affirmatively enter into a peering agreement with other Usenet providers before it could begin peering as evidence that the peering process somehow involves human intervention and is, therefore "volitional" under *Netcom*.   But the evidence before the Court is that those agreements are entirely content neutral. The fact that a human had to intervene to form the content-neutral peering agreement is no more evidence of direct liability than the fact that, at some point in the past, a human had to make the computer server, plug it in, or turn it on.   The undisputed evidence before the court demonstrates that the peering process itself, in which the *content* is actually exchanged and copied is a completely automated process.   "[D]esigning or implementing a system that automatically and uniformly creates temporary copies of all data sent through it" is not a direct cause of infringement.   *Netcom*, 907 F.Supp. at 1369; *accord CoStar, Inc. v. LoopNet, Inc.*, 373 F.3d at 555 ("automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act.").

The evidence of direct infringement as to Livewire is even more sparse.   The sum total of evidence before the Court as to Livewire is that Livewire pays Giganews to provide subscribers access to Giganews' Usenet servers and, in turn, charges its subscribers a fee to access those Usenet servers.   There is no evidence that Livewire operates any *Usenet* servers of its own, or that any infringing material has ever appeared on any of the *Web* servers Livewire does own and operate.   (*See* footnote 4, *supra*) There is simply no evidence that Livewire has any direct role in any act of infringement whatsoever, let alone any act of infringement relating to Perfect 10's copyrighted works.

Perfect 10 attempts to construe Judge Collins' order as holding that such evidence is sufficient to prove direct infringement.   If that were so, however, Giganews would be equally liable for direct infringement, a result both Judge Matz' order and Judge Collins' orders preclude.   Even if that were not the case, the portion of Judge Collins' order Perfect 10 cites for this proposition does not support their claim.   In denying Livewire's motion to dismiss Perfect 10's claim for direct infringement, Judge Collins relied exclusively upon Perfect 10's allegation that Livewire "*sells the infringing material* it receives from Giganews at different prices, depending on usage."   (Dkt. No. 128, p. 4 (emphasis added) (quoting) Dkt. No. 105, ¶59.)   As discussed above with respect to Giganews, however, after years of extensive discovery,[16] there is no evidence to support this allegation.   Rather, the undisputed evidence affirmatively shows Livewire sells access to all the content available on Giganews' servers.   There is no evidence that Livewire *sells* any of Perfect 10's copyrighted material.[17]   To "sell" is to "transfer (property) by sale."   Black's Law Dictionary 632 (2d. Pocket Ed. 2001).   There is no evidence, however, that Livewire even had a property interest in any of the content on Giganews' servers that Livewire is capable of selling.   There is no evidence, for example, that Livewire is capable of editing, modifying, deleting, or otherwise altering anything on Giganews' servers.   The undisputed evidence instead shows that Livewire's sole property interest in Giganews' servers is the right to access the servers, which it then assigns to end-users for a price.   But the right to access to something is entirely distinct from the right to possess or sell the thing itself.   An easement to the beach is not the same as owning the beach, and sale of that easement to someone else is not a sale of the beach.   The undisputed record shows that Livewire owns the easement, not the

---

[16] Fact and expert discovery in this action are both closed.

[17] To "sell" is to "transfer (property) by sale."   Black's Law Dictionary 632 (2d. Pocket Ed. 2001).   There is no evidence, however, that Livewire even has a property interest in any of the content on Giganews' servers that it is capable of selling. There is no evidence, for example, that Livewire is capable of editing, modifying, deleting, or otherwise altering anything on Giganews' servers.   The undisputed evidence instead shows that Livewire's sole property interest in Giganews' servers is the right to access the servers, which it then assigns to end-users for a price.   But the right to of access to something is entirely distinct from the right to possess or sell the thing itself.   An easement to the beach is not the same as owning the beach, and sale of that easement to someone else is not a sale of the beach.   The undisputed record shows that Livewire owns the easement, not the beach.   Perfect 10's essentially argues that sale of the easement is the equivalent of selling a handful of shells found on the beach.   It is not.

beach.    Perfect 10 essentially argues that sale of the easement is the equivalent of selling a handful of shells found on the beach.    It is not.

The only thing Livewire sells is content-neutral access to the Usenet, in general,[18] which even Perfect 10 acknowledges has both infringing and non-infringing uses.   *See Reno v. ACLU*, 521 U.S. 844, 851 (1997) (observing that "thousands of such [news]groups" on the Usenet, "each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls."); *cf. Capitol Records, LLC v. ReDigi, Inc.*, 934 F.Supp.2d 640, 657 (S.D.N.Y. 2013) (distinguishing owners of service that was exclusively designed and solely used to copy copyrighted material, who could be held liable for direct infringement, evidenced direct liability, from the owner of a service that "offered a mix of protected and public" content, who could not be held liable for direct infringement).

### 3.    Law of the Case and Reconsideration

In an implicit admission that the facts before the Court are no different than the allegations Judge Matz and Judge Collins previously rejected, Perfect 10 repeatedly urges the Court to depart from Judge Matz' and Judge Collins' prior rulings.   (*See, e.g.,* Dkt. No. 436, pp. 116-17, 25.)[19]   The Court declines to do so.   To begin with, the Court thinks those orders were rightly decided for the reasons discussed above.   More importantly, though, those orders are the law of the case.   "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."   *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988).   Generally, a court may only exercise its discretion to depart from the law of the case where:

---

[18] Or at least the substantial portion of the Usenet available through Giganews' servers.

