1 David J. Pasternak, CSBN 72201
Receiver
2 1875 Century Park East, Suite 2200
Los Angeles, California 90067-2523
3 Telephone:  310.553.1500
Facsimile:  310.553.1540
4 E-Mail:  djp@paslaw.com

5

6

7 **UNITED STATES DISTRICT COURT**

8 **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

9

10

| | |
|---|---|
| 11 PERFECT 10, INC., a California corporation, | **Case No. 2-11-cv-07098-AB (JPRx)** |
| 12         Plaintiff, | **Hon. Andre Birotte, Jr.** |
| 13    vs. | **NOTICE OF HEARING AND RECEIVER'S SECOND REPORT** |
| 14 GIGANEWS, INC., a Texas Corporation, et al., | **AND ACCOUNT FOR THE TIME PERIOD FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018** |
| 15 | |
| 16         Defendants. | **DATE:  JUNE 18, 2018** |
| 17 AND RELATED CROSS-ACTIONS | **TIME:  10:00 A.M. COURTROOM:  7B** |
| 18 | |

19

20      Pursuant to Local Rule 66-6.1 and 66-7(c), Receiver

21 David J. Pasternak submits the following Receiver's

22 Second Report and Account for the Time Period from

23 August 1, 2017 Through January 31, 2018 for hearing in

24 Courtroom 7B at 350 West 1st Street, Los Angeles, CA

25 90012-4565 on Friday, June 15, 2018 at 10:00 a.m.

26      On February 24, 2017, David J. Pasternak was

27 appointed as Receiver in this matter to take sole and

28 immediate custody, possession and control of all of the

PASTERNAK
& PASTERNAK

{00196222.DOCX 66390.0001 }                      1                2-11-cv-07098-AB (JPRx)

NOTICE OF HEARING AND RECEIVER'S SECOND REPORT AND ACCOUNT FOR THE TIME PERIOD
FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018

1  intellectual property of Perfect 10, Inc. ("Perfect
2  10"), including but not limited to its domain names,
3  copyrights, copyright interests, trademarks, trademark
4  interests, and associated goodwill, and related
5  interests ("the Property").  The Receiver was directed
6  by this Court to sell the Property in order to satisfy
7  this Court's Judgment.
8      The Receiver began serving as this Court's Receiver
9  immediately after learning about the issuance of this
10  Court's February 24, 2017 Order appointing him as
11  Receiver.  Shortly thereafter, pursuant to this Court's
12  authorization, he retained SoCal IP Law Group LLP
13  ("SoCal") as his intellectual property attorneys
14  pursuant to a Legal Services Agreement previously filed
15  with this Court.
16      With SoCal's assistance and the cooperation of
17  Perfect 10 and its principal, Norman Zada, the Receiver
18  believes that he has taken custody, possession and
19  control of all of the Property.  SoCal has coordinated
20  the filing of all necessary notices and registrations in
21  order to transfer the Property to the Receiver, and the
22  filing of all updates necessary to keep the
23  registrations current.  During this time period, the
24  Receiver and Norman Zada entered into a Declaration of
25  Assignment, a copy of which is attached as **Exhibit 1**.
26      On April 4, 2017, the Receiver filed and served a
27  summary Inventory identifying the property and documents
28  in his possession.  The Receiver's office has prepared a

PASTERNAK
& PASTERNAK

{00196222.DOCX 66390.0001 }                    2                    2-11-cv-07098-AB (JPRx)

NOTICE OF HEARING AND RECEIVER'S SECOND REPORT AND ACCOUNT FOR THE TIME PERIOD
FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018

1  detailed listing of the Property which is hundreds of
2  pages long, and consequently is not being filed with
3  this Court because of its volume.

4      As previously reported, the Receiver has a self-
5  storage unit for most of the Property, but also has
6  entered into an Agreement with PacificTitle Archives, a
7  copy of which has previously been filed with this Court,
8  for the storage of film stock which requires special
9  handling and maintenance.

10     The Receiver previously reported that he learned
11 that Perfect 10 had an appeal pending at the
12 Bundesgerichtshof (the German High Court) in Germany
13 against AOL Deutschland Medien GmbH concerning the
14 alleged unauthorized use of eight photographs or images.
15 The Receiver was informed by Perfect 10's German counsel
16 that Perfect 10 had filed an action against AOL Germany
17 asking for the prohibition of the provision of public
18 access to certain pictures subject to Perfect 10's
19 intellectual property rights as well as disclosure and
20 damages.  The case was dismissed by judgment of Hamburg
21 District Court dated December 3, 2010, ruling that there
22 was no case against AOL Germany as far as results of its
23 search engine were concerned.  The regional court of
24 appeal granted leave to appeal to the Federal Supreme
25 Court, with the hearing on September 21, 2017.  At that
26 hearing, the German Supreme Court dismissed the appeal.
27 A copy of the judgment dismissing the appeal is attached
28 as **Exhibit 2**.  Perfect 10 thereafter had the option of

1 claiming a violation of fair hearing before December 27,
2 2017 or filing a constitutional complaint to the German
3 Federal Constitutional Court before January 11, 2018.
4 The Receiver was advised by Perfect 10's German counsel
5 that either approach was unlikely to be successful.
6 When Mr. Zada urged the Receiver to pursue the case, the
7 Receiver asked Mr. Zada to advance the funds to pursue
8 either of these alternatives.  Mr. Zada refused to
9 provide the necessary funding.  Consequently, the
10 Receiver took no further action regarding the German
11 case.

12     After communicating with potential purchasers of the
13 Property, the Receiver negotiated with Plaintiff and Mr.
14 Zada for the sale of all of the Property.  After
15 Plaintiff made the highest purchase offer, the Receiver
16 negotiated the terms of the sale contract with
17 Plaintiff's counsel.  Those negotiations were continuing
18 at the end of January, 2018.  The sale will be subject
19 to overbidding at the future hearing before this Court
20 to approve and confirm the sale of the Property.

21     A financial report detailing the receipts and
22 disbursement of this Receivership Estate for the time
23 period from August 1, 2017 through January 31, 2018 is
24 attached as **Exhibit 3**.  As detailed in that financial
25 report, receipts during the time period from August 1,
26 2017 through January 31, 2018 totaled $75,009.58 (which
27 includes $75,000 received from Plaintiff in exchange for
28 the Receiver's third Receiver's Certificate),

PASTERNAK
& PASTERNAK

{00196222.DOCX 66390.0001 }                    4                    2-11-cv-07098-AB (JPRx)

NOTICE OF HEARING AND RECEIVER'S SECOND REPORT AND ACCOUNT FOR THE TIME PERIOD
FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018

1 | disbursements totaled $33,729.36 during this time
2 | period, and the Receivership Estate held $41,682.55 in a
3 | segregated interest-bearing business checking account at
4 | 1st Century Bank on January 31, 2018.  1st Century Bank
5 | is a bank located in the same Century City office
6 | building as the Receiver's office.

7 | The Receiver has separately filed and served the
8 | billing statements for his office and for SoCal for the
9 | time period from August 1, 2017 through January 31, 2018
10 | attached to six Notices of Receivership Fees and Costs
11 | for each of those months.  During that time period, the
12 | Receiver's fees and costs totaled $8,581.66, all of
13 | which has been paid.  During that time period, SoCal's
14 | fees and costs have totaled $12,182.55, all of which has
15 | been paid.

17 | DATED:  May 3, 2018

David J. Pasternak
Receiver

PASTERNAK
& PASTERNAK

{00196222.DOCX 66390.0001 }                     5                     2-11-cv-07098-AB (JPRx)

NOTICE OF HEARING AND RECEIVER'S SECOND REPORT AND ACCOUNT FOR THE TIME PERIOD
FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018

*Exhibit   1*

# Declaration of Assignment

whereas

**PERFECT 10, INC.,**

a company organized under the laws of the United States of America, resident at

11803 Norfield Court
Los Angeles, CA 90077
UNITED STATES

– hereinafter referred to as ASSIGNOR –

is the owner of the following trademarks:

(a) **Name:**             **PERFECT 10**
    **Number:**           97704265
    **Application date:**  1997-11-14

(b) **Name:**             **NATURAL 10**
    **Number:**           98723724
    **Application date:**  1998-03-19

– hereinafter referred to as the TRADEMARKS, and

whereas

**David J. Pasternak,**

a natural person under the laws of the United States of America, resident at

310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362
UNITED STATES

– hereinafter referred to as ASSIGNEE –

is desirous of acquiring all rights, titles, interests, and obligations of the ASSIGNOR with respect to the TRADEMARKS.

Therefore, the ASSIGNOR hereby assigns to the ASSIGNEE all of the ASSIGNOR's rights, titles, interests, and obligations with respect to the TRADEMARKS.

The ASSIGNEE agrees to receive the assignment of the TRADEMARKS as stated above.

ASSIGNOR and ASSIGNEE agree that the assignment is recorded in the trademark register of the National Institute of Industrial Property in France (INPI).

**ASSIGNOR**

PERFECT 10, INC.

11803 Norfield Court
Los Angeles, CA 90077
UNITED STATES

Place _Los Angeles_   Date _11/13/17_

Signature

Name _Norman Zada_

Position _President_

**ASSIGNEE**

David J. Pasternak, _Receiver_
310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362
UNITED STATES

Place _Los Angeles_   Date _11/13/17_

Signature

Name _DAVID PASTERNAK_

Position _RECEIVER_

Exhibit ___1___ Page ___7___

*Exhibit   2*





# BUNDESGERICHTSHOF

## IM NAMEN DES VOLKES

## URTEIL

I ZR 11/16

Verkündet am:
21. September 2017
Führinger
Justizangestellte
als Urkundsbeamtin
der Geschäftsstelle

in dem Rechtsstreit

Perfect 10 Inc., Beverly Park 72, Beverly Hills, Kalifornien, Vereinigte Staaten von Amerika,

Klägerin und Revisionsklägerin,

- Prozessbevollmächtigte:   Rechtsanwälte Dr. von Plehwe und Schäfer -

gegen

AOL Deutschland Medien GmbH, vertreten durch den Geschäftsführer Andreas Demuth, Zirkusweg 1, Hamburg,

Beklagte und Revisionsbeklagte,

- Prozessbevollmächtigte:   Rechtsanwälte Prof. Dr. Rohnke und Dr. Winter -

Exhibit *2* Page *8*

- 2 -

Der I. Zivilsenat des Bundesgerichtshofs hat auf die mündliche Verhand-
lung vom 21. September 2017 durch den Vorsitzenden Richter Prof. Dr. Büscher,
die Richter Prof. Dr. Schaffert, Dr. Kirchhoff, Prof. Dr. Koch und Feddersen

für Recht erkannt:

Die Revision gegen das Urteil des Hanseatischen Oberlandesge-
richts Hamburg - 5. Zivilsenat - vom 10. Dezember 2015 wird auf
Kosten der Klägerin zurückgewiesen.

Von Rechts wegen

Tatbestand:

1          Die in Kalifornien geschäftsansässige Klägerin betreibt die Internetseite
„www.perfect10.com", auf der sie erotische Fotografien anbietet. Bestimmte In-
halte ihres Internetauftritts können nur von registrierten Kunden gegen Zahlung
eines Entgelts und nach Eingabe eines Passworts genutzt werden. Die Kunden
dürfen die im passwortgeschützten Bereich eingestellten Aktfotografien auf ihre
Rechner herunterladen.

2          Die Beklagte betreibt unter dem Domainnamen „www.aol.com" ein Inter-
netportal, auf dem sie verschiedene Dienstleistungen anbietet. Dazu zählt die
kostenfreie Durchführung einer Bilderrecherche anhand von Suchbegriffen, die
Nutzer in eine Suchmaske auf der Webseite der Beklagten eingeben können.
Für die Durchführung der Bilderrecherche greift die Beklagte auf den Internet-
suchdienst der Google. Inc. (im Folgenden Google) zurück, zu dem sie auf ihrer
Webseite einen elektronischen Verweis (Link) gesetzt hat. Die Suchmaschine
Google ermittelt die im Internet vorhandenen Bilddateien, indem Computerpro-
gramme (sogenannte Crawler) die Internetseiten in regelmäßigen Zeitabstän-
den nach dort eingestellten Bildern durchsuchen. Dabei können die Crawler nur



Exhibit 2 Page 9

- 3 -

Bilder aufspüren, die auf frei zugänglichen Internetseiten eingestellt sind. Die aufgefundenen Bilder werden in einem automatisierten Verfahren nach Suchbegriffen indexiert und als kleinformatige Vorschaubilder auf den Servern von Google gespeichert. Geben die Internetnutzer in die Suchmaske der Beklagten einen Suchbegriff ein, werden die von Google hierzu indexierten Vorschaubilder abgerufen und auf der Webseite der Beklagten in Ergebnislisten angezeigt.