[19] For example, Perfect 10 criticizes Judge Collins holding that Giganews does not directly violate Perfect 10's right of distribution by way of the Mimo application because Judge Collins ruling did not address, and is contrary to the Ninth Circuit's holding in *Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1160 (9th Cir. 2007).   (Dkt. No. 436 at p. 16.)   Judge Collins did not need to independently address *Amazon* because Judge Matz had already done so.   Specifically, Judge Matz held Perfect 10's citation to *Amazon* on this point was inapposite because "there was no question in [*Amazon*] that the defendant had committed a volitional act … ."   (Dkt. No. 97, p. 9.)   Rather, in *Amazon*, the evidence showed that the defendants were not passively allowing users to view images uploaded by third parties, but that the defendants themselves modified the offending image into a smaller "thumbnail" image which the defendants then copied to their own servers for their own use.   *Amazon*, 508 F.3d at 1155.   Notably, it was Judge Matz who originally held the defendants' conduct in *Amazon* (of modifying, copying, and then displaying their own version of the image) constituted direct infringement.   The Ninth Circuit affirmed Judge Matz on this point, noting that it was undisputed in that the defendants in that case directly communicated copies of those modified thumbnail images to end-users.   *Id.* at 1160.   Because the defendant's active involvement in the infringement was undisputed, the Ninth Circuit declined to decide "whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works."   *Id.* at 1160 n.6.   There is no evidence in this case that either Giganews or Livewire ever modified any of Perfect 10's copyrighted images posted by third parties for Giganews' own use.

> "1) the first decision was clearly erroneous; 2) an intervening
> change in the law has occurred; 3) the evidence on remand is
> substantially different; 4) other changed circumstances exist; or
> 5) a manifest injustice would otherwise result. Failure to apply
> the doctrine of the law of the case absent one of the requisite
> conditions constitutes an abuse of discretion."

*United States v. Alexander*, 106 F.3d 874, 876.

As discussed above, however, Judge Matz' and Judge Collins' orders were soundly decided, not clearly erroneous.   Nor has the intervening law changed.   Perfect 10 cites a single case (*Capitol Records, LLC v. ReDIGI, Inc.*, *supra*) that was decided after Judge Matz' order, and no cases decided after Judge Collins expressly adopted Judge Matz' holding.   (See Dkt. No. 128, p. 3 n.1 ("The Court agrees with Judge Matz's scholarly analysis of the 'volitional act' requirement, notably that it is a means of showing a defendant's direct involvement in the infringement, that is, that the defendant directly caused the infringement.   The Court sees no reason to depart from Judge Matz's analysis.")   In any event, *Capitol Records, LLC v. ReDIGI, Inc.* is inapplicable because, in that case, the offending computer software was designed for the *sole* purpose of copying copyrighted material from one computer to another.   *Capitol Records, LLC v. ReDigi, Inc.*, 934 F.Supp.2d at 657.   The district court took great pains to emphasize this unique aspect of that case (*see Id.* (noting "ReDigi's founders built a service where *only* copyrighted work could be sold" and "ReDigi's Media Manager scans a user's computer to build a list of eligible files that consists *solely* of protected music purchased on iTunes) (emphasis in original)), and expressly distinguished its facts from cases where the offending service "offered a mix of protected and public" content.   *Id.* (contrasting the facts in that case, which evidenced direct liability, with the facts in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, *supra*, 536 F.3d 121, which did not).

And, as already noted, the evidence before the Court is identical to the allegations before Judge Matz.   To the extent the evidence differs from the allegations before Judge Collins a few months later, the evidence only defeats Perfect 10's claim that Giganews itself uploaded, downloaded, transferred, copied, or displayed any of Perfect 10's copyrighted content.   Perfect 10 fails to identify any manner in which circumstances have changed or how properly applying the law would result in a "manifest injustice."   Under these circumstances, it would constitute an abuse of discretion to depart Judge Matz' and Judge Collins' prior holdings.   If Perfect 10 believed there was a basis to seek reconsideration of those orders, it was required to do so by way of a separately noticed motion for reconsideration and within a reasonable amount of time.   Fed. R. Civ. Proc. 60(b), (c).   It did not do so.

## IV.   CONCLUSION

A claim for direct copyright liability demands evidence that the defendant had a direct hand in causing the infringement.  The undisputed evidence before the Court, however, demonstrates that Defendants had no direct causal role in the alleged infringement.  Perfect 10's attempt to hold Giganews and Livewire liable for direct infringement conflates the doctrines of direct and indirect liability and ignores Judge Matz' and Judge Collins' express holdings that Perfect 10 could not proceed on a theory of direct liability without something more.   After extensive discovery, there is nothing more.  Both the law of the case and this Court's independent analysis demand the conclusion that Defendants cannot be liable for direct infringement as a matter of law, and the Court **GRANTS** their motion for partial summary judgment on Perfect 10's claim for direct infringement.  (Dkt. No. 357.)   Because Perfect 10's other theories of indirect liability as to Livewire have already been dismissed without leave to amend, this order completely disposes of all of Perfect 10's claims against Livewire.   The Court will separately address Perfect 10's remaining claims for indirect liability as to Giganews in its ruling on the parties' other summary judgment motions.

The Court having granted summary judgment on the issue of direct liability in favor of defendants, Perfect 10's mirror image motion for summary judgment on the question of direct liability (Dkt. No. 453) is **DENIED AS MOOT**.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 17, 2014 at 10:00 a.m. is hereby **VACATED**.