3        Bei Eingabe der Suchbegriffe „Alexandra Cornfeld" und „Alexa Latona" in die Suchmaske der Beklagten wurden am 9. und 11. Juni 2009 unter der Kopfzeile „AOL Bildersuche Suchergebnisse" jeweils vier verkleinerte Aktfotografien von zwei unter diesen Pseudonymen auftretenden Models als Vorschaubilder angezeigt. Die Bildersuchmaschine Google hatte die Fotografien auf den Internetseiten „www.mmmh.com.ar" und „www.kep.tar.hu" aufgefunden. Die Suchmaske der Beklagten war zu dieser Zeit mit dem Vermerk „AOL-Suche" und dem Hinweis „powered by Google" versehen.

4        Die Klägerin mahnte die Beklagte mit Schreiben vom 16. Juni 2009 unter Berufung auf ihre ausschließlichen urheberrechtlichen Nutzungsrechte an den Fotografien ab. Die Beklagte sperrte daraufhin die Namen „Alexandra Cornfeld" und „Alexa Latona" als Suchbegriffe, ohne eine strafbewehrte Unterlassungserklärung abzugeben.

5        Die Klägerin hat behauptet, sie habe die ausschließlichen Nutzungsrechte an den acht Fotografien erworben und diese, versehen mit der Aufschrift „Perfect10.com" und einem Copyright-Vermerk, in den passwortgeschützten Bereich ihrer Internetseite eingestellt. Von dort hätten Kunden die Bilder heruntergeladen und unerlaubt auf den von der Suchmaschine Google aufgefundenen Internetseiten veröffentlicht. Drei der Fotografien seien noch am 16. bzw. 21. Juli 2010 und sieben der Fotografien noch am 7. September 2015 auf der Webseite der Beklagten als Vorschaubilder angezeigt worden. Die Klägerin hat geltend gemacht, durch die Anzeige der Vorschaubilder auf der Internetseite der Beklagten sei ihr ausschließliches Recht zur öffentlichen Zugänglichma-


Exhibit 2 Page 10

- 4 -

chung der Lichtbilder verletzt worden. Für diese Verletzung hafte die Beklagte
als Täter, zumindest aber als Störer.

6        Die Klägerin hat zuletzt beantragt, die Beklagte unter Androhung von
Ordnungsmitteln zu verurteilen, es zu unterlassen, die aus der Anlage BK 1 er-
sichtlichen, mit den Ziffern 1 bis 8 versehenen Fotografien in der Bundesrepub-
lik Deutschland öffentlich zugänglich zu machen oder öffentlich zugänglich ma-
chen zu lassen. Ferner hat sie die Beklagte im Wege der Stufenklage auf Aus-
kunftserteilung und Schadensersatz in Anspruch genommen.

7        Das Landgericht hat die Klage abgewiesen. Die Berufung der Klägerin ist
ohne Erfolg geblieben. Mit ihrer vom Berufungsgericht zugelassenen Revision,
deren Zurückweisung die Beklagte beantragt, verfolgt die Klägerin ihre Klage-
anträge weiter. Zum Unterlassungsantrag beantragt sie hilfsweise, die Beklagte
unter Androhung von Ordnungsmitteln zu verurteilen, es zu unterlassen, es Drit-
ten zu ermöglichen, die aus der Anlage BK 1 ersichtlichen Fotografien in der
Bundesrepublik Deutschland öffentlich zugänglich zu machen oder öffentlich
zugänglich machen zu lassen. Zum Antrag auf Auskunftserteilung und Scha-
densersatz beantragt sie hilfsweise Leistung an den durch Entscheidung des
United States District Court, Central District of California, Western Division, vom
24. Februar 2017 eingesetzten Receiver, Rechtsanwalt David J. Pasternak,
Pasternak & Pasternak, zu erbringen.

Entscheidungsgründe:

8        A. Das Berufungsgericht hat angenommen, der Klägerin stünden die gel-
tend gemachten Ansprüche nicht zu, weil die Beklagte die Fotografien weder
als Täter rechtswidrig öffentlich zugänglich gemacht habe noch als Störer für et-
waige von Dritten begangene Urheberrechtsverletzungen hafte. Dazu hat es
ausgeführt:

9        Die Fotografien seien jedenfalls als Lichtbilder urheberrechtlich ge-
schützt. Die Klägerin sei zur Geltendmachung urheberrechtlicher Ansprüche


Exhibit 2 Page 11

- 5 -

berechtigt, weil sie Inhaberin der ausschließlichen Nutzungsrechte an den Aufnahmen sei. Die Beklagte habe die Lichtbilder jedoch nicht täterschaftlich öffentlich zugänglich gemacht. Im Ausgangspunkt komme zwar in Betracht, dass sie eine solche Handlung als Täter oder Mittäter begangen habe, weil sie sich die von der Suchmaschine Google ermittelten Treffer durch die Einbindung in ihr Internetangebot zu eigen gemacht und die Vorschaubilder in bewusstem und gewolltem Zusammenwirken mit Google angezeigt habe. Da die Fotografien im frei zugänglichen Internet auffindbar gewesen seien, setze ihre öffentliche Zugänglichmachung aber voraus, dass die Klägerin sie nur für ein beschränktes Publikum wiedergegeben und nicht an eine Wiedergabe gegenüber allen Internetnutzern gedacht habe. Die Klägerin habe jedoch nicht bewiesen, dass die Fotografien ausschließlich im passwortgeschützten Bereich ihres Internetangebots eingestellt gewesen seien und sie ihren Kunden nicht das Recht eingeräumt habe, die heruntergeladenen Bilddateien in andere Internetseiten einzustellen. Jedenfalls wäre eine - unterstellte - Tathandlung der Beklagten in Gestalt einer öffentlichen Zugänglichmachung aufgrund einer (schlichten) Einwilligung der Klägerin nicht rechtswidrig.

10      Die von der Klägerin hilfsweise geltend gemachte Störerhaftung schlage sich in der Fassung des Unterlassungsantrags nicht hinreichend nieder und komme auch in der Sache nicht in Betracht. Es fehle bereits an einer rechtswidrigen Urheberrechtsverletzung eines Dritten, zu der die Beklagte einen Beitrag hätte leisten können. Außerdem könne nicht davon ausgegangen werden, dass der Beklagten Prüf- oder Überwachungspflichten zur Verhinderung vergleichbarer Rechtsverletzungen zumutbar seien. Im Übrigen habe die Klägerin nicht substantiiert dargelegt und unter Beweis gestellt, dass es zu weiteren gleichartigen Urheberrechtsverstößen über das Internetangebot der Beklagten gekommen sei, nachdem diese durch die Abmahnung über die Urheberrechtsverstöße in Kenntnis gesetzt worden sei.

11      B. Die gegen diese Beurteilung gerichtete Revision der Klägerin hat keinen Erfolg. Das Berufungsgericht hat im Ergebnis mit Recht angenommen,


Exhibit 2 Page 12

- 6 -

dass die mit der Klage geltend gemachten Ansprüche unbegründet sind, weil
die Beklagte für etwaige Verletzungen des ausschließlichen Rechts zur öffentli-
chen Wiedergabe der Fotografien nicht haftet.

12       I. Die Klägerin ist befugt, die Klageansprüche gerichtlich geltend zu ma-
chen. Ihrer Prozessführungsbefugnis steht nicht entgegen, dass der United Sta-
tes District Court, Central District of California, Western Division, mit Order vom
24. Februar 2017 zur Vollstreckung eines gegen die Klägerin erwirkten Urteils
einen Zwangsverwalter (Receiver) bestellt hat, der sämtliche urheberrechtlichen
Ansprüche der Klägerin pfänden und verwerten soll. Die Beklagte hat nicht dar-
gelegt, dass der Zwangsverwalter nach der Order des US-amerikanischen Ge-
richts ermächtigt ist, auch die von der Klägerin im vorliegenden Rechtsstreit
geltend gemachten urheberrechtlichen Ansprüche wegen einer Verletzung von
in Deutschland nach dem Urheberrechtsgesetz geschützten Rechten an den
Fotografien zu pfänden und zu verwerten. Der von der Beklagten vorgelegten
Order vom 24. Februar 2017 ist dies nicht zu entnehmen. Im Übrigen bliebe die
Prozessführungsbefugnis der Klägerin selbst bei einer Pfändung und Überwei-
sung dieser Ansprüche bestehen. Wird eine streitbefangene Forderung rechts-
geschäftlich oder im Wege der Zwangsvollstreckung auf einen Dritten übertra-
gen, so hat dies gemäß § 265 Abs. 2 Satz 1 ZPO auf den Prozess keinen Ein-
fluss. Der Rechtsvorgänger behält weiter seine Prozessführungsbefugnis und
darf den Rechtsstreit als Partei im eigenen Namen in sogenannter Prozess-
standschaft weiterführen (vgl. BGH, Urteil vom 12. März 1986 - VIII ZR 64/85,
NJW 1986, 3206, 3207 mwN; Urteil vom 25. März 1991 - II ZR 13/90, BGHZ
114, 138, 141; Urteil vom 5. April 2001 - IX ZR 441/99, BGHZ 147, 225, 229).

13       II. Die von der Klägerin geltend gemachten Ansprüche sind nach deut-
schem Recht zu beurteilen. Nach Art. 8 Abs. 1 der Verordnung (EG)
Nr. 864/2007 über das auf außervertragliche Schuldverhältnisse anzuwendende
Recht (Rom-II-VO) ist auf außervertragliche Schuldverhältnisse aus einer Ver-
letzung von Rechten des geistigen Eigentums das Recht des Staates anzu-
wenden, für den der Schutz beansprucht wird. Nach diesem Recht sind das


Exhibit 2 Page 13

- 7 -

Bestehen des Rechts, die Rechtsinhaberschaft des Verletzten, Inhalt und Umfang des Schutzes sowie der Tatbestand und die Rechtsfolgen einer Rechtsverletzung zu beurteilen (st. Rspr.; vgl. Urteil vom 24. September 2014 - I ZR 35/11, GRUR 2015, 264 Rn. 24 = WRP 2015, 347 - Hi Hotel II; Urteil vom 21. April 2016 - I ZR 34/14, GRUR 2016, 1048 Rn. 24 = WRP 2016, 1114 - An Evening with Marlene Dietrich, jeweils mwN). Da Gegenstand der Klage allein Ansprüche wegen Verletzungen urheberrechtlich geschützter Rechte an Fotografien sind, für die die Klägerin im Inland urheberrechtlichen Schutz beansprucht, ist im Streitfall deutsches Urheberrecht anzuwenden.

14        III. Das Berufungsgericht hat im Ergebnis zu Recht angenommen, dass die von der Klägerin gegen die Beklagten erhobenen Ansprüche auf Unterlassung der öffentlichen Wiedergabe der Fotografien im Inland (§ 97 Abs. 1 Satz 1 UrhG), Auskunftserteilung (§ 242 BGB) und Schadensersatz (§ 97 Abs. 2 UrhG) nicht begründet sind und die Stufenklage daher insgesamt abzuweisen ist (vgl. dazu BGH, Urteil vom 16. Juni 2010 - VIII ZR 62/09, NJW-RR 2011, 189 Rn. 24 mwN). Durch die Anzeige der Fotografien als Vorschaubilder auf ihrer Internetseite hat die Beklagte weder das Recht der öffentlichen Zugänglichmachung im Sinne von § 19a UrhG (dazu B III 3) oder ein unbenanntes Recht der öffentlichen Wiedergabe im Sinne von § 15 Abs. 2 UrhG (dazu B III 4) täterschaftlich verletzt noch hat sie für eine solche Verletzung unter dem Gesichtspunkt der Störerhaftung einzustehen (dazu B III 5).

15        1. Das Berufungsgericht ist rechtsfehlerfrei davon ausgegangen, dass die Fotografien jedenfalls als Lichtbilder im Sinne von § 72 UrhG den Schutz des Urheberrechtsgesetzes genießen. Anknüpfungspunkt für den urheberrechtlichen Schutz eines Werks ist die Staatsangehörigkeit des Urhebers, nicht die Staatsangehörigkeit desjenigen, der Nutzungsrechte von ihm ableitet (vgl. BGH, Beschluss vom 30. März 2000 - I ZR 133/97, GRUR 2000, 1020, 1022 - La Bohème; Katzenberger/Metzger in Schricker/Loewenheim, Urheberrecht, 5. Aufl., § 120 UrhG Rn. 10). Das Berufungsgericht hat es als erwiesen erachtet, dass die Fotografien von einem tschechischen Fotografen angefertigt wor-


Exhibit 2 Page 14

- 8 -

den sind. Nach § 120 Abs. 2 Nr. 2 UrhG stehen Staatsangehörige eines anderen Mitgliedstaates der Europäischen Union deutschen Staatsangehörigen gleich und genießen daher wie diese nach § 120 Abs. 1 Satz 1 UrhG den urheberrechtlichen Schutz für alle ihre Werke, gleichviel, ob und wo die Werke erschienen sind. Die Bestimmung des § 120 UrhG ist nach § 124 UrhG für den Schutz von Lichtbildern (§ 72 UrhG) sinngemäß anzuwenden.