**IT IS SO ORDERED**

# Exhibit 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.:   CV 11-07098-AB (SHx) | Date:   November 14, 2014 |
|---|---|

Title:   *Perfect 10, Inc. v. Giganews, Inc.*

Present: The Honorable   ANDRÉ BIROTTE JR.

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   **[In Chambers] Order (1) GRANTING Defendant Giganews, Inc.'s Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 440) and (2) DENYING AS MOOT Plaintiff's Mirror-Image Motion for Partial Summary Judgment on the Issue of Indirect Copyright Infringement (Dkt. No. 467)**

Pending before this Court are the parties' competing motions for partial summary judgment regarding Defendant Giganews, Inc.'s ("Giganews") liability for indirect copyright infringement.   As stated more fully below, there is no evidence that Giganews received a direct financial benefit from third-party infringement of Perfect 10's copyrights to support a claim for vicarious liability.   Additionally, the record is devoid of any evidence that Giganews had the necessary knowledge of specific third-party infringement to support a claim for contributory infringement.   Accordingly, the Court **GRANTS** Giganews' motion for summary judgment on the issue of indirect liability. (Dkt. No. 440.).   Because the Court grants partial summary judgment in favor of Giganews on the issue of indirect infringement, the Court **DENIES** Perfect 10's competing motion for partial summary judgment on the same issue (Dkt. No. 467) as **MOOT**.

## I.  BACKGROUND[1]

Much of the evidence before the Court on this motion is identical to evidence submitted in support of and in opposition to the parties' competing motions for partial summary judgment on the issue of direct liability.   The Court set out a lengthy summary of that evidence in its separate order granting Defendants' motion for partial summary judgment on the issue of direct liability and denying Perfect 10's competing motion. For the sake of brevity, the Court does not restate that summary here.   Rather, the Court incorporates that summary of evidence by reference.   The Court discusses the limited additional evidence relevant to these two motions as necessary below.

## II.  LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).   "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact."   *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56).   An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party.   *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.   *Anderson*, 477 U.S. at 251.   "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ."   *Id.*, at 252.   To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial.   *Id.*, at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party may meet this burden in one of two ways.   In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that

---

[1]  The Court has read and considered the parties' voluminous evidentiary objections filed along with the briefing. In considering these motions, the Court does not rely on any inadmissible expert testimony that it already excluded in connection with Defendants three *Daubert* motions. (*See* Dkt. Nos. 580, 581, & 582.)   To the extent that the Court addresses any disputed evidence in this order, Defendants' objection to that evidence is overruled.

affirmatively disproves an essential element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970).   This is sometimes referred to as the "tried-and-true" form of summary judgment.   Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial.   Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325.   This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery.   Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact.   At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial."   *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003).   The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment.   *Anderson*, 477 U.S. at 249.   "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249).   The question is not whether the non-moving party is able to muster *any* evidence that would support it claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law."   *Anderson*, 477 U.S. at 251-52   Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations."   *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292–1293 (9th Cir.2000).

## III.   DISCUSSION

Courts "recognize three doctrines of copyright liability" for usurpation of those exclusive rights: "direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement."   *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).   In this action, Perfect 10 pursues all three theories of liability.   The Court separately addressed Perfect 10's claim for direct copyright infringement.   These motions concern Perfect 10's claims for indirect copyright infringement, namely vicarious and contributory infringement.

### A.   Vicarious Infringement

"[T]he lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn … ."   *Sony Corp. of America v. Universal City Studios, Inc.* ("*Sony Corp.*"), 464 U.S. 417, 434 n.17 (1984) (quoting *Sony Corp. of America v.*

*Universal City Studios, Inc.*, 480 F.Supp. 429, 457-58 (C.D. Cal. 1979)).   However, "in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities.   *Perfect 10, Inc. v. Amazon.com, Inc*. ("*Amazon*"), 508 F.3d 1146, 1175 (9th Cir. 2007). "Whereas contributory infringement is based on tort-law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior*."   *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n* ("*Visa*"), 494 F.3d 788, 802 (9th Cir. 2007).   Because vicarious liability arises out of principles of agency, a claim for vicarious infringement requires evidence of some level of principle-agent relationship.   To prevail on a claim for vicarious infringement, then, a plaintiff must prove "that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."   *Visa*, 494 F.3d at 788 (footnote omitted).   Both elements are essential to a claim of vicarious infringement, and failure to satisfy either element is fatal to a claim for vicarious infringement.   *Id.* at 806 (declining to reach the element of direct financial interest because plaintiff failed to allege defendant had the right or ability to control); *Ellison v. Robertson*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004) (declining to reach the element of the right or ability to control because there was no evidence that defendant received a direct financial benefit from third-party infringement).

## 1.     Direct Financial Interest

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits."   *Ellison v. Robertson*, 357 F.3d at 1079.   "Financial benefit exists where the availability of infringing material acts as a 'draw' for customers."   *A&M Records, Inc. v. Napster, Inc.* ("*Napster*"), 239 F.3d 1004, 1023 (9th Cir. 2001) (internal quotes omitted). The size of the "draw" relative to a defendant's overall business is immaterial.   A defendant receives a "direct financial benefit" from third-party infringement so long as the infringement of third parties acts as a "draw" for customers "regardless of *how substantial* the benefit is in proportion to a defendant's overall profits."   *Ellison v. Robertson*, 357 F.3d at 1079.