16          2. Das Berufungsgericht hat ohne Rechtsfehler angenommen, dass die Klägerin als Inhaberin der ausschließlichen urheberrechtlichen Nutzungsrechte an den Aufnahmen berechtigt ist, urheberrechtliche Ansprüche wegen einer Verletzung dieser Rechte geltend zu machen (vgl. BGH, Urteil vom 29. April 1999 - I ZR 65/96, BGHZ 141, 267, 272 f. - Laras Tochter; Urteil vom 15. August 2013 - I ZR 85/12, ZUM-RD 2013, 514 Rn. 23). Nach den Feststellungen des Berufungsgerichts hat der Fotograf der Klägerin die ausschließlichen Nutzungsrechte an seinen Aufnahmen für Deutschland eingeräumt. Die Berechtigung der Klägerin zur Geltendmachung von Ansprüchen wegen einer Verletzung dieser Rechte ist nicht dadurch entfallen, dass der United States District Court mit Order vom 24. Februar 2017 einen Zwangsverwalter bestellt hat, der ihre urheberrechtlichen Ansprüche pfänden und verwerten soll. Es ist nicht ersichtlich, dass sich diese Order auf die hier in Rede stehenden urheberrechtlichen Ansprüche wegen einer Verletzung von in Deutschland nach dem Urheberrechtsgesetz geschützten Rechten an den Fotografien bezieht (vgl. Rn. 12). Selbst wenn die streitbefangenen Forderungen durch den Zwangsverwalter gepfändet worden wären, hätte die Klägerin der damit veränderten materiellen Rechtslage entsprochen, indem sie mit ihrem Hilfsantrag hinsichtlich der Ansprüche auf Auskunft und Zahlung Leistung an den Zwangsverwalter als Rechtsnachfolger verlangt hat (vgl. BGH, NJW 1986, 3206, 3207 mwN; BGHZ 114, 138, 141; BGHZ 147, 225, 229). Hinsichtlich des Unterlassungsanspruchs bedurfte es keiner Umstellung des Klageantrags, weil die Verurteilung zur Unterlassung schlechthin und nicht gegenüber einem bestimmten Berechtigten zu erfolgen hat (BGH, Urteil vom 7. Mai 2013 - X ZR 69/11, BGHZ 197, 196 Rn. 55



Exhibit 2 Page 15

- 9 -

- Fräsverfahren). Letztlich kann offenbleiben, wer zur Geltendmachung der An-
sprüche berechtigt ist, da diese Ansprüche ohnehin nicht bestehen.

17        3. Das Berufungsgericht hat im Ergebnis mit Recht angenommen, dass
die Beklagte nicht in das ausschließliche Recht zur öffentlichen Zugäng-
lichmachung der Lichtbilder (§ 15 Abs. 2 Satz 1 und 2 Nr. 2, § 19a UrhG) ein-
gegriffen hat.

18        a) Das Berufungsgericht hat es im Ausgangspunkt für möglich gehalten,
dass die Beklagte durch die Anzeige der Fotografien als Vorschaubilder eine
Handlung der öffentlichen Zugänglichmachung als Täter oder Mittäter vorge-
nommen habe. Es sei zwar davon auszugehen, dass die Vorschaubilder aus-
schließlich auf den Servern von Google gespeichert seien und die Beklagte auf
diese Daten keinen Zugriff habe. Dadurch, dass die Beklagte die von Google
absprachegemäß überspielten Suchergebnisse in ihren Internetauftritt integriert
und (auch) als eigenes Angebot präsentiert habe, könne sie aber eine eigene
Tathandlung der öffentlichen Zugänglichmachung wegen Zueigenmachens der
von Google gelieferten Bilddateien oder aufgrund bewussten und gewollten Zu-
sammenwirkens mit Google begangen haben. Diese Beurteilung hält der recht-
lichen Nachprüfung nicht stand. Die Revisionserwiderung macht zutreffend gel-
tend, dass auf der Grundlage der vom Berufungsgericht getroffenen Feststel-
lungen ein öffentliches Zugänglichmachen der Lichtbilder durch die Beklagte
von vornherein ausscheidet.

19        b) Eine öffentliche Zugänglichmachung im Sinne von § 19a UrhG erfor-
dert, dass Dritten der Zugriff auf ein urheberrechtlich geschütztes Werk eröffnet
wird, das sich in der Zugriffssphäre des Vorhaltenden befindet (vgl. BGH, Urteil
vom 29. April 2010 - I ZR 9/08, BGHZ 185, 291 Rn. 19 - Vorschaubilder I; Urteil
vom 29. April 2010 - I ZR 39/08, GRUR 2011, 56 Rn. 23 = WRP 2011, 88
- Session-ID; Beschluss vom 16. Mai 2013 - I ZR 46/12, GRUR 2013, 818 Rn. 8
= WRP 2013, 1047 - Die Realität I; Urteil vom 9. Juli 2015 - I ZR 46/12, GRUR
2016, 171 Rn. 13 = WRP 2016, 224 - Die Realität II). Die Anzeige von Lichtbil-

Exhibit  2 Page 16

- 10 -

dern in der Trefferliste einer Suchmaschine stellt eine eigene Nutzungshand-
lung des öffentlichen Zugänglichmachens dar, wenn der Betreiber der Suchma-
schine die Lichtbilder auf einem eigenen Rechner - und damit unabhängig von
der ursprünglichen Quelle - vorhält und auf diese Weise die Kontrolle über ihre
Bereithaltung ausübt (vgl. BGHZ 185, 291 Rn. 20 - Vorschaubilder I). Die Ver-
knüpfung eines auf einer fremden Internetseite bereitgestellten Lichtbilds mit
der eigenen Internetseite mittels eines elektronischen Verweises (Links) stellt
dagegen keine urheberrechtliche Nutzungshandlung des öffentlichen Zugäng-
lichmachens dar, weil allein der Betreiber der fremden Internetseite, der das
Lichtbild ins Internet gestellt und dadurch öffentlich zugänglich gemacht hat,
darüber entscheidet, ob es der Öffentlichkeit zugänglich bleibt (vgl. BGH, Urteil
vom 17. Juli 2003 - I ZR 259/00, BGHZ 156, 1, 14 - Paperboy; BGH, GRUR
2011, 56 Rn. 24 - Session-ID; GRUR 2013, 818 Rn. 24 - Die Realität I; GRUR
2016, 171 Rn. 14 - Die Realität II).

20          c) Das Berufungsgericht hat angenommen, die auf der Webseite der Be-
klagten als Ergebnisse einer Bildersuche angezeigten Vorschaubilder seien
ausschließlich auf den Servern von Google gespeichert. Die Vermutung der
Klägerin, die Beklagte habe Zugriff auf die Bilddateien, sei mangels tatsächli-
cher Anknüpfungspunkte als unsubstantiiert anzusehen. Gegen diese Beurtei-
lung erhebt die Revision keine Rügen. Danach hat die Beklagte den Tatbestand
der öffentlichen Zugänglichmachung nicht selbst verwirklicht. Entgegen der An-
sicht des Berufungsgerichts kommt es nicht darauf an, ob die Beklagte sich die
von Google gelieferten Vorschaubilder durch die Einbettung in ihre Internetseite
zu eigen gemacht hat (vgl. BGH, GRUR 2016, 171 Rn. 27 - Die Realität II). Der
Tatbestand der öffentlichen Zugänglichmachung wird durch das tatsächliche
Vorhalten eines Lichtbilds zum Abruf verwirklicht und nicht dadurch, dass der
für den Internetauftritt Verantwortliche den - unzutreffenden - Eindruck erweckt,
er halte das Lichtbild selbst zum Abruf bereit (vgl. BGH, GRUR 2013, 818 Rn. 9
- Die Realität I).

21



- 11 -

d) Entgegen der Ansicht des Berufungsgerichts kann die Beklagte die Lichtbilder auch nicht mittäterschaftlich öffentlich zugänglich gemacht haben, weil sie mit Google vereinbart hat, dass sie die Vorschaubilder von deren Servern abruft und auf ihrer Webseite anzeigt. Ein bewusstes und gewolltes Zusammenwirken mit einem Dritten bei einer Urheberrechtsverletzung setzt eine Kenntnis von konkret drohenden Rechtsverletzungen voraus (vgl. BGH, Urteil vom 12. Juli 2012 - I ZR 18/11, BGHZ 194, 339 Rn. 17 - Alone in the Dark; Urteil vom 15. August 2013 - I ZR 80/12, GRUR 2013, 1030 Rn. 28 = WRP 2013, 1348 - File-Hosting-Dienst; Urteil vom 5. Februar 2015 - I ZR 240/12, GRUR 2015, 485 Rn. 37= WRP 2015, 577 - Kinderhochstühle im Internet III). Die Vorschaubilder werden in einem automatisierten Verfahren angezeigt, ohne dass sie der Beklagten vorher zur Kenntnis gelangen. Eine mittäterschaftliche Haftung der Beklagten kann auch nicht mit der vom Berufungsgericht gegebenen Begründung angenommen werden, wegen der Funktionsweise der Google-Suchmaschine lasse sich eine urheberrechtswidrige Anzeige von Fotografien prinzipiell nie sicher ausschließen. Der Umstand, dass die Beklagte mit gelegentlichen Urheberrechtsverletzungen bei der Präsentation von Vorschaubildern gerechnet haben mag, begründet keine Kenntnis von einer urheberrechtswidrigen Anzeige gerade der in Rede stehenden Fotografien.

22        4. Die Beklagte hat durch die Anzeige der Fotografien als Vorschaubilder auf ihrer Internetseite kein unbenanntes ausschließliches Recht der Klägerin zur öffentlichen Wiedergabe der Lichtbilder (§ 15 Abs. 2 UrhG) täterschaftlich verletzt.

23        a) Gemäß § 15 Abs. 2 Satz 1 UrhG hat der Urheber das ausschließliche Recht, sein Werk in unkörperlicher Form öffentlich wiederzugeben (Recht der öffentlichen Wiedergabe). Dieses Recht umfasst nach § 15 Abs. 2 Satz 2 UrhG insbesondere das Vortrags-, Aufführungs- und Vorführungsrecht (§ 19 UrhG), das Recht der öffentlichen Zugänglichmachung (§ 19a UrhG), das Senderecht (§ 20 UrhG), das Recht der Wiedergabe durch Bild- oder Tonträger (§ 21 UrhG) sowie das Recht der Wiedergabe von Funksendungen und von öffentlicher Zu-

Exhibit  Page 18

- 12 -

gänglichmachung (§ 22 UrhG). Die Vorschrift des § 15 Abs. 2 UrhG enthält kei-
ne abschließende, sondern eine beispielhafte („insbesondere") Aufzählung der
dem Urheber vorbehaltenen Verwertungsrechte und lässt deshalb die Anerken-
nung unbenannter Verwertungsrechte der öffentlichen Wiedergabe zu (vgl.
BGHZ 156, 1, 13 - Paperboy; BGH, GRUR 2016, 171 Rn. 16 - Die Realität II).

24          Insofern ist zu berücksichtigen, dass § 15 Abs. 2 UrhG die Bestimmung
des Art. 3 Abs. 1 der Richtlinie 2001/29/EG zur Harmonisierung bestimmter As-
pekte des Urheberrechts und der verwandten Schutzrechte in der Informations-
gesellschaft umsetzt, durch die das Recht der öffentlichen Wiedergabe voll-
ständig harmonisiert worden ist (vgl. EuGH, Urteil vom 13. Februar 2014
- C-466/12, GRUR 2014, 360 Rn. 33 bis 41 = WRP 2014, 414 - Svensson/
Retriever Sverige). Ein unbenanntes Recht der öffentlichen Wiedergabe ist da-
her in richtlinienkonformer Auslegung von § 15 Abs. 2 UrhG anzunehmen, so-
weit Art. 3 Abs. 1 der Richtlinie 2001/29/EG weitergehende Rechte als die in
§ 15 Abs. 2 Satz 2 UrhG benannten Rechte der öffentlichen Wiedergabe ge-
währt (vgl. BGH, GRUR 2016, 171 Rn. 17 - Die Realität II; BGH, Beschluss vom
23. Februar 2017 - I ZR 267/15, GRUR 2017, 514 Rn. 17 = WRP 2017, 569
- Cordoba). Nach Art. 3 Abs. 1 der Richtlinie 2001/29/EG sehen die Mitglied-
staaten vor, dass den Urhebern das ausschließliche Recht zusteht, die draht-
gebundene oder drahtlose öffentliche Wiedergabe ihrer Werke einschließlich
der öffentlichen Zugänglichmachung der Werke in der Weise, dass sie Mitglie-
dern der Öffentlichkeit von Orten und zu Zeiten ihrer Wahl zugänglich sind, zu
erlauben oder zu verbieten.

25          b) Die hier in Rede stehende Wiedergabe fällt in den Anwendungsbe-
reich von Art. 3 Abs. 1 der Richtlinie 2001/29/EG.