Although the scope "draw" need not be substantial, Perfect 10 must still prove a direct causal link between the infringing activities *at issue in this case* and a direct financial benefit to Giganews.   This action is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted images; it is not a lawsuit against copyright infringement in general on the Usenet.   That is to say, the "direct financial benefit" requirement demands more than evidence that customers were "drawn" to Giganews to obtain access to infringing material in general.   Perfect 10 must prove with

competent evidence that at least some of Giganews' customers were "drawn" to Giganews' services, in part, to obtain access to infringing *Perfect 10* material. Despite extensive discovery (which is now closed) the record lacks (and Perfect 10 does not identify) a single piece of evidence to that effect. Even if the scope of causation is expanded to the broader category of erotic images, there is no evidence that any customer was ever "drawn" to Giganews' Usenet offerings to obtain access to erotic images. "There is no evidence that indicates that [Giganews'] customers either subscribed because of the available infringing [Perfect 10] material or canceled subscriptions because it was no longer available. While a causal relationship might exist between [Giganews'] profits from subscriptions and the infringing activity taking place on its USENET servers, [Perfect 10] has not offered enough evidence for a reasonable juror so to conclude." *Ellison v. Robertson*, 357 F.3d at 1079.

Instead, Perfect 10 points to evidence that there is a lot of copyrighted material on the Usenet and concludes that the availability of copyrighted material in general constitutes a draw. If anything, however, Perfect 10's evidence that the Usenet is awash in copyrighted material only supports the conclusion no reasonable juror could find a direct causal connection between infringing Perfect 10 content and Giganews' profits. For example, if as Perfect 10 asserts, "staggering amounts of copyrighted works owned by move producers and television networks are available" on Giganews' servers (Dkt. No. 536, p. 13), what evidence is there that any Giganews subscriber purchased Giganews' services in part *because of* the relatively miniscule number of Perfect 10 images available on Giganews' servers? In short, there is none. But if the universe of infringing material on the Usenet is as broad and diverse as Perfect 10 suggests, any conclusion that subscribers were "drawn" to Giganews' services *as a result of* the availability of Perfect 10 content would be pure speculation. Speculation is not evidence of causation.

Nor is it enough to prove that some Giganews' subscribers accessed or posted infringing material once they had already subscribed to Giganews. There are "cases in which customers value a service that does not 'act as a draw.'" *Ellison v. Robertson*, 357 F.3d at 1079. That a Giganews customer may have posted or accessed copyrighted Perfect 10 material as "an added benefit" to a subscription is insufficient. *Id*. To survive summary judgment on its theory of vicarious infringement, Perfect 10 must have "significant probative evidence" that at least some of Giganews' customers subscribed to Giganews servers at least partially for the purpose of accessing or posting Perfect 10's copyrighted material, or at least copyrighted erotic images. There is no such evidence in the record, and "[t]he record lacks evidence that [Giganews] attracted or retained subscriptions because of the infringement or lost subscriptions because of [Giganews'] eventual obstruction of the infringement. Accordingly, no jury could reasonably conclude that [Giganews] received a direct financial benefit from providing access to the infringing material." *Id*; *accord Religious Technology Center v. Netcom On-Line Communication*

*Services, Inc.* ("*Netcom*"), 907 F.Supp. 1361, 1377 (N.D. Cal. 1995) (granting summary judgment on claim for vicarious infringement in defendant Usenet provider's favor because "[t]here is no evidence that infringement by Erlich, or any other user of Netcom's services, in any way enhances the value of Netcom's services to subscribers or attracts new subscribers."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 724, 748 (S.D.N.Y. 2012) (no evidence of direct financial benefit for purposes of vicarious infringement where there was "no evidence indicating that either [of the defendants] capitalizes specifically because a given image a user selects to print is infringing" and because "Defendants' profits are derived from the service they provide, not a particular infringement."); *see also Perfect 10, Inc. v. CCBill LLC* ("*CCBill*"), 488 F.3d 1102, 1118 (9th Cir. 2007) ("receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity'").[2]

### a. *Arista Records* and *Napster* Do Not Require a Different Conclusion

Perfect 10's contention that *Arista Records LLC v. Usenet.com, Inc.* ("*Arista Records*"), 633 F.Supp.2d 124, 157 (S.D.N.Y. 2009) "compels" the conclusion that Giganews received a direct financial benefit from the availability of copyrighted Perfect 10 materials (Dkt. No. 536, p. 15) misapprehends the holding in that case.   It is true that, in *Arista Records*, the district court granted summary judgment in favor of the plaintiff despite the fact that "infringing music account[ed] for less than 1% of the newsgroups available" on the defendants Usenet servers.   *Arista Records*, 633 F.Supp.2d at 157. But in *Arista Records*, the magistrate judge had already granted an adverse inference against the defendant that the music groups in question "acted as a draw to entice users to Defendants' service" as a discovery sanction.   *Id.*   Unlike here, it was undisputed in *Arista Records* that the specific content in question acted as a draw, and the Plaintiff did not need to introduce additional evidence to that effect.   There is no similar evidence in this case and there is no significant probative evidence that the copyrighted images at issue in this action acted as a draw (as opposed to an added benefit) for a single Giganews subscriber.

Nor is this case akin to *Napster*, (see Dkt. No. 536, p. 15) in which the evidence showed the defendant's service was almost exclusively designed to "download and upload copyrighted music."   *Napster*, 239 F.3d at 1013-14.   If, for example, Giganews offered content-based subscriptions for users to specifically access erotic images, it may be the case that a juror could reasonably infer that the availability of Perfect 10 images were a "draw" to customers seeking access to erotic images to the extent those images

---

[2]  Perfect 10 also suggests in a footnote that Giganews received a direct financial benefit from the presence of Perfect 10 images because Perfect 10 has paid subscription fees to Giganews to access Giganews' servers for the purposes of this lawsuit.   (Dkt. 536, p. 16 n.3.)   The notion that a litigant can create its own "direct financial benefit" to fabricate a claim for vicarious infringement out of thin air is as specious as it sounds.   The Court does not address this argument further.

filled out a more complete "catalogue" of erotic images.   The evidence here, however, shows that Giganews sells content-neutral subscriptions that permit users to access a variety of content that is limited only by the imaginations of its users.   After years of discovery, there is simply no evidence in the record that the availability of the copyrighted works at issue in this action (or even the availability of erotic images more generally) ever influenced a single subscriber's binary decision to subscribe or not subscribe.