26          aa) Das Recht zur öffentlichen Wiedergabe im Sinne von Art. 3 Abs. 1
der Richtlinie 2001/29/EG umfasst nur die Wiedergabe an eine Öffentlichkeit,
die nicht an dem Ort anwesend ist, an dem die Wiedergabe ihren Ursprung
nimmt (vgl. Erwägungsgrund 23 Satz 2 der Richtlinie). Nicht erfasst sind direkte



Exhibit 2 Page 19

- 13 -

Aufführungen und Darbietungen von Werken vor einer Öffentlichkeit, die sich in unmittelbarem körperlichen Kontakt mit der Person befindet, die dieses Werk aufführt oder darbietet (EuGH, Urteil vom 4. Oktober 2011 - C-403/08 und C-29/08, Slg. 2011, I-09083 = GRUR 2012, 156 Rn. 200 bis 202 - Football Association Premier League und Murphy; Urteil vom 24. November 2011 - C-283/10, Slg. 2011, I-12031 = GRUR Int. 2012, 156 Rn. 35 f. - UCMR-ADA/Zirkus Globus; BGH, GRUR 2017, 514 Rn. 19 - Cordoba).

27      bb) Bei der vorliegend in Rede stehenden Anzeige der Fotografien als Vorschaubilder auf der Webseite der Beklagten hat kein unmittelbarer körperlicher Kontakt zwischen den ein Werk aufführenden oder darbietenden Personen und einer durch diese Wiedergabe erreichten Öffentlichkeit bestanden. Es hat daher eine Wiedergabe an eine Öffentlichkeit vorgelegen, die an dem Ort, an dem die Wiedergabe ihren Ursprung genommen hat, nicht anwesend war.

28      c) Der Begriff der „öffentlichen Wiedergabe" erfordert eine individuelle Beurteilung. Er hat zwei Tatbestandsmerkmale, nämlich eine Handlung der Wiedergabe (dazu B III 4 d) und die Öffentlichkeit dieser Wiedergabe (dazu B III 4 e). Ferner sind eine Reihe weiterer Kriterien zu berücksichtigen, die unselbständig und miteinander verflochten sind (dazu B III 4 f). Da diese Kriterien im jeweiligen Einzelfall in sehr unterschiedlichem Maß vorliegen können, sind sie einzeln und in ihrem Zusammenwirken mit den anderen Kriterien anzuwenden (vgl. EuGH, Urteil vom 8. September 2016 - C-160/15, GRUR 2016, 1152 Rn. 32 bis 34 = WRP 2016, 1347 - GS Media/Sanoma u.a.; Urteil vom 26. April 2017 - C-527/15, GRUR 2017, 610 Rn. 28 bis 30 = WRP 2017, 677 - Stichting Brein/Wullems; Urteil vom 14. Juni 2017 - C-610/15, GRUR 2017, 790 Rn. 23 bis 25 = WRP 2017, 936 - Stichting Brein/XS 4ALL). Bei der danach gebotenen individuellen Beurteilung des Streitfalls hat die Beklagte durch die Anzeige der Fotografien als Vorschaubilder auf ihrer Internetseite das ausschließliche Recht zur öffentlichen Wiedergabe nicht verletzt.


Exhibit 2 Page 20

- 14 -

29      d) Die Beklagte hat durch die verkleinerte Anzeige der Fotografien auf ihrer Internetseite eine Handlung der Wiedergabe der Lichtbilder vorgenommen.

30      aa) Der Begriff der Wiedergabe ist im Blick auf das Hauptziel der Richtlinie 2001/29/EG, ein hohes Schutzniveau für die Urheber sicherzustellen (vgl. Erwägungsgründe 4 und 9 der Richtlinie), weit zu verstehen (vgl. Erwägungsgrund 23 der Richtlinie; EuGH, GRUR 2014, 360 Rn. 17 - Svensson/Retriever Sverige; GRUR 2016, 1152 Rn. 29 - GS Media/Sanoma u.a.). Er erfasst jede Übertragung eines geschützten Werks unabhängig vom eingesetzten technischen Mittel oder Verfahren (vgl. EuGH, GRUR 2012, 156 Rn. 186 und 193 - Football Association Premier League und Murphy; EuGH, Urteil vom 27. Februar 2014 - C-351/12, GRUR 2014, 473 Rn. 23 und 25 = WRP 2014, 418 - OSA/Léčebné lázně; Urteil vom 31. Mai 2016 - C-117/15, GRUR 2016, 684 Rn. 38 - Reha Training/GEMA). Eine Wiedergabe setzt voraus, dass der Nutzer in voller Kenntnis der Folgen seines Verhaltens - also absichtlich und gezielt - Dritten einen Zugang zum geschützten Werk verschafft, ohne dass es darauf ankommt, ob die Dritten den Zugang nutzen (vgl. EuGH, GRUR 2014, 360 Rn. 19 - Svensson/Retriever Sverige; GRUR 2017, 610 Rn. 36 - Stichting Brein/ Wullems; GRUR 2017, 790 Rn. 31 - Stichting Brein/XS 4ALL). Ein solcher Zugang wird geschaffen, wenn auf einer Internetseite anklickbare Links zu geschützten Werken bereitgestellt werden, die auf einer anderen frei zugänglichen Internetseite veröffentlicht sind (vgl. EuGH, GRUR 2014, 360 Rn. 18 und 20 - Svensson/Retriever Sverige; GRUR 2017, 610 Rn. 37 - Stichting Brein/ Wullems; GRUR 2017, 790 Rn. 32 - Stichting Brein/XS 4ALL).

31      bb) Nach diesen Kriterien ist der von der Beklagten zur Verfügung gestellte elektronische Verweis auf den Bildersuchdienst Google als Handlung der Wiedergabe einzustufen. Durch die Bereitstellung der Suchfunktion hat die Beklagte in voller Kenntnis der Folgen ihres Verhaltens - also absichtlich und gezielt - den Nutzern ihrer Internetseite ermöglicht, mithilfe der Eingabe von Suchbegriffen die auf den Servern von Google gespeicherten Vorschaubilder aufzurufen (vgl. EuGH, GRUR 2017, 790 Rn. 36 - Stichting Brein/XS 4ALL).


Exhibit __2__ Page __21__

- 15 -

Dabei kommt es nicht darauf an, ob die Nutzer diesen Zugang tatsächlich genutzt haben (vgl. BGH, GRUR 2016, 171 Rn. 23 - Die Realität II; GRUR 2017, 514 Rn. 24 - Cordoba).

32        cc) Die Revisionserwiderung macht ohne Erfolg geltend, die Beklagte habe den Internetnutzern den Zugang speziell zu den streitgegenständlichen Fotografien nicht bewusst und in voller Kenntnis ihres Verhaltens vermittelt. Sie habe ihre Suchmaske lediglich über einen allgemeinen Link mit der Suchmaschine Google verbunden, die ihrerseits in einem automatisch-technischen Prozess eine Vielzahl von Webseiten überprüft und die aufgefundenen Fotografien anhand von Suchbegriffen indexiert habe. Durch die Eingabe der indexierten Suchbegriffe auf der Webseite der Beklagten hätten die Internetnutzer die Vorschaubilder ohne deren Kenntnis und Kontrolle aufgerufen.

33        Nach der Rechtsprechung des Gerichtshofs der Europäischen Union genügt es für eine Handlung der Wiedergabe, dass der Nutzer Dritten wissentlich und willentlich ermöglicht, auf urheberrechtlich geschützte Werke zuzugreifen (vgl. EuGH, Urteil vom 15. März 2012 - C-162/10, GRUR 2012, 597 Rn. 31 - Phonografic Performance; EuGH, GRUR 2017, 610 Rn. 41 - Stichting Brein/ Wullems; GRUR 2017, 790 Rn. 36 - Stichting Brein/XS 4ALL). Er muss keine konkrete Kenntnis von den einzelnen zugänglich gemachten Werken besitzen (vgl. v. Ungern-Sternberg in Schricker/Loewenheim aaO § 15 UrhG Rn. 79; ders., GRUR 2012, 576, 578; Ohly, GRUR 2016, 1155, 1156; Leistner, ZUM 2016, 980, 982; Neubauer/Soppe, GRUR 2017, 615, 616).

34        e) Die Wiedergabe der Fotografien als Vorschaubilder auf der Internetseite der Beklagten ist im Sinne von Art. 3 Abs. 1 der Richtlinie 2001/29/EG öffentlich erfolgt.

35        aa) Der Begriff der Öffentlichkeit ist nur bei einer unbestimmten Zahl potentieller Adressaten und recht vielen Personen erfüllt. Hinsichtlich des letztgenannten Kriteriums ist die kumulative Wirkung zu beachten, die sich aus der Zugänglichmachung der Werke bei den potentiellen Adressaten ergibt. Daher


Exhibit  2  Page  22

- 16 -

kommt es nicht nur darauf an, wie viele Personen gleichzeitig Zugang zu dem-
selben Werk haben, sondern auch, wie viele von ihnen nacheinander Zugang
zu diesem Werk haben (vgl. EuGH, Urteil vom 7. Dezember 2006 - C-306/05,
Slg. 2006, I-11519 = GRUR 2007, 225 Rn. 37 f. - SGAE/Rafael; Urteil vom
7. März 2013 - C-607/11, GRUR 2013, 500 Rn. 32 f. = WRP 2013, 618 - ITV
Broadcasting/TVC; EuGH, GRUR 2014, 360 Rn. 21 - Svensson/Retriever Sve-
rige; GRUR 2016, 1152 Rn. 36 - GS Media/Sanoma u.a.; GRUR 2017, 610
Rn. 44 - Stichting Brein/Wullems; GRUR 2017, 790 Rn. 41 - Stichting Brein/XS
4ALL).

36          bb) Die Beklagte verschafft einer unbestimmten und recht großen Zahl
von Personen Zugang zu den Fotografien. Die Lichtbilder können durch alle
Internetnutzer, die die passenden Suchbegriffe in die Suchmaske auf der Web-
seite der Beklagten eingeben, wahrgenommen werden. Die Revisionserwide-
rung macht vergeblich geltend, die Anzeige der Vorschaubilder beruhe auf ei-
nem individuellen Suchvorgang des jeweiligen Nutzers. Entscheidend ist, dass
die Beklagte diesen Suchvorgang einer unbestimmten Vielzahl von Internetnut-
zern ermöglicht.

37          f) Geht der Tathandlung der öffentlichen Wiedergabe eine öffentliche
Wiedergabe voraus, so ist für ihre Einstufung als erlaubnispflichtige „öffentliche
Wiedergabe" im Sinne von Art. 3 Abs. 1 der Richtlinie 2001/29/EG erforderlich,
dass das geschützte Werk unter Verwendung eines technischen Verfahrens,
das sich von dem bisher verwendeten unterscheidet, oder - ansonsten - für ein
neues Publikum wiedergegeben wird. Erfolgt die nachfolgende öffentliche Wie-
dergabe nach einem spezifischen technischen Verfahren, das sich von demje-
nigen der ursprünglichen öffentlichen Wiedergabe unterscheidet, braucht nicht
geprüft zu werden, ob das Werk für ein neues Publikum wiedergegeben wird; in
einem solchen Fall bedarf die öffentliche Wiedergabe ohne weiteres der Er-
laubnis des Urheberrechtsinhabers (vgl. EuGH, GRUR 2007, 225 Rn. 40 f.
- SGAE/Rafael; GRUR 2012, 156 Rn. 197 - Football Association Premier Lea-
gue und Murphy; GRUR 2013, 500 Rn. 39 und 24 bis 26 - ITV Broadcasting/


Exhibit 2 Page 23

- 17 -

TVC; GRUR 2014, 360 Rn. 24 - Svensson/Retriever Sverige; EuGH, Urteil vom
21. Oktober 2014 - C-348/13, GRUR 2014, 1196 Rn. 14 = WRP 2014, 1441
- BestWater International/Mebes und Potsch; EuGH, GRUR 2016, 1152 Rn. 37
- GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 33 - Stichting Brein/Wullems;
GRUR 2017, 790 Rn. 28 - Stichting Brein/XS 4ALL).

38          aa) Im Streitfall sind die Fotografien nicht nach einem technischen Ver-
fahren wiedergegeben worden, das sich von demjenigen der ursprünglichen
Wiedergabe unterscheidet.

39          (1) Erfolgen die ursprüngliche und die nachfolgende Wiedergabe im In-
ternet, handelt es sich um dasselbe technische Verfahren (vgl. EuGH, GRUR
2014, 360 Rn. 24 - Svensson/Retriever Sverige; GRUR 2014, 1196 Rn. 15
- BestWater International/Mebes und Potsch; GRUR 2016, 1152 Rn. 42 - GS
Media/Sanoma u.a.).

40          (2) Bevor die Aufnahmen auf der Webseite der Beklagten als Vorschau-
bilder angezeigt worden sind, waren sie im Internetportal der Klägerin und auf
den Internetseiten „www.mmmh.com.ar" und „www.kep.tar.hu" eingestellt und
dort für eine unbestimmte Vielzahl von Nutzern einsehbar. Auf den zuletzt ge-
nannten Internetseiten sind sie von der Suchmaschine Google aufgefunden, auf
deren Servern als Vorschaubilder gespeichert, von dort im Zuge von Suchvor-
gängen abgerufen und auf der Webseite der Beklagten angezeigt worden. Die
beanstandete öffentliche Wiedergabe und die vorherigen öffentlichen Wieder-
gaben sind damit jeweils im Internet und daher nach demselben technischen
Verfahren erfolgt.