### b.   Prior Orders in this Action Do Not Require a Different Conclusion

Perfect 10 also argues that Judge Matz and Judge Collins "have already ruled that the monthly fee charged by Giganews to its users to access allegedly infringing material constituted a direct financial benefit."   (Dkt. No. 536, p. 14 (citing Dkt. No. 97, p. 18 and Dkt. No. 129, p. 6.)   Neither Judge Matz nor Judge Collins so held.   In his order on Defendants' first motion to dismiss, Judge Matz emphasized the importance of the procedural posture of the in holding that Perfect 10 had adequately *alleged* a claim for vicarious infringement.   (Dtk. No. 97, pp. 16-18.)   Indeed, Judge Matz distinguished the motion to dismiss from *Ellison v. Robertson*, *supra*, and *Netcom*, *supra*, both of which involved summary judgment after an ample opportunity for discovery.   (Dkt. No. 97, pp. 17-18.)   In fact, Judge Matz correctly observed that the operative question is whether there is a "causal relationship" between Perfect 10's infringing content and Giganews' subscription revenues. (Dkt. No. 97, p. 17.)   Judge Collins adopted Judge Matz' analysis and found that the same allegations were sufficient to advance the action past the pleadings stage.   However, after full discovery, the evidence does not bear out Perfect 10's allegations that the availability of its copyrighted content is a draw for Giganews' customers, and summary judgment in Giganews' favor is consistent with Judge Matz' and Judge Collins' liberal assessment of the sufficiency of the pleadings.

### 2.   Right or Ability to Control

Because there is no evidence in the record that Giganews obtained a direct financial benefit from the availability of Perfect 10's copyrighted images at issue in this action, the Court need not address whether Giganews had the right and ability to supervise or control its users' allegedly infringing activity.   *Ellison v. Robertson*, 357 F.3d at 1079 n.10.

### B.   Contributory Infringement

Perfect 10's third and final claim of copyright infringement against Giganews is for contributory copyright infringement.   "[O]ne contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement."   *Visa*, 494 F.3d at 795.   As to the second element, in the

context of cyberspace "a computer system operator can be held contributory liable" under a "material contribution" theory of contributory infringement "if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Amazon*, 508 F.3d at 1172 (internal quotes and citations omitted).

The alternative "inducement" theory for the second element of contributory liability has four prongs: "(1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Columbia Pictures Indus., Inc. v. Fung*, ("*Fung*") 710 F.3d 1020, 1032 (9th Cir. 2013). Giganews contends that the inducement theory of contributory liability is the *only* theory of contributory liability in light of *Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913 (2005) rather than an alternative to the "material contribution" theory of contributory liability. However, the Ninth Circuit has repeatedly held that the two tests are alternative. See *Fung*, 710 F.3d at 1029 n.11; *Amazon*, 508 F.3d at 1171; *Visa*, 494 F.3d at 795-96.[3]

Although the "material contribution" and "inducement" tests vary in a number of ways, they both reflect the Supreme Court's holding in *Grokster* that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Grokster*, 545 U.S. at 930. Under either theory, "*Grokster* tells us that contribution to infringement must be intentional for liability to arise." *Amazon*, 508 F.3d at 1170. "'[M]ere knowledge of infringing potential or of actual infringing uses' does not subject a product distributor or service provider to liability." *Fung*, 710 F.3d at 1038 (quoting *Grokster*, 545 U.S. at 937. "[P]roper proof of the defendant's intent that its product or service be used to infringe copyrights is paramount." *Fung*, 710 F.3d at 1038. However, that element of intention includes the "common law principles … that intent may be imputed" to include the "natural and probable consequences of [one's] conduct." *Id*. at 1170-71. In the context of inducement theory, intent is captured in the requirement that the defendant distribute the device or product with the "object of promoting its use to infringe a copyright… ." *Fung*, 710 F.3d at 1032. For "material inducement" the intent manifested in the dual requirements that the service provider (1) had "actual knowledge that specific infringing material is available using its system" (*Visa*, 494 F.3d 788 (internal quotes omitted); but (2) "failed to take reasonable and feasible steps to refrain from providing access to infringing images." (*Amazon*, 508 F.3d at 1177.) Under the latter test, intent is merely imputed from the defendant's failure to take "reasonable and feasible steps" in the face of specific knowledge.

---

[3] Indeed, the "material contribution" theory of contributory liability appears to be consistent with the Supreme Court's formulation that one may be liable for contributory infringement by *either* "inducing *or* encouraging direct infringement." *Grokster*, 545 U.S. at 930 (emphasis added). The Ninth Circuit's "material contribution" theory of liability appears to be a restatement of the "encouraging" theory of liability articulated by the Supreme Court in *Grokster*.