41          bb) Das Berufungsgericht hat - in anderem Zusammenhang - angenom-
men, die Beklagte habe die Fotografien nicht öffentlich wiedergegeben, weil sie
diese keinem neuen Publikum zugänglich gemacht habe. Diese Beurteilung hält
der rechtlichen Nachprüfung nicht stand. Eine öffentliche Wiedergabe der Foto-
grafien im Sinne von Art. 3 Abs. 1 der Richtlinie 2001/29/EG kann im Streitfall
auf der Grundlage der vom Berufungsgericht getroffenen Feststellungen nicht

Exhibit 2 Page 24

- 18 -

mit der Begründung verneint werden, die Beklagte habe die Fotografien nicht
für ein neues Publikum wiedergegeben.

42        (1) Eine öffentliche Wiedergabe für ein neues Publikum setzt voraus,
dass sie sich an ein Publikum richtet, an das der Inhaber des Urheberrechts
nicht dachte, als er die ursprüngliche öffentliche Wiedergabe erlaubte (vgl.
EuGH, GRUR 2014, 360 Rn. 24 - Svensson/Retriever Sverige; GRUR 2014,
1196 Rn. 14 - BestWater International/Mebes und Potsch; GRUR 2016, 1152
Rn. 37 - GS Media/Sanoma u.a.).

43        Das kann der Fall sein, wenn auf einer Internetseite anklickbare Links zu
urheberrechtlich geschützten Werken gesetzt werden, die auf der anderen In-
ternetseite aufgrund beschränkender Maßnahmen nur einem begrenzten Publi-
kum zugänglich sind. Ermöglicht der Link es den Internetnutzern, die beschrän-
kenden Maßnahmen zu umgehen, so sind diese Nutzer als neues Publikum
anzusehen, das der Urheberrechtsinhaber nicht erfassen wollte, als er die ur-
sprüngliche öffentliche Wiedergabe erlaubte (vgl. EuGH, GRUR 2014, 360
Rn. 31 - Svensson/Retriever Sverige; GRUR 2016, 1152 Rn. 50 - GS Media/
Sanoma u.a.; GRUR 2017, 610 Rn. 49 - Stichting Brein/Wullems; vgl. auch
BGH, GRUR 2011, 56 Rn. 27 - Session-ID).

44        Etwas anderes gilt, wenn auf einer Webseite anklickbare Links zu urhe-
berrechtlich geschützten Werken bereitgestellt werden, die auf einer anderen
Webseite mit Erlaubnis des Urheberrechtsinhabers für alle Internetnutzer frei
zugänglich sind. In einem solchen Fall ist davon auszugehen, dass der Rechts-
inhaber bei seiner Erlaubnis alle potentiellen Besucher dieser Webseite und
damit alle Internetnutzer vor Augen hatte. Werden die dort eingestellten Werke
den Nutzern einer anderen Webseite über einen anklickbaren Link zugänglich
gemacht, sind diese Nutzer als potentielle Adressaten der ursprünglichen Wie-
dergabe und damit als Mitglieder der Öffentlichkeit anzusehen, die der Urheber-
rechtsinhaber erfassen wollte, als er die ursprüngliche Wiedergabe erlaubte.
Eine solche Wiedergabe erfolgt nicht gegenüber einem neuen Publikum und


Exhibit 2 Page 25

- 19 -

bedarf daher nicht nach Art. 3 Abs. 1 der Richtlinie 2001/29/EG der Erlaubnis
des Urheberrechtsinhabers (vgl. EuGH, GRUR 2014, 360 Rn. 25 bis 28
- Svensson/Retriever Sverige; GRUR 2014, 1196 Rn. 15 f. - BestWater Interna-
tional/Mebes und Potsch; GRUR 2016, 1152 Rn. 40 bis 42 - GS Media/Sanoma
u.a.; GRUR 2017, 610 Rn. 48 - Stichting Brein/Wullems).

45        (2) Von diesen Grundsätzen ist auch das Berufungsgericht ausgegan-
gen. Es hat angenommen, da die Fotografien auf den Internetseiten
„www.mmmh.com.ar" und „www.kep.tar.hu" frei auffindbar gewesen seien, liege
eine rechtsverletzende Nutzungshandlung der Beklagten nur vor, wenn die Klä-
gerin die Fotografien durch die Einstellung in ihr Internetportal lediglich einem
begrenzten Nutzerkreis habe zugänglich machen wollen und die Aufnahmen
von ihrem Internetportal unter Verletzung von Nutzungsbeschränkungen der
Besucher ins frei zugängliche Internet gelangt seien. Für diesen Umstand sei
die Klägerin darlegungs- und beweisbelastet, weil die Wiedergabe für ein neues
Publikum ein anspruchsbegründendes Tatbestandsmerkmal der öffentlichen
Wiedergabe darstelle und es sich bei den Beschränkungen der Nutzungsmög-
lichkeit und den Bedingungen für die Nutzung des Internetportals der Klägerin
um Interna handele, die sie - anders als die Beklagte - ohne weiteres darlegen
und beweisen könne. Die Klägerin habe zwar substantiiert dargelegt, dass die
Fotografien nur in dem für registrierte Nutzer zugänglichen und passwortgesi-
cherten Bereich ihres Internetangebots eingestellt gewesen seien und sie ihren
Kunden das Recht zur Speicherung der Bilddateien auf den eigenen Rechnern,
aber nicht zur Einstellung in andere Internetseiten eingeräumt habe. Ein ent-
sprechender Beweis sei ihr aber nicht gelungen. Nach dem Ergebnis der Be-
weisaufnahme bleibe die Möglichkeit bestehen, dass die Bilddateien mit Billi-
gung der Klägerin ins frei zugängliche Internet gelangt seien. Diese Beurteilung
ist nicht frei von Rechtsfehlern.

46        (3) Die Revision macht allerdings ohne Erfolg geltend, da die Beklagte
die Suchfunktion als Teil ihres Geschäftsmodells anbiete, sei nach der Recht-
sprechung des Gerichtshofs der Europäischen Union zu vermuten, dass die als

Exhibit _2_ Page _26_

- 20 -

Vorschaubilder angezeigten Fotografien auf den von der Suchmaschine Google aufgefundenen Internetseiten unbefugt veröffentlicht worden seien. Der Gerichtshof ist für Hyperlinks, die in Gewinnerzielungsabsicht zu anderen Webseiten mit unbefugt veröffentlichten Werken gesetzt worden sind, von einer widerleglichen Vermutung ausgegangen, dass die Links in voller Kenntnis einer fehlenden Erlaubnis der Urheberrechtsinhaber gesetzt worden sind (vgl. EuGH, GRUR 2016, 1152 Rn. 44 bis 53 und 55 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 49 - Stichting Brein/Wullems). Gegenstand der Vermutung ist danach nicht das Fehlen der Erlaubnis des Urheberrechtsinhabers, sondern die Kenntnis des Nutzers von der fehlenden Erlaubnis des Rechtsinhabers.

47        (4) Das Berufungsgericht ist aber zu Unrecht davon ausgegangen, die Klägerin treffe die Beweislast dafür, dass sie die Fotografien ausschließlich in den passwortgeschützten Bereich ihres Internetportals eingestellt hat. Entgegen der Ansicht des Berufungsgerichts trägt die Beklagte die Beweislast dafür, dass die Bilder in den frei zugänglichen Bereich des Internetportals der Klägerin eingestellt waren. Danach kann auf der Grundlage der vom Berufungsgericht getroffenen Feststellungen nicht davon ausgegangen werden, dass die Klägerin die in Rede stehenden Fotografien bereits allen Internetnutzern frei zugänglich gemacht und die Beklagte die Lichtbilder auf ihrer Webseite daher nicht für ein neues Publikum wiedergegeben hat.

48        Die Bestimmung des Art. 3 Abs. 1 der Richtlinie 2001/29/EG sieht vor, dass jede Handlung der öffentlichen Wiedergabe eines Werks vom Urheberrechtsinhaber erlaubt werden muss (vgl. EuGH, GRUR 2016, 1152 Rn. 43 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 47 - Stichting Brein/Wullems). Die Klägerin hat vorgetragen, die Beklagte habe die Fotografien als Vorschaubilder auf ihrer Internetseite veröffentlicht. Damit hat sie eine Handlung der öffentlichen Wiedergabe dargelegt, die nach Art. 3 Abs. 1 der Richtlinie 2001/29/EG der Erlaubnis der Klägerin als ausschließlich Nutzungsberechtigter bedurfte. Die Beklagte hat eingewandt, eine Erlaubnis der Klägerin sei nicht erforderlich gewesen, weil diese die Fotografien in ihrem Internetportal bereits für alle Inter-

Exhibit ___2___ Page 27


- 21 -

netnutzer einsehbar veröffentlicht habe und die Vorschaubilder deshalb nicht für
ein neues Publikum wiedergegeben würden. Für die tatsächlichen Vorausset-
zungen dieser rechtshindernden Einwendung ist nach allgemeinen Grundsät-
zen die Beklagte beweisbelastet (zu § 17 Abs. 2 UrhG vgl. BGH, Urteil vom
21. März 1985 - I ZR 166/82, GRUR 1985, 924, 926 - Schallplattenimport II;
Urteil vom 3. März 2005 - I ZR 133/02, GRUR 2005, 505, 506 = WRP 2005, 622
- Atlanta; zu § 24 Abs. 1 MarkenG vgl. EuGH, Urteil vom 8. April 2003
- C-244/00, Slg. 2003, I-3051 = GRUR 2003, 512 Rn. 35 f. - Van Doren u.a./
Lifestyle [Stüssy]; BGH, Beschluss vom 11. Mai 2000 - I ZR 193/97, GRUR
2000, 879, 880 = WRP 2000, 1280 - stüssy; Urteil vom 15. März 2012
- I ZR 52/10, GRUR 2012, 626 Rn. 26 und 30 = WRP 2012, 81 - CONVERSE I).

49    Eine andere Verteilung der Beweislast ergibt sich entgegen der Ansicht
des Berufungsgerichts nicht daraus, dass es sich bei der Anmeldung im Inter-
netportal der Klägerin und den eingerichteten Zugangsbeschränkungen um Um-
stände aus ihrer Geschäftssphäre handelt. Hat die primär darlegungspflichtige
Partei keine nähere Kenntnis der maßgeblichen Umstände und keine Möglich-
keit zur weiteren Sachverhaltsaufklärung, während dem Prozessgegner nähere
Angaben dazu ohne weiteres möglich und zumutbar sind, so trifft den Gegner
zwar regelmäßig eine sekundäre Darlegungslast (vgl. BGH, Urteil vom 19. Ok-
tober 2011 - I ZR 140/10, GRUR 2012, 602 Rn. 23 = WRP 2012, 721 - Vor-
schaubilder II; Urteil vom 8. Januar 2014 - I ZR 169/12, BGHZ 200, 76 Rn. 17
- BearShare). Kommt er seiner sekundären Darlegungslast nicht nach, gilt der
Vortrag der primär darlegungsbelasteten Partei nach § 138 Abs. 3 ZPO als zu-
gestanden (vgl. BGH, Urteil vom 20. Oktober 2005 - IX ZR 276/02, NJW-RR
2006, 552 Rn. 11; BGH, GRUR 2012, 626 Rn. 28 - CONVERSE I). Die sekun-
däre Darlegungslast führt jedoch nicht zu einer Umkehr der Beweislast (vgl.
BGHZ 200, 76 Rn. 18 - BearShare). Das Berufungsgericht ist zutreffend davon
ausgegangen, dass die Klägerin die Einrichtung eines passwortgesicherten Be-
reichs in ihrem Internetportal und die Einstellung der Fotografien in diesen Be-
reich substantiiert dargelegt hat. Ihr Vortrag genügt daher den Anforderungen



- 22 -

an eine sekundäre Darlegungslast. Dann aber bleibt die Beklagte dafür beweis-belastet, dass die Lichtbilder auch im frei zugänglichen Bereich der Internetseite der Klägerin eingestellt waren.

50          (5) Mit der vom Berufungsgericht gegebenen Begründung kann auch nicht angenommen werden, die Beklagte habe die Lichtbilder auf ihrer Websei-te nicht für ein neues Publikum wiedergegeben, weil die Klägerin den Nutzern ihres Internetportals das Recht zur Einstellung der Fotografien in andere Inter-netseiten - und so auch in die von der Suchmaschine Google aufgefundenen Webseiten „www.mmmh.com.ar" und „www.kep.tar.hu" - eingeräumt habe. Ent-gegen der Ansicht des Berufungsgerichts hat nicht die Klägerin zu beweisen, dass sie ihren Kunden keine Erlaubnis zur Einstellung der Fotografien ins Inter-net erteilt hat, sondern obliegt der Beklagten der Nachweis, dass die Klägerin eine solche Erlaubnis erteilt hat.