### 1.   There Is No Evidence that Perfect 10 Had Knowledge of Specific Infringement

Still, irrespective of the two variations on the second element for contributory liability, the first element of any claim for contributory liability is the same in every case: "knowledge of another's infringement."   *Visa*, 494 F.3d at 788. Where, as here, the service has "substantial lawful as well as unlawful uses" contributory liability (under either theory) "requires more than a generalized knowledge … of the possibility of infringement" before courts will impute the necessary intent to violate specific copyrights.   *Luvdarts, LLC v. AT&T Mobility, LLC*, ("*Luvdarts*") 710 F.3d 1068, 1072 (9th Cir. 2013) (quoting *Grokster*, 545 U.S. at 932-33).   So long as the system is "capable of substantial noninfringing uses" (*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984) "contributory liability [does] not automatically follow" just because the "system allows for the exchange of copyrighted material … ." *Luvdarts*, 710 F.3d at 1072 (quoting *Napster*, 239 F.3d at 1021).   The Usenet system to which Giganews provides its subscribers access is capable (and is used) for substantial noninfringing purposes.   *See Reno v. ACLU*, 521 U.S. 844, 851 (1997) (observing that "thousands of such [news]groups" on the Usenet, "each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls.")

Under either test, then, Plaintiff must prove that Giganews had "actual knowledge of specific acts of infringement" to hold Giganews "liable for contributory copyright infringement."   *Napster*, 239 F.3d at 1021; *accord Luvdarts*, 710 F.3d at 1072.   With the exception of items brought to Giganews' attention through Perfect 10's DMCA takedown notices (discussed below), there is no evidence that Giganews ever had actual knowledge of any specific Perfect 10 images on its servers.   Instead, Perfect 10 first argues that Giganews had "constructive knowledge" of the alleged infringement by virtue of the vast amounts of infringing material found on Giganews' servers.   (Dkt. No. 536, p. 17.)   To begin with, Perfect 10 does not submit any competent evidence to suggest that infringement of other forms of media is rampant on Giganews' servers.   (See Dkt. Nos. 580-583 excluding Perfect 10's expert testimony to that effect as lacking foundation).   Equally as important, however, is that "general awareness that infringement may be occurring" is usually irrelevant to the specific question of whether a particular defendant violated a particular copyright held by a particular plaintiff. *Viacom Int'l. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012), cited with approval in *UMG Recordings, Inc. v. Shelter Capital Partners LLC* ("*UMG Recordings*"), 718 F.3d 1006, 1023 (9th Cir. 2013).   This is because "merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement … ."   *UMG Recordings*, 718 F.3d at 1022; *see also Napster*, 239 F.3d at 1020-21 (declining to "impute the requisite level of knowledge to Napster merely

because peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights")

Perfect 10 also contends that Giganews had constructive knowledge that every post submitted under the same email address used in an identified infringing message or using same "image identifier" was infringing.  (Dkt. No. 536, pp. 19-20.)   But as the Court notes in its separate order on direct infringement (at page 3), the basic structure of Usenet posting makes it impossible to tell if two messages with the same "sender" email address are actually from the same person or whether two posts with the same "image identifier" actually contain the same image.   The only information truly unique to a post is the Message-ID.   Perfect 10 confuses "constructive knowledge" about the relationship between two arbitrary (and frequently false) email addresses or image identifiers with the duty to investigate whether a second post actually infringed.   However the law "impose[s] no such investigative duties on service providers."  *CCBill*, 488 F.3d at 1114.   "We do not place the burden of determining whether [materials] are actually illegal on a service provider." *UMG Recordings*, 718 F.3d at 1023.   The Court reiterates Judge Collins holding that Congress has expressly disclaimed a service provider's duty to "disable or delete all messages a repeat infringer has ever posted" as opposed to disabling the users account and removing specifically identified messages.   (Dkt. No. 180, p. 9.) Such a result would run the serious risk of stifling free speech by taking down noninfringing content and fly in the face of the Digital Millennium Copyright Act ("DMCA"), which "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright."  *CCBill*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("declin[ing] to shift [that] substantial burden from the copyright owner to the provider").[4]

### a.   Knowledge Pursuant to Perfect 10's DMCA Takedown Notices

Perfect 10 also argues that Giganews obtained actual knowledge of the allegedly infringing content on its servers by way of Perfect 10's various DMCA notices.   There is no dispute that a proper takedown notice under the DMCA would confer Giganews with actual knowledge of the specific acts of infringement identified in the notice.   *See Luvdarts*, 710 F.3d at 1072-73; *see also Napster*, 239 F.3d at 1021 ("for the operator to have sufficient knowledge, the copyright holder must 'provide the necessary documentation to show there is likely infringement.'") (quoting *Netcom*, 907 F.Supp. at 1374).   However, takedown notices that do not substantially comply with the

---

[4]Perfect 10 also briefly cites the standard for "willful blindness," which, when applicable, can substitute for actual knowledge.   (Dkt. No. 536, p. 20.)   However, as discussed more fully below, the evidence demonstrates that Giganews "promptly removed infringing material when it became aware of specific instances of infringement" and the evidence does not support a claim of willful blindness.   *UMG Recordings*, 718 F.3d at 1023.

requirements set forth in the DMCA "shall not be considered … in determining whether a a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."[5]   17 U.S.C. §512(c)(3)(B)(i).

As Judge Collins already observed, however, Perfect 10's practice of sending Giganews screenshots of a newsreader window along with instructions "to conduct searches of specific names within certain newsgroups" and instructing Giganews "that all of the messages yielded by those searches on a certain date contained infringing material" (Dkt. No. 180, p. 13)[6] fails to substantially comply with the requirements for a DMCA takedown notice.  In order to comply with the DMCA (and therefore confer actual knowledge on the recipient), a takedown notice must identify "the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, **and information reasonably sufficient to permit the service provider to locate the material**."   17 U.S.C. §512(c)(3)(A)(iii) (emphasis added).   "The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously." *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d 110, 115 (S.D.N.Y. 2013) (internal citations omitted).