51          Nach Art. 3 Abs. 1 der Richtlinie 2001/29/EG bedarf jede Handlung der öffentlichen Wiedergabe eines Werks der Erlaubnis des Urheberrechtsinhabers. Die Frage, ob der Rechtsinhaber der öffentlichen Wiedergabe des geschützten Werks zugestimmt hat, betrifft ein Tatbestandsmerkmal, das einen Eingriff in sein Ausschließlichkeitsrecht verhindert (vgl. BGHZ 185, 291 Rn. 28 - Vor-schaubilder I; Fuchs/Farkas, ZUM 2016, 370, 372; Leistner in Schricker/Loe-wenheim aaO § 97 UrhG Rn. 25; aA OLG München, WRP 2016, 1415 Rn. 26; vgl. auch Rauer/Ettig, WRP 2016, 1319 Rn. 18). Wer eine Handlung der öffent-lichen Wiedergabe vornimmt, hat daher darzulegen und erforderlichenfalls zu beweisen, dass diese Handlung durch eine vom Rechtsinhaber erteilte Erlaub-nis gedeckt ist (vgl. BGH, Urteil vom 27. September 1995 - I ZR 215/93, BGHZ 131, 8, 14 - Pauschale Rechtseinräumung; Urteil vom 28. Oktober 2010 - I ZR 18/09, GRUR 2011, 714 Rn. 29 = WRP 2011, 913 - Der Frosch mit der Maske; BGH, ZUM-RD 2013, 514 Rn. 24).

52          Die Beklagte hat eine Handlung der öffentlichen Wiedergabe vorgenom-men, indem sie Fotografien auf ihrer Webseite als Vorschaubilder angezeigt


Exhibit  2 Page 29

- 23 -

hat. Das Berufungsgericht hat rechtsfehlerfrei angenommen, die Klägerin sei
der Behauptung der Beklagten, sie gestatte ihren Kunden, die aus dem pass-
wortgeschützten Bereich heruntergeladenen Fotografien ins frei zugängliche
Internet einzustellen, substantiiert entgegengetreten. Unter diesen Umständen
obliegt der Beklagten der Beweis für die behauptete Erlaubnis der Klägerin.
Entgegen der Ansicht des Berufungsgerichts besteht keine tatsächliche Vermu-
tung, dass die Einstellung von urheberrechtlich geschützten Werken auf frei
zugänglichen Internetseiten vom Rechtsinhaber erlaubt worden ist (vgl. BGH,
GRUR 2012, 602 Rn. 22 - Vorschaubilder II).

53          g) Die Annahme des Berufungsgerichts, die Beklagte habe das aus-
schließliche Recht der Klägerin zur öffentlichen Wiedergabe der Lichtbilder
nicht verletzt, stellt sich aber aus anderen Gründen als richtig dar (§ 561 ZPO).
Die Anzeige der Vorschaubilder auf der Internetseite der Beklagten ist nicht als
rechtsverletzend anzusehen, weil für die Beklagte nicht erkennbar war, dass die
von der Bildersuchmaschine Google aufgefundenen Fotografien unbefugt im
frei zugänglichen Internet veröffentlicht waren.

54          aa) Das Setzen von Hyperlinks auf eine Internetseite mit geschützten
Werken, die auf einer anderen Internetseite ohne Erlaubnis des Urheberrechts-
inhabers frei zugänglich sind, stellt nur dann eine „öffentliche Wiedergabe" im
Sinne von Art. 3 Abs. 1 der Richtlinie 2001/29/EG dar, wenn der Verlinkende
die Rechtswidrigkeit der Veröffentlichung der Werke auf der anderen Internet-
seite kannte oder vernünftigerweise kennen konnte (vgl. EuGH, GRUR 2016,
1152 Rn. 49 und 55 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 49 - Stich-
ting Brein/Wullems).

55          Diese Einschränkung beruht auf der Erwägung, dass das Internet für die
durch Art. 11 der EU-Grundrechtecharta gewährleistete Meinungs- und Informa-
tionsfreiheit von besonderer Bedeutung ist und Hyperlinks zum guten Funkti-
onieren des Internets und zum Meinungs- und Informationsaustausch in diesem
Netz beitragen, das sich durch die Verfügbarkeit immenser Informationsmengen

Exhibit 2 Page 30

- 24 -

auszeichnet (vgl. EuGH, GRUR 2016, 1152 Rn. 45 - GS Media/Sanoma u.a.).
Die unübersehbare Informationsfülle im Internet könnte ohne den Einsatz von
Hyperlinks zur Verknüpfung der dort zugänglichen Dateien nicht erschlossen
werden (vgl. BGH, Urteil vom 18. Juni 2015 - I ZR 74/14, BGHZ 206, 103
Rn. 24 f. - Haftung für Hyperlink). Insbesondere für Einzelpersonen, die Links
auf frei zugängliche andere Webseiten setzen wollen, kann es schwierig sein zu
überprüfen, ob die auf den anderen Webseiten eingestellten Werke mit Zu-
stimmung der Urheberrechtsinhaber im Internet veröffentlicht sind (vgl. EuGH,
GRUR 2016, 1152 Rn. 46 - GS Media/Sanoma u.a.). Die Funktionalität des In-
ternets würde unangemessen beeinträchtigt, wenn die Internetnutzer Hyperlinks
zu auf anderen Webseiten frei zugänglichen Werken zögerlicher setzten, weil
sie sich dem Risiko einer Klage wegen einer Urheberrechtsverletzung ausge-
setzt sähen (vgl. Schlussanträge des Generalanwalts Wathelet vom 7. April
2016 - C-160/15, juris Rn. 77 f. - GS Media/Sanoma u.a). Im Blick darauf ist die
Bereitstellung eines Hyperlinks nur dann als „öffentliche Wiedergabe" im Sinne
von Art. 3 Abs. 1 der Richtlinie 2001/29/EG anzusehen, wenn der Betreffende
wusste oder hätte wissen müssen, dass der von ihm gesetzte Link Zugang zu
einem unbefugt im Internet veröffentlichten Werk schafft, etwa weil er vom Ur-
heberrechtsinhaber zuvor darauf hingewiesen wurde (vgl. EuGH, GRUR 2016,
1152 Rn. 49 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 49 - Stichting
Brein/Wullems).

56        Die vorgenannten Erwägungen gelten in besonderem Maße für Hyper-
links, die - wie im Streitfall der von der Beklagten gesetzte Link - den Internet-
nutzern Zugang zu Suchmaschinen verschaffen. Suchmaschinen leisten als
Hilfsmittel zum Auffinden von Inhalten im Internet einen wesentlichen Beitrag
zur Informationsvermittlung. Sie gewährleisten im Interesse der Informationsge-
sellschaft die Funktionsfähigkeit des Internets. Ohne die Inanspruchnahme von
Suchdiensten wäre die sinnvolle Nutzung der unübersehbaren Informationsfülle
im Internet praktisch ausgeschlossen (vgl. BGHZ 156, 1, 18 f. - Paperboy). Das



- 25 -

gilt nicht nur für die Suche nach Texten, sondern auch für die Suche nach Bildern (vgl. v. Ungern-Sternberg, GRUR 2009, 369, 372).

57        bb) Nach diesen Maßstäben stellt die Anzeige der Vorschaubilder auf der Internetseite der Beklagten keine die ausschließlichen Nutzungsrechte der Klägerin verletzende öffentliche Wiedergabe im Sinne von Art. 3 Abs. 1 der Richtlinie 2001/29/EG dar. Die Beklagte musste nicht vernünftigerweise damit rechnen, dass die Fotografien in die von der Suchmaschine Google aufgefundenen Webseiten unbefugt eingestellt worden waren.

58        (1) Die Revision macht erfolglos geltend, nach der Rechtsprechung des Gerichtshofs der Europäischen Union sei zu vermuten, dass die Beklagte die von der Suchmaschine Google aufgefundenen Vorschaubilder auf ihrer Webseite in Kenntnis ihrer unbefugten Veröffentlichung im frei zugänglichen Internet wiedergegeben habe.

59        (2) Der Gerichtshof der Europäischen Union ist bei mit Gewinnerzielungsabsicht gesetzten Hyperlinks auf bestimmte andere Internetseiten, in die urheberrechtlich geschützte Werke rechtswidrig eingestellt sind, von einer widerleglichen Vermutung ausgegangen, dass die Hyperlinks in voller Kenntnis der fehlenden Erlaubnis des Urheberrechtsinhabers zur Veröffentlichung der geschützten Werke im Internet gesetzt worden sind. Diese Bewertung beruht auf der Annahme, dass von demjenigen, der Hyperlinks mit Gewinnerzielungsabsicht setzt, erwartet werden kann, dass er vor der öffentlichen Wiedergabe die erforderlichen Nachprüfungen vornimmt, um sich zu vergewissern, dass die betreffenden Werke auf den anderen Internetseiten nicht unbefugt veröffentlicht worden sind (vgl. EuGH, GRUR 2016, 1152 Rn. 51 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 49 - Stichting Brein/Wullems). Das gilt auch, wenn der Verlinkende nicht gerade durch die Linksetzung auf die fraglichen Werke, sondern mit seiner Internetseite insgesamt Gewinn - etwa in Form von Werbeeinnahmen - erzielen will (vgl. EuGH, GRUR 2017, 790 Rn. 46 - Stichting Brein/XS 4ALL; LG Hamburg, GRUR-RR 2017, 216 Rn. 26; Volkmann, CR

Exhibit  Page 32

- 26 -

2017, 36, 38; aA Fricke/Gerecke, AfP 2017, 25, 26 f.; Neubauer/Soppe, GRUR
2017, 615, 616; v. Ungern-Sternberg in Schricker/Loewenhelm aaO § 15 UrhG
Rn. 106).

60        (3) Die vom Gerichtshof der Europäischen Union herangezogene Vermu-
tung greift bei der gebotenen individuellen Beurteilung (vgl. EuGH, GRUR 2016,
1152 Rn. 47 - GS Media/Sanoma u.a.; GRUR 2017, 610 Rn. 28 - Stichting
Brein/Wullems; GRUR 2017, 790 Rn. 23 - Stichting Brein/XS 4ALL) unter Be-
rücksichtigung der besonderen Bedeutung von Suchmaschinen für die Informa-
tionsvermittlung im Internet und damit die Funktionsfähigkeit des Internets nicht
für Hyperlinks ein, die von einer mit Gewinnerzielungsabsicht betriebenen Inter-
netseite zu einer Suchmaschine gesetzt werden. Vom Anbieter einer Such-
maschine kann vernünftigerweise nicht erwartet werden, dass er sich vergewissert,
ob die von den Suchprogrammen aufgefundenen Abbildungen von Werken
oder Lichtbildern rechtmäßig ins Internet eingestellt worden sind, bevor er diese
Abbildungen als Vorschaubilder wiedergibt. Für einen Internetanbieter wie die
Beklagte, der den Besuchern seiner Webseite die Suchfunktion im Wege eines
Links auf die Server des Suchmaschinenbetreibers zur Verfügung stellt, gilt
nichts anderes.

61        Einer Pflicht des Anbieters einer Suchfunktion, Nachforschungen zur
Rechtmäßigkeit der Veröffentlichung der von Suchmaschinen aufgefundenen
Abbildungen anzustellen, stehen Aufgabe und Funktionsweise der Suchma-
schinen entgegen. Der Zugriff einer Suchmaschine auf andere Internetseiten
erfolgt nicht in der Weise, dass - wie in den vom Gerichtshof der Europäischen
Union entschiedenen Fällen - absichtlich und gezielt einzelne Hyperlinks auf
bestimmte andere Internetseiten gesetzt werden. Suchmaschinen durchsuchen
das frei zugängliche Internet in einem automatisierten Verfahren unter Einsatz
von Computerprogrammen, wobei sie nicht danach unterscheiden können, ob
der aufgefundene Inhalt von einem Berechtigten oder einem Nichtberechtigten
ins Internet eingestellt worden ist (vgl. BGH, GRUR 2012, 602 Rn. 28 - Vor-
schaubilder II). Eine (widerlegliche) Vermutung, dass der Betreiber eines Such-



Exhibit 2 Page 33

- 27 -

dienstes Kenntnis von der Rechtswidrigkeit der Veröffentlichung der aufgefundenen Werke hat, würde dazu führen, dass ihm eine allgemeine Pflicht zur Kontrolle der durch die Suchmaschine indexierten Inhalte auferlegt würde (vgl. Schlussanträge des Generalanwalts Szpunar vom 8. Februar 2017 - C-610/15, juris Rn. 52 - Stichting Brein/XS 4ALL).

62          Eine allgemeine Kontrollpflicht wäre im Blick auf die Aufgabe von Internetsuchmaschinen unangemessen. Wegen ihrer essentiellen Bedeutung für die Nutzung des Internets dürfen keine Prüfpflichten statuiert werden, die den Betrieb von Suchmaschinen gefährden oder unverhältnismäßig erschweren (vgl. BGHZ 194, 339 Rn. 28 - Alone in the Dark; BGHZ 206, 103 Rn. 27 - Haftung für Hyperlinks). Die Annahme einer - praktisch kaum zu bewerkstelligenden - allgemeinen Kontrollpflicht würde die Existenz von Suchmaschinen in Frage stellen, weil sich die Betreiber dem unübersehbaren Risiko einer Inanspruchnahme durch eine Vielzahl von Urheberrechtsinhabern ausgesetzt sähen (vgl. Volkmann, CR 2017, 36, 41). Das würde dem Ziel der Richtlinie 2001/29/EG zuwiderlaufen, die Entwicklung der Informationsgesellschaft zu fördern (vgl. Erwägungsgrund 2 der Richtlinie).