Perfect 10's takedown notices, which "point[] to a list of search results, not to any material in particular," (Dkt. No. 180, p. 15) obstruct this goal. As Judge Collins observed, "the material accessible through the Usenet is in a constant state of flux. As such, there is no certainty that any particular search will yield the exact same results at different times. Searches moments apart could yield different results."   (*Id.*)   But even if the results of such searches were consistent, Perfect 10's search-screenshot takedown notices "requires a Usenet provider to compare its search results to Plaintiff's search results in an onerous side-by-side, line-by-line manner" (Dkt. No. 180, p. 16) defeating the service provider's ability to "find and address the allegedly infringing material expeditiously."   *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d at 115.   This is particularly true where, as here, Perfect 10's voluminous takedown notices would require a manual, line-by-line comparison of countless individual search results for each notice. And even Perfect 10's evidence revealed that their own search-criteria method "yielded some messages that were non-infringing."   (Dkt. No. 180, p. 16.)   These aspects of Perfect 10's takedown notices are particularly problematic because a takedown notice under the DMCA must also include "a statement that the complaining party has a good

---

[5]  The Court's discussion of Perfect 10's DMCA takedown notices here must be distinguished from an analysis of whether Giganews would qualify for the safe harbor provisions under that statute.   There are a number of elements a defendant must satisfy to qualify for the safe harbor provisions set forth in that statute.   17 U.S.C. §512(a)-(d), (i).   Here, the Court addresses the narrower question of whether there is any evidence that Giganews had actual knowledge of the specific acts of alleged infringement at issue in this case.   Because *compliant* DMCA takedown notices are one method of obtaining such knowledge, the Court must address those notices to adjudicate the instant motion.

[6]  Judge Collins order is also published at *Perfect 10, Inc. v. Giganews, Inc.*, 993 F.Supp.2d 1192 (C.D. Cal. 2014).

faith belief that the use of the material in the manner complaint of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. §512(c)(3)(A)(v).   But in the absence of any assurance that Giganews' search results would yield results consistent with Perfect 10's search, or that Perfect 10's search results were limited to infringing material, it would be impossible to make that necessary representation in good faith.

As this Court already held in its order on direct liability, the evidence before the Court is undisputed that the only method for consistently identifying a specific Usenet message that Giganews could promptly remove is the post's Message-ID.   While some of Perfect 10's takedown notices have included the relevant Message-ID (undisputedly conferring knowledge on Giganews), the evidence shows that Giganews promptly disabled access to the offending messages.   (Dkt. No. 442, ¶39.)   Perfect 10 concedes that Giganews generally blocks access to messages when Perfect 10 provides a Message-ID.   (Dkt. No. 558, ¶45; Dkt. No. 537, ¶45.)   However, Perfect 10 attempts to create a disputed issue of fact on this point by identifying 542 messages (out of the thousands for which it provided Message-IDs) that Giganews has not removed.   (Dkt. No. 558, ¶45; Dkt. No. 537, ¶45.)   But as Giganews' evidence makes clear, Perfect 10 submitted those Message-ID's by faxing screen printouts with the Message-ID in small text.   (Dkt. No. 546-7.)   That is, Giganews received a copy of a reproduction of already small text, which is illegible.   (*Id.*)   Perfect 10 admits that "[w]hen Perfect 10 sent Giganews a notice of claimed infringement containing faxed screenshots displaying illegible Message-IDs, Giganews sent Perfect 10 a letter asking it to provide the Message-ID in a legible form."   (Dkt. No. 441, ¶ 47; Dkt. No. 537, ¶47.)   However, Perfect 10 refused to provide the original digital files it admits it had on file.   (Dkt. No. 442, ¶38; *compare* Dkt. No. 546-7 (versions of takedown notices Giganews received via fax) *with* Dkt. No. 508-3, Exh. 31 (versions of takedown notices Perfect 10 has on in digital format).   Not only did Perfect 10 submit illegible Message-IDs for the 542 messages it claims Giganews refused to take down, but when Giganews asked Perfect 10 to resubmit the Message-IDs in a legible format so that Giganews could block access to the infringing messages (as Giganews had done with thousands of other messages in response to Perfect 10's takedown notices) Perfect 10 refused to do what was well within its power.

Even more puzzling, Perfect 10 also admits that it is aware of and capable of using an infinitely simpler method of presenting Giganews with readily identifiable Message-IDs for use in a proper takedown notice.   Perfect 10 admits it "is aware of and has used software that allows it to extract thousands of Message-IDs for messages it believes to be infringing in about ten seconds."   (Dkt. No. 441, ¶ 46; Dkt. No. 537, ¶46.) This feature has been built into the Mimo software Perfect 10 uses for its screenshots since at least April 2011.   (Dkt. No. 325-11, pp. 3-4 (release notes for update to Mimo software). In fact, Perfect 10's CEO, Norma Zada recently declared under oath that, using the Message-ID extraction feature, he was able to extract the Message-IDs for 19 pages