63          Im Blick darauf kann die Kenntnis des Anbieters einer Suchfunktion, dass die von der Suchmaschine aufgefundenen Inhalte unbefugt ins Internet eingestellt worden sind, nicht vermutet werden, auch wenn das Angebot mit Gewinnerzielungsabsicht erfolgt (vgl. auch Jani/Leenen, NJW 2016, 3135, 3137; Leistner, ZUM 2016, 980, 983; Ohly, GRUR 2016, 1155, 1157; Rauer/Ettig, WRP 2016, 1319 Rn. 24; Volkmann, CR 2017, 36, 41). Vielmehr muss positiv festgestellt werden, dass der Anbieter der Suchfunktion von der fehlenden Erlaubnis des Rechtsinhabers zur Veröffentlichung der Werke wusste oder hätte wissen müssen (vgl. EuGH, GRUR 2017, 790 Rn. 45 - Stichting Brein/XS 4ALL und die Schlussanträge des Generalanwalts Szpunar vom 8. Februar 2017 - C-610/15, juris Rn. 52 - Stichting Brein/XS 4ALL).

64

Exhibit 2 Page 34

- 28 -

(4) Das Berufungsgericht ist davon ausgegangen, es könne nicht festge-
stellt werden, dass die Beklagte bei der Wiedergabe der Fotografien als Vor-
schaubilder auf ihrer Internetseite am 9. und 11. Juni 2009 wusste oder hätte
wissen müssen, dass diese rechtswidrig ins frei zugängliche Internet eingestellt
worden waren. Diese Beurteilung hält den Angriffen der Revision stand.

65          Die Revision macht erfolglos geltend, die Klägerin habe bereits Ende
2008 die US-amerikanische Muttergesellschaft der Beklagten in mehreren
DMCA-Complaints darüber informiert, dass die Fotografien unter Verletzung ih-
rer ausschließlichen Nutzungsrechte als Vorschaubilder angezeigt worden sei-
en. Das Berufungsgericht hat es nicht als belegt angesehen, dass die DMCA-
Complaints die hier in Rede stehenden Lichtbilder betrafen und sich auch auf
ihre öffentliche Wiedergabe in Deutschland bezogen. Zudem könne aus den ge-
sellschaftsrechtlichen Verknüpfungen nicht ohne weiteres geschlossen werden,
dass auch die Beklagte über die in den DMCA-Complaints mitgeteilten Informa-
tionen verfügt habe. Soweit die Revision dies anders sieht, ersetzt sie die tat-
richterliche Beurteilung durch ihre eigene Einschätzung, ohne einen Rechtsfeh-
ler des Berufungsgerichts aufzuzeigen.

66          Die Revision führt vergeblich an, die Rechtswidrigkeit der Veröffentli-
chungen sei daran ersichtlich gewesen, dass die Fotografien nach dem von der
Klägerin gehaltenen Vortrag mit Copyright-Vermerken versehen gewesen sei-
en. Es kann offenbleiben, ob in einem solchen Vermerk ein wirksamer Hinweis
darauf gesehen werden kann, dass der Rechtsinhaber seine Zustimmung zur
öffentlichen Wiedergabe der Fotografie auf die öffentliche Wiedergabe auf die-
ser Internetseite beschränkt (BGH, GRUR 2016, 171 Rn. 35 - Die Realität II).
Etwaige Copyright-Vermerke waren für die Beklagte nicht erkennbar, weil die
Suche, der Abruf und die Anzeige der Vorschaubilder in einem automatisierten
Verfahren erfolgt sind.

67          (5) Danach hat die Beklagte erst durch die Abmahnung vom 16. Juni
2009 erfahren, dass die Fotografien ohne Erlaubnis der Klägerin im frei zugäng-

Exhibit    2 Page 35

- 29 -

lichen Internet veröffentlicht waren. Hat der Nutzer Kenntnis davon erlangt,
dass die öffentliche Wiedergabe der geschützten Werke unter Verletzung von
Urheberrechten erfolgt ist, und arbeitet er nach Erlangung dieser Kenntnis nicht
redlich darauf hin, den rechtswidrigen Zustand abzustellen, kann sein Verhalten
so verstanden werden, dass er die Fortsetzung der widerrechtlichen Zugäng-
lichmachung billigt, und als öffentliche Wiedergabe in Kenntnis der fehlenden
Erlaubnis des Urheberrechtsinhabers angesehen werden (vgl. Schlussanträge
des Generalanwalts Szpunar vom 8. Februar 2017 - C-610/15, juris Rn. 51
- Stichting Brein/XS 4ALL). Von einem solchen Verhalten der Beklagten kann
auf der Grundlage der vom Berufungsgericht getroffenen Feststellungen nicht
ausgegangen werden.

68        Das Berufungsgericht hat angenommen, der Beklagten seien Prüf- oder
Überwachungspflichten zur Verhinderung einer erneuten Anzeige der Fotogra-
fien auf ihrer Internetseite nicht zumutbar. Durch die Sperrung der Künstlerna-
men der abgebildeten Models als Suchbegriffe hätten die Lichtbilder nur in sehr
geringem Maß herausgefiltert werden können. Soweit die Klägerin den Einsatz
einer Bilderkennungssoftware für angezeigt halte, habe sie nicht hinreichend
dargelegt, dass eine solche Software mit einer gewissen Verlässlichkeit be-
stimmte Bilddateien erkennen sowie in funktionstüchtiger Weise in den Ablauf
der Suchvorgänge und deren Anbindung an das Internetangebot der Beklagten
integriert werden könnte. Diese Beurteilung hält der rechtlichen Nachprüfung im
Ergebnis stand.

69        Soweit das Berufungsgericht eine Pflicht der Beklagten zur Sperrung von
Suchbegriffen verneint hat, weil dadurch die Anzeige der fraglichen Bilddateien
nicht verlässlich verhindert werden könne, ist diese Annahme nicht frei von
Rechtsfehlern. Die Eignung eines Wortfilters für die Erkennung von Urheber-
rechtsverletzungen wird nicht dadurch beseitigt, dass damit Verletzungshand-
lungen nicht vollständig erfasst werden können (vgl. BGHZ 194, 339 Rn. 35
- Alone in the Dark; BGH, ZUM-RD 2013, 514 Rn. 61). Die Beklagte hat jedoch

Exhibit 2 Page 36


- 30 -

einen Wortfilter in der Weise eingesetzt, dass sie die Pseudonyme der auf den Lichtbildern angezeigten Models als Suchbegriffe gesperrt hat.

70          Die Revision macht erfolglos geltend, das Berufungsgericht habe die Anforderungen an einen schlüssigen Sachvortrag der Klägerin zum Einsatz einer Bildfiltersoftware überspannt. Bei der Zumutbarkeit von Überwachungsmaßnahmen des Betreibers einer Internetplattform handelt es sich um eine anspruchsbegründende Voraussetzung, deren tatsächliche Grundlage regelmäßig der Anspruchsteller darzulegen hat (vgl. BGH, Urteil vom 26. November 2015 - I ZR 174/14, BGHZ 208, 82 Rn. 40 - Störerhaftung des Access-Providers). Die Beklagte hat eingewandt, sie könne eine Begrenzung der angezeigten Lichtbilder nur insoweit bewirken, als sie bestimmte Suchbegriffe sperre und dadurch verhindere, dass die Anfrage an die Suchmaschine Google weitergeleitet werde. Auf die technischen Abläufe der Crawlersuche, die vom Suchdienst Google technisch generierten Ergebnisse, die Indexierung der Inhalte und die - nicht bild-, sondern textgesteuerten - Bildersuchprozesse selbst könne sie keinen Einfluss nehmen. Unter diesen Umständen hätte es näherer Darlegungen der Klägerin bedurft, in welcher Weise die Beklagte durch den Einsatz einer Bilderkennungssoftware den Zugriff auf bestimmte auf den Servern von Google gespeicherte Vorschaubilder hätte unterbinden können. Dass die von der Klägerin angeführte Bilderkennungssoftware auf diese technischen Gegebenheiten zugeschnitten ist, ist nicht ersichtlich und macht auch die Revision nicht geltend.

71          Im Übrigen hat das Berufungsgericht angenommen, die Klägerin habe nicht bewiesen, dass nach der Inkenntnissetzung der Beklagten von der unerlaubten Einstellung der Fotografien ins frei zugängliche Internet die Lichtbilder erneut mithilfe der von dieser angebotenen Suchfunktion angezeigt worden sind. Die von der Klägerin vorgelegten Internetausdrucke vom 16. und 21. Juli 2010 und vom 7. September 2015 ließen wegen der geringen Größe der gezeigten Vorschaubilder und der abweichenden Bildausschnitte keine verlässliche Beurteilung zu, dass es sich um dieselben Fotografien handelte. Bei den in den Screenshots vom 7. September 2015 gezeigten Bildausschnitten könne

Exhibit  2 Page 37

- 31 -

zudem nicht davon ausgegangen werden, dass sie unter Zuhilfenahme der von
der Beklagten angebotenen Suchfunktion ermittelt worden seien. Gegen diese
tatrichterliche Beurteilung hat die Revision keine Rügen erhoben.

72          5. Die Revision wendet sich erfolglos gegen die Annahme des Beru-
fungsgerichts, die Beklagte hafte nicht als Störer für Verletzungen der aus-
schließlichen Nutzungsrechte der Klägerin, die Dritte durch die Einstellung der
Fotografien ins frei zugängliche Internet begangen haben mögen.

73          a) Durch die Wendung „öffentlich zugänglich machen zu lassen" im Un-
terlassungsantrag kommt entgegen der Ansicht des Berufungsgerichts hinrei-
chend zum Ausdruck, dass die Klägerin die Beklagte auch als Störer in An-
spruch nimmt (vgl. BGH, GRUR 2013, 1030 Rn. 20 - File-Hosting-Dienst). Das
Berufungsgericht hat jedoch mit Recht angenommen, dass die Voraussetzun-
gen für eine Störerhaftung der Beklagten nicht vorliegen.

74          b) Als Störer kann bei der Verletzung absoluter Rechte in Anspruch ge-
nommen werden, wer - ohne Täter oder Teilnehmer zu sein - in irgendeiner
Weise willentlich und adäquat-kausal zur Verletzung des geschützten Rechts-
guts beiträgt. Als Beitrag kann auch die Unterstützung oder Ausnutzung der
Handlung eines eigenverantwortlich handelnden Dritten genügen, sofern der in
Anspruch Genommene die rechtliche und tatsächliche Möglichkeit zur Verhin-
derung dieser Handlung hatte. Da die Störerhaftung nicht über Gebühr auf Drit-
te erstreckt werden darf, die weder als Täter noch als Teilnehmer für die be-
gangene Urheberrechtsverletzung in Anspruch genommen werden können,
setzt die Haftung des Störers nach der Rechtsprechung des Senats die Verlet-
zung von Prüf- oder Überwachungspflichten voraus. Deren Umfang bestimmt
sich danach, ob und inwieweit dem als Störer in Anspruch Genommenen nach
den Umständen des Einzelfalls eine Prüfung oder Überwachung zur Verhinde-
rung von Verletzungshandlungen Dritter zuzumuten ist. Das richtet sich nach
den jeweiligen Umständen des Einzelfalls unter Berücksichtigung der Funktion
und Aufgabenstellung des als Störer in Anspruch Genommenen sowie mit Blick



- 32 -

auf die Eigenverantwortung desjenigen, der die rechtswidrige Beeinträchtigung
selbst unmittelbar vorgenommen hat (vgl. BGHZ 200, 76 Rn. 22 - BearShare;
BGH, GRUR 2015, 485 Rn. 49 f. - Kinderhochstühle im Internet III; BGH, Urteil
vom 24. November 2016 - I ZR 220/15, GRUR 2017, 617 Rn. 11 = WRP 2017,
705 - WLAN-Schlüssel).

75          c) Das Berufungsgericht hat zutreffend angenommen, dass die Beklagte
nicht als Störer haftet, weil sie keine Prüf- oder Überwachungspflichten verletzt
hat.

76          aa) Die Beklagte traf im Blick auf eine Störerhaftung keine allgemeine
- praktisch nicht umzusetzende - Überwachungspflicht, weil die angebotene
Suchfunktion auf vielfältige Weise ohne eine Verletzung von Urheberrechten
nutzbar ist und die Beklagte nicht durch eigene Maßnahmen die Gefahr einer
rechtsverletzenden Nutzung durch andere Internetnutzer gefördert hat (vgl.
Rn. 60 bis 63; vgl. ferner BGHZ 194, 339 Rn. 22 und 28 - Alone in the Dark;
BGH, GRUR 2013, 1030 Rn. 31 - File-Hosting-Dienst; BGHZ 208, 82 Rn. 27
- Störerhaftung des Access-Providers). Eine Prüfpflicht der Beklagten konnte
deshalb erst aus Anlass der Abmahnung vom 16. Juni 2009 entstehen, mit der
sie davon in Kenntnis gesetzt worden ist, dass die Veröffentlichung der Fo-
tografien im frei zugänglichen Internet die ausschließlichen Nutzungsrechte der
Klägerin verletzt (vgl. BGHZ 185, 291 Rn. 39 - Vorschaubilder I).