of search results.   (Dkt. No. 325, ¶18.)   Using that same method, Zada estimated it would take less than 15 minutes to extract the Message-ID's for "more than 90% of the infringing Perfect 10 content that Perfect 10 is aware of on Defendant's servers."   (*Id.*)   And in deposition, Zada testified it is "actually very easy for Perfect 10 to collect message IDs to put into a DMCA notice" and that Perfect 10 has now extracted Message IDs for "approximately 54,000 Perfect 10 messages," but Perfect 10 refuses to submit a DMCA takedown notice using that information.   (Dkt. No. 443-2, pp. 104:18-23, 132:1-6, 181:9-11   Had Perfect 10 performed its own "investigative duties" (*CCBill*, 488 F.3d at 1114), extracted the Message-IDs, and submitted those Message-IDs to Perfect 10 in a machine-readable format, there would be little left to discuss in this case. The evidence shows that when copyright holders submit takedown notices to Giganews with specific Message-IDs in machine readable format, even large-scale requests are processed, usually within 48-hours.   (Dkt. No. 442, ¶¶32-36.)   Perfect 10's own evidence makes clear that Giganews immediately processes takedown notices containing such machine-readable Message-IDs through an automated process.   (Dkt. No. 539-1, p. 40:21-25.) Indeed, pursuant to such requests, Giganews blocked access to more than a half-a-billion individual messages between November 6, 2012 and November 6, 2013. (*Id.*, at ¶32.)

But Perfect 10 did not take that simple step to protect its copyrights.   Instead, it sent Giganews hundreds of inadequate screenshot-search takedown notices that largely failed to provide Giganews with "information reasonably sufficient to permit the service provider to locate the [allegedly infringing] material."   17 U.S.C. §512(c)(3)(A)(iii). Such "deficient notifications shall not be considered in determining whether [Giganews] ha[d] actual or constructive knowledge."   *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F.Supp.2d at 115 (citing 17 U.S.C. §512(c)(3)(B)(i)).

In short, there is no evidence that Giganews had any knowledge, actual or constructive, of any specific infringing content other than those messages for which Perfect 10 provided legible Message IDs.   As to those messages, the evidence is undisputed that Giganews promptly blocked access to the infringing messages.   And while Perfect 10 is aware of a simple method of providing the Message-IDs for more than 90% of all the content it believes is infringing on Giganews' servers, it refuses to utilize that method while simultaneously faulting Giganews for declining to do so.   Perfect 10 criticizes Giganews for "foisting upon the copyright holder" the burden of identifying the specific infringing content with a Message-ID. (Dkt. No. 443-2, p. 313:2-3).   But it is the law, not Giganews, that "place[s] the burden of … identifying the potentially infringing material and adequately documenting infringement … *squarely on the owners of the copyright*."   *CCBill*, 488 F.3d at 1113 (emphasis added).   The Court "decline[s] to shift [that] substantial burden from the copyright owner to the provider."   *Id.*

### 2.    Material Contribution or Inducement

Because, after full discovery, there is no evidence that Giganews had any actual knowledge of any specific infringing materials that it did not immediately block access to, Perfect 10 cannot establish the first element of a claim for contributory infringement as a matter of law.   *Visa*, 494 F.3d at 788.   Accordingly, the Court need not address the second element of a claim for contributory infringement under either the "material contribution" or "inducement" theory.

## IV.    CONCLUSION

After extensive discovery, there is no "significant probative evidence" in the record tending to show that Giganews either: (a) received a direct financial benefit from the presence of Perfect 10 copyrighted material on its servers; or (b) had actual (or even constructive) knowledge that specific infringing Perfect 10 material was available on its servers.   Absent the former evidence, Perfect 10's claim for vicarious infringement fails as a matter of law.   And without the latter form of evidence, Perfect 10 cannot succeed on its claim for contributory liability under either the "material contribution" theory or the "inducement" theory.   Accordingly, the Court **GRANTS** Giganews' motion for summary judgment on Perfect 10's remaining claims for vicarious and contributory copyright infringement.   (Dkt. No. 440.)

The Court having granted summary judgment on the issue of indirect liability in favor of defendants, Perfect 10's mirror image motion for summary judgment on the question of direct liability (Dkt. No. 467) is **DENIED AS MOOT**.

By this order, each of the three theories copyright liability Perfect 10 alleged against Defendants Giganews and Livewire in its sole cause of action for copyright infringement have been adjudicated in Defendants favor (either by summary judgment or a motion to dismiss), completely resolving the action.   Accordingly, Defendants are ordered to submit a Proposed Judgment, for the Court's review, by no later than, Friday, November 21, 2014.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 17, 2014 at 10:00 a.m. is hereby **VACATED**.

   **IT IS SO ORDERED**

# Exhibit 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No.:   CV 11-07098-AB (SHx) | Date:   November 14, 2014 |

Title:   *Perfect 10, Inc. v. Giganews, Inc.*

Present: The Honorable   ANDRÉ BIROTTE JR.

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   **[In Chambers] Order DENYING the Parties' Remaining Motions for Partial Summary Judgment as MOOT (Dkt. Nos. 449, 534, & 535)**

Pending before this Court are the parties' competing motions for partial summary judgment regarding the adequacy of Plaintiff Perfect 10's takedown notices under the Digital Millennium Copyright Act (Dkt. Nos. 449 & 534 ) and Defendants' motion for partial summary judgment regarding the number of works at issue in the action.   (Dkt. No. 535.)   In its two separate orders granting Defendants' motions for partial summary judgment on the issues of direct and indirect copyright infringement, the Court has completely resolved this action and entered judgment in favor of Defendants.   This action being resolved in its entirety, the Court **DENIES** the remaining motions for partial summary judgment as **MOOT**.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for November 17, 2014 at 10:00 a.m. is hereby **VACATED**.

**IT IS SO ORDERED**