77          bb) Das Berufungsgericht hat zu Recht angenommen, dass die Beklagte
ihre durch die Abmahnung ausgelöste Prüfpflicht nicht verletzt hat. Es ist
rechtsfehlerfrei davon ausgegangen, dass die Beklagte alle ihr technisch zu-
mutbaren Maßnahmen ergriffen hat, um eine erneute Anzeige der Fotografien
als Vorschaubilder auf ihrer Internetseite zu unterbinden, und nach der Abmah-
nung die Fotografien nicht mehr über die von der Beklagten angebotene Such-
funktion wiedergegeben worden sind (vgl. Rn. 67 bis 71).

78          C. Ein Vorabentscheidungsersuchen an den Gerichtshof der Europäi-
schen Union nach Art. 267 Abs. 3 AEUV ist nicht veranlasst. Im Streitfall stellt

Exhibit    2   Page  39

- 33 -

sich keine entscheidungserhebliche Frage zur Auslegung der Richtlinie
2001/29/EG, die nicht durch die Rechtsprechung des Gerichtshofs der Europäi-
schen Union geklärt oder zweifelsfrei zu beantworten ist (vgl. EuGH, Urteil vom
6. Oktober 1982 - 283/81, Slg. 1982, 3415 = NJW 1983, 1257, 1258
- C.I.L.F.I.T.; Urteil vom 1. Oktober 2015 - C-452/14, GRUR Int. 2015, 1152
Rn. 43 - AIFA/Doc Generici). Es ist anhand der vom Gerichtshof aufgestellten
Beurteilungskriterien nicht zweifelhaft, dass eine öffentliche Wiedergabe ur-
heberrechtlich geschützter Werke im Sinne von Art. 3 Abs. 1 der Richtlinie
2001/29/EG durch den Anbieter einer Suchfunktion, der einen Link auf eine
Suchmaschine setzt, nur in Betracht kommt, wenn der Urheberrechtsinhaber
die Veröffentlichung der Werke im frei zugänglichen Internet nicht erlaubt hat
und feststeht, dass der Anbieter der Suchfunktion davon Kenntnis hatte oder
vernünftigerweise hätte haben können.

Exhibit ___2___ Page 40

- 34 -

79          D. Danach ist die Revision gegen das Berufungsurteil auf Kosten der
Klägerin (§ 97 Abs. 1 ZPO) zurückzuweisen.


Büscher                          Schaffert                          Kirchhoff


            Koch                              Feddersen


Vorinstanzen:
LG Hamburg, Entscheidung vom 03.12.2010 - 310 O 331/09 -
OLG Hamburg, Entscheidung vom 10.12.2015 - 5 U 6/11 -

Exhibit ____2____ Page ____41____

*Exhibit   3*

# PERFECT 10
## DAVID J. PASTERNAK RECEIVER
## BUSINESS CHECKING ACCOUNT
### August 1, 2017 through August 31, 2017

| Date | Num | Name | Memo | Debit | Credit | Balance |
|------|-----|------|------|-------|--------|---------|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | 402.33 |
| 08/31/17 | 8/1-31 | 1CB | 8/1-8/31/17  Interest Income | 0.01 | | 402.34 |
| Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at July 31, 2017 | | | | 0.01 | 0.00 | 402.34 |

Exhibit ___3___ Page ___42___

# PERFECT 10
# DAVID J. PASTERNAK RECEIVER
# BUSINESS CHECKING ACCOUNT
### September 1, 2017 through September 30, 2017

| Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | 402.34 |
| 09/15/17 | 23F10B | Giganews Inc. | Receivership Certificate #3 | 75,000.00 | | 75,402.34 |
| 09/18/17 | 14898 | Pasternak & Pasternak ALC | Receiver's Fees & Costs through 5/31/17 | | 692.10 | 74,710.24 |
| 09/18/17 | 14898 | Pasternak & Pasternak ALC | Receiver's Fees & Costs through 8/31/17 | | 15,584.73 | 59,125.51 |
| 09/18/17 | 14899 | So Cal IP Law Group | General Matters, Copyrights, Domain Names, Trade Marks Through 5/31/17 Balance | | 88.63 | 59,036.88 |
| 09/18/17 | 14899 | So Cal IP Law Group | General Matters, Copyrights, Domain Names, Trade Marks Through 6/30/17 | | 1,014.24 | 58,022.64 |
| 09/18/17 | 14899 | So Cal IP Law Group | Legal Fees & Costs Through 7/31/17 | | 1,044.46 | 56,978.18 |
| Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at September 30, 2017 | | | | 75,000.00 | 18,424.16 | 56,978.18 |

# PERFECT 10
## DAVID J. PASTERNAK RECEIVER
## BUSINESS CHECKING ACCOUNT
### October 1, 2017 through October 31, 2017

| Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | 56,978.18 |
| 09/30/17 | 9/1-30 ADJ 1CB | | 9/1-9/30/17  Interest Income | 0.14 | | 56,978.32 |
| 10/05/17 | 8/7-10/4 | 1CB | 8/7/17-10/4/17 Interest Income (Bank Correction) | 1.42 | | 56,979.74 |
| 10/06/17 | 14899 | So Cal IP Law Group | Legal Fees & Costs Through 8/31/17 | | 4,839.58 | 52,140.16 |
| 10/10/17 | 14900 | Pacific Title Archives | 10/17 Storage | | 506.82 | 51,633.34 |
| 10/10/17 | 14901 | Pasternak & Pasternak ALC | Receiver's Fees & Costs through 9/30/17 | | 2,214.79 | 49,418.55 |
| 10/10/17 | 14902 | So Cal IP Law Group | Domain Names through 9/30/17 | | 76.50 | 49,342.05 |
| 10/10/17 | 14902 | So Cal IP Law Group | Trademarks through 9/30/17 | | 255.00 | 49,087.05 |
| 10/31/17 | 10/1-31 | 1CB | 10/1-10/31/17  Interest Income | 1.99 | | 49,089.04 |
| **Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at September 30, 2017** | | | | 3.55 | 7,892.69 | 49,089.04 |

# PERFECT 10
# DAVID J. PASTERNAK RECEIVER
# BUSINESS CHECKING ACCOUNT
### November 1, 2017 through November 30, 2017

| Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | **49,089.04** |
| 11/30/17 | 11/1-30 | 1st Century Bank | 11/1-11/30/17  Interest Income | 2.02 | | 49,091.06 |
| Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at November 30, 2017 | | | | 2.02 | 0.00 | 49,091.06 |

# PERFECT 10
# DAVID J. PASTERNAK RECEIVER
# BUSINESS CHECKING ACCOUNT
### December 1, 2017 through December 31, 2017

| Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | 49,091.06 |
| 12/07/17 | 14903 | Pacific Title Archives | 11/17-12/17 Storage | | 1,013.64 | 48,077.42 |
| 12/31/17 | 12/1-31 | 1st Century Bank | 12/1-12/31/17 Interest Income | 2.06 | | 48,079.48 |
| Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at December 31, 2017 | | | | 2.06 | 1,013.64 | 48,079.48 |

# PERFECT 10
## DAVID J. PASTERNAK RECEIVER
## BUSINESS CHECKING ACCOUNT
### January 1, 2018 through Janaury 31, 2018

| Date | Num | Name | Memo | Debit | Credit | Balance |
|------|-----|------|------|-------|--------|---------|
| **BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8** | | | | | | **48,079.48** |
| 01/11/18 | 14904 | Pacific Title Archives | 1/18 Storage | | 506.82 | 47,572.66 |
| 01/11/18 | 14905 | Pasternak & Pasternak ALC | Fees and Costs through 11/30/17 | | 874.24 | 46,698.42 |
| 01/11/18 | 14906 | So Cal IP Law Group | Fees and Costs through 11/30/17 | | 5,017.81 | 41,680.61 |
| 01/31/18 | 1/1-31 | 1st Century Bank | 1/1-1/31/18 Interest Income | 1.94 | | 41,682.55 |
| Total BUSINESS CHECKING ACCOUNT - 1st Century Bank a/c#210012-148-8 at Janaury 31, 2018 | | | | **1.94** | **6,398.87** | **41,682.55** |

## **PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 1875 Century Park East, Suite 2200, Los Angeles, CA 90067-2523.

On **May 3, 2018**, I served true copies of the following document(s) described as **NOTICE OF HEARING AND RECEIVER'S SECOND REPORT AND ACCOUNT FOR THE TIME PERIOD FROM AUGUST 1, 2017 THROUGH JANUARY 31, 2018** on the interested parties in this action as follows:

### *See Attached Service List*

➔ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the service list. The envelope or package was mailed with postage thereon fully prepaid. I am "readily familiar" this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on the same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address @paslaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

➔ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **May 3, 2018**, at Los Angeles, California.

C. German

PASTERNAK
& PASTERNAK

{00173384.DOCX 66390.0001 }

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court for the Central District Of California**
**(Western Division - Los Angeles)**
**Civil Docket For Case No.: 2:11-cv-07098-AB-(JPRx)**

*Service List*

| | |
|---|---|
| Lynell D. Davis, Esq.<br>Perfect 10, Inc.<br>11803 Norfield Court<br>Los Angeles, CA 90077<br>Telephone: 310.476.0700<br>Facsimile: 310.476.8138<br>E-Mail: lynellDDavisesq@gmail.com\ | *Counsel for Debtor, Norman Zada* |
| Eric J. Benink, Esq.<br>Krause Kalfayan Benink and Slavens LLP<br>550 West C Street, Suite 530<br>San Diego, CA 92101<br>Telephone: 619.232.0331<br>Facsimile: 619.232.4019<br>E-Mail: eric@kkbs-law.com | *Counsel for Perfect 10, Inc.* |
| Matthew C. Mickelson, Esq.<br>Law Offices of Matthew C. Mickelson<br>16055 Ventura Boulevard, Suite 1230<br>Encino, CA 91436<br>Telephone: 818.832.3360<br>Facsimile: 818.382.3364<br>E-Mail: mattmickelson@bizla.rr.com | *Counsel for Perfect 10, Inc.* |
| David N. Schultz, Esq.<br>1747 Preuss Road<br>Los Angeles, CA 90035<br>Telephone: 310.839.3150<br>E-Mail: schu1984@yahoo.com | *Counsel for Perfect 10, Inc.* |
| Jonathan L. Abrams, Esq.<br>Anthony K. Brown, Esq.<br>Abrams Brown LLP<br>12121 Wilshire Boulevard, Suite 740<br>Los Angeles, CA 90025-1166<br>Telephone: 424.832.3774<br>Facsimile: 310.564.1769<br>E-Mail: jabrams@abramsbrown.com<br>E-Mail: tbrown@abramsbrown.com | *Counsel for Defendant Giganews, Inc.* |

PASTERNAK
& PASTERNAK

{00173384.DOCX 66390.0001 }

1   Andrew P. Bridges, Esq.                     *Counsel for Defendant Giganews, Inc.*
    Jedediah Wakefield, Esq.
2   Todd R. Gregorian, Esq.
    Liwen A. Mah, Esq.
3   Fenwick& West LLP
    555 California Street, 12th Floor
4   San Francisco, CA 94104
5   Telephone: 415.875.2300
    Facsimile: 415.281.1350
6   E-Mail: abridges@fenwick.com
    E-Mail: jwakefield@fenwick.com
7   E-Mail: tgregorian@fenwick.com
8   E-Mail: imah@fenwick.com

9   Annasara G. Purcell, Esq.                   *Counsel for Defendant Giganews, Inc.*
    Armen N. Nercessian, Esq.
10  Joseph S. Belichick, Esq.
    Fenwick & West LLP
11  801 California Street
12  Mountain View, CA 94041
    Telephone: 650.988.8500
13  Facsimile: 650.988.5200
    E-Mail: apurcell@fenwick.com
14  E-Mail: anercessian@fenwick.com
    E-Mail: irubel@fenwick.com
15  E-Mail: jbelichick@fenwick.com

16  Ronald P. Slates, Esq.                      *Counsel for Defendant Livewire Services,*
17  Law Offices of Ronald P. Slates PC          *Inc.*
    500 South Grand Avenue, Suite 2010
18  Los Angeles, California 90071
19  Telephone: (213) 624-1515
    Facsimile: 213.624.7536
20  E-Mail: rslates2@rslateslaw.com
    E-Mail: jkluewer@rslateslaw.com
21

22  Steven W. Yuen, Esq.                        *Counsel for Objector John Doe 4352658*
    Heath & Yuen, APC
23  268 Bush Street, Suite 3006
    San Francisco, CA 94104
24  Telephone: 415.622.7004
    Facsimile: 415.373.3957
25  E-Mail: syuen@heathandyuen.com

26

27

28

PASTERNAK
& PASTERNAK

{00173384.DOCX 66390.0001 